UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


John Tieso

    Plaintiff

v.                           Case No.


The Catholic University of
America, a non stock corporation
registered in the state of Virginia

    Defendant


**COMPLAINT**
(Jury Trial Demanded)

<u>Venue</u>


   28 U.S.C. § 1391 (b)(1) provides that "a civil action may be brought in a judicial district in which any defendant resides of the State in which the district is located."  28 U.S.C. § 1391 (c)(2) defines 'residency' as "any judicial district in which such defendant is subject to the court's personal jurisdiction...."

   The Catholic University of America (hereafter referred to as "Catholic University")  has a physical campus located at 2050 Ballenger Ave. Alexandria, Va 22314.  Catholic University is teaching classes at this location and is engaged in operating a business in Alexandria Virginia. Catholic University has

1

registered with the Virginia State Corporation Commission and has appointed a registered agent for purposes of service in Virginia. Catholic University has a website to advertise its classes in Alexandria Virginia at https://www.catholic.edu/alexandria/index.html.

Catholic University has minimum contacts in the State of Virginia and the court has personal jurisdiction over the defendant with this court being the proper venue to hear this Complaint.

The Plaintiff is a resident of Arlington, Virginia.

<u>Jurisdiction</u>

The Court has jurisdiction as the Complaint alleges violations of the Constitutional right of Free Speech, violations of Federal Regulation by the Secretary of Education 20 U.S.C. § 1221e-3 and § 3474, CFR part 75.500, Executive Order 13684, and violations of the due process clause of the Constitution under 28 U.S.C.§ 1331.

The position of the plaintiff is that the damages under the contract cause of action can be heard by the Court. Under federal jurisdiction, the Plaintiff may proceed in federal court as this claim relate to a claim that the Court does have jurisdiction over. 28 U.S.C. § 1367.

<u>Statement of Facts</u>

1.  On September 18, 2019, John Tieso, (hereafter referred to as "Mr. Tieso") was appointed as an Adjunct Assistant Professor. See attached **Exhibit A** made a part of this pleading. His appointment was a term appointment and he was terminated prior to the expiration of the term.

2.  The appointment was made subject to the Catholic University *Faculty Handbook*.  The *Faculty Handbook* is a part of the contract between Catholic University and Mr. Tieso.

3.  In the Spring of 2020, Mr. Tieso received a message regarding classes he would be teaching in the Fall of 2020.

4.  Mr. Tieso had planned and expected to be teaching in the Summer and  Fall semesters of 2020 based on this email.  He relied on this representation in not obtaining teaching assignments at other universities.  His expectation was that he would be teaching MGT 331 Database Management, MGT 240 Introduction to Management of Information, and potentially MGT 365 Quantitative Analysis.

5.  On May 18, 2020, Mr. Seegers, the Associate Dean of the Busch School of Business, informed Mr. Tieso that Dr. Abela, the Dean, had postponed his Summer 2020 class, suspended his teaching pending the completion of an investigation regarding his Twitter account.  See attached **Exhibit B** made a part of this pleading.

6.  Mr. Tieso had first started teaching part time as a lecturer

3

at Catholic University in August 2013. He was promoted to Assistant Professor and was a member of the Faculty September 18, 2019.

7.  He taught approximately 3 classes a semester for 7 years, a total of 45 classes both graduate and undergraduate.

8.  Mr. Tieso was awarded a special commendation for his efforts and skills as a teacher. See attached **Exhibit EE** made a part of this pleading. He was promoted by the University from Lecturer to Assistant Professor after consideration by Faculty of Catholic University review panel and based on their unanimous approval.

9.  Mr. Tieso was give a high rating by his students. See attached **Exhibit FF** made a part of this pleading as indicative of the students' evaluation.

10. The procedure and normal course of dealing between the parties was that, even though the contract for services was for a set period of time, Mr. Tieso was regularly renewed to continue his teaching, and this was the normal course of dealing between the parties.  Mr. Tieso relied on this course of dealing in arranging his other personal and business affairs.

11.  The practice of Catholic University in the normal course of business regarding all Faculty members was to automatically renew contracts with Lecturers and Professors.

12.  The September 18, 2019 letter and the *Faculty Handbook* make no reference to the *Faculty Handbook* and the September 18, 2019

4

letter being the sole understanding or interpretation of their contract (hereafter referred to as "Contract").

13.  Mr. Tieso had a Twitter account starting in 2009.  The social media account made no connection between Mr. Tieso and Catholic University.  He made no reference in his social media that he was an Adjunct Assistant Professor at Catholic University, nor of  any relationship between he and Catholic University on his Twitter account.

14.   Mr. Tieso had approximately 109,000 posts on Twitter.

15.   On May 5, 2020 Larry Miller from WUSA 9 emailed Mr. Tieso about his posts on Twitter.

16.   On May 5, 2020, Karna Lozoya, Vice President of University Communications, emailed Lawrence J. Morris, Counselor to the President regarding certain Tweets by Mr. Tieso. See attached **Exhibit C** made a part of this pleading.

17.  On May 6, 2020, Dr. Andrew Abela, Dean of the Business School called to ask that Mr. Tieso inactivate his Twitter account.

18.  On May 6, 2020, the same day, Mr. Tieso sent an email to Dean Abela and Harvey Seegers, Associate Dean, that he had deactivated his Twitter account.  See attached **Exhibit D** made a part of this pleading.

19.  On May 6, 2020 Mr. Morris labeled the tweets as "racial." See attached **Exhibit C** made a part of this pleading.

5

20.  Mr. Tieso emailed Aaron Dominguez, Provost, on June 8, 2020 asking about the "investigation". See attached **Exhibit E** made a part of this pleading. Mr. Tieso did not receive a reply.

21. On June 11, 2020, Vincent Lacovara, Chief Ethics and Compliance Offer and Chief Privacy Officer at Catholic University, emailed stating there were no charges against Mr. Tieso, even though Mr. Tieso was suspended from his work on May 18th, and that the University "is looking at what University polices or standards might be vis-a-vis the tweets." See attached **Exhibit F** made a part of this pleading.

22.  Mr. Lacovara references the University's social media policy in Exhibit F paragraph V Posting on Personal Sites.  Which only applies to "persons in leadership rolls" which is not defined. and the University merely "urges" as a policy versus the University's policy where a faculty member <u>must</u> comply:

 a) paragraph III <u>Registration and Oversight of University Social Media Accounts</u> "University Social Media accounts 'must' be created ....",

 b) paragraph IV <u>Requirements for Faculty who use University Social Media Accounts</u> "Comments or information posted 'may not' be ...."  Mr. Tieso was not using University social media accounts.

 c) paragraph IV B "Confidential or proprietary information ...'may not' be posted on Social Media"

6

d) paragraph IV C "...'may only' use the University's approved names...."

e) paragraph IV D "...'must' respect the copywrights...."

f) paragraph IV E "University communications with the News Media 'must' be managed ...."

Paragraph V <u>Posting and Personal Sites</u> mentions the procedures when Posting on Personal Sites and the University affiliation is list.

23.  These requirements do not apply to Mr. Tieso because he never mentioned any affiliation with Catholic University in his Tweets, and he was not using University social media.

See attached **Exhibit G** made a part of this pleading.

24.  Mr. Lacovara on June 11, 2020 says "I want to give you the opportunity to be heard.", and Mr. Tieso replied on the same day that he was "Happy to discuss if there is some objective reason to do so...." See attached **Exhibit H** made a part of this pleading.

Mr. Tieso never received a response from anyone at Catholic University.

25.  Neither Dominguez, the Provost, nor Abela, Dean of the Business School, ever contacted Mr. Tieso as to his position.

26.  Mr. Tieso was not allowed to participate in any investigation, had no opportunity to explain the context of his tweets, and had no opportunity to know the names of his accusers,

no opportunity to confront his accusers, nor was he provided any documentation regarding any investigation.

27.  On June 23, 2020 Dean Abela sent an email informing Mr. Tieso that the investigation was complete, and based on his tweets, Mr. Tieso was fired. See attached **Exhibit I** made a part of this pleading.


<u>Count I - Employee freedom of speech violation</u>


Plaintiff repeats and re-alleges each of the foregoing allegations in this Complaint.

28.   Catholic University is subject to Executive Order 13864, entitled *Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities*. See attached **Exhibit J** made a part of this pleading.

29.  Catholic University received direct grants and direct federal financial assistance during 2019 and 2020.

30.  Catholic University received indirect federal financial assistance during 2019 and 2020.

31.  To cite a few examples, under the CARES Act, Catholic University was allotted millions of dollars directly to give as grants to students. See attached **Exhibit K** made a part of this pleading.

        On July 1, 2020, Catholic University was awarded millions of

8

dollars from the US Health Resources and Services Administration. See attached **Exhibit L** made a part of this pleading.

Catholic University receives indirect aid via the students PELL grants.

Faculty members of Catholic University receive grants from the US government which indirectly aids Catholic University. See attached **Exhibit M** made a part of this pleading.

Catholic University announced an awarded of 64.1 million dollars from NASA for research.  See attached **Exhibit N** made a part of this pleading.

32.  An Act of Congress in the 70th Congress 1928 approved and confirmed the formation of Catholic University stating its rights, duties, and responsibilities. See attached **Exhibit P** made a part of this pleading.

33.  Executive Order 13864 states the standards for both private and public universities regarding freedom of speech.  Public universities must uphold the fundamental rights guaranteed in the First Amendment and private institutions must comply with their stated institutional policies regarding freedom of speech and references 34 CFR part 75.  See attached **Exhibit O** made a part of this pleading. Under 20 U.S.C § 1221e-3 and § 3474 the Secretary of Education has the authority to make and issue rules and Regulations.

34.  As Catholic University was formed by the United States

Congress and is receiving public funds, it is a public university and is subject to CFR part 75.500 (b)(1).

In the alternative, if Catholic University is deemed a private university is to subject to the federal regulations as stated in  part c) of the federal regulation regarding private institutions.

35.  As quoted in the National Catholic Register, John Garvey, the President of Catholic University summarizes Catholic University's policy, "You can't have a university without freedom of speech." Joan Frawley Desmond, *How Catholic Universities Campuses handle Free Speech in Age of Intolerance, National Catholic Register*, Oct 30, 2017.

36.   Catholic University's *Demonstrations Policy* reviewed July 24, 2019 states its policy,  "The Catholic University of America values and defends the right of free speech and the freedom of members of the University community to express themselves on University property, provided that such expression does not violate the law or applicable University policies." See attached **Exhibit Q** made a part of this pleading.

37.   Under Aims of the University, Catholic University states its policy "... where freedom is fostered and where the only constraint upon the truth is truth itself."  See *Faculty Handbook* part I page 11. See attached **Exhibit R** made a part of this pleading.

38.  On page 14 of the *Faculty Handbook*, <u>Statement on Academic
Freedom - The Catholic University of America</u>, Catholic
University's policy is "It is a tradition that posits freedom of
inquiry, open discussion and unrestricted exchange of ideas as
essential to the pursuit of knowledge."

   In 1915 the American Association of University Professors
(hereafter referred to as 'AAUP') identified "three major
components of academic freedom: research; teaching; and
extramural utterances...."

      In 1964 the Committee A on Academic Freedom and Tenure
stated, "The controlling principal is that a faculty member's
expression of opinion as a citizen cannot constitute grounds for
dismissal unless it clearly demonstrates the faculty members
unfitness to serve.  Extramural utterances rarely bear upon the
faculty member's fitness for continuing service."

      In the 1970 Interpretive Comments, the AAUP restated the
1964 position on extramural utterances, and added that "Moreover,
a final decision should take into account the faculty member's
entire record as a teacher and scholar."

39.  Catholic University is accredited through the Middle States
Commission on Higher Education (hereafter referred to as "MSCHE")
and has agreed to adhere to MSCHE standards.

40.  MSCHE states under Standard II- Ethics and Integrity
paragraph one, "a commitment to academic freedom, intellectual

freedom, freedom of expression, and respect for intellectual property rights;"  See attached **Exhibit S** made a part of this pleading, page 6.

41.  Catholic University has, by being accredited by the MSCHE, agreed to the following items under Standard II-Ethics and Integrity at page 6,

> 2. a climate that fosters respect among students, faculty, staff, and administration from a range of diverse backgrounds, ideas, and perspectives;

42.  Catholic University, in violation of the MSCHE Standards for Ethics and Integrity, fired Mr. Tieso because of his ideas and perspectives.

43. On November 24, 2021, in an open letter Mr. Garvey stated, "It has been the University's policy, throughout my time as President, not to cancel speakers or prevent speech by members of the community." See attached **Exhibit T** made a part of this pleading.

44.  The tweets posted by Mr. Tieso were the basis and cause of his termination.

45.  The termination of Mr. Tieso was:

a) a violation of the University's stated policy of free speech as pronounce publicly by the president of Catholic University and its written stated policies.

b) a violation of the standards of the university's accreditation requirements,

c)  a violation of federal Regulations issued by the Department
of Education and Executive Order 13864, and

d) a violation of Mr. Tieso's constitutional right to freedom of
speech at a public university.

<u>Count II Due Process</u>

Plaintiff repeats and re-alleges each of the foregoing
allegations in this Complaint and further alleges.

46.  Dean Abela in his May 6, 2020 phone call requested Mr. Tieso
deactivate the account.  Mr. Tieso did deactivate the account the
same day.

47.   There is no statement in the *Faculty Handbook* barring Mr.
Tieso's outside political internet statements unrelated to the
subject matter of Mr. Tieso's courses.

48.  The response of Catholic University first requiring the
Tweet account be closed and second the University changing its
position in firing Mr. Tieso is arbitrary and capricious.

49.  Mr. Lawrence Morris, Counsel to the President, prejudiced
any investigation by pre-determining that the tweets were
"racial" without any opportunity by Mr. Tieso to respond and
prior to the investigation.

50.  No notice and no hearing was given to Mr. Tieso.

51.  The names of the accusers were not given to Mr. Tieso.

52.  No documents or emails regarding the accusations were given to Mr. Tieso.

53.   There was no opportunity to cross examine the accusers, nor to participate in the investigation.

54.   There is no notice of Catholic University's policy nor standards regarding off-campus remarks not associated with Catholic University.

55.   The Tweets were unrelated to the subjects that Mr. Tieso was teaching and no mention in the tweets that he was employed at Catholic University.

56.  Catholic University failed to inform Mr. Tieso prior to the event what speech was prohibited.

57.  Catholic University violated  part I of the *Faculty Handbook*, Section 4 page 7, by denying the Academic Senate its rights to the academic governing of the university.

     "The Academic Senate shares with the President the immediate responsibility for academic governing of the university ...." See attached **Exhibit GG** made a part of this pleading.

 58.   The President of Catholic University, Mr. John Garvey,  did not send the matter of Mr. Tieso's firing for formal hearing before the faculty and breached his responsibility to share in the academic governing of the university.

59.  Mr. Garvey failed to follow the industry custom and norms in negating the rights of the Academic Senate.

Because academic freedom developed as a professional norm of academia and not as a legal right, two related norms developed to safeguard faculty from potential violations of their academic freedom.  The first is tenure, which constrains universities' ability to terminate faculty who have met certain quality assurance standards. The second is shared governance, which requires meaningful faculty involvement in university policymaking and other matters that have the potential to significantly affect either educational outcomes or faculty as a class of employees. Consistent with this expectation, the most critical decisions affecting faculty, such as faculty tenure and termination, are expected to involve some level of peer review.

University of St Thomas Law Journal Vol 15:2, page 372 (2019)

60.  Catholic University is accredited by the Middle States Commission on Higher Education *Standard II Ethics and Integrity* and at page 5 has agreed "in all activities, whether internal or external, an institution must be faithful to its mission, honor its contracts and commitments, adhere to its policies, and represent itself truthfully."

61.  Catholic University has, by seeking and accepting accreditation by MSCHE, agreed to the following items under *Standard II-Ethics and Integrity* page 6,

3. a grievance policy that is documented and disseminated to address complaints or grievances raised by students, faculty, or staff. The institution's policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably;

5. fair and impartial practices in the hiring, evaluation, promotion, discipline, and separation of employees;

15

**See Exhibit S.**

62.  Mr. Tieso is a third party intended beneficiary from the Agreement between Catholic University and MSCHE, Mr. Tieso was aware of the accreditation and protections and relied on the Agreement.

63.  The language in the *Faculty Handbook* at II-G-7 193, states, "The University may, following **due process** specified below ...." See attached **Exhibit X** made a part of this pleading.

64.  Catholic University breached the due process requirement of the Contract, the accreditation body MSCHE, and the industry norms by:

 a. prejudging Mr. Tieso as a racist by Mr. Lawrence Miller, legal counsel for Catholic University, prior to the investigation even commencing,

 b.  by failing to allow Mr. Tieso to know the undisclosed people who accused him of racism and sexism,

 c. not allowing an opportunity to confront the accusers,

 d. giving no notice and no opportunity to respond or participate in the investigation,

 e. failing to provide any documentation which was the basis of Dean Abela's decision,

 f. failing to honor the requirement under the *Faculty Handbook* for a formal hearing,

 g. not providing due process as stated in the *Faculty Handbook*

h.   changing the punishment after he had agreed to the very corrective action that Dean Abela had requested,

i. the failure of Mr. Garvey to refer the matter to the Faculty Academic Senate,

j.   Catholic University violating is own policy on what must be done versus what is merely urged regarding social media, and

k.   a failure to clearly state how violations of the speech policy would be disciplined.

m.   giving no indication or warning that comments unconnected and unassociated with the University and outside Mr. Tieso's job requirements would lead to his firing.

66.   Catholic University violated: 1. its own policies regarding the due process for termination of a faculty member according to the *Faculty Handbook*; 2. the ethic standards that Catholic University agreed to abide by with the MSCHE accreditation body standards for due process; 3. the standards developed by the America Association of University Professors due process standards; and 4.  Mr. Tieso's right to due process under the United States Constitution.


## Count III    Breach of Contract


Plaintiff repeats and re-alleges each of the foregoing

allegations in this Complaint and further alleges.

67.   Exhibit A, the Appointment letter of September 18, 2019 was written by Provost Aaron Dominguez, Ph.D.

68.   Aaron Dominguez Ph.D. was authorized to write the appointment letter.

The following form the Contract between Mr. Tieso and Catholic University:

 a. The Appointment letter,

 b. the *Faculty Handbook*

 c. the course of dealings that the parties had established, and

 d. the industry norm of University employment of faculty.

 (hereafter referred to as "Contract").

70.   Starting at the bottom of page 15 of the *Faculty Handbook* it states, "The *Faculty Handbook* outlines the norms and procedures relating the academic freedom with regard to initial appointment, tenured appointment, and where cause has been established, the dismissal of faculty members." See attached **Exhibit CC** made a part of this pleading.

71.   Catholic University *Faculty Handbook*, Part I, Section 5, page 9, The Faculties, defines who is a member of the Faculty, "Only those who hold appointments in faculty rank(i.e., the rank of Instruction or higher rank)...." See attached **Exhibit V** made a part of this pleading.

72.   Mr. Tieso, as an Assistant Professor, was a member of the

Faculty at the time of his termination.  See Part II of the
*Faculty Handbook* Section A, Appointment to Faculty, II-A-1
Faculty Membership .001, page 2. See attached **Exhibit U** made a
part of this pleading.

    "A Faculty member with a Contract appointment is accorded
parity of benefits ...with other Faculty of comparable rank ...."

   See .033, page 7, attached **Exhibit W** made a part of this
pleading.

73.  Mr. Tieso was dismissed from the faculty.

74.  No cause was established according to the procedures
required of the *Faculty Handbook*.

75.  The *Faculty Handbook* at II-G-7, .193, .194, and the
following paragraphs outline the procedure, address when there is
Dismissal for Cause. See attached **Exhibit X** made a part of this
pleading.

76.  II-G-7, .193 applies to Mr. Tieso as he was a "Faculty
member".

77.  Catholic University was required to follow the steps
specified in paragraphs .193 through .211 and refused to do so.

78.   Paragraph .194 required "an attempt through personal
consultation to resolve the matter."  No attempt was made by
Catholic University to resolve the matter through personal
consultation.

79.  On August 14, 2021, the University was notified that Mr.

Tieso was ready to more forward with the formal dismissal proceeding per the Contract. See attached **Exhibit Y** made a part of this pleading.

80.  The *Faculty Handbook* was not written by Mr. Tieso.   The *Faculty Handbook* was prepared solely by Catholic University, and where ambiguous should be construed against Catholic University.

81.  The Contract is an adhesion contract prepared by Catholic University.

82.  Catholic University refused to honor the proceeding required for a dismissal for cause per II-G-7 of the *Faculty Handbook*.

83.  By failing to abide by the terms of the Contract, Catholic University materially breached the Contract.

84.   Mr. Tieso has applied and not been able to find work as a professor at a university because of his firing by Catholic University.  Mr. Tieso has lost wages and his reputation was injured.

85.  Mr. Tieso was fired prior to the expiration of the date stated in his Contract. Mr. Tieso had been and was fulfilling his responsibilities under the Contract as an Assistant Professor.

86.  The language in the *Faculty handbook* at II-G-7 193, states, "The University may, following due process specified below, dismiss a Faculty member for demonstrable incompetence or dishonesty in teaching or research, for manifest neglect of duty, or *for other adequate cause*."

20

87.  There is no evidence of incompetence, dishonesty, nor of neglect of duty.

88.  The only remaining justification for Mr. Tieso's firing is supposedly "for other adequate cause".  The clause "for other adequate cause" is vague and undefined.

89.  The basis for Mr. Tieso's firing was supposedly "for other adequate cause".

90.  Firing Mr. Tieso on such a undefined and vague reasoning as "for other adequate cause" transforms the Contract for a period of a year with defined requirements into a contract at will.  In effect the Contract is negated by Catholic University and Mr. Tieso was treated as an employee who could be fired at Will.

91.  As the Contract, which incorporated the *Faculty Handbook*, is vague and ambiguous as to the basis of firing in the use of the language "for other adequate cause", the industry norm should be used as to what is a basis for firing.

92.  **Section B Categories and Terms of Appointment** of the *Faculty Handbook* in part II at II-B-1, page 5 categories the type of Faculty and which section of the *Handbook* apply,  See attached **Exhibit Z** made a part of this pleading, addresses "Contract Appointments Without Tenure at II-B-4".  Mr. Tieso was a contract appointment without tenure.

II-B-4 .032 requires **notice** as outline in B-3 025-030 on page 7. See attached **Exhibit AA** made a part of this pleading.

93.  At part II of the *Faculty Handbook* at II-C-7 at page 17 regarding reappointment of contract terms, .091 requires **notice** of non renewal, as set forth above (B-4 .025-.030). See attached **Exhibit BB** made a part of this pleading.  The problem with II-C-7 .091 is there is no II-B-4 .025-.030.  There is a II-B-3 .025-.030.  The error in drafting should be held against Catholic University as it were the sole author.

The error in II-C-7 can be resolved by II-B-4 .032 at page 7, which states clearly that notice is to be given as provided in II-B-3, at page 5 and 6, which describes the due dates for **notice** of in paragraphs II-B-3 at .025 -030.

94.  Catholic University failed to give proper notice to Mr. Tieso as outlined in B-4 regarding contract professors and referenced with detail in B-3.

95.  The industry norm regarding non reappointment is stated in the American Association of University Professors Bulletin (Autumn, 1964) and reads as follows:

THE STANDARDS FOR NOTICE OF NON REAPPOINTMENT

(Endorsed by The Fiftieth Annual Meeting)

Because a probationary appointment, even though for a fixed or stated term, carries an expectation of renewal, the faculty member should be explicitly informed of a decision not to renew his appointment, in Order that he may seek a position at another college or university. Such notice should be given at an early date, since a failure to secure another position for the ensuing academic year will deny the faculty member the opportunity to practice his profession. The purpose of this Statement is to set forth

22

in detail, for the use of the academic profession, those standards for notice of non reappointment which the Association over a period of years has actively supported and which are expressed as a general principle in the 1940 Statement of Principles on Academic Freedom and Tenure.

96.  "As a corporate entity, a Faculty is a body of teachers empowered to act in such matters as the appointment and promotion of its members." *Faculty Handbook* Section 5, page 9. See attached **Exhibit HH** made a part of this pleading.

97.  The Faculty through the Academic Senate had an interest in the relationship between the University and Mr. Tieso.  The *Faculty Handbook* empowers the Faculty regarding the terms of Mr. Tieso's contract, appointment, and termination.

98.  Article I of the *Constitution of the Academic Senate The Catholic University of America* states,  "The Academic Senate shares with the President the immediate responsibility for the academic governing of the University by establishing, maintaining, supervising and in general being responsible for the academic policies of the University."  See attached **Exhibit DD**, made a part of this pleading.  Mr. Tieso is a third party beneficiary of the shared responsibility and was aware and relied on the supervisory role of the Academic Senate.

99.  Mr. John Garvey, the University President, in failing to forward the demand to be heard in a formal hearing before the Faculty, has caused Catholic University to breach the Contract.

23

100.  By refusing to forward the issue to the Faculty Senate, John Garvey failed to "... commence formal dismissal proceedings.... and by failing to "notify the officers of the Academic Senate that a proceeding for dismissal has been instituted."  The Academic Senate was entitled to be informed.

101.  The President interfered with Mr. Tieso's rights under his contract and violated the Faculty's authority under the Contract and *Constitution of the Academic Senate* to hear the case after demands for a formal hearing were made by Mr. Tieso.

102.  Mr. Garvey unjustifiedly induced Catholic University to breach the Contract.

103.  As a result of the President refusing to forward the matter to the Faculty for a formal hearing, Mr. Tieso has been injured.

104.  Catholic University did materially breach the Contract with Mr. Tieso.

105.  Mr. Tieso was damaged by the loss of his position at Catholic University, the damage to his reputation, and the loss of future income.

106.  Catholic University breached  the Contract, and Mr. Tieso has suffered actual and consequential damages.

<u>Prayer for Relief -  Damages</u>

The Plaintiff asks that the Court issue a declaratory judgement in favor of the Plaintiff that Catholic University violated its own policies regarding freedom of speech as pronounced by the President of the University, by the *Faculty Handbook*, the accreditation body, Dept of Education rule 34 CFR part 75.500, Presidential executive Order 13864, and the First Amendment of the Constitution.

The Plaintiff asks that the Court issue a declaratory judgment in favor of the Plaintiff:  that Catholic University did violate the due process as the firing was capricious and arbitrary; not providing Mr. Tieso notice defining an offense; failing to follow its own policy on faculty speech; not defining the penalty to which Mr. Tieso was subjected to prior to the event; failing to provide an opportunity to confront the accusations/accusers; refusing to allow Mr. Tieso to participate in any investigation; bad faith in no informal resolution process, violating the due process clause in the *Faculty Handbook*, failing to refer the matter for a formal hearing; violating the standards stated and agreed to by the University with the MSCHE; and violating industry custom.

The Plaintiff asks the Court reinstate Mr. Tieso to his position as Assistant Professor at Catholic University.

25

The Plaintiff asks the Court award lost wages in the amount of $48,000.

The Plaintiff asks the Court award consequential damages in the amount of $336,000 for damage to the Plaintiff reputation and future earnings.

The Plaintiff asks the Court award Plaintiff's attorney's fees, suit expenses, costs, pre and post judgement interest.

The Plaintiff asks the Court award punitive damages of $336,000.

The Plaintiff aks the Court award any other appropriate equitable or legal remedy to which the Plaintiff is entitled.

<u>Jury Trial Demanded</u>

Pursuant to Federal Rule of Civil Procedure 38, The Plaintiff, John Tieso, demands a jury trial on all issues so triable.


/s/ John Tieso
_____

John Tieso, Plaintiff

/s/ Arthur Lander
_____
Arthur Lander
Counsel for the Plaintiff
300 N. Washington St. #104
Alexandria, Va 22314
703-486-0700
<u>law@businesslegalservicesinc.com</u>
703-527-7207 fax
Va Bar No. 29731



PLAINTIFF'S
EXHIBIT
A

September 18, 2019

Mr. John V. Tieso
Busch School of Business
The Catholic University of America

Dear Professor Tieso:

On the recommendation of Dr. Andrew Abela, Dean, The Busch School of Business, I am pleased to extend to you an offer of appointment as Adjunct Assistant Professor in The Busch School of Business of The Catholic University of America, effective August 20, 2019 and extending until August 19, 2020. This appointment is made subject to the *Faculty Handbook* and may be extended by regular reappointment but does not include eligibility for continuous tenure or any benefits and does not carry with it a guarantee of salary.

The Catholic University of America was founded in the name of the Catholic Church and maintains a unique relationship with it. The University's operations, policies and activities reflect this foundation and relationship and are conducted in accordance with its stated mission. Regardless of their religious or denominational affiliation, all employees are expected to respect and support the University's mission in the fulfillment of their responsibilities and obligations appropriate to their appointment.

Best wishes.

Sincerely,

Aaron Dominguez, Ph.D.
Provost

cc:     Mr. John Garvey, President
        Dr. Andrew Abela, Dean, Busch School of Business

**Office of the Provost**
620 Michigan Ave., N.E. | Washington, DC 20064 | 202-319-5244

 **CARDINAL MAIL**                                   John V. Tieso <tieso@cua.edu>

## Fwd: Your Summer Session One Courses Have Been Postponed
1 message

**Harvey F. Seegers** <seegersh@cua.edu>                    Mon, May 18, 2020 at 12:10 PM
To: "John V. Tieso" <tieso@cua.edu>

John -- a correction to my previous email. The decision to suspend your teaching during the investigation was made by Dean Abela, and not the Provost. I apologize for my mistake. Sincerely, Harvey

---------- Forwarded message ---------
From: **Harvey F. Seegers** <seegersh@cua.edu>
Date: Mon, May 18, 2020 at 11:31 AM
Subject: Your Summer Session One Courses Have Been Postponed
To: John V. Tieso <tieso@cua.edu>



John,

I have tried, but have been unable, to reach you by phone. The urgency of this matter necessitates I send this email.

The Provost has decided to postpone your Session One Summer Courses to Summer Session Two. His office has received additional complaints, some from alumni, regarding your Twitter comments. Accordingly, an investigation will be conducted by the Provost's Office to determine the facts. The Provost has determined to suspend your teaching pending completion of the investigation.

Your students are being notified today of the course rescheduling. If you have any questions regarding these instructions, please do not hesitate to call me at 404-520-3102.

Sincerely,

Harvey

--
**H.F. Seegers, J.D., M.B.A.**
Associate Professor of Practice
Associate Dean | Busch School of Business
The Catholic University of America
Washington, DC 20064

Office: MALONEY 407
Phone: 404-520-3102
seegersh@cua.edu

 THE CATHOLIC UNIVERSITY OF AMERICA | The Busch School of Business

On May 6, 2020, at 8:41 AM, President of Catholic University
<president@cua.edu> wrote:

Dear Aaron,

If you have a minute, let's talk about this.



PLAINTIFF'S
EXHIBIT

tabbies

C

J

On Wed, May 6, 2020 at 8:22 AM Lawrence J. Morris <morrisl@cua.edu>
wrote:

Attached are racial tweets from the account of a Busch  school adjunct
brought to Karna's attention last night by local media who heard from a
couple of students. Andrew is telling him to remove the account, has not
ruled  out other action.
Larry

**Lawrence J. Morris**
Chief of Staff I Counselor to the President
202 319-5102
catholic.edu
THE CATHOLIC
UNIVERSITY
OF AMERICA

--------- Forwarded message ---------
From: **Karna Lozoya** <lozoya@cua.edu>
Date: Tue, May 5, 2020 at 7:09 PM
Subject: RE John Tieso
To: Lawrence Morris <morrisl@cua.edu>, **Andrew Abela**
<abela@cua.edu>

These are two tweets the students pointed to that were particularly
offensive. Karna

Sent from my iPhone

 **CARDINAL MAIL**

John V. Tieso <tieso@cua.edu>

## Twitter Account
1 message

John V. Tieso <tieso@cua.edu>                                                      Wed, May 6, 2020 at 10:02 AM
To: "Andrew V. Abela" <deanabela.cua@gmail.com>, "Harvey F. Seegers" <seegersh@cua.edu>

Andrew,
The Twitter account is deleted, with the following last message

Today is my last day on Twitter -- this is my last tweet. Several people have claimed
in my tweets that I am racist -- which I certainly am not, and would not give such
an impression.

Best to all.

Hopefully, this will keep things at bay. Thanks for the call.
Best
 John T
John V. Tieso
Adjunct Assistant Professor
The Busch School of Business

(c)703-864-1209
E-Mail: tieso@cua.edu


PLAINTIFF'S EXHIBIT
D



PLAINTIFF'S
EXHIBIT
E

From: **John V. Tieso** <tieso@cua.edu>
Date: Mon, Jun 8, 2020 at 7:40 AM
Subject: Charges against me, investigation
To: Aaron Domínguez <domingueza@cua.edu>, <mwsh@att.net>

Sir,

It has now been over a month since the University unilaterally declared me a racist, based on an alleged anonymous letter, repeated by WUSA9 reporter Miller. Since that time, I have also learned you are supposedly conducting an investigation of my Twitter Account to substantiate that charge.

Sadly, the University administration has given me no formal notice of any of these actions, no charges, and no indication of whether there is to be any real investigation. Likewise, I have not had access to the supposedly incriminating letter, although it was, according to WUSA9, leaked to them.

As President Garvey said at the time of the Father James Martin controversy in 2017,

"The campaigns by various groups to paint Fr. Martin's talk as controversial reflect the same pressure being applied by the left for universities to withdraw speaker invitations. **Universities and their related entities should be places for the free, civil exchange of ideas. Our culture is increasingly hostile to this idea."**

President Garvey, at that time, strongly defended academic freedom, although it now appears to fail to apply to me as well.

I request to be officially informed of any charges against me, which have resulted already in significant damage to my personal and professional reputation, due primarily to the precipitate actions of Dean Abela and the Public Affairs officer at CUA.

Further, I request to be informed of the initiation, status, and results of the 'investigation' supposedly underway, and whether, under any circumstances, I will be enabled to provide my side of this situation, thus far denied me.

As a reminder, I have attached the letter from the Foundation for Individual Rights in Education (FIRE), which wrote to President Garvey on my behalf, and which, to date has not be answered by the University.

Would appreciate a response by Friday, June 12th.

Respectfully,

John V. Tieso
Adjunct Assistant Professor
The Busch School of Business

(c)703-864-1209
E-Mail: tieso@cua.edu



PLAINTIFF'S
EXHIBIT
F
tabbies

On Thu, Jun 11, 2020 at 1:13 PM Vincent Anthony Lacovara <LACOVARA@cua.edu> wrote:
There are no University "charges."  Several people raised concerns with the University about tweets from several years ago, and then about more recent tweets last month. The University is looking at what University policies or standards might be involved vis-a-vis the tweets.

With respect to your specific question about the University's social media policy, here is the link: https://policies.catholic.edu/marketing-communications/socialmedia.html. All policies are published at https://policies.catholic.edu/.

Vin Lacovara

*Certified Compliance and Ethics Professional (CCEP)*®
Chief Ethics and Compliance Officer and Chief Privacy Officer
Office of the President
The Catholic University of América
tel. 202-319-6170

cua-compliance@cua.edu



PLAINTIFF'S
EXHIBIT
G

**Policy: Social media Policy  (Retrieved from:** https://policies.catholic.edu/marketing-communications/socialmedia.html

### V. Posting on Personal Sites

"When staff and faculty are expressing individual or collective views **and their University affiliation is listed**, they should make clear that the statements or opinions are their own and that they are not speaking for or in the name of the University"

"Even with these requirements and guidelines in place, **persons in leadership roles with the University** are urged, especially, to be mindful that many resources exist by which readers of social media posts can try to identify authors and the organizations with which they may be associated. Consequently, please keep in mind that the possibility exists the contents of even personal posts may be interpreted by others as being the "official" view of a representative of the University. This extends, as well, to potential retweets, reposts, and sharing of the original content of others."

Marketing and Communications > Social Media Policy

# Social Media Policy

| | |
|---|---|
| **Approved by:** | The President |
| **History:** | Issued       -- June 1, 2017 |
| | Revised     -- October 29, 2018 |
| | Last Reviewed -- October 29, 2018 |
| **Related Policies:** | Code of Conduct for Staff and Faculty; Copyright Policy; Information Security and Assurance Policy; Marketing/Advertising Policy; Permission to Photograph Policy; Press Releases Policy; Non-Discrimination, Anti-Harassment, and Title IX Compliance Policy; Political Activities Policy; Sexual Offenses Policy (Student); Sexual Offenses Policy (Employees); Speaking to the News Media Policy; Student Code of Conduct; Technology Use Policy; Trademark Policy |
| **Additional References:** | The Catholic University of America Style and Visual Identity Guide; Social Media Council Guidelines and Resource Book |
| **Responsible Official:** | Associate Vice President for Marketing and Communications tel. (202) 319-5600 |

# I. Policy Statement

Social Media play a vital role in a University community. At the same time, the University seeks to speak with one voice on official matters and to protect and accurately communicate the University's mission and reputation. To achieve these goals, this policy sets forth requirements and guidelines for staff, faculty and students regarding use of Social Media sites that purport to represent the University or its schools, departments or units. The Office of Marketing and Communications shall have the final say on all University Social Media accounts.

## II. Definitions

**A. Social Media** refer to websites and other online mechanisms or electronic platforms used for sharing or disseminating information, for personal or professional networking, or for other forms of social interaction. Examples of Social Media include, but are not limited to: blogs and other web-based journals; social or professional networking sites (such as Facebook, Twitter, Snapchat and LinkedIn); video or photo sharing (such as YouTube, Flickr or Instagram); and online encyclopedias (such as Wikipedia).

**B. University Social Media** means any Social Media that purport to represent the University or its schools, departments or units.

**C. News Media** mean entities or mechanisms for delivering news to the general public or to a targeted audience. News Media include but are not limited to: newspapers; magazines or journals; television or radio stations or networks; and online media, including Social Media.

## III. Registration and Oversight of University Social Media Accounts

University Social Media accounts must be created and registered in coordination with the Office of Marketing and Communications at socialmedia@cua.edu.

An account administrator, preferably a member of the professional staff, must be designated by the University unit responsible for each Social Media account, and the name of that administrator must be provided to the <u>Office of Marketing and Communications</u>, who shall have the final say on all University Social Media accounts. The responsibilities of account administrators are set forth in the University's <u>Social Media Council Guidelines and Resource Book</u>.

All aspects of account and site management, including responsibility for monitoring the site and its content, reside with the unit responsible for the account and site. Account administrators are responsible for ensuring that the site is compliant with University policies and are responsible for removing from the site any comments or other material deemed inflammatory, vulgar, or otherwise inappropriate.

The <u>Office of Marketing and Communications</u> retains the authority to deactivate any University Social Media account that violates this policy.

## IV. Requirements for University Social Media Accounts

Staff, faculty and students who use University Social Media accounts are subject to the same University policies and standards of conduct that apply to in-person activities and interactions on behalf of the University and to the following:

### A. Non-Discrimination and Anti-Harassment

Comments or information posted may not be discriminatory or harassing per the University's <u>Non-Discrimination, Anti-Harassment, and Title IX Compliance Policy</u> and Sexual Offenses policies (linked above), and may not be abusive, threatening or defamatory.

### B. Confidentiality, Privacy and Proprietary Information

Social Media sites are public. Confidential or proprietary information pertaining to the University or to University staff, faculty, students, alumni or affiliates may not be posted on Social Media. All information created or posted on or through University computers systems is subject to University policies, and is subject to the requirements of the University's Information Security and Assurance Policy.

## C. University Marks

Staff, faculty and students may only use the University's approved names, seal, logos and other copyrighted or trademarked material in Social Media to identify themselves on matters of official University business. All such use also must follow The Catholic University of America Style and Visual Identity Guide.

## D. Copyright

All members of the University community must respect the copyrights held by owners of literary, dramatic, musical, artistic and other intellectual property. Review the University's Copyright Guidelines, as set forth in the Copyright Policy, before posting any copyrighted material through Social Media.

## E. Announcing University News and Contacts with the News Media

Per the University's Press Releases Policy, University communications with the News Media must be managed by the Office of Marketing and Communications. If sharing University news, share only news and events that are a matter of public record, and link directly to the University news source maintained by the Office of Marketing and Communications.

Social Media posts may generate interest from print, television or online News Media sources. If contacted by any media source, contact the Office of Marketing and Communications before responding per the Speaking to the News Media Policy.

## F. Political Activities

University Social Media accounts and postings must abide by the University's <u>Political Activities Policy</u>.

## G. Photographs and Videos

If photographs or videos are to be used in a Social Media postings, follow the University's <u>Permission to Photograph Policy</u> regarding necessary consent.

## H. Additional Requirements

Individual University schools or units may have additional social media policies or requirements, so long as they are consistent with this policy. Individual users may have other requirements or codes of ethics that impose additional rules or restrictions that are specific to a profession or license.

## V. Postings on Personal Sites

Staff and faculty are encouraged to speak in their areas of expertise per the <u>Speaking to the News Media Policy</u>. When staff and faculty are expressing individual or collective views and their University affiliation is listed, they should make clear that the statements or opinions are their own and that they are not speaking for or in the name of the University. In making personal postings in such instances, staff and faculty should use disclaimer language such as: *"The views expressed in this [posting, blog, site, account, etc.] are my own and do not represent the views of The Catholic University of America."*

The University's approved names, seal, logos and other copyrighted or trademarked material may not be used on personal Social Media. In addition, staff and faculty members' affiliations with the University (e.g. "dean," coach," "professor" or other title), or the name or abbreviation of the University or its schools, departments or units, may not be used in the monikers/handles of personal accounts. (Examples include @CatholicUPresident, @CUASwimmingCoach, @CUADeanofSchool, @CUAHistoryProf).

Even with these requirements and guidelines in place, persons in leadership roles with the University are urged, especially, to be mindful that many resources exist by which readers of social media posts can try to identify authors and the organizations with which they may be associated. Consequently, please keep in mind that the possibility exists the contents of even personal posts may be interpreted by others as being the "official" view of a representative of the University. This extends, as well, to potential retweets, reposts, and sharing of the original content of others.

# VI. Violations

Employees are personally responsible for any social media postings they make. Violations of this policy may result in removal of a University Social Media account or authority to post to such an account, or other University disciplinary action.

**VII. Style and Content Guidelines for Postings to University Social Media Accounts**

For assistance in creating and posting content most effectively to Social Media sites, review the University's Social Media Council Guidelines and Resource Book and contact the Office of Marketing and Communications (socialmedia@cua.edu). These resources will help schools, departments and units develop a communication strategy, brand the account, and develop targeted and effective postings.

 **CARDINAL MAIL**

John V. Tieso <tieso@cua.edu>

## Re: Your Email to the Provost
1 message

**John V. Tieso <tieso@cua.edu>**                                   Thu, Jun 11, 2020 at 6:23 PM
To: Vincent Anthony Lacovara <LACOVARA@cua.edu>

A bit late, isn't it?  Happy to discuss further if there is some objective reason to do so, other than simply protecting the butt of CUA. Saw thecollegefix.com article today.

John V. Tieso
Adjunct Assistant Professor
The Busch School of Business

(c)703-864-1209
E-Mail: tieso@cua.edu

On Thu, Jun 11, 2020 at 4:34 PM Vincent Anthony Lacovara <LACOVARA@cua.edu> wrote:
> Concerns were raised.  When concerns are raised the University looks into it.  I want to give you the
> opportunity to be heard.

Vin Lacovara

*Certified Compliance and Ethics Professional (CCEP)*®
Chief Ethics and Compliance Officer and Chief Privacy Officer
Office of the President
The Catholic University of America
tel. 202-319-6170

cua-compliance@cua.edu
catholic.edu



 THE CATHOLIC UNIVERSITY OF AMERICA



PLAINTIFF'S
EXHIBIT
I

—————— Forwarded message ——————
From: **Dean Abela** <DeanAbela@cua.edu>
Date: Tue, Jun 23, 2020 at 12:28 PM
Subject: Conclusion
To: John V. Tieso <tieso@cua.edu>

Dear John,

We have completed our investigation of the recent complaints we received about your Twitter activity. We have concluded that several of your tweets, including those about Barack Obama, Michelle Obama and Hillary Clinton, would be interpreted by a reasonable person to be racist and/or sexist, especially in the context of the general tone of your tweets, and inconsistent with the respect for human dignity that is at the core of the mission of the Busch School of Business. It's worth noting the important distinction between your delivering a vigorous and forceful argument for a position on the one hand, which we support, and your delivering one that is spiteful, degrading, and lacking in charity on the other, which we do not support or accept. Unfortunately your tweets seem to be very much of the latter kind.

As you know, we expect all faculty in the Busch School of Business not only to be great classroom teachers, as you have been, but also to be great role models for our students. Your Twitter activity as I have described it above is inconsistent with being such a role model, and therefore you will not be teaching any future classes, and I will not be renewing your teaching appointment.

Thank you for your years of service to our students, and I am disappointed that they had to end this way.

Sincerely,

Andrew

————————————————
Andrew V. Abela, Ph.D.
Dean, Busch School of Business
The Catholic University of America


PLAINTIFF'S
EXHIBIT
J

**U.S. Department of Education**

**Religious Liberty and Free Inquiry Final Rule**

The U.S. Department of Education has issued the Religious Liberty and Free Inquiry Final Rule (Final Rule) to help ensure that public institutions uphold fundamental rights guaranteed by the First Amendment to the U.S. Constitution and that private institutions adhere to their stated institutional policies regarding freedom of speech, including academic freedom.

The Final Rule also ensures the equal treatment and constitutional rights of religious student organizations at public institutions, and separately provides clarity to faith-based institutions with respect to their non-discrimination duties under Title IX. This rulemaking follows months of careful deliberation and extensive input from stakeholders, represented by over 17,000 public comments.

*Improving Free Inquiry: Implementation of Executive Order 13864*

The Department has taken historic action to implement Executive Order 13864, entitled *Improving Free Inquiry, Transparency, and Accountability at Colleges and Universities.* The Final Rule helps ensure that public institutions of higher education uphold fundamental rights guaranteed in the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic freedom, and that private institutions of higher education adhere to their own stated institutional policies regarding freedom of speech, including academic freedom. Public institutions of higher education must comply with the First Amendment to the U.S. Constitution, as a material condition of a direct grant under 34 CFR Part 75, or a subgrant from a state-administered formula grant program under 34 CFR Part 76. Private institutions of higher education must comply with their stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of a direct grant under 34 CFR Part 75, or a subgrant from a state-administered formula grant program under 34 CFR Part 76.

The Department recognizes that state and federal courts have a well-developed body of case law to determine whether a public institution has violated the First Amendment, or whether a private institution has violated its own stated institutional policies regarding freedom of speech, including academic freedom. Accordingly, the Department will rely upon a final, non-default judgment by a state or federal court to determine whether a public or private institution has violated these material grant conditions. A public or private institution must report any such final, non-default judgment to the Department no more than 45 calendar days after such judgment is entered.

The Department may pursue existing remedies for an institution's noncompliance with these material conditions. Existing remedies include imposing special conditions, temporarily withholding cash payments pending correction of the deficiency, suspension or termination of a federal award, and potentially debarment.

*ED's Regulations to Preserve and Protect Religious Liberty*

Clarification of Title IX Religious Exemption

The Department recognizes that educational institutions, stakeholders, and the public benefit from greater clarity concerning religious exemptions to Title IX, and greater transparency as to what factors the Department considers when evaluating a school's invocation of a religious exemption. The Final Rule, for the first time, codifies how an educational institution may demonstrate that it is controlled by a religious organization for purposes of Title IX, 20 U.S.C. § 1681(a)(3). Federal law already provides that Title IX "shall not apply" to educational institutions that are "controlled by a religious organization," to the extent that application of Title IX "would not be consistent with the religious tenets of such

## U.S. Department of Education

### Religious Liberty and Free Inquiry Final Rule

organization."[1]  Likewise, federal regulations echo the fact that Title IX does not apply to certain schools "controlled by a religious organization."[2]  Before now, neither Title IX nor its implementing regulations have ever defined what it means to be "controlled by a religious organization."  Now, the Final Rule gives schools and other stakeholder clarity on the meaning of this phrase.

The Final Rule gives fair notice to stakeholders and the public of when the religious exemption under Title IX applies, and balances the Department's interest in securing religious freedom for educational institutions with its interest in ensuring vigorous enforcement of Title IX's prohibition of discrimination on the basis of sex. The Final Rule provides a non-exhaustive list of criteria that an educational institution may use to satisfy the definition of "controlled by a religious organization."

#### Equal Treatment of Religious Student Organizations at Public Institutions

The Department recognizes the important role of student organizations, including religious student organizations, at public institutions of higher education and their First Amendment rights.  The Final Rule requires that a public institution must not deny to any student organization whose stated mission is religious in nature any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution, as a material condition of a direct grant under 34 CFR Part 75, or a subgrant from a state-administered formula grant program under 34 CFR Part 76.  For example, a religious student organization would have the same rights as other student organizations at the public institution to receive official recognition, to use the institution's facilities, and to receive student fee funds.  In this manner, the Final Rule prohibits discrimination against religious student organizations because of their beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

#### Programs under Title III and Title V of the Higher Education Act of 1964, as Amended

The Department amends regulations governing the Strengthening Institutions Program, the Developing Hispanic-Serving Institutions Program, the Strengthening Historically Black Colleges and Universities Program, and the Strengthening Historically Black Graduate Institutions Program under the Higher Education Act of 1965, as amended.  The Final Rule addresses constitutional concerns about the prohibition to use development grants for activities or services if they merely relate to "sectarian instruction" and "religious worship."  The Final Rule prohibits use of such grants for activities or services that constitute religious instruction, religious worship, or proselytization consistent with the First Amendment to the U.S. Constitution and other federal laws. The Final Rule also addresses constitutional concerns about part of the definition of a "school or department of divinity" as an institution, or department, or program of instruction designed to prepare the students to teach "theological subjects," which may, for example, prohibit an institution from using a grant for a secular department of religion that prepares students to teach various religions in a comparative religion course. The Final Rule amends the definition of a "school or department of divinity" to mean an institution, or a department of an institution, whose program is solely to prepare students to become ministers of religion or to enter into some other religious vocation.  This definition is more consistent with the First Amendment and other federal laws.

---

[1] 20 U.S.C. § 1681(a)(3).

[2] 34 C.F.R. § 106.12(a).

CARES/American Rescue Plan Reporting

HEERF III Funding Report

Updated October 7, 2021



The Higher Education Emergency Relief Fund III (HEERF III) is authorized by the American Rescue Plan (ARP), Public Law 117-2, signed into law on March 11, 2021, providing $39.6 billion in support to institutions of higher education to serve students and ensure learning continues during the COVID-19 pandemic.

Download the September 30 report
Download the March 31 report
Download the June 30 report
 Updated October 8, 2021

Background: The Coronavirus Aid, Relief, and Economic Security Act or, CARES Act, was passed by Congress and signed by the President on March 27th, 2020. This bill allotted $1.187 million to the Catholic University of America to distribute directly to students in the form of emergency financial aid grants. A matching $1.187 million was provided to Catholic University to help cover costs associated with significant changes to the delivery of instruction due to the coronavirus. In December of 2020, the Higher Education Emergency Relief Fund II (HEERF II) was authorized by the CRRSAA, Public Law 116-260 authorizing another $81.88 billion in support for education. This bill allotted another $1.187 million to Catholic University for student emergency grants. In March of 2021 under the American Rescue Plan, HEERF III funding, Catholic University was granted $3,117,415 in student emergency grants. To date Catholic University has receive more the $5.4 million in student grants to help mitigate the costs associated with the pandemic.

This site has been developed to provide transparency to our community on the distribution of these funds to students and how the matching awards have been utilized by the University. The first quarterly report on institutional usage of these funds can be found here; the second quarterly institutional report can be found here; the third quarterly report can be found here. The remainder of this report is dedicated to reporting on the distribution of emergency financial aid grants to students. Future reports will be issued on a quarterly basis following the latest guidance issued by the Department of Education. This site has been developed to provide transparency to our community on the distribution of these funds to students and how the matching awards have been utilized by the University. The first quarterly report on institutional usage of these funds can be found here; the second quarterly institutional report can be found here; the third quarterly report can be found here. The remainder of this report is dedicated to reporting on the distribution of emergency financial aid grants to students. Future reports will be issued on a quarterly basis following the latest guidance issued by the Department of Education.

The Catholic University of America signed and returned to the Department of Education the Certification and Agreement for Emergency Financial Aid Grants to Students under American Rescue Plan HEERF III funding in February of 2021. The university intends to use no less than

50 percent of the funds received under the American Rescue Plan, HEERF III funding to provide emergency financial aid grants to students.

As of September 30, 2021:

The total amount of funds that Catholic University will receive or has received from the Department pursuant to the Certification and Agreement [for] Emergency Financial Aid Grants to Students under the American Rescue Plan, HEERF III funding: **$3,117,415**.

The total amount of Emergency Financial Aid Grants distributed to students under American Rescue Plan, HEERF III funds as of the date of submission: **$2,033,000**.

The estimated total number of students at Catholic University eligible to participate in programs under American Rescue Plan, HEERF III and thus eligible to receive Emergency Financial Aid Grants to students under this provision: **4,184**.

The total number of students who have received an Emergency Financial Aid Grant to students under the American Rescue Plan, HEERF III: **673**.

View a snapshot of the official site for students to apply for HEERF III funds here.
All eligible students received one email regarding appeals under professional judgement and 2 emails informing them of the HEERF III funding application process that included a link to the application. Below is a sample of the HEERF III application process and professional judgement notification. There were no changes made to the HEERF III application available email – the templates were identical. Students also received an approval email.

View the sample emails here.
With the ongoing financial strains our students and their families are experiencing due to the pandemic, we felt it was prudent to provide funding into the Spring 2022 term. In November of 2021, Catholic University will notify all eligible students the application for HEERF III funding will open again. We will award the remaining ARP, HEERF III funding to students with exceptional need, with priority going to Pell Grant recipients. A reminder of our appeal process for professional judgements for those families with documented financial losses, will be sent at the same time to all FAFSA filers. We will continue to award emergency student grants until all funds are exhausted.

As of March 31, 2021:

The total amount of funds that Catholic University will receive or has received from the Department pursuant to the Certification and Agreement [for] Emergency Financial Aid Grants to Students: **$1,187,286**.

The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES Act as of the date of submission: **$1,187,286**

The estimated total number of students at Catholic University eligible to participate in

programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to students under Section 18004(a)(1) of the CARES Act: **2,480**.

The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act: **849**.
As of December 31, 2020:

The total amount of funds that Catholic University will receive or has received from the Department pursuant to the Certification and Agreement [for] Emergency Financial Aid Grants to Students: **$1,187,286**.

The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES Act as of the date of submission: **$1,186,786**
The estimated total number of students at Catholic University eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to students under Section 18004(a)(1) of the CARES Act: **2,480**.

The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act: **848**.

As of September 30, 2020:
- The total amount of funds that Catholic University will receive or has received from the Department pursuant to the its Certification and Agreement [for] Emergency Financial Aid Grants to Students: **$1,187,286**.
- The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES Act as of the date of submission: **$1,085,650**.
- The estimated total number of students at Catholic University eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to students under Section 18004(a)(1) of the CARES Act: **2,480**.
- The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act: **713**.

As of August 12, 2020:

- The total amount of funds that Catholic University will receive or has received from the Department pursuant to the its Certification and Agreement [for] Emergency Financial Aid Grants to Students: **$1,187,286**.
- The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES Act as of the date of submission: **$1,085,650**.
- The estimated total number of students at Catholic University eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to students under Section 18004(a)(1) of the CARES Act: **2,480**.

- The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act: **713**.

As of June 25, 2020:

- The total amount of funds that Catholic University will receive or has received from the Department pursuant to the its Certification and Agreement [for] Emergency Financial Aid Grants to Students: **$1,187,286.**
- The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES Act as of the date of submission: **$1,067,050.**
- The estimated total number of students at Catholic University eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to students under Section 18004(a)(1) of the CARES Act: **2,480.**
- The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act: **697**.

As of May, 13, 2020:

- The total amount of funds that Catholic University will receive or has received from the Department pursuant to the its Certification and Agreement [for] Emergency Financial Aid Grants to Students: **$1,187,286.**
- The total amount of Emergency Financial Aid Grants distributed to students under Section 18004(a)(1) of the CARES Act as of the date of submission: **$770,040.**
- The estimated total number of students at Catholic University eligible to participate in programs under Section 484 in Title IV of the Higher Education Act of 1965 and thus eligible to receive Emergency Financial Aid Grants to students under Section 18004(a)(1) of the CARES Act: **2,480.**
- The total number of students who have received an Emergency Financial Aid Grant to students under Section 18004(a)(1) of the CARES Act: **455.**

Instructions, directions, or guidance provided by the institution to students concerning the Emergency Financial Aid Grants. **NOTE: All students who were approved for an emergency CARES Act grant after May 6, 2020 received the identical notification dated below from May 6, 2020.**

Method(s) used to determine which students receive Emergency Financial Aid Grants and how much they would receive under Section 18004(a)(1) of the CARES Act:

Catholic University created a Google-based application that required students to identify both the amount of funding requested and a detailed rationale for their request; this application was only available to students under their Network login credentials. Applicable student data (i.e. student status, student identification number, international status, FERPA on file, degree program type, etc.) from our student information system was matched with each student applicant to determine qualified students. Qualified students were rank ordered (highest to lowest) based upon federal unmet need and expected family contributions. Approved students were awarded the amount that they requested up to a limit of $2,000.

*On April 15, 2020, all currently enrolled University students were sent the following instructions via email:*

Dear Students,

I hope you had a restful Easter break, that you and your family are healthy, and that your studies are going well.

Late last week, we received a notification from the Department of Education that the first installment of our funding from the CARES Act would be available for our use in the near future. 100% of this installment will fund emergency financial assistance for our students. Catholic University will use the funding to provide one-time emergency grants of between $500 and $2,000.

These grants are intended to lessen financial challenges resulting from the current health crisis including travel assistance, emergency medical expenses, expenses related to student virtual learning, overdue utility bills, housing assistance, food insecurity, and more. This funding is not intended to replace or supplement existing financial aid and does not have to be repaid.

All undergraduate and graduate students enrolled in campus-based programs who are experiencing unexpected financial hardship resulting from the coronavirus pandemic may apply. Students enrolled in fully online degree programs are not eligible.

We will work to address demonstrated needs to the extent funds are available. Priority will be given to students with the highest demonstrated financial need. Students in need of financial assistance should complete this application. Please provide as much detail on your circumstances as possible. Applications will be reviewed on a rolling basis until the available funds have been distributed.

Approved applications will have funds placed directly on their student accounts for immediate refund. In order to receive the refund quickly, applicants should ensure that they have direct deposit established on their student account. Students enroll in direct deposit by following these instructions on the Enrollment Services' website.

The University will also allocate funds for one-time need-based tuition assistance grants to help students who have financial distress caused by the pandemic. These grants will help to reduce educational expenses for the upcoming summer sessions and/or the 2020-2021 academic year. Eligibility will be determined from the FAFSA and from the Office of Student Financial Assistance Appeals Form.

Please contact the Office of the Dean of Students for questions about the CARES Act grant program and the Office of Student Financial Assistance aid for questions about tuition assistance grants.

Sincerely,
Dean Sawyer

*On April 21, 2020, all students who had applied for an emergency grant (to that point in time) were sent the following instructions via email:*

Dear Student,

Thank you for applying for CARES Act funding through the Student Emergency Fund. I

wanted to take a moment and provide you with an update on our process for reviewing grant applications. It is important that you know that these funds are being allocated to the University through the United States Department of Education. By Federal statute, these grants are being provided to students "for their expenses related to the disruption of campus operations due to coronavirus, such as food, housing, course materials, technology, healthcare, and child-care expenses." This afternoon, the Department of Education released additional guidance that will help guide our review process. Once a decision has been reached regarding your application, we will be in touch.

Take care,
Dean Sawyer

*On May 6, all students who were approved for an emergency grant were sent the following instructions via email:*

Dear Student,

Thank you for applying for CARES Act funding through the Student Emergency Fund. Late last week, we began awarding funding to approved applicants. The easiest way to determine if you were awarded funds is to visit your student account on Cardinal Station. If approved, you will see "CARES Act Grant" on your account. Funds were distributed to your banking institution if you are signed up for direct deposit and via check if you are not signed up for direct deposit. As I mentioned in a prior email, these funds are being allocated to the University through the United States Department of Education. By Federal statute, these grants are being provided to students "for their expenses related to the disruption of campus operations due to coronavirus, such as food, housing, course materials, technology, healthcare, and child-care expenses" and **it is expected that approved applicants will use these funds accordingly**.

If you were awarded a grant, but your situation has changed and you no longer need all or part of the grant, please send a check (with Return of CARES Act Grant in the memo line) to:

Office of the Dean of Students
Pryzbyla 353
Washington, DC 20064

We are continuing to work through several hundred applications and will make additional awards in the coming weeks.

Take care,
Dean Sawyer

Retrieved from: https://www.catholic.edu/resources/consumer-information/cares-act-disclosure/index.html

Catholic University Homepage > 2020 > $3.2 Million Awarded to CatholicU Social Work School

# $3.2 Million Awarded to CatholicU Social Work School

PLAINTIFF'S
EXHIBIT
L

July 01, 2020



NCSSS graduate students deliver supplies to those in need in the D.C. area during the Coronavirus pandemic.

In June, Catholic University's National Catholic School of Social Service (NCSSS) was awarded a five-year, $3.2 million grant from the U.S. Health Resources and Services Administration (HRSA) through the Scholarships for Disadvantaged Students Program.

With this grant, NCSSS will improve the quality of and access to mental health services in medically underserved communities in and around Washington, D.C., by recruiting, supporting, and training individuals from disadvantaged backgrounds as future social workers. Per HRSA's qualifications, "disadvantaged" is defined as students who are the first in their family to go to college; come from a family that receives public assistance; are from low-income households; or have a physical, learning, or mental impairment.

"For more than 100 years, the National Catholic School of Social Service (NCSSS) has been preparing students to go forth and reach the marginalized. This grant is important as it fits with the mission of the school that prioritizes responding to the needs of the vulnerable by preparing social workers to work towards the improvement of mental health services in underserved communities," says Jo Anne Regan, NCSSS dean.

NCSSS will use the $640,000 per year to boost recruitment and retention of full-time students in its Master's of Social Work (MSW) programs. Scholarships of up to $40,000 per year will be awarded based on each student's financial need.

The school also plans to enhance recruitment of racial and ethnic minority students, who are historically underrepresented in health professional careers. The school will partner with local colleges and universities, including historically black colleges and universities, to promote the scholarship to undergraduate students and work with local health and human services organizations to recruit paraprofessionals interested in pursuing a master's degree. Sixteen scholarships will be awarded per year, with the first round of scholarships awarded in fall 2020.

"I am thrilled to have worked with many of my NCSSS colleagues, who brought their expertise to our discussions about this grant application and made it stronger the more we reflected on how to craft our proposal," says Christine Sabatino, chair of the MSW program and faculty principal investigator for the grant. "I am always inspired by the collegial climate in our school."

The project team — which also includes NCSSS's Director of Admission and Financial Aid Aileen Worrell, Director of Field Education and Professional Development Roslynn Scott-Adams, and Director of Field Education (Online MSW Program) Danielle Stokes-Parker — will lead NCSSS efforts to prepare and train scholarship recipients to work within primary care or medically underserved communities upon graduation.

Catholic University's Institutional Partnerships Division of University Advancement worked closely with Sabatino on the grant submission.

"In the context of COVID-19 and ongoing racial social injustice, now more than ever there is a demand for well-trained, high-quality, diverse, and compassionate social workers. These scholarships will help NCSSS meet the current and emerging needs of communities," said Lesa-Kaye Holtham, senior associate director of institutional partnerships. "This grant is also reflective of an institutional culture of faculty and staff who are committed to preparing our students to make an impact on our community."

Sabatino said the HRSA grant award — which was awarded to only 79 programs across the country — is quite an honor. The funding will enable NCSSS to continue its long tradition of training professionals to serve the physical and mental health challenges of the most vulnerable individuals, families, and communities.

"More importantly, we are admitting students for the on-campus and online MSW graduate degree, especially in this era of COVID-19, who might not otherwise have the opportunity because they cannot come to campus," Sabatino said. "This grant also helps us to promote the mission of NCSSS to 'educate students from diverse faiths and cultures who in their professional endeavors will embody the values of social justice, service, and scholarship.'"

For more information on scholarship eligibility and the application process, please contact Aileen Worrell at worrell@cua.edu.

## Related News

Case 1:22-cv-00031-PTG-JFA   Document 1   Filed 01/12/22   Page 53 of 110 PageID# 53

Catholic University Homepage  >  2020  >  Researching During a Pandemic

# Researching During a Pandemic

December 15, 2020





01:57

When many things shut down last spring as the COVID-19 pandemic ramped up, one of the things that kept going at Catholic University was research.

Biology Professor Ann Corsi has continued her developmental biology experiments on her nematode worms, *C. elegans*.

"One of the advantages of being at a smaller school with a smaller research operation is that we have been able to carry on reasonably well throughout the pandemic," Corsi says. "I have three graduate students working with me and two of them have been coming to campus much of the time since March."

*Dr. Corsi's work is funded by an R15 Academic Research Enhancement Award (AREA) grant from the National Institute of Dental and Craniofacial Research at the National Institutes of Health*

12/14/21, 1:25 PM
Case 1:22-cv-00031-PTG-JFA Document 1 Filed 01/12/22 Page 54 of 110 PageID# 54
Researching During a Pandemic - Catholic University of America, Washington, DC | CUA

## Related News

<u>CatholicU Doctoral Candidate Named Jefferson Lab Fellow</u> December 10, 2020

<u>Mathematics Students Apply Models to Find Real Solutions</u> December 09, 2020

<u>Provost Named American Association for the Advancement of Science Fellow</u>

December 01, 2020

**MORE NEWS**

Catholic University Homepage > 2021 > CatholicU Receives $64.1 Million Research Award from NASA

# CatholicU Receives $64.1 Million Research Award from NASA

**PLAINTIFF'S EXHIBIT**

N

July 12, 2021



*L-R: Ralph Albano, John Philip (Physics Chair), Gina Vandross-Martin (PHaSER senior budget analyst), Jeff Brosius (PHaSER deputy PI), Steve Kraemer, Professor of Physics; Bob Robinson (PHaSER PI), Vadim Uritsky (Associate Professor, Physics), Lizz Bowlen (IACS budget analyst)*

It was recently announced that The Catholic University of America has received a $64.1 million research award from NASA to fund a cooperative agreement with CatholicU's Institute for Astrophysics and Computational Sciences and five other local partners: University of Maryland Baltimore County (UMBC), University of Maryland College Park (UMCP), George Mason University (GMU), Howard University (HU), and Universities Space Research Association (USRA).

The agreement establishes the <u>Partnership for Heliophysics and Space Environment Research (PHaSER)</u> with funding for the next five years. PHaSER will support the scientific and technical program of NASA Goddard Space Flight Center's Heliophysics Science Division (HSD).

"When executed, this becomes the largest single research grant in the history of The Catholic University of America, and when taken with our recent subaward on the <u>CRESST II</u> NASA cooperative agreement, pushes our NASA-funded project total to just over $90 million over the next five years," says University Provost Aaron Dominguez.

The guiding principles of PHaSER are to:

- sustain and strengthen existing partnerships with HSD civil service researchers,
- nurture early-career scientists by providing a broad range of opportunities for students and newly minted Ph.D. scientists,
- facilitate collaborations with visiting scientists and the broader research community,
- strengthen diversity and inclusion through aggressive programs aimed at underrepresented groups, and
- enable productive integration of PHaSER scientific staff in Heliophysics science planning, technology development, and all phases of mission implementation.

"The overall purpose is to enable scientific research in the Heliophysics Division at NASA Goddard," said Bob Robinson, director of PHaSER and research professor of physics at CatholicU. "The mission of the Heliophysics Division is to study the transport of energy, in the form of particles and radiation from the sun through interplanetary space and its effects on Earth's atmosphere and ionosphere."

PHaSER will primarily support HSD through the recruitment, hiring, and retention of high-quality scientists and students in cooperation with the HSD scientists responsible for specific research areas.

"PHaSER represents a network as much as a partnership, and we will leverage the many linkages the member institutions have to help move HSD scientific and technical projects forward," the group said in its proposal. "This is particularly important for being well positioned to support new initiatives in HSD by providing access to people and resources with little delay and optimum results."

Similarly, PHaSER will support special programs to stimulate and support HSD collaborations, connections, and scientific interchanges with the external science communities through visiting scientist, postdoc and sabbatical support, student and internship programs, and conference hosting and organization.

Cooperative agreements like PHaSER "help fulfill the University's mission in education, providing opportunities for CatholicU students and faculty to take advantage of the expertise and resources that we have at NASA Goddard," says Robinson. "I'm excited to see that connection continue and strengthen under the new agreement."

PHaSER continues and expands the on-going support currently undertaken through two separate cooperative agreements: the Center for Excellence in the Physics of the Heliosphere and Sun (CEPHEUS), led by CatholicU with subawards to GMU; and the Goddard Planetary Heliophysics Institute (GPHI) led by UMBC in partnership with UMCP.

Through CEPHEUS, researchers have been studying space weather — solar phenomena like flares, storms, and coronal mass ejections — that can adversely affect radio communications, satellite technologies, and power grids on Earth. As a part of this research, the Catholic University Physics Department opened a Space Weather Center on campus in 2016. In this center, students -- both undergraduate and graduate -- have access to solar monitoring feeds and equipment modeled after those found at NASA Goddard.

Through CEPHEUS, CatholicU has been employing 50 to 70 full- and part-time scientists associated with HSD. Together with its PHaSER partners, the number of affiliated scientists will grow to 80 to 100 researchers under the new award.

**PARTNERS:**

Case 1:22-cv-00031-PTG-JFA   Document 1   Filed 01/12/22   Page 58 of 110 PageID# 58

10/1/21, 10:34 AM                                        eCFR :: 34 CFR Part 75 Subpart E -- What Conditions Must Be Met by a Grantee?

📅 Displaying title 34, up to date as of 9/29/2021. Title 34 was last amended 9/29/2021.

ENHANCED CONTENT - TABLE OF CONTENTS

**Subpart E**        What Conditions Must Be Met by a Grantee?                                    75.500 − 75.684
  Nondiscrimination                                                                               75.500
     **§ 75.500**  Constitutional rights, freedom of inquiry, and Federal statutes and regulations on nondiscrimination.
  Project Staff                                                                                   75.511 − 75.519
     **§ 75.511**   Waiver of requirement for a full-time project director.
     **§ 75.515**   Use of consultants.
     **§ 75.516**   Compensation of consultants - employees of institutions of higher education.
     *§ 75.517 [Reserved]*
     **§ 75.519**   Dual compensation of staff.
  Conflict of Interest                                                                            75.524 − 75.525
     **§ 75.524**  Conflict of interest: Purpose of § 75.525.
     **§ 75.525**  Conflict of interest: Participation in a project.
  Allowable Costs                                                                                 75.530 − 75.534
     **§ 75.530**  General cost principles.
     **§ 75.531**  Limit on total cost of a project.
     **§ 75.532**  Use of funds for religion prohibited.
     **§ 75.533**  Acquisition of real property; construction.
     **§ 75.534**  Training grants - automatic increases for additional dependents.
  Indirect Cost Rates                                                                             75.560 − 75.580
     **§ 75.560**  General indirect cost rates; exceptions.
     **§ 75.561**  Approval of indirect cost rates.
     **§ 75.562**  Indirect cost rates for educational training projects.
     **§ 75.563**  Restricted indirect cost rate - programs covered.
     **§ 75.564**  Reimbursement of indirect costs.
     **§ 75.580**  Coordination with other activities.
  Evaluation                                                                                      75.590 − 75.592
     **§ 75.590**  Evaluation by the grantee.
     **§ 75.591**  Federal evaluation - cooperation by a grantee.
     **§ 75.592**  Federal evaluation - satisfying requirement for grantee evaluation.
  Construction
     **§ 75.600**                                                                   Use of a grant for construction:
                                                                                    Purpose of §§ 75.601-75.615.
     **§ 75.601**                                                                   Applicant's assessment of
                                                                                    environmental impact.
     **§ 75.602**                                                                   Preservation of historic sites
                                                                                    must be described in the
                                                                                    application.
     **§ 75.603**                                                                   Grantee's title to site.
     **§ 75.604**                                                                   Availability of cost-sharing funds.
     **§ 75.605**                                                                   Beginning the construction.
     **§ 75.606**                                                                   Completing the construction.
     **§ 75.607**                                                                   General considerations in
                                                                                    designing facilities and carrying
                                                                                    out construction.
     **§ 75.608**                                                                   Areas in the facilities for cultural
                                                                                    activities.



PLAINTIFF'S
EXHIBIT

| Subject | Statute | Regulation |
|---|---|---|
| Discrimination on the basis of race, color, or national origin | Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d through 2000d-4) | 34 CFR part 100. |
| Discrimination on the basis of sex | Title IX of the Education Amendments of 1972 (20 U.S.C. 1681-1683) | 34 CFR part 106. |
| Discrimination on the basis of handicap | Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) | 34 CFR part 104. |
| Discrimination on the basis of age. | The Age Discrimination Act (42 U.S.C. 6101 et seq.) | 34 CFR part 110. |

(b)

(1) Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public and that is legally required to abide by the First Amendment to the U.S. Constitution (hereinafter "public institution"), must also comply with the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic freedom, as a material condition of the Department's grant. The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. A final judgment is a judgment that the public institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment.

(2) Each grantee that is a public institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 45 calendar days after such final, non-default judgment is entered.

(c)

(1) Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is private (hereinafter "private institution") must comply with its stated institutional policies regarding freedom of speech, including academic freedom, as a material condition of the Department's grant. The Department will determine that a private institution has not complied with these stated institutional policies only if there is a final, non-default judgment by a State or Federal court to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom. A final judgment is a judgment that the private institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the private institution to be in compliance with its stated institutional policies.

(2) Each grantee that is a private institution also must submit to the Secretary a copy of the final, non-default judgment by that State or Federal court to conclude the lawsuit no later than 45 calendar days after such final, non-default judgment is entered.

(d) As a material condition of the Department's grant, each grantee that is a public institution shall not deny to any student organization whose stated mission is religious in nature and that is at the public institution any right, benefit, or privilege that is otherwise afforded to other student organizations at the public institution (including but not limited to full access to the facilities of the public institution, distribution of student fee funds, and official recognition of the student organization by the public institution) because of the religious student organization's beliefs, practices, policies, speech, membership standards, or leadership standards, which are informed by sincerely held religious beliefs.

(e) A grantee that is a covered entity as defined in 34 CFR 108.3 shall comply with the nondiscrimination requirements of the Boy Scouts of America Equal Access Act, 20 U.S.C. 7905, 34 CFR part 108.

(Authority: 20 U.S.C. 1221e-3 and 3474)

*[85 FR 59978, Sept. 23, 2020]*

PROJECT STAFF



PLAINTIFF'S
EXHIBIT
$p$

*Public Law No. 235, 70th Congress (S. 2310)*

*Act of April 3, 1928, ch. 312, 45 Stat.402*

*An Act Supplementary to, and amendatory of, the incorporation of the Catholic University of America, organized under and by virtue of a certificate of incorporation pursuant to class 1, chapter 18, of the Revised Statutes of the United States relating to the District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the incorporation of the Catholic University of America under chapter 18, Revised Statutes of the United States relating to the District of Columbia, be, and the same is hereby, approved and confirmed.*

*Section 2. That in addition to the rights, duties, and obligations enjoyed and imposed by chapter 18 of the Revised Statutes of the District of Columbia the said university may enter into affiliated agreements with any institutions of learning within or outside of the District of Columbia, for the purpose of giving to students of such institutions the educational facilities of said university, upon such terms as are mutually agreed upon by the said university and the affiliated institutions.*

*Section 3. That said university shall have, and is hereby given, the power to increase the number of its trustees from time to time by a two-thirds vote of the whole number of the trustees at the time such vote is taken to a number not exceeding fifty.*

*In case of the increase of the number of trustees a certificate stating the number of the board and the time when it shall go into effect, and that the action so taken was by a two-thirds vote as required by this Act, shall be filed with the Recorder of Deeds of the District of Columbia.*

*Section 4. The said board of trustees shall have, and are hereby given, full power and authority, by a vote of two -thirds of its members, to adopt and change by-laws for the conduct of the business and educational work of said university, to fix the time of meetings, regular and special, and the form of notice to be given; they may appoint an executive committee, composed of trustees, designate the number and chairman thereof, with such powers and authority as are usually exercised by an executive committee, and which shall be conferred by the board subject always to. the control of the board of trustees; they may create and establish schools and departments of learning to be connected with and become a part of said university, and establish such scholastic boards and officers as may be required for academic operation and direction in education; they may receive, invest, and administer endowments and gifts of money and property absolute or subject to payments by way of annuities during the life of the donor, for the maintenance of educational work by said university and by any department or chair thereof, now established or which may hereafter be created or established by said university, and they shall have all of the powers and authority heretofore granted to or invested in the trustees of said university by chapter 18 of the Revised Statutes of the United States relating to the District of Columbia.*

*Section 5. That nothing in this Act contained shall be so construed as to prevent Congress from altering, amending, or repealing the same.*

41

Safety and Security > Demonstrations Policy

# Demonstrations Policy


PLAINTIFF'S EXHIBIT

| | |
|---|---|
| **Approved by:** | President |
| **History:** | Issued     -- March 22, 2017 |
| | Revised     -- |
| | Last Reviewed -- July 24, 2019 |
| **Related Policies:** | Code of Conduct for Staff and Faculty; Code of Student Conduct; Political Activities Policy; Posting Policy; Presentations Policy |
| **Additional References:** | |
| **Responsible Official:** | Associate Vice President for Emergency Management and Public Safety tel. (202) 319-5111 |

## I. Policy Statement

The Catholic University of America values and defends the right of free speech and the freedom of members of the University community to express themselves on University property, provided that such expression does not violate the law or applicable University policies.



Members of the University community must remember that the University is private property. Accordingly, the University reserves the right to limit the time, place and manner of Demonstrations that occur on its private property.

Responsibility for the speech or conduct is assumed by the individual, and the exercise of these rights must not deny the same rights to any other individual or violate the limitations as set forth in this policy.

## II. Definitions

**A. Demonstration** means a public meeting, gathering or activity to express views, disagreement, or support regarding a given subject. Forms of Demonstrations include, but are not limited to marches, parades, protests, picketing, or sit-ins.

# III. Policy Requirements

## A. Notice to the University

To promote the health and safety of the University community and maintain normal University operations, Demonstrations should be scheduled in advance with the Department of Public Safety (DPS). Organizers of Demonstrations are strongly encouraged to provide the following information to DPS (tel. 202 319-5111) at least 3 days in advance of the planned activity:

1. Brief description of the Demonstration

2. Date

3. Location

4. Beginning and ending times

5. Name of sponsoring group

6. Point of contact (name, e-mail and telephone number)

## B. Conduct

Demonstrations shall not be discouraged on University property so long as organizers, speakers or participants do not use force or the threat of force or other means of intimidation, so long as the orderly functions of the University are not obstructed, and so long as the limitations set forth in this policy are respected. Specifically, no action may endanger the safety or security of the University community, infringe upon the rights of other members of the community, obstruct access to University facilities or spaces, damage property, disrupt normal University operations, or otherwise violate applicable laws or University policies.

Unless specifically authorized by the University, persons who are not members of the University community (students, staff or faculty) are not permitted to demonstrate on University property.

## C. Signs, Placards and Literature

The use of signs, banners or placards is permissible so long as such use does not endanger the health or safety of others or otherwise violate the limitations set forth in this policy. Such materials may not be affixed to University property, such as buildings, trees, benches or lampposts.

Literature and other printed materials may be distributed, but may not be forced upon others, scattered on the ground, or left unattended on University property such as tables, benches or sidewalks. Posting of any materials must comply with the University's Posting Policy.

## D. Directives of University Officials

The directives of University officials must be followed at all times.

The University reserves the right to bar from University property any individual who is not affiliated with the University who is determined to be posing a health or safety risk, violating the law, or violating this or other applicable University policies.

Violations of this policy should be reported to the Department of Public Safety at tel. (202) 319-5111.

**PLAINTIFF'S
EXHIBIT
R**

After deliberations in academic years 1977-1978 and 1978-1979 and in consultation with the Academic Senate produced a revision of the 1968 "Goals of the University," and this document was submitted to the Board of Trustees on September 6, 1979. With further revision by a joint committee of the two bodies, the text was approved by the Academic Senate on May 7, 1980, and by the Board of Trustees on June 21 of that year.

Finally, in the wake of a University Self-Study in 1988-1989 and a visit on behalf of the Middle States Commission on Higher Education in 1990, the possibility of combining the two statements, with any necessary revisions, into a single mission statement was studied. On November 21, 1991, the Academic Senate voted to incorporate the two documents, of 1968 and 1980, into a single mission statement but without change in either document.

At its meeting on December 12, 2006, the Board of Trustees of The Catholic University of America approved the following revised "**Mission Statement**" for the university:

> *As the national university of the Catholic Church in the United States, founded and sponsored by the bishops of the country with the approval of the Holy See, The Catholic University of America is committed to being a comprehensive Catholic and American institution of higher learning, faithful to the teachings of Jesus Christ as handed on by the Church. Dedicated to advancing the dialogue between faith and reason, The Catholic University of America seeks to discover and impart the truth through excellence in teaching and research, all in service to the Church, the nation and the world.*

This revised statement replaces the two documents --- "Statement of Aims" and "Statement of Goals" --- that were combined as a mission statement and approved by the Board of Trustees in 1980. While those two documents have been replaced by a single, concise, updated statement comparable to those used by other institutions of higher learning, they still contain elements important to understanding the historic mission of The Catholic University of America. The academic senate has requested that they continue to be documents of reference for the university and the president has approved that request. They are presented here in their approved formulation:

### AIMS OF THE UNIVERSITY

The Catholic University of America is a community of scholars, both faculty and students, set apart to discover, preserve and impart the truth in all its forms, with particular reference to the needs and opportunities of the nation. As a university, it is essentially a free and autonomous center of study and an agency serving the needs of human society. It welcomes the collaboration of all scholars of good will who, through the process of study and reflection, contribute to these aims in an atmosphere of academic competence where freedom is fostered and where the only constraint upon truth is truth itself.

As a Catholic university, it desires to cultivate and impart an understanding of the Christian faith within the context of all forms of human inquiry and values. It seeks to ensure, in an institutional manner, the proper intellectual and academic witness to Christian inspiration in individuals and in the community, and to provide a place for continuing reflection, in the light of Christian faith, upon the growing treasure of human knowledge.

11



3624 Market Street
Suite 2 West
Philadelphia, PA 19104
www.msche.org
Follow us: @mscheorg



PLAINTIFF'S
EXHIBIT
5

# STANDARDS

## Standards for Accreditation and Requirements of Affiliation



An institution of higher education is a community dedicated to students, to the pursuit and dissemination of knowledge, to the study and clarification of values, and to the advancement of the society it serves. The Middle States Commission on Higher Education (MSCHE), through accreditation, mandates that its member institutions meet rigorous and comprehensive standards, which are addressed in the context of the mission of each institution and within the culture of ethical practices and institutional integrity expected of accredited institutions. In meeting the quality standards of MSCHE accreditation, institutions earn accredited status, and this permits them to state with confidence: "Our students are well-served; society is well-served."

Download the ***Standards for Accreditation and Requirements of Affiliation***.

### A Guided Review to the Standards for Accreditation and Requirements of Affiliation

The below videos provide context for the Standards for Accreditation and Requirements of Affiliation. Please note that there have been updates to content contained within these videos, and they will be updated and replaced in Spring/Summer 2021.

**Understanding the Standards and Requirement of Affiliation** | **Standard I** | **Standard II** | **Standard III** | **Standard IV** | **Standard V** | **Standard VI** | **Standard VII**

Any questions about the content of these videos should be directed to an institution's MSCHE Vice President Staff Liaison, or to **info@msche.org**.

## Introduction

Middle States accreditation is an expression of confidence in an institution's mission and goals, its performance, and its resources. An institution is accredited when the educational community has verified that its goals are achieved through self-regulation and peer review. The extent to which each educational institution accepts and fulfills the responsibilities inherent in the process of accreditation is a measure of its commitment to striving for and achieving excellence in its endeavors.

The Middle States Commission on Higher Education Accreditation Standards and Requirements of Affiliation are comprised of the enclosed seven standards and 15 requirements which serve as an ongoing guide for those institutions considering application for membership, those accepted as candidate institutions, and those accredited institutions engaged in self-review and peer evaluation. Accredited institutions are expected to demonstrate compliance with these standards and requirements, to conduct their activities in a manner consistent with the standards and requirements, and to engage in ongoing processes of self-review and improvement.

Four principles guided the development of these standards: first, the mission-centric standards acknowledge the diversity of institutions; second, the focus of the standards is on the student learning experience; third, the standards emphasize institutional assessment and assessment of student learning; fourth, the standards support innovation as an essential part of continuous institutional improvement.

These standards affirm that the individual mission and goals of each institution remain the context within which these accreditation standards are applied. They emphasize functions rather than specific structures, recognizing that there are many different models for educational and operational excellence.

Each standard is expressed in one or two sentences and is then followed by criteria. The criteria specify characteristics or qualities that encompass the standard. Institutions and evaluators will use these criteria together with the standards, within the context of institutional mission, to demonstrate or determine compliance. Institutions and evaluators should not use the criteria as a checklist.

## Requirements of Affiliation

Case 1:22-cv-00031-PTG-JFA   Document 1-3   Filed 01/13/22   Page 67 of 110 PageID# 67

To be eligible for, to achieve, and to maintain Middle States Commission on Higher Education accreditation, an institution must demonstrate that it fully meets the following Requirements of Affiliation. Compliance is expected to be continuous and will be validated periodically, typically at the time of institutional self-study and during any other evaluation of the institution's compliance. Once eligibility is established, an institution then must demonstrate on an ongoing basis that it meets the Standards for Accreditation.

1. The institution is authorized or licensed to operate as a postsecondary educational institution and to award postsecondary degrees; it provides written documentation demonstrating both. Authorization or licensure is from an appropriate governmental organization or agency within the Middle States region (Delaware, the District of Columbia, Maryland, New Jersey, New York, Pennsylvania, Puerto Rico, and the U.S. Virgin Islands), as well as by other agencies as required by each of the jurisdictions, regions, or countries in which the institution operates.
Institutions that offer only postsecondary certificates, diplomas, or licenses are not eligible for accreditation by the Middle States Commission on Higher Education.

2. The institution is operational, with students actively enrolled in its degree programs.

3. For institutions pursuing Candidacy or Initial Accreditation, the institution will graduate at least one class before the evaluation team visit for initial accreditation takes place, unless the institution can demonstrate to the satisfaction of the Commission that the lack of graduates does not compromise its ability to demonstrate that students have achieved appropriate learning outcomes.

4. The institution's representatives communicate with the Commission in English, both orally and in writing.

5. The institution complies with all applicable government (usually Federal and state) laws and regulations.

6. The institution complies with applicable Commission, interregional, and inter-institutional policies. These policies can be viewed on the Commission website, **www.msche.org**.

7. The institution has a mission statement and related goals, approved by its governing board, that defines its purposes within the context of higher education.

8. The institution systematically evaluates its educational and other programs and makes public how well and in what ways it is accomplishing its purposes.

9. The institution's student learning programs and opportunities are characterized by rigor, coherence, and appropriate assessment of student achievement throughout the

educational offerings, regardless of certificate or degree level or delivery and instructional modality.

10. Institutional planning integrates goals for academic and institutional effectiveness and improvement, student achievement of educational goals, student learning, and the results of academic and institutional assessments.

11. The institution has documented financial resources, funding base, and plans for financial development, including those from any related entities (including without limitation systems, religious sponsorship, and corporate ownership) adequate to support its educational purposes and programs and to ensure financial stability. The institution demonstrates a record of responsible fiscal management, has a prepared budget for the current year, and undergoes an external financial audit on an annual basis.

12. The institution fully discloses its legally constituted governance structure(s) including any related entities (including without limitation systems, religious sponsorship, and corporate ownership). The institution's governing body is responsible for the quality and integrity of the institution and for ensuring that the institution's mission is being accomplished.

13. A majority of the institution's governing body's members have no employment, family, ownership, or other personal financial interest in the institution. The governing body adheres to a conflict of interest policy that assures that those interests are disclosed and that they do not interfere with the impartiality of governing body members or outweigh the greater duty to secure and ensure the academic and fiscal integrity of the institution. The institution's district/system or other chief executive officer shall not serve as the chair of the governing body.

14. The institution and its governing body/bodies make freely available to the Commission accurate, fair, and complete information on all aspects of the institution and its operations. The governing body/bodies ensure that the institution describes itself in comparable and consistent terms to all of its accrediting and regulatory agencies, communicates any changes in accredited status, and agrees to disclose information (including levels of governing body compensation, if any) required by the Commission to carry out its accrediting responsibilities.

15. The institution has a core of faculty (full-time or part-time) and/or other appropriate professionals with sufficient responsibility to the institution to assure the continuity and coherence of the institution's educational programs.

## Standard I - Mission and Goals

The institution's mission defines its purpose within the context of higher education, the students it serves, and what it intends to accomplish. The institution's stated goals are clearly linked to its mission and specify how the institution fulfills its mission.

**Criteria**

An accredited institution possesses and demonstrates the following attributes or activities:

1. clearly defined mission and goals that:

    a. are developed through appropriate collaborative participation by all who facilitate or are otherwise responsible for institutional development and improvement;

    b. address external as well as internal contexts and constituencies;

    c. are approved and supported by the governing body;

    d. guide faculty, administration, staff, and governing structures in making decisions related to planning, resource allocation, program and curricular development, and the definition of institutional and educational outcomes;

    e. include support of scholarly inquiry and creative activity, at levels and of the type appropriate to the institution;

    f. are publicized and widely known by the institution's internal stakeholders;

    g. are periodically evaluated;

2. institutional goals that are realistic, appropriate to higher education, and consistent with mission;

3. goals that focus on student learning and related outcomes and on institutional improvement; are supported by administrative, educational, and student support programs and services; and are consistent with institutional mission; and

4. periodic assessment of mission and goals to ensure they are relevant and achievable.

## Standard II - Ethics and Integrity ⌃

Ethics and integrity are central, indispensable, and defining hallmarks of effective higher education institutions. In all activities, whether internal or external, an institution must be faithful to its mission, honor its contracts and commitments, adhere to its policies, and represent itself truthfully.

## Criteria

An accredited institution possesses and demonstrates the following attributes or activities:

 1. a commitment to academic freedom, intellectual freedom, freedom of expression, and respect for intellectual property rights;

2. a climate that fosters respect among students, faculty, staff, and administration from a range of diverse backgrounds, ideas, and perspectives;

3. a grievance policy that is documented and disseminated to address complaints or grievances raised by students, faculty, or staff. The institution's policies and procedures are fair and impartial, and assure that grievances are addressed promptly, appropriately, and equitably;

4. the avoidance of conflict of interest or the appearance of such conflict in all activities and among all constituents;

5. fair and impartial practices in the hiring, evaluation, promotion, discipline, and separation of employees;

6. honesty and truthfulness in public relations announcements, advertisements, recruiting and admissions materials and practices, as well as in internal communications;

7. as appropriate to its mission, services or programs in place:

a. to promote affordability and accessibility;

b. to enable students to understand funding sources and options, value received for cost, and methods to make informed decisions about incurring debt;

8. compliance with all applicable federal, state, and Commission reporting policies, regulations, and requirements to include reporting regarding:

a. the full disclosure of information on institution-wide assessments, graduation, retention, certification and licensure or licensing board pass rates;

b. the institution's compliance with the Commission's Requirements of Affiliation;

c. substantive changes affecting institutional mission, goals, programs, operations, sites, and other material issues which must be disclosed in a timely and accurate fashion;

d. the institution's compliance with the Commission's policies; and

9. periodic assessment of ethics and integrity as evidenced in institutional policies, processes, practices, and the manner in which these are implemented.

**Standard III - Design and Delivery of the Student Learning Experience**

**Standard IV - Support of the Student Experience**

**Standard V - Educational Effectiveness Assessment**

**Standard VI - Planning, Resources, and Institutional Improvement**

**Standard VII - Governance, Leadership, and Administration**

PLAINTIFF'S
EXHIBIT
tabbies
1

# Law School Icon | A Letter to the Campus Community

November 24, 2021

Dear Members of the University Community,

I am sure that most of you have seen some media coverage relating to the image, hung in our Law School, that depicted Mary holding the body of the dead Christ. Many see the male figure as George Floyd, but our Law School has always seen the figure as Jesus.

The painting was put in place last February in a ceremony outside the law school's Mary Mirror of Justice chapel. The press began covering it this week, leading to criticism on social media and a substantial number of emails and phone calls. Some critics called the image blasphemous because they saw it as deifying or canonizing George Floyd. Some comments that we received were thoughtful and reasonable. Some were offensive and racist. Much of the criticism came from people unconnected to the

University.

As the controversy developed, we responded to the press and to some of the reasonable critics. I am including our statement to the media below. It has been the University's policy, throughout my time as President, not to cancel speakers or prevent speech by members of the community. Last Spring we applied this policy to an appearance by Abby Johnson. Consistent with that policy, we declined suggestions in this case that we take the image down. Last night, however, the picture was stolen from its place outside the chapel. Our Department of Public Safety discovered the theft shortly after it occurred and continues to investigate.

We have replaced the picture with an identical, though smaller, copy that hung in our Campus Ministry office. Our "no cancellation" policy does not apply only to the administration. We hope to continue to build on campus a culture that engages in thoughtful dialogue and debate, not the sort of bully tactics epitomized by this theft.

Sincerely,

John Garvey, President

PLAINTIFF'S
EXHIBIT
ს

# Section A.  Appointment to a Faculty

II-A-1   **Faculty membership**

.001   Membership in the Faculty of a School or Department is held by persons with valid appointments to one of the four generally recognized Faculty ranks, namely,  Ordinary Professor, Associate Professor, Assistant Professor, or Instructor.

.002   Distinguished Professors not attached to a School or Department may be appointed  to Faculty membership according to norms applicable for the appointment of Ordinary Professors (*D-3.145*), provided each such appointment is specifically approved by the Academic Senate.

.002a   The Chancellor of the University by virtue of office shall have the title, The  Cardinal William Baum University Professor, and, unless otherwise approved by the appropriate voting bodies according to the norms applicable for faculty  appointments and the awarding of continuous tenure, without membership in a specific School or Department and without tenure.

.002b   The President of the University by virtue of office shall have the title, The Bishop  John J. Keane University Professor, and, unless otherwise approved by the  appropriate voting bodies according to the norms applicable for faculty  appointments and the awarding of continuous tenure, without membership in a  specific School or Department and without tenure.

.003   For purposes of procedures outlined below for appointments and promotions, Ordinary Professors and Associate Professors will be referred to as Senior Faculty;  Assistant Professors and Instructors as Junior Faculty.

.004   Appointments to regular membership in a Faculty are of three kinds: appointments   with continuous tenure, term appointments probationary for tenure, and contract appointments without tenure. Contract appointments without tenure are  distinguished by a prefix or suffix to the professorial title as appropriate to the academic field  and function (e.g. "Clinical," "Teaching," or "of Practice").

.005   Others may be associated with a Faculty (a) as Professors Emeriti; (b) in Research, Visiting, or Adjunct capacities, as designated by the prefix to the professorial title; (c) as Lecturers; (d) as Research Associates, Clinical Associates, or Visiting  Scholars; or (e) as Teaching or Research Assistants. In each case, an appointee has  such privileges as the Department or School may grant, except the privileges of  voting and serving in an administrative capacity within the Faculty (i.e., as dean or chair, or as associate dean or chair), which are enjoyed only by regular members of a  Faculty as defined in the paragraphs above. Association with a Faculty, regardless of  length of service or type of

**PLAINTIFF'S EXHIBIT**

✓

relating to undergraduate study, parallel to the responsibilities of the Graduate Board (above). Undergraduate Board reports its recommendations to the Academic Senate. The Vice Provost Undergraduate Studies is the Chair of the Undergraduate Board ex officio. Members are appointed by the Academic Senate upon the joint recommendation of the Chair of the Undergraduate Board and the Dean of the School from which the appointment is made. Each School is represented on the Undergraduate Board by a number of members equal to the number of its faculty delegates in the Academic Senate. Deans are eligible for membership on the Board. The terms of office coincide with those of the delegates to the Academic Senate.

### Section 5: The Faculties                                    *Revised December 2016*

As a corporate entity, a Faculty is a body of teachers empowered to act in such matters as the appointment and promotion of its members, the admission of students, the prescription of curriculum requirements, and the recommendation of candidates for degrees. The term, however, is often used unofficially to denote the body of teachers in the entire institution or in a component part of a Faculty, such as a Department.

Only those who hold appointments in faculty rank (i.e., the rank of Instructor or higher rank) are members entitled to vote on matters before a Faculty. Requirements and procedures for appointments as members and associates of a Faculty are explained in Part II of this *Faculty Handbook*. It will be noted that privileges of participation in meetings without the right to vote may be extended to associates and to students and that in certain matters, especially in appointments and promotions and in consultations prior to the appointment of a Dean or Chair of a Department, separate votes may be required of tenured members of a Faculty or of those higher in rank than a candidate for appointment or promotion.

There are at present twelve Schools of the University and a Metropolitan College. In order of establishment, the Schools are Theology and Religious Studies (1889), Philosophy (1895), Columbus School of Law (1899), Arts and Sciences (1906), Canon Law (originally established in 1923, re-established in 2002), Engineering (1930), the National Catholic School of Social Service (1934), Nursing (1935), the Benjamin T. Rome School of Music (1965), Architecture and Planning (1992), the Metropolitan School of Professional Studies (1979), and the Tim and Steph School of Business and Economics (2013). Each School is administered by a Dean who reports to the Provost and the President.

Two Schools are subdivided into departments. Each Department is administered by a Chair who is responsible to the Dean and Faculty of the Department. The School of Arts and Sciences has Departments of Anthropology, Art, Biology, Chemistry, Drama, Education, English Language and Literature, Greek and Latin, History, Mathematics, Media and Communication Studies, Modern Languages and Literatures, Physics, Politics, Psychology, Semitic and Egyptian Languages and Literatures, and Sociology, as well as Programs in Biochemistry, Comparative Literature, and Irish Studies. The Academic Council of the School, composed of the Chairs of the Departments with the Dean presiding, is the standing committee of the Faculty with primary responsibility for the administration of the School.

The School of Engineering has Departments of Biomedical Engineering, Civil Engineering, Electrical Engineering and Computer Science, and Mechanical Engineering, as well as a Program in Engineering Management. The Chairs of the Departments constitute the Executive Committee of the School, over which the Dean presides. The University also offers interdisciplinary programs in Early Christian Studies and in Medieval and Byzantine Studies.

9



ways:

    a.  Those whose primary responsibility is to teach full-time with limited additional duties determined by the Dean or Department Chair; or

    b.  Those whose primary responsibility is to teach with additional duties as determined by the Dean or Department Chair; or

    c.  Those whose primary responsibility is to teach with additional commitments to scholarship or practice as required by the profession and determined by the Dean or Department Chair.

Delineation of said manner of service may be noted in the appointee's contract

**.032**   The initial appointment shall be for one or two years. Reappointments through the sixth year shall generally be for two years. Exceptions to this shall be made in consultation with the Provost.  Renewal for successive terms follow the same procedures as apply to Faculty with appointments probationary for tenure.  After six years of continuous service, subsequent  reappointments shall be for periods between three and five years, but without continuous  tenure. If the appointment is not renewed, written notice of non-renewal shall be  given as provided in *B-3.025-030*.

**.033**   Contract appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or (in the schools of Architecture, Business and Economics, Law, Music, Nursing, Social Service, and Theology and Religious Studies only) Ordinary Professor. A Faculty member with a Contract appointment is  accorded parity of benefits, perquisites, governance, and  voting rights with other Faculty of comparable rank with the following exceptions:

    a.  Sabbaticals shall normally not be offered but may be negotiated on a case-by-case basis with the Dean and the approval of the Provost

    b.  Contract faculty do not have voting rights for tenure decisions or reappointment.

Contract appointments with a doctoral degree may serve on doctoral boards in accordance with individual school policies.

**.034**   A Faculty member with a Contract appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for  recruitment and appointment. In such a case, time served in the Contract position  beyond the first year may be counted toward the maximum allowable period of probationary service (*B-3.018-022*).

Any time served in the Contract position beyond the first year that would be counted



PLAINTIFF'S
EXHIBIT

X

42

through the Senate to the President for final action. In the case of a Faculty member with continuous tenure, final action by the Board of Trustees is required.

## II-G-5    **Abolition of Position**

**.189**    Termination of an appointment with continuous tenure, or of a probationary appointment before the end of its specified term, may follow elimination of a position because of discontinuance of a Program, Department, or School (*see II-B-2.17; II-E-1.167; II-H-8*). If an appointment is terminated for this reason, the University will make every reasonable effort to transfer the affected individual to another suitable position. If the new position is academic, the transfer and the terms of the appointment are subject to the approval of the cognizant Department and/or School according to normal procedure (*Section C. Procedures for Appointments and Promotions*). Failing such transfer, notice or severance salary in lieu of notice will be given according to the schedule outlined in *B-3. 025-030* in the case of a probationary appointee, or for one year in the case of a tenured appointee. Should the position be reinstated within a period of two years, the previous incumbent, if tenured at the time of termination, will be offered reappointment. The Faculty member must accept reappointment within thirty days from the date of offer.

**.190**    The decision to terminate the services of a member of a Faculty because of abolition of the position held may be appealed as provided in *IIE-1.167*.

## II-G-6    **Obligations of Clerics and Members of Religious Congregations and Communities**

**.191**    In issuing an appointment to a cleric or a professed religious of the Roman Catholic Church, the University recognizes not only the professional qualifications of the appointee but also the public effects of the appointee's status as an ordained cleric or professed religious, which include primary obligations to ecclesiastical superiors and observance of the provisions of Canon Law. If a Roman Catholic cleric loses clerical status under any canonical condition that requires his resignation from the University, or if such resignation is required as the result of an ecclesiastical process determining that he no longer may function as a Roman Catholic cleric, or if the cleric or a professed religious is recalled by his or her legitimate ecclesiastical superiors even without cause, the University's contractual obligations shall become void.

## II-G-7    Dismissal for Cause

**.192**    Authority. Only the Board of Trustees may dismiss for cause a Faculty member with tenure or whose term appointment has not expired.

**.193**    Grounds for Dismissal. The University may, following due process specified below, dismiss a Faculty member for demonstrable incompetence or dishonesty in teaching or

43

research, for manifest neglect of duty, or for other adequate cause.

**.194**   Informal Resolution.  When there is reason to believe that there are grounds for the dismissal of a member of a Faculty who has tenure or whose term appointment has not expired, the President or his or her representative will advise the Faculty member of the alleged grounds and attempt through personal consultation to resolve the matter.

**.195**   Commencement and Notice of Dismissal Proceedings.  If the matter is not resolved informally, the President may commence formal dismissal proceedings by providing the Faculty member with a written statement of the grounds for dismissal. Such a statement must explain with particularity the factual bases of the alleged grounds for dismissal. The written statement of grounds for dismissal must also state that the Faculty member has the right to be heard by an Ad Hoc Hearing Committee of the Academic Senate. The President shall at the same time notify in writing the officers of the Academic Senate that a proceeding for dismissal has been instituted.

**.196**   Ad Hoc Committee of the Academic Senate. When the Academic Senate receives notice that a proceeding for dismissal has been instituted, it shall constitute an Ad Hoc Hearing Committee consisting of five Tenured Senior Faculty members. One of the committee members will be designated by the Senate to serve as Chair. The Senate will also designate, in ranked order, a number of alternates. Any appointee who cannot render an unbiased judgment will so notify the Chairperson of the Academic Senate and be relieved of service. The President and the Faculty member will each have the right to strike, without stating cause, two members proposed for the Committee.

**.197**   Faculty Member's Response. When the Ad Hoc Hearing Committee has been constituted, the Chairperson of that Committee will (1) notify the Faculty member and the President that a Committee has been formed; (2) identify its members; (3) and instruct the Faculty member to submit to this committee and the President a written response to the President's stated Grounds for Dismissal within thirty days of the notice. (4) advise the Faculty member that he or she may be assisted or represented by counsel and/or by an academic advisor, at the Faculty member's choice and expense, throughout the process, and (5) request the President, if he or she chooses, to designate a representative to participate in the proceedings.

**.198**   Notice of Hearing. The Committee shall notify the Faculty member and the President, by certified mail, not less than thirty days in advance of a scheduled hearing. If the Faculty member waives a hearing, the Committee will reach its conclusion based on the documentary evidence presented by the President and the Faculty member.

**.199**   Conduct of Hearing. The Committee, in consultation with the parties, shall decide whether the hearing will be public or private. At the request of either party, or the Committee, a representative of a responsible educational association may attend the proceedings as an observer.

44

.200    Record of Hearing. A verbatim record of the hearing shall be taken, and, if requested, a printed copy shall be made available to the Faculty member without cost. The Faculty member and the President's representative will have the right to confront and cross-examine all witnesses. If a witness cannot or will not appear, but the Committee determines that the interests of justice so require, a written statement by that witness may be admitted in evidence. In such a case the Committee will identify the witness, disclose the statement, and if possible provide for interrogatories. In a hearing on charges of incompetence the testimony shall include that of qualified Faculty members from this or other institutions of higher education.

.201    Rules of Evidence. The Hearing Committee is not bound by strict legal rules of evidence, but may admit any evidence which it judges to be relevant, reliable, and probative on the issues involved.

.202    Burden of Proof. The burden of proving that there is adequate cause for dismissal rests with the President, and shall be satisfied only by clear and convincing evidence in the record considered as a whole.

.203    Access to Evidence. The Faculty member will be afforded an opportunity to obtain necessary witnesses and documentary or other evidence, and the University will, insofar as is reasonable, secure the cooperation of such witnesses and make available necessary documents and other evidence within its control. The Hearing Committee shall grant adjournments requested by either party to investigate evidence as to which there is a valid claim of surprise.

.204    Public Announcements. Private hearings are considered confidential. In such a private hearing, except for announcements covering the time and location of the hearing and similar matters, public statements and publicity about the case by either the Faculty member or administrative officers of the University shall be avoided until the proceedings have been completed, including consideration by the Board of Trustees.

.205    Committee's Determination. After the hearing, or after reviewing all documentary evidence presented in lieu of hearing, the Committee will render a decision by majority vote.

.206    If the Committee concludes that the President has established grounds for dismissal, it may further determine that some action other than dismissal is warranted. The Committee shall prepare written findings of facts identifying the factual bases for its conclusion. The evidentiary record must support the findings. The Faculty member and the President shall be notified of the decision in writing and shall be provided with a copy of the findings of facts and the conclusion. On request, the President and the Faculty member shall be given a copy of the hearing record.

45

**.207** If the Committee concludes that adequate cause for dismissal has not been established, and the President rejects the Committee's conclusion, the President may so advise the Faculty member and the Committee in writing of the basis of the rejection and ask the Committee to reconsider the matter. In responding to the President's request the Committee will consider any response by the Faculty member. If the Committee reaffirms its conclusion that adequate cause for dismissal has not been established, it will so report to the President and the Faculty member.

**.208** If the Committee concludes that adequate cause for dismissal has not been established, the President may ask the Committee to reconsider the matter. The request for reconsideration shall be in writing and shall state the basis for the request. A copy of the request shall be sent to the Faculty member who shall be given an opportunity to respond. In making its determination, the Committee shall give consideration to the response of the Faculty member and a copy of its final determination shall be sent to the President and to the Faculty member.

**.209** Board of Trustees. If dismissal or other penalties are recommended, or, contrary to the Committee's conclusion the President chooses to pursue dismissal proceedings, the President will transmit the record of the case to the Board of Trustees. The Board's review will be based on the record of the Hearing Committee, and it will provide opportunity for argument, oral or written, by the parties. The decision of the Hearing Committee will either be sustained, or the proceeding returned to the Committee with specific objections to the Committee's findings or conclusions. The Hearing Committee will then reconsider, taking into account the stated objections of the Board and receiving new evidence if necessary. The Board of Trustees will make a final decision only after study of the Committee's reconsideration.

**.210** Status of Faculty Member During Proceedings. Until a final decision regarding dismissal has been reached, the Faculty member will be suspended, or assigned to other duties in lieu of suspension, only if continuance in the normal course of Faculty duties threatens immediate harm to oneself or others. Before suspending a Faculty member, the President or a representative shall consult with the Committee on Academic Freedom and Tenure of the Academic Senate concerning the reason for the suspension. The Faculty member's compensation shall continue during the period of suspension.

**.211** Dismissal. If dismissed, the Faculty member shall receive notice of termination and compensation for the notice period required for non-renewal as provided in *B-3.023-028* or, if the Faculty member was tenured, for one year. This provision for notice and salary does not apply if the conduct that justified dismissal involved moral turpitude.

**BUSINESS LEGAL SERVICES, INC.**

**LAW FIRM**

ARTHUR LANDER
ADMITTED TO PRACTICE
IN VIRGINIA AND THE
DISTRICT OF COLUMBIA

300 N. WASHINGTON ST. #104
ALEXANDRIA, VIRGINIA 22314
**PHONE: (703) 486-0700**
**FAX: (703) 527-7207**

August 14, 2021



Mr. Aaron Dominquez, Ph.D.
Office of the Provost
Catholic University
620 Michigan Avenue N.E.
Washington, DC   20064

Dear Dr. Dominquez,

On September 18, 2019, John Tieso was appointed as Adjunct Assistant Professor through the period ending August 19, 2020.

On May 18, 2020, Mr. Seegers, the Associate Dean of the Busch School of Business informed Mr. Tieso that Dr. Abela, the Dean, had postponed his class, suspended his teaching pending completion of an investigation.

My Tieso was never given a hearing. nor informed of the results. nor specifics of any investigation.

The letter of September 18, 2019, states the appointment is made subject to and incorporates the Faculty Handbook as part of his contract.

The CUA Faculty Handbook Part I at page 15 outlines the norms and procedures relating to academic freedom.

The CUA Faculty Handbook Part II at page 42 outlines Dismissal for Cause at paragraph 193.  Since this matter was not resolved informally, the President was to commence a formal dismissal proceeding.

We are prepared to move forward with the formal dismissal proceeding per the contract.

Sincerely,

Arthur Lander, Esq.



PLAINTIFF'S EXHIBIT 2

5

# Section B. Categories and Terms of Appointment

**II-B-1**   **Categories of Appointment**

**.016**   Regular membership in a Faculty includes appointments with continuous tenure *(B-2)*, appointments probationary for tenure *(B-3)*, and contract appointments without tenure *(B-4)*. All other appointments to association with a Faculty, as described in *(B-5-7)*, regardless of length of term or extent of duties, full-time or part-time, do not confer regular membership in a Faculty. Unless specifically provided for in this Handbook and arranged for by prior mutual agreement, these appointments do not count as time in service toward acquisition of tenure.

**II-B-2**   **Tenured Appointments**

**.017**   A tenured Faculty appointment is a permanent appointment to a School of this University, or, if the School is departmentalized, to a particular Academic Department of the School. In the case of a joint appointment, tenure applies to the position as mutually agreed upon by the academic units involved. A Distinguished Professor (*cf. A-1.002*) with tenure holds an appointment in the University at large. In the event that the University is reorganized through mergers or other restructuring of academic units, the tenured appointment of an affected Faculty member continues in the successor academic unit. If the reorganization results in the abolition of a particular academic unit, tenured faculty appointments may be terminated according to provisions in *H-8*.

**II-B-3**   **Appointments Probationary for Tenure**

**.018**   An appointment probationary for tenure is an appointment to a Faculty for a term of one or two years, and is subject to renewal up to a maximum of seven years of service, whether continuous or, if not continuous, in the aggregate, at this University. In determining the maximum duration of probationary status the following shall apply:

**.019**   (a) Appointments *ad interim* are included;

**.020**   (b) Appointments as Visiting Faculty are included beyond the first year;

**.021**   (c) Time spent on Leave of Absence and parental leave is excluded;

**.022**   (d) Maximum duration is extended by one year for each new child.

**.023**   (e) In extraordinary cases, pursuant to a written agreement signed by the appointee and the Provost, the period during which the appointee provides at least half-time service in non-academic duties may be excluded; for example, Deans, or Assistant or Associate Deans, may qualify under this rule, but in no case may such extension run for more than

PLAINTIFF'S
EXHIBIT
*A A*

6

four years.

**.024** (f) Part time service shall be accounted for tenure extension as defined in the Policy of the University. See also Part III B-8.

**.025** Probationary appointments are for the term stated in the official letter of appointment and, subject to the requirements of this article, end on the date specified unless a new letter of appointment is issued prior to such terminal date. Written notice that a probationary appointment will not be renewed or that the term of an existing probationary appointment is to be amended will be given:

**.026** (a) By March 1 of the first academic year of service if the appointment expires at the end of that academic year, or at least three months in advance of its expiration if this occurs at some other time during the year;

**.027** (b) By December 15 of the second academic year of service if the appointment expires at the end of the academic year, or at least six months in advance of the expiration of the appointment if this occurs at some other time during the year;

**.028** (c) At least twelve months before the expiration of an appointment, if this occurs after two or more years of service at the University.

**.029** The notice of non-renewal shall be in standard form and need not state reasons for the decision, except as provided in *C-12.*

**.030** If the University fails to provide timely notice under this article, the appointment is extended under existing terms and conditions for a period equivalent to an additional academic year. An extension under this provision, even if the time of service in probationary status then exceeds seven years, does not automatically entitle the Faculty member to an appointment with continuous tenure.

## II-B-4    **Contract Appointments Without Tenure**

**.031** On the recommendation of the cognizant Faculty and with the approval of the Provost, and based on a written description of the teaching and related duties, a Faculty position involving full-time teaching in a clinical or professional skills program or to support particular instructional needs in other programs may be designated as a non-tenure track ("Contract") position.  Titles associated with contract positions shall be appropriately distinguishing, such as "Assistant Teaching Professor" or "Assistant Professor of Practice," as determined by the Provost in consultation with the relevant/cognizant Dean or Chair. The Academic Senate may set specific limits on the number of contract appointments authorized in a particular academic unit.

Professors of Practice serve the teaching mission of the University in at least one of three

ways:

    a. Those whose primary responsibility is to teach full-time with limited additional duties determined by the Dean or Department Chair; or

    b. Those whose primary responsibility is to teach with additional duties as determined by the Dean or Department Chair; or

    c. Those whose primary responsibility is to teach with additional commitments to scholarship or practice as required by the profession and determined by the Dean or Department Chair.

Delineation of said manner of service may be noted in the appointee's contract

**.032** The initial appointment shall be for one or two years. Reappointments through the sixth year shall generally be for two years. Exceptions to this shall be made in consultation with the Provost. Renewal for successive terms follow the same procedures as apply to Faculty with appointments probationary for tenure. After six years of continuous service, subsequent reappointments shall be for periods between three and five years, but without continuous tenure. If the appointment is not renewed, written notice of non-renewal shall be given as provided in *B-3.025-030*.

**.033** Contract appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or (in the schools of Architecture, Business and Economics, Law, Music, Nursing, Social Service, and Theology and Religious Studies only) Ordinary Professor. A Faculty member with a Contract appointment is accorded parity of benefits, perquisites, governance, and voting rights with other Faculty of comparable rank with the following exceptions:

    a. Sabbaticals shall normally not be offered but may be negotiated on a case-by-case basis with the Dean and the approval of the Provost

    b. Contract faculty do not have voting rights for tenure decisions or reappointment.

Contract appointments with a doctoral degree may serve on doctoral boards in accordance with individual school policies.

**.034** A Faculty member with a Contract appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for recruitment and appointment. In such a case, time served in the Contract position beyond the first year may be counted toward the maximum allowable period of probationary service *(B-3.018-022)*.

Any time served in the Contract position beyond the first year that would be counted

PLAINTIFF'S
EXHIBIT
β β

17

Senate's action is forwarded to the Provost for the approval by the President.

## II-C-7   Sequence of Reviews—Reappointment to Probationary or Contract Terms

**.090**   Reviews of Faculty for the purpose of recommending reappointment without continuous tenure are conducted at the level of the School. If the School is departmentalized, a review by the Department is also required.

**.091**   Reviews for reappointment shall be scheduled so as to meet the requirements for notice of non-renewal, as set forth above (*B-4. 025-030*). Accordingly, such reviews shall be conducted and concluded during the year prior to the last year of appointment then in force.  The schedule for reviews for reappointments is as follows:

a.   After an initial appointment to a term of one year the review for the first reappointment is conducted as soon as possible after the first semester of service.

b.   After an initial appointment to a term of two years, the review for the first reappointment is conducted during the third semester of full-time service.

c.   After the second reappointment of Faculty on a tenure-track or contract appointment, the  review is conducted during the seventh semester of full-time service if all of the Faculty member's prior appointments had been for the usual two years. If the Faculty member has not had a sequence of two year appointments, the review for the second reappointment and subsequent reappointments is conducted during the year prior to the last year of the appointment then in force.

**.092**   In a non-departmentalized School, the review for reappointment is initiated by the Dean who submits the case to the CAP of the School. The results of the deliberation and the vote of the CAP are then presented to the Tenured Senior Faculty of the School. This vote constitutes the final recommendation of the School on the reappointment.

**.093**   In a departmentalized School, the review for reappointment is initiated by the Chair of the cognizant Department who submits the case to the Tenured Senior Faculty of the Department. The results of the deliberation and the vote of the Department are then presented to the CAP of the School. The vote of the CAP constitutes the final recommendation of the School on the reappointment.

**.094**   The recommendation of the School is transmitted to the Provost. If the recommendation is positive, the Provost forwards it to the President for approval. If the recommendation is negative, the Provost notifies the candidate of the decision.

four years.

**.024**   (f) Part time service shall be accounted for tenure extension as defined in the Policy of the University. See also Part III B-8.

**.025**   Probationary appointments are for the term stated in the official letter of appointment and, subject to the requirements of this article, end on the date specified unless a new letter of appointment is issued prior to such terminal date. Written notice that a probationary appointment will not be renewed or that the term of an existing probationary appointment is to be amended will be given:

**.026**   (a) By March 1 of the first academic year of service if the appointment expires at the end of that academic year, or at least three months in advance of its expiration if this occurs at some other time during the year;

**.027**   (b) By December 15 of the second academic year of service if the appointment expires at the end of the academic year, or at least six months in advance of the expiration of the appointment if this occurs at some other time during the year;

**.028**   (c) At least twelve months before the expiration of an appointment, if this occurs after two or more years of service at the University.

**.029**   The notice of non-renewal shall be in standard form and need not state reasons for the decision, except as provided in *C-12*.

**.030**   If the University fails to provide timely notice under this article, the appointment is extended under existing terms and conditions for a period equivalent to an additional academic year. An extension under this provision, even if the time of service in probationary status then exceeds seven years, does not automatically entitle the Faculty member to an appointment with continuous tenure.

II-B-4   **Contract Appointments Without Tenure**

**.031**   On the recommendation of the cognizant Faculty and with the approval of the Provost, and based on a written description of the teaching and related duties, a Faculty position involving full-time teaching in a clinical or professional skills program or to support particular instructional needs in other programs may be designated as a non-tenure track ("Contract") position. Titles associated with contract positions shall be appropriately distinguishing, such as "Assistant Teaching Professor" or "Assistant Professor of Practice," as determined by the Provost in consultation with the relevant/cognizant Dean or Chair. The Academic Senate may set specific limits on the number of contract appointments authorized in a particular academic unit.

Professors of Practice serve the teaching mission of the University in at least one of three

PLAINTIFF'S
EXHIBIT
C C

the interaction of scholar with scholar. The Catholic University of America respects the right
of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the
principles, sources and methods of their academic disciplines. These principles, sources and methods, as they
develop over time, are not external to their respective disciplines. The University sanctions and encourages
investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and
new. The University accepts the responsibility of protecting both teacher and student from being forced to deny
truth that has been discovered or to assert claims that have not been established in the discipline.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with
students, peers and officers of the university. Second, it presumes scholarly competence, observance of the
professional standards of one's discipline, commitment to the stated mission of the University, and an openness
to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a
responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of
the opinions and responsibilities of others.

The Catholic University of America, from its establishment, has voluntarily embraced a special relationship
with the Church. This relationship, with the mutual responsibilities involved, has been made an internal and
constitutive part of its mission. Accordingly, priority is given to the study of Catholic theology and related
disciplines. In the tradition of the Church, theology serves the Christian community by seeking to express the
abiding truth of Christ in human terms and, thereby, to mediate between faith and culture. Theology
contributes to an understanding of faith and becomes a means of communicating the Church's teachings to the
community of believers and to society at large.

As an academic discipline, Catholic theology is the systematic reflection on the data of revelation expressed in
Sacred Scriptures and Tradition as proclaimed, preserved and interpreted by the magisterium of the Church,
and received by faith. The teachings of the magisterium are a necessary factor in ascertaining truth in the
discipline of Catholic theology. The Catholic University of America affirms its commitment to safeguard the
freedom that is necessary if theologians are to pursue the disciplined study of Christian faith in the Catholic
tradition according to rigorous standards of scientific investigation. The University recognizes that scholars use
diverse methods and sources to explicate the original deposit of faith and to discern patterns of doctrinal
development over the centuries. The University also recognizes that freedom of inquiry, thought and
expression is requisite to the advancement of knowledge and to the deepening of understanding in matters of
faith.

As in the case of all other faculty members, the academic freedom of those engaged in theological disciplines
presupposes personal integrity, scholarly competence, commitment to the mission of the University,
observance of professional standards and openness to criticism from one's peers. In addition, Catholic theology
acknowledges the singular responsibility of the Church's magisterium to safeguard the integrity of the Christian
message, and to protect the faithful from erroneous teachings in faith and morals. Although the roles and
responsibilities of theologians differ from those of bishops, theologians share a common goal with the
magisterium in their service to the ecclesial community. Catholic theologians are expected to give assent to the
teachings of the magisterium in keeping with the various degrees of assent that are called for by authoritative
teaching. Differences arising over the interpretation and presentation of Church teaching are resolved through
dialogue of scholars with members of the magisterium, with due recognition that final authority in matters of
faith and morals lies with the magisterium. Such dialogue is carried on in accordance with established
procedures in a spirit of Christian charity and mutual, professional respect.

The *Faculty Handbook* outlines the norms and procedures relating the academic freedom with regard to initial

15

appointment, tenured appointment and, where cause has been established, the dismissal of faculty members. In addition, Canonical Statutes govern appointments in the Ecclesiastical Faculties. These documents embody the institution's guarantees that its faculty enjoys the freedom of academic inquiry and expression that is central to its identity as a University authentically Catholic and distinctively American.

*Issued September 12, 1969*
*Revised December 12, 2006*

**Section 4: Bylaws of the University**

*Revised December 14, 2010*
*Revised December 13, 2016*

### Introduction to the Bylaws

The revision of the University's governing documents was begun in 1967 as a result of the efforts of a newly appointed Special Committee on Survey and Objectives of the Board of Trustees. Dr. Carroll A. Hochwalt of St. Louis, Missouri, served as Chairman of the Committee that initiated a series of discussions intended to elucidate the University's purposes and character. Another Special Committee of which His Eminence, Lawrence Cardinal Shehan, Archbishop of Baltimore, was Chairman, undertook the revision of the papal statutes and the civil Bylaws then in effect. Their work resulted in the replacement of these instruments by a single document.

The Bylaws were approved by the Board of Trustees on September 12, 1969. The Holy See gave its approval to the Statement of Objectives, Historical Preface, and Bylaws on January 23, 1970, and they were promulgated by President Clarence C. Walton on February 6, 1970. The Bylaws were revised and approved by the Board of Trustees on December 14, 2010. The most recent revision of the Bylaws were approved by the Board of Trustees on December 13, 2016.

PLAINTIFF'S
EXHIBIT
D D

**Section 5: Constitution of the Academic Senate**  *Issued November 21, 1970*
*Revised June 2006*
*Approved December 13, 2016*

### Introduction to the Constitution of the Academic Senate

During academic years 1968 1969 and 1969 1970 the Academic Senate prepared a constitution, which would define its role and procedures in the academic governance of the University, as these had previously been defined in the 1937 Statutes and earlier documents. The document adopted by the Academic Senate on June 3, 1970, was then submitted to the Board of Trustees, and after certain revisions reached by common agreement of the two bodies, was approved by the Board on November 21, 1970.

The Constitution of the Academic Senate, approved by the Board of Trustees, has the same force of law as do the Bylaws. The original text of the Constitution has since been amended by the Senate, with the revisions ratified by the Board of Trustees, principally in order to reflect organizational changes in the University and in the titles of officers of administration. The following text incorporates these amendments.

### CONSTITUTION OF THE ACADEMIC SENATE
### THE CATHOLIC UNIVERSITY OF AMERICA

#### Article I
The Academic Senate shares with the President the immediate responsibility for the academic governing of the University by establishing, maintaining, supervising, and in general being responsible for the academic policies of the University.

#### Article II
The voting members of the Academic Senate shall consist of; the President; the Provost; the Vice Provost and Dean of Graduate Studies; the Vice Provost and Dean of Undergraduate Studies; the Deans of the several Faculties; delegates elected by the several Faculties in the proportion of one delegate for each Faculty, a second delegate for each Faculty having thirty or more full time members and an additional delegate for every forty full-time members beyond the number of thirty; two delegates elected by the Faculty of Arts and Sciences to represent baccalaureate programs of the School of Arts and Sciences. In addition, voting members shall include the Associate Provost, University Libraries and one professional librarian elected by the professional library staff, two graduate students appointed by the Graduate Student Association, and three undergraduate students appointed by the Undergraduate Student Government, who shall have full voting rights as Academic Senators except in passing upon the qualifications of faculty members proposed for rank or tenure. Delegates elected to the Academic Senate by the several Faculties shall hold office for a period of three years. They may be re-elected. Student delegates shall be elected annually.

In the election of Faculty Delegates to the Senate, all full time Faculty members are eligible for election and each has a deliberative vote. Faculty delegates to the Trustees shall be ex officio, non-voting members of the Academic Senate. The Registrar shall be an ex-officio, non-voting member of the Academic Senate. The Academic Senate may annually by a two thirds vote invite non-voting participation by such persons it deems will contribute to its effectiveness.

# THE CATHOLIC UNIVERSITY OF AMERICA

The Busch School of Business

PLAINTIFF'S EXHIBIT

E E

tabbies®

*Service Award*

presented to

*John V. Tieso*

in recognition of giving the most of his time to mentoring and advising students

May 2, 2019

Dr. Michael Pakaluk
Acting Dean

Kevin Rensch
Assistant Dean for Students

MGT 331 01 Database Management : John Tieso

THE CATHOLIC UNIVERSITY OF AMERICA
Financial Planning, Institutional Research, and Assessment

**INDIVIDUAL REPORT : COURSE EVALUATION RESULTS**
**MGT 331 01 Database Management : John Tieso**
**Spring 2015**



PLAINTIFF'S EXHIBIT
F F
tabbies

## Total Enrolled:

**CUA: Student Course Evaluations**

| Raters | Raters |
|---|---|
| Responded | 11 |
| Invited | 29 |
| Response Ratio | 38% |

## Student level:

| Options | Percentage |
|---|---|
| Junior | 22% |
| Senior | 78% |

## Course Taken For:

| Options | Percentage |
|---|---|
| My major | 38% |
| Distribution | 50% |
| Elective | 13% |

## Course Required:

| Options | Percentage |
|---|---|
| Required | 67% |
| Not required | 33% |

## Expected course grade:

| Options | Percentage |
|---|---|
| A | 100% |

1/5

MGT 331 01 Database Management : John Tieso

## Evaluation of the Instructor: Mean Comparison



## Evaluation of the Instructor: John Tieso (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) The instructor had a thorough understanding of the course content | 6.91 | 0.30 | 6.42 | 1.07 | 6.55 | 0.94 |
| 2) The instructor was well prepared for each class | 6.82 | 0.60 | 6.30 | 1.18 | 6.43 | 1.05 |
| 3) The instructor presented material in a clear and systematic manner | 6.82 | 0.60 | 5.97 | 1.49 | 6.14 | 1.36 |
| 4) The instructor communicated a sense of enthusiasm about the course material | 6.91 | 0.30 | 6.20 | 1.34 | 6.41 | 1.12 |
| 5) The instructor was responsive to the diverse learning needs and styles of the students | 7.00 | 0.00 | 5.90 | 1.56 | 6.08 | 1.40 |
| 6) The instructor provided timely and detailed feedback on tests, reports, and other assignments | 6.73 | 0.65 | 5.93 | 1.53 | 6.12 | 1.37 |
| 7) The instructor had a clear and realistic definition of good performance | 6.91 | 0.30 | 6.02 | 1.43 | 6.18 | 1.31 |
| 8) The instructor was available outside of class to provide assistance | 7.00 | 0.00 | 6.02 | 1.45 | 6.26 | 1.23 |
| 9) The instructor treated students with respect | 7.00 | 0.00 | 6.34 | 1.24 | 6.48 | 1.08 |
| 10) I would recommend this instructor to a fellow student | 6.80 | 0.63 | 5.96 | 1.65 | 6.14 | 1.50 |

MGT 331 01 Database Management : John Tieso

## Evaluation of the Course: Mean Comparison



## Evaluation of the Course: MGT 331 01 Database Management (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) Course aims and objectives were clearly articulated at the start of the course | 6.64 | 0.92 | 6.14 | 1.28 | 6.28 | 1.17 |
| 2) Course aims and objectives were achieved by the end of the course | 6.64 | 0.92 | 6.09 | 1.33 | 6.23 | 1.21 |
| 3) The text and/or required readings were appropriate to the aims and objectives of the course | 6.64 | 0.92 | 6.12 | 1.30 | 6.23 | 1.23 |
| 4) Course assignments were appropriate to the aims and objectives of the course | 6.73 | 0.90 | 6.17 | 1.27 | 6.28 | 1.16 |
| 5) Course discussions and lectures were appropriate to the aims and objectives of the course | 6.82 | 0.60 | 6.16 | 1.26 | 6.29 | 1.18 |
| 6) This course challenged me intellectually | 6.45 | 1.29 | 6.02 | 1.38 | 6.10 | 1.36 |
| 7) I looked forward to attending this course | 6.45 | 1.04 | 5.61 | 1.72 | 5.72 | 1.69 |
| 8) This course was well organized | 6.64 | 0.92 | 5.91 | 1.52 | 6.05 | 1.40 |
| 9) This course met my expectations | 6.64 | 0.92 | 5.86 | 1.55 | 5.97 | 1.49 |
| 10) I would recommend this course to a fellow student | 6.55 | 1.21 | 5.81 | 1.66 | 5.92 | 1.62 |

THE CATHOLIC UNIVERSITY OF AMERICA
Financial Planning, Institutional Research, and Assessment

**INDIVIDUAL REPORT : COURSE EVALUATION RESULTS**
**MGT 118 34 Vocation of Business : John Tieso**
**Fall 2015**

## Total Enrolled:

**CUA: Student Course Evaluations New**

| Raters | Raters |
|---|---|
| Responded | 0 |
| Invited | 21 |
| Response Ratio | 0% |

## Evaluation of the Instructor: Mean Comparison



## Evaluation of the Instructor: John Tieso (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department (BSECO) | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) The instructor had a thorough understanding of the course content | 6.88 | 0.35 | 6.46 | 0.98 | 6.53 | 0.95 |
| 2) The instructor was well prepared for each class | 6.75 | 0.46 | 6.38 | 1.02 | 6.42 | 1.06 |
| 3) The instructor presented material in a clear and systematic manner | 6.88 | 0.35 | 6.01 | 1.38 | 6.06 | 1.40 |
| 4) The instructor communicated a sense of enthusiasm about the course material | 6.88 | 0.35 | 6.37 | 1.08 | 6.39 | 1.13 |
| 5) The instructor was responsive to the diverse learning needs and styles of the students | 6.63 | 0.52 | 5.99 | 1.38 | 6.01 | 1.42 |
| 6) The instructor provided timely and detailed feedback on tests, reports, and other assignments | 6.88 | 0.35 | 5.98 | 1.41 | 6.08 | 1.37 |
| 7) The instructor had a clear and realistic definition of good performance | 6.88 | 0.35 | 6.11 | 1.31 | 6.15 | 1.31 |
| 8) The instructor was available outside of class to provide assistance | 6.63 | 1.06 | 6.17 | 1.24 | 6.26 | 1.21 |
| 9) The instructor treated students with respect | 6.88 | 0.35 | 6.48 | 1.06 | 6.49 | 1.08 |
| 10) I would recommend this instructor to a fellow student | 6.75 | 0.46 | 6.09 | 1.46 | 6.11 | 1.51 |

Case 1:22-cv-00031-PTG-JFA   Document 1   Filed 01/12/22   Page 96 of 110 PageID# 96

## Evaluation of the Course: Mean Comparison



## Evaluation of the Course: MGT 118 36 Vocation of Business (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department (BSECO) | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) Course aims and objectives were clearly articulated at the start of the course | 5.63 | 2.20 | 6.23 | 1.15 | 6.26 | 1.17 |
| 2) Course aims and objectives were achieved by the end of the course | 6.13 | 1.13 | 6.15 | 1.17 | 6.20 | 1.21 |
| 3) The text and/or required readings were appropriate to the aims and objectives of the course | 6.75 | 0.71 | 6.13 | 1.25 | 6.21 | 1.22 |
| 4) Course assignments were appropriate to the aims and objectives of the course | 6.63 | 0.74 | 6.19 | 1.18 | 6.27 | 1.17 |
| 5) Course discussions and lectures were appropriate to the aims and objectives of the course | 6.13 | 1.25 | 6.22 | 1.17 | 6.28 | 1.18 |
| 6) This course challenged me intellectually | 6.00 | 1.20 | 6.03 | 1.36 | 6.10 | 1.33 |
| 7) I looked forward to attending this course | 5.13 | 1.89 | 5.67 | 1.65 | 5.66 | 1.70 |
| 8) This course was well organized | 5.88 | 1.73 | 5.99 | 1.37 | 6.01 | 1.43 |
| 9) This course met my expectations | 5.75 | 1.75 | 5.89 | 1.48 | 5.92 | 1.51 |
| 10) I would recommend this course to a fellow student | 6.38 | 1.19 | 5.89 | 1.57 | 5.89 | 1.62 |

THE CATHOLIC UNIVERSITY OF AMERICA
Financial Planning, Institutional Research, and Assessment

### INDIVIDUAL REPORT : COURSE EVALUATION RESULTS
#### MGT 331 01 Database Management : John Tieso
Fall 2013

## Total Enrolled:

**CUA: Student Course Evaluations**

| Raters | Raters |
|---|---|
| Responded | 11 |
| Invited | 15 |
| Response Ratio | 73% |

## Student level:

| Options | Percentage |
|---|---|
| Junior | 9% |
| Senior | 91% |

## Course Required:

| Options | Percentage |
|---|---|
| Required | 55% |
| Not required | 45% |

## Expected course grade:

| Options | Percentage |
|---|---|
| A | 82% |
| B | 18% |

MGT 331 01 Database Management : John Tieso

## Evaluation of the Instructor: Mean Comparison



## Evaluation of the Instructor: John Tieso (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | University | | Department (BSECO) | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) The instructor had a thorough understanding of the course content | 6.73 | 0.65 | 6.48 | 1.01 | 6.38 | 1.10 |
| 2) The instructor was well prepared for each class | 6.73 | 0.65 | 6.33 | 1.14 | 6.26 | 1.19 |
| 3) The instructor presented material in a clear and systematic manner | 6.64 | 0.67 | 6.01 | 1.42 | 5.97 | 1.39 |
| 4) The instructor communicated a sense of enthusiasm about the course material | 6.73 | 0.65 | 6.31 | 1.20 | 6.22 | 1.21 |
| 5) The instructor was responsive to the diverse learning needs and styles of the students | 6.73 | 0.65 | 5.91 | 1.47 | 5.91 | 1.41 |
| 6) The instructor provided timely and detailed feedback on tests, reports, and other assignments | 6.73 | 0.65 | 5.99 | 1.43 | 5.96 | 1.38 |
| 7) The instructor had a clear and realistic definition of good performance | 6.73 | 0.65 | 6.06 | 1.36 | 6.07 | 1.29 |
| 8) The instructor was available outside of class to provide assistance | 6.64 | 0.67 | 6.13 | 1.30 | 6.04 | 1.32 |
| 9) The instructor treated students with respect | 6.73 | 0.65 | 6.42 | 1.15 | 6.42 | 1.07 |
| 10) I would recommend this instructor to a fellow student | 6.73 | 0.65 | 6.05 | 1.55 | 6.07 | 1.49 |

MGT 331 01 Database Management : John Tieso

## Evaluation of the Course: Mean Comparison



## Evaluation of the Course: MGT 331 01 Database Management (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | University | | Department (BSECO) | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) Course aims and objectives were clearly articulated at the start of the course | 6.73 | 0.65 | 6.19 | 1.22 | 6.11 | 1.30 |
| 2) Course aims and objectives were achieved by the end of the course | 6.73 | 0.65 | 6.12 | 1.26 | 6.06 | 1.32 |
| 3) The text and/or required readings were appropriate to the aims and objectives of the course | 6.73 | 0.65 | 6.10 | 1.31 | 6.03 | 1.36 |
| 4) Course assignments were appropriate to the aims and objectives of the course | 6.73 | 0.65 | 6.17 | 1.24 | 6.12 | 1.27 |
| 5) Course discussions and lectures were appropriate to the aims and objectives of the course | 6.64 | 0.67 | 6.19 | 1.25 | 6.14 | 1.26 |
| 6) This course challenged me intellectually | 6.73 | 0.65 | 6.03 | 1.39 | 5.95 | 1.45 |
| 7) I looked forward to attending this course | 6.73 | 0.65 | 5.58 | 1.73 | 5.51 | 1.76 |
| 8) This course was well organized | 6.73 | 0.65 | 5.92 | 1.48 | 5.87 | 1.52 |
| 9) This course met my expectations | 6.73 | 0.65 | 5.83 | 1.56 | 5.77 | 1.57 |
| 10) I would recommend this course to a fellow student | 6.73 | 0.65 | 5.81 | 1.67 | 5.82 | 1.66 |

THE CATHOLIC UNIVERSITY OF AMERICA
Planning, Institutional Research, Student Learning Outcomes Assessment

### INDIVIDUAL REPORT : COURSE EVALUATION RESULTS
### HIT 773 02 Systems Analysis & Design : John Tieso
### Summer 2014

## Total Enrolled:

**Copy of CUA: Student Course Evaluations for Reporting**

| Raters | Raters |
|---|---|
| Responded | 16 |
| Invited | 24 |
| Response Ratio | 67% |

## Student Level:

| Options | Percentage |
|---|---|
| Master's | 100% |

## Course Taken For:

| Options | Percentage |
|---|---|
| My major | 100% |

## Course Required:

| Options | Percentage |
|---|---|
| Required | 100% |

## Expected course grade:

| Options | Percentage |
|---|---|
| A | 100% |

HIT 773 02 Systems Analysis & Design : John Tieso

## Evaluation of the Instructor: Mean Comparison



## Evaluation of the Instructor: John Tieso (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) The instructor had a thorough understanding of the course content | 6.25 | 1.06 | 6.43 | 1.13 | 6.47 | 1.12 |
| 2) The instructor was well prepared for each class | 6.19 | 1.11 | 6.19 | 1.31 | 6.23 | 1.31 |
| 3) The instructor presented material in a clear and systematic manner | 6.31 | 0.95 | 5.96 | 1.42 | 5.96 | 1.51 |
| 4) The instructor communicated a sense of enthusiasm about the course material | 6.50 | 0.89 | 6.26 | 1.28 | 6.29 | 1.28 |
| 5) The instructor was responsive to the diverse learning needs and styles of the students | 6.38 | 0.96 | 5.93 | 1.48 | 5.96 | 1.55 |
| 6) The instructor provided timely and detailed feedback on tests, reports, and other assignments | 6.19 | 1.28 | 5.75 | 1.62 | 5.86 | 1.67 |
| 7) The instructor had a clear and realistic definition of good performance | 6.31 | 0.95 | 5.94 | 1.52 | 6.00 | 1.52 |
| 8) The instructor was available outside of class to provide assistance | 6.06 | 1.18 | 6.04 | 1.40 | 6.12 | 1.40 |
| 9) The instructor treated students with respect | 6.75 | 0.77 | 6.45 | 1.09 | 6.47 | 1.13 |
| 10) I would recommend this instructor to a fellow student | 6.25 | 1.18 | 6.04 | 1.55 | 6.06 | 1.58 |

## Evaluation of the Course: Mean Comparison



## Evaluation of the Course: HIT 773 02 Systems Analysis & Design (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average Mean | Average Standard Deviation | Department Mean | Department Standard Deviation | University Mean | University Standard Deviation |
|---|---|---|---|---|---|---|
| 1) Course aims and objectives were clearly articulated at the start of the course | 6.00 | 1.15 | 6.04 | 1.45 | 6.16 | 1.34 |
| 2) Course aims and objectives were achieved by the end of the course | 6.06 | 1.34 | 5.98 | 1.43 | 6.07 | 1.40 |
| 3) The text and/or required readings were appropriate to the aims and objectives of the course | 6.31 | 1.08 | 6.08 | 1.39 | 6.10 | 1.36 |
| 4) Course assignments were appropriate to the aims and objectives of the course | 6.13 | 1.31 | 6.10 | 1.32 | 6.14 | 1.34 |
| 5) Course discussions and lectures were appropriate to the aims and objectives of the course | 6.19 | 1.11 | 6.08 | 1.40 | 6.11 | 1.40 |
| 6) This course challenged me intellectually | 5.69 | 1.70 | 5.89 | 1.51 | 6.02 | 1.45 |
| 7) I looked forward to attending this course | 5.75 | 1.65 | 5.69 | 1.67 | 5.75 | 1.68 |
| 8) This course was well organized | 5.81 | 1.28 | 5.83 | 1.61 | 5.90 | 1.56 |
| 9) This course met my expectations | 5.75 | 1.61 | 5.78 | 1.69 | 5.82 | 1.68 |
| 10) I would recommend this course to a fellow student | 5.69 | 1.92 | 5.78 | 1.74 | 5.86 | 1.71 |

THE CATHOLIC UNIVERSITY OF AMERICA
Financial Planning, Institutional Research, and Assessment

### INDIVIDUAL REPORT : COURSE EVALUATION RESULTS
### MGT 218 31 Vocation of Business : John Tieso
### Fall 2014

## Total Enrolled:

**CUA: Student Course Evaluations**

| Raters | Raters |
|---|---|
| Responded | 0 |
| Invited | 0 |
| Response Ratio | 0% |

## Evaluation of the Instructor: Mean Comparison



## Evaluation of the Instructor: John Tieso (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department (BSECO) | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) The instructor had a thorough understanding of the course content | 6.71 | 0.49 | 6.44 | 1.07 | 6.47 | 1.06 |
| 2) The instructor was well prepared for each class | 6.57 | 0.53 | 6.29 | 1.19 | 6.34 | 1.17 |
| 3) The instructor presented material in a clear and systematic manner | 6.57 | 0.53 | 5.94 | 1.49 | 6.01 | 1.46 |
| 4) The instructor communicated a sense of enthusiasm about the course material | 6.57 | 0.53 | 6.28 | 1.25 | 6.33 | 1.20 |
| 5) The instructor was responsive to the diverse learning needs and styles of the students | 6.43 | 0.53 | 5.88 | 1.55 | 5.93 | 1.51 |
| 6) The instructor provided timely and detailed feedback on tests, reports, and other assignments | 6.43 | 0.53 | 5.98 | 1.48 | 6.04 | 1.42 |
| 7) The instructor had a clear and realistic definition of good performance | 6.43 | 0.53 | 6.05 | 1.43 | 6.07 | 1.40 |
| 8) The instructor was available outside of class to provide assistance | 6.71 | 0.49 | 6.04 | 1.45 | 6.17 | 1.31 |
| 9) The instructor treated students with respect | 6.43 | 0.79 | 6.37 | 1.20 | 6.40 | 1.20 |
| 10) I would recommend this instructor to a fellow student | 6.57 | 0.53 | 6.03 | 1.58 | 6.04 | 1.59 |

MGT 218 33 Vocation of Business - John Tieso

## Evaluation of the Course: Mean Comparison



## Evaluation of the Course: MGT 218 33 Vocation of Business (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | Department (BSECO) | | University | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) Course aims and objectives were clearly articulated at the start of the course | 6.43 | 0.79 | 6.11 | 1.31 | 6.21 | 1.21 |
| 2) Course aims and objectives were achieved by the end of the course | 6.71 | 0.49 | 6.07 | 1.36 | 6.15 | 1.24 |
| 3) The text and/or required readings were appropriate to the aims and objectives of the course | 6.57 | 0.53 | 6.12 | 1.32 | 6.17 | 1.26 |
| 4) Course assignments were appropriate to the aims and objectives of the course | 6.57 | 0.53 | 6.12 | 1.30 | 6.22 | 1.21 |
| 5) Course discussions and lectures were appropriate to the aims and objectives of the course | 6.57 | 0.53 | 6.15 | 1.31 | 6.23 | 1.22 |
| 6) This course challenged me intellectually | 5.86 | 1.35 | 6.02 | 1.40 | 6.05 | 1.36 |
| 7) I looked forward to attending this course | 6.57 | 0.79 | 5.62 | 1.68 | 5.62 | 1.72 |
| 8) This course was well organized | 6.57 | 0.79 | 5.88 | 1.50 | 5.97 | 1.44 |
| 9) This course met my expectations | 6.29 | 0.76 | 5.83 | 1.56 | 5.88 | 1.53 |
| 10) I would recommend this course to a fellow student | 6.57 | 0.79 | 5.84 | 1.64 | 5.85 | 1.66 |

THE CATHOLIC UNIVERSITY OF AMERICA
Financial Planning, Institutional Research, and Assessment

### INDIVIDUAL REPORT : COURSE EVALUATION RESULTS
### MGT 365 01 Quant Methods Decision Making : John Tieso
### Spring 2014

## Total Enrolled:

**CUA: Student Course Evaluations**

| Raters | Raters |
|---|---|
| Responded | 13 |
| Invited | 57 |
| Response Ratio | 23% |

## Student level:

| Options | Percentage |
|---|---|
| Sophomore | 8% |
| Junior | 69% |
| Senior | 23% |

## Course Taken For:

| Options | Percentage |
|---|---|
| My major | 92% |
| Distribution | 8% |

## Course Required:

| Options | Percentage |
|---|---|
| Required | 83% |
| Not required | 17% |

## Expected course grade:

| Options | Percentage |
|---|---|
| A | 77% |
| B | 23% |

## Evaluation of the Instructor: Mean Comparison



## Evaluation of the Instructor: John Tieso (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | University | | Department (BSECO) | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) The instructor had a thorough understanding of the course content | 6.54 | 0.52 | 6.47 | 1.04 | 6.47 | 1.03 |
| 2) The instructor was well prepared for each class | 6.23 | 1.42 | 6.35 | 1.14 | 6.34 | 1.14 |
| 3) The instructor presented material in a clear and systematic manner | 6.15 | 1.34 | 6.01 | 1.45 | 5.99 | 1.47 |
| 4) The instructor communicated a sense of enthusiasm about the course material | 6.31 | 1.11 | 6.33 | 1.20 | 6.32 | 1.18 |
| 5) The instructor was responsive to the diverse learning needs and styles of the students | 6.54 | 0.88 | 5.95 | 1.48 | 5.95 | 1.49 |
| 6) The instructor provided timely and detailed feedback on tests, reports, and other assignments | 6.38 | 0.87 | 6.06 | 1.40 | 6.17 | 1.27 |
| 7) The instructor had a clear and realistic definition of good performance | 6.54 | 0.88 | 6.08 | 1.40 | 6.13 | 1.32 |
| 8) The instructor was available outside of class to provide assistance | 6.31 | 0.95 | 6.16 | 1.30 | 6.16 | 1.27 |
| 9) The instructor treated students with respect | 6.54 | 0.88 | 6.42 | 1.16 | 6.44 | 1.11 |
| 10) I would recommend this instructor to a fellow student | 6.38 | 0.96 | 6.04 | 1.58 | 6.12 | 1.49 |

## Evaluation of the Course: Mean Comparison



## Evaluation of the Course: MGT 365 01 Quant Methods Decision Making (1 = Strongly disagree.... 7 = Strongly agree)

| Question | Average | | University | | Department (BSECO) | |
|---|---|---|---|---|---|---|
| | Mean | Standard Deviation | Mean | Standard Deviation | Mean | Standard Deviation |
| 1) Course aims and objectives were clearly articulated at the start of the course | 6.31 | 0.75 | 6.19 | 1.24 | 6.21 | 1.19 |
| 2) Course aims and objectives were achieved by the end of the course | 6.31 | 0.63 | 6.10 | 1.30 | 6.10 | 1.29 |
| 3) The text and/or required readings were appropriate to the aims and objectives of the course | 6.31 | 0.85 | 6.11 | 1.32 | 6.11 | 1.28 |
| 4) Course assignments were appropriate to the aims and objectives of the course | 6.08 | 0.95 | 6.17 | 1.27 | 6.19 | 1.22 |
| 5) Course discussions and lectures were appropriate to the aims and objectives of the course | 6.54 | 0.97 | 6.19 | 1.27 | 6.17 | 1.26 |
| 6) This course challenged me intellectually | 6.23 | 0.83 | 6.01 | 1.42 | 6.07 | 1.33 |
| 7) I looked forward to attending this course | 6.00 | 1.35 | 5.57 | 1.78 | 5.60 | 1.70 |
| 8) This course was well organized | 6.08 | 1.12 | 5.93 | 1.50 | 5.94 | 1.47 |
| 9) This course met my expectations | 6.23 | 1.01 | 5.83 | 1.60 | 5.87 | 1.52 |
| 10) I would recommend this course to a fellow student | 6.15 | 0.99 | 5.80 | 1.71 | 5.86 | 1.60 |



committees of the Board of Trustees, other than the Executive Committee, and may also be asked to participate in other University activities from time to time. Any Trustee Emeritus or Emerita appointed to serve on a committee of the Board of Trustees may vote on any matter to be presented to the Board of Trustees or Executive Committee as a recommendation of such committee, but may not vote on any matter in which the committee is exercising the final authority of the Board of Trustees. The attendance of any Trustee Emeritus or Emerita appointed to any committee at any meeting of that committee shall not count towards the establishment of a quorum for the transaction of business by such committee. A Trustee Emeritus or Emerita shall serve until death, incapacity, resignation, or removal.

### Section 4: Academic Senate                                           *Revised June 2006*

The Academic Senate shares with the President the immediate responsibility for academic governing of the university by establishing, maintaining, supervising, and in general being responsible for the academic policies of the University. Its Constitution and any amendments, as approved by the Board of Trustees, is in full force and effect binding on the Faculty of the University. The Constitution which is given below in Part B, Current Governing Documents, determines the membership of officers of administration, deans, faculty delegates, students, and others.

Elections of delegates from the Faculties, in proportion to the number of regular faculty members, are held in the individual schools during the month of March for three year terms beginning the following September 1. Deans send notices of the election at least two weeks in advance. Elections are by secret ballot, absentee ballots are excluded, and a simple majority is required. In the event of a vacancy before the expiration of a regular term, a delegate is elected for the remainder of the term.

The Associate Provost, University Libraries and one professional member of the Library Staff elected by the Staff are members of the Senate. Student delegates are elected annually under the auspices of the Graduate Student Association and the Undergraduate Student Government. Both representatives of the Libraries and student representatives have full voting rights, except in passing on the qualifications of faculty members proposed for rank or tenure. The Registrar is a non-voting member of the Senate.

The three faculty representatives elected as non-voting members of the Board of Trustees also serve as members of the Academic Senate, without vote but with the right to propose and second motions. In addition, the Senate may annually, by two-thirds vote, invite non-voting participation by other persons.

### a. Committees of the Academic Senate

Ordinarily, the Chair of each standing committee of the Academic Senate is appointed from the membership, but other members may be appointed from any part of the University. Members serve for one year and may be reappointed. The standing committees are listed here in alphabetical order.

The Committee on Academic Freedom and Tenure investigates and reports to the Academic Senate any policy that may affect academic freedom and/or tenure.

The Committee on Appointments and Promotions examines all applications for appointment, promotion, and tenure on which the Academic Senate must pass and makes recommendations for their disposition.

The Committee on Budget and Planning participates in an advisory capacity in the preparation of the

PLAINTIFF'S
EXHIBIT
HH

relating to undergraduate study, parallel to the responsibilities of the Graduate Board (above). The Undergraduate Board reports its recommendations to the Academic Senate. The Vice Provost for Undergraduate Studies is the Chair of the Undergraduate Board ex officio. Members are appointed by the Academic Senate upon the joint recommendation of the Chair of the Undergraduate Board and the Dean of the School from which the appointment is made. Each School is represented on the Undergraduate Board by a number of members equal to the number of its faculty delegates in the Academic Senate. Deans are eligible for membership on the Board. The terms of office coincide with those of the delegates to the Academic Senate.

### Section 5: The Faculties

*Revised December 2016*

As a corporate entity, a Faculty is a body of teachers empowered to act in such matters as the appointment and promotion of its members, the admission of students, the prescription of curriculum requirements, and the recommendation of candidates for degrees. The term, however, is often used unofficially to denote the body of teachers in the entire institution or in a component part of a Faculty, such as a Department.

Only those who hold appointments in faculty rank (i.e., the rank of Instructor or higher rank) are members entitled to vote on matters before a Faculty. Requirements and procedures for appointments as members and associates of a Faculty are explained in Part II of this *Faculty Handbook*. It will be noted that privileges of participation in meetings without the right to vote may be extended to associates and to students and that in certain matters, especially in appointments and promotions and in consultations prior to the appointment of a Dean or Chair of a Department, separate votes may be required of tenured members of a Faculty or of those higher in rank than a candidate for appointment or promotion.

There are at present twelve Schools of the University and a Metropolitan College. In order of establishment, the Schools are Theology and Religious Studies (1889), Philosophy (1895), Columbus School of Law (1899), Arts and Sciences (1906), Canon Law (originally established in 1923, re-established in 2002), Engineering (1930), the National Catholic School of Social Service (1934), Nursing (1935), the Benjamin T. Rome School of Music (1965), Architecture and Planning (1992), the Metropolitan School of Professional Studies (1979), and the Tim and Steph School of Business and Economics (2013). Each School is administered by a Dean who reports to the Provost and the President.

Two Schools are subdivided into departments. Each Department is administered by a Chair who is responsible to the Dean and Faculty of the Department. The School of Arts and Sciences has Departments of Anthropology, Art, Biology, Chemistry, Drama, Education, English Language and Literature, Greek and Latin, History, Mathematics, Media and Communication Studies, Modern Languages and Literatures, Physics, Politics, Psychology, Semitic and Egyptian Languages and Literatures, and Sociology, as well as Programs in Biochemistry, Comparative Literature, and Irish Studies. The Academic Council of the School, composed of the Chairs of the Departments with the Dean presiding, is the standing committee of the Faculty with primary responsibility for the administration of the School.

The School of Engineering has Departments of Biomedical Engineering, Civil Engineering, Electrical Engineering and Computer Science, and Mechanical Engineering, as well as a Program in Engineering Management. The Chairs of the Departments constitute the Executive Committee of the School, over which the Dean presides. The University also offers interdisciplinary programs in Early Christian Studies and in Medieval and Byzantine Studies.

9