IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JOHN TIESO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 1:22-CV-00031 (PTG-JFA) |
| | ) | |
| THE CATHOLIC UNIVERSITY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT THE CATHOLIC UNIVERSITY OF AMERICA'S
MEMORANDUM IN SUPPORT OF IT MOTION TO DISMISS, OR IN THE
ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 56 and Local Rules 7(F)(1) and 56, Defendant, The Catholic University of America ("CUA"), by and through its undersigned attorneys, respectfully submits this Memorandum in Support of its Motion to Dismiss, or in the Alternative, for Summary Judgment in response to the Complaint filed by Plaintiff John Tieso ("Plaintiff").

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................1

    A.   Introduction to CUA .............................................................................1

    B.   Overview of CUA's Organization..........................................................3

    C.   Understanding the CUA Faculty............................................................4

    D.   Plaintiff's Association with CUA ...........................................................6

STANDARD OF REVIEW ...................................................................................11

ARGUMENT ........................................................................................................14

    A.   This Court lacks subject matter jurisdiction because the Complaint fails to state a viable Constitutional or federal claim upon which relief can be granted, or because any such claim is subject to summary judgment in CUA's favor, and the entire Complaint must be dismissed as a result .................14

        1.   *Count I fails to state a Constitutional or federal claim upon which relief can be granted for violation of free speech, and any such contention under the Constitution or federal regulation is otherwise subject to summary judgment* .......................................14

        2.   *Count II fails to state a Constitutional or federal claim upon which relief can be granted for violation of due process, and any such contention under the Constitution or federal regulation is otherwise subject to summary judgment* .......................................18

        3.   *Because Counts I and II must be dismissed, this Court lacks subject matter jurisdiction, and the Court should also dismiss Count III pursuant to 28 U.S.C. § 1367(c)(3)* ............................20

    B.   Counts I and II also fail to state a claim upon which relief can be granted under Plaintiff's remaining theories........................................................21

        1.   *Plaintiff's theories based on violation of accreditation standards fail to state a claim on which relief can be granted and are otherwise subject to summary judgment* .......................................22

        2.   *Plaintiff's theories based on violation of the Faculty Handbook fail to state a claim on which relief can be granted and are otherwise subject to summary judgment*.......................................25

    C.   CUA is entitled to summary judgment on Plaintiff's breach of contract claim in Count III, and on Counts I and II to the extent they are construed as breach of contract claims........................................................26

CONCLUSION......................................................................................................30

## I.     __INTRODUCTION__

This case is an improper attempt by a former part-time, adjunct faculty member to bring Constitutional claims against a private university. Plaintiff was appointed as an adjunct by CUA for a one-year term which, unless renewed by CUA, automatically expired in August 2020. After receiving complaints in May 2020 of racially charged, insensitive social media posts by Plaintiff, CUA later determined not to renew or extend his appointment as an adjunct faculty.  Meanwhile, Plaintiff was paid all compensation owed to him through the end of his one-year term.  Plaintiff now sues CUA for violation of free speech under the Constitution or Executive Order 13864 (Count I) and violation of Constitutional Due Process (Count II), as well as a supplemental claim for breach of contract under the CUA Faculty Handbook (Count III). Because Plaintiff fails to allege a Constitutional or federally based claim on which relief can be granted, this Court lacks subject matter jurisdiction, and the entire Complaint should be dismissed.  Alternatively, CUA is entitled to summary judgment on all claims.

## II.    __STATEMENT OF UNDISPUTED MATERIAL FACTS__

A.     Introduction to CUA

1.     CUA is a private, nonprofit institution incorporated in the District of Columbia. (Exhibit A – Affidavit of J. Steven Brown dated February 15, 2022, at ¶ 3).

2.     Located in Washington, D.C., CUA is the national university of the Roman Catholic Church in the United States and the only institution of higher education founded by the bishops of this country. (Exhibit A-1 – CUA Faculty Handbook, Part I, at pp. 3-4 and 11-13).

3.     Established in 1887 as a graduate research center with the support and approval of the Holy See, CUA "has evolved into a modern American university, committed not only to graduate but also to undergraduate and professional education and to the cultivation of the arts."

(Exh. A-1, at pp. 3-4, 11-13, and 37-38). "As a member of the American academic community, it accepts the standards and procedures of American institutions and seeks to achieve distinction within the academic world." (*Id.* at 12).

4.      Even still, CUA remains uniquely characterized by its identity as a Catholic institution. As stated in its Mission Statement, "[CUA] is committed to being a comprehensive Catholic and American institution of higher learning, faithful to the teachings of Jesus Christ as handed on by the Church. Dedicated to advancing the dialogue between faith and reason, [CUA] seeks to discover and impart the truth through excellence in teaching and research, all in service to the Church, the nation and the world." (Exh. A, ¶ 5; Exh. A-1, at p. 11).

5.      "At every level, [CUA] is dedicated to the advancement of learning and particularly the development of knowledge in the light of Christian revelation..." (Exh. A-1, at p. 12).   "As a Catholic university, it desires to cultivate and impart an understanding of the Christian faith within the context of all forms of human inquiry and values." (*Id.* at 11).

6.      With respect to its Catholic identity, CUA is guided by and embraces the apostolic constitution, *Ex Corde Ecclesiae*, which "presents four essential characteristics of a Catholic university: (1) a Christian inspiration not only of individuals but of the entire university community; (2) continuing reflection in the light of the Catholic faith upon the growing treasury of human knowledge to which the university seeks to contribute by its own research; (3) fidelity to the Christian message as it is comes through the Church; and (4) an institutional commitment to the service of the people of God and of the human family." (*Id.* at 13).

7.      To these ends, "[e]ach member of the faculty…is expected in virtue of their contract of employment to respect and support the University's Mission Statement.  In addition, each member of the faculty has a responsibility to reflect on ways in which his or her research

2

contributes to the University's identity, especially as described in *Ex Corde Ecclesiae*…Promoting the institution's Catholic identity is the responsibility of the entire University community. Indeed, a candidate's willingness to respect and contribute to the mission of the University is a consideration in the tenure process." (*Id.* at 14).

        B.     <u>Overview of CUA's Organization</u>

        8.     CUA is organized into twelve Schools of the University, one of which is the Busch School of Business. (Exh. A, ¶ 6; Exh. A-1, at p. 9).[1]

        9.     While the operations of CUA are overseen by its Board of Trustees, the day-to-day affairs of CUA are led by the President, John Garvey, Esq., and several other senior administrators, together with the Academic Senate which shares with the President immediate responsibility for academic governing of CUA pursuant to its Bylaws.[2] (Exh. A, ¶ 7; Exh. A-1, at p. 34).

        10.     Among those senior administrators is the Provost, Dr. Aaron Dominguez, who sits as the chief academic officer and oversees the academic life of the University's twelve schools. (Exh. A, ¶ 9). Dr. Dominguez is assisted by several Vice Provosts and an Assistant Provost, including the Senior Vice Provost for Academic Administration and Dean of Graduate Studies, Dr. J. Steven Brown. (*Id*. at ¶¶ 1, 2, and 9). Dr. Brown is the only "Senior" Vice Provost. (*Id.*).

        11.     In his capacity as Senior Vice Provost, Dr. Brown supervises the administrators and staff in the Office of the Provost, including the Academic Budgets team. He also handles graduate academic programs and appeals and is the *ex officio* chair of the Committee on Appointments and

---

[1] Three of the Schools are further broken down into Departments, which are led by Chairs. The Busch School of Business is not one of those schools. (Exh. A, ¶ 12).

[2] The Academic Senate is comprised of the President, the Provost, the Vice Provost and Dean of Graduate Studies, the Vice Provost and Dean of Undergraduate Studies, the Deans, other administrative officials, representatives of the student bodies, and delegates elected by the School faculties. (Exh. A, ¶ 8).

Promotions of the Academic Senate, the university-wide committee responsible for conducting reviews for appointment and promotion. (Exh. A, ¶ 2).

12.     Reporting to the Provost are the Deans of the twelve CUA Schools. (Exh. A, ¶ 10). The Deans are responsible for the proper function of their respective Schools, including strategic planning; admitting students to the School; maintaining the School's programs; and managing the School's budget and policies. In addition, the Deans, in conjunction with the Senior Vice Provost, handle faculty appointments, reappointments, promotions, and tenure for their Schools. (*Id.*).

C.     Understanding the Faculty of CUA

13.     CUA has a Faculty Handbook which is comprised of four parts. Part II governs appointments and promotions of faculty members. (Exh. A, ¶ 4; *see also* Exhibit A-2 – CUA Faculty Handbook, Part II).

14.     There are two categories of faculty: (a) regular members of Faculty ("Regular Faculty"); and (b) "others associated with the Faculty" ("Associated Faculty"). (Exh. A, ¶ 12).

15.     The Regular Faculty consists of faculty who have been appointed to "regular membership in a [School] Faculty," at a specific rank of Instructor, Assistant Professor, Associate Professor, or Ordinary Professor. (Exh. A, ¶ 13; Exh. A-2, at §§ II-A-1.001 and .004). Members of the Regular Faculty are appointed by the President of CUA following the "Procedures for Appointment and Qualification" set forth in Section II-C of the Faculty Handbook.  The Regular Faculty generally consists of full-time faculty members. (Exh. A, ¶ 13; Exh. A-2, at § II-C).

16.     Pursuant to Section II-A-1.004 of the Faculty Handbook, "Appointments to regular membership in a Faculty are of three kinds: appointments with continuous tenure [i.e., permanent, tenured instructors or professors], term appointments probationary for tenure [i.e., probationary, tenure-track instructors or professors], and contract appointments without tenure [i.e., a non-tenure

track, full-time teaching position]." (Exh. A, ¶ 14; Exh. A-2, at § II-A-1.004; *see also* Exh. A-2, § II-B-1 (specifying the three types of "[r]egular membership in a Faculty"); II-B-2 (defining "Tenured Appointments"); II-B-3 (defining "Appointments Probationary for Tenure"); and II-B-4 (defining "Contract Appointments Without Tenure")).

17.     Members of the Regular Faculty enjoy certain rights and privileges commensurate with such appointment.  For example, "the privileges of voting and serving in an administrative capacity within the Faculty (i.e., as dean or chair, or as associate dean or chair)…are enjoyed only by regular members of a Faculty…" (Exh. A, ¶ 15; Exh. A-2, at § II-A-1.005).

18.     The Associated Faculty, on the other hand, consists of non-regular members of the Faculty who are "associated with a [School] Faculty" in one of several positions. As described in Section II-A-1.005, "Others may be associated with a Faculty (a) as Professors Emeriti; (b) in Research, Visiting, or Adjunct capacities, as designated by the prefix to the professional title; (c) as Lecturers; (d) as Research Associates, Clinical Associates, or Visiting Scholars; or (e) as Teaching or Research Assistants." (Exh. A, ¶ 16; Exh. A-2, at § II-A-1.005).

19.     Associated Faculty members enjoy fewer rights and privileges than the Regular Faculty. The rights and privileges granted to the Associated Faculty, including adjunct faculty, are at the discretion of their respective Deans. (Exh. A, ¶ 17; *see also*, *e.g.*, Exh. A-2, at § II-B-6.047 ("An Adjunct Professor enjoys such privileges as the host [School] Faculty may extend")).

20.     "Association with a Faculty, regardless of length of service or type of appointment (full-time or part-time), does not entitle the appointee to regular membership of a Faculty except through the procedures for recruitment and appointment of Faculty as provided in Section C, Procedures for Appointments and Promotions." (Exh. A, ¶ 18; Exh. A-2, at § II-A-1.005; *see also* Exh. A-2, at § II-B-1.016 ("All other appointments to association with a Faculty, as described in

(B-5-7), regardless of length of term or extent of duties, full-time or part-time, do not confer regular

membership in a Faculty")).

21.     Certain Associated Faculty positions are more fully described in Section II-B-6 of

the Faculty Handbook.  Regarding adjunct professors, Section .045 provides, in relevant part:

> An adjunct appointment at any of the four professorial ranks [i.e., Instructor,
> Assistant Professor, Associate Professor, or Professor] may be made on
> recommendation of the cognizant Dean and Department or School Faculty and
> upon approval of the Committee on Appointments and Promotions of the
> School…An adjunct appointment is for part-time service. The appointment is for
> one academic year and may be renewed on the recommendation of the cognizant
> Dean and Department or School Faculty.

(Exh. A, ¶ 19; Exh. A-2, at § II-B-6.045).

22.     Section II-E of the Faculty Handbook governs "Appeals from Adverse Decisions."

(Exh. A, ¶ 20; Exh. A-2, at § II-E). This section applies only to Regular Faculty.  First, it provides

for appeals only by "members of the Faculty" and does not provide for appeals by others

"associated with the Faculty." (Exh. A, ¶ 20; Exh. A-2, at § II-E Introduction) (emphasis added).

Second, it provides for appeals only related to "decisions made by the University on promotion,

tenure and reappointment to probationary or contract terms," (*id*. (emphasis added)), which are the

three categories of Regular Faculty, (Exh. A, ¶ 20; Exh. A-2, at §  II-A-1.004).

23.     Lastly, Section II-G of the Handbook governs "Termination of Appointments."

(Exh. A, ¶ 21; Exh. A-2, at § II-G). While it provides due process procedures for dismissal of a

Regular Faculty member with tenure or whose term appointment has not expired, with respect to

Associated Faculty it states, "An appointment as a Faculty associate is terminated automatically at

the end of the stated term without further notice." (Exh. A, ¶ 21; Exh. A-2, at § II-G-1.185).

D.     Plaintiff's Association with CUA

24.     Plaintiff did not fall within any of the three kinds of Regular Faculty appointments,

and at no time was he ever appointed to regular membership of a Faculty. (Exh. A, ¶ 22).

25.     Instead, from August 2013 to August 2019, Plaintiff was "associated" with the Faculty of CUA as a Lecturer. On September 18, 2019, Plaintiff was appointed, effective August 20, 2019, as an Adjunct Assistant Professor with the Busch School of Business for a one-year term through August 19, 2020. (Exh. A, ¶ 23; <u>Exhibit A-3</u> – Appointment Letter; Compl., at ¶ 1 and Exh. A; *see also* <u>Exhibit B</u> – Affidavit of Andrew Abela dated February 15, 2022, at ¶ 3). Per the letter, Plaintiff was appointed by the Provost on the recommendation of the Dean of the Busch School of Business, Dr. Andrew Abela. (Exh. A-3; Exh. B, ¶ 3).

26.     Also per the letter, Plaintiff's appointment was "subject to the *Faculty Handbook* and <u>may</u> be extended by regular reappointment but does not include eligibility for continuous tenure or any benefits and does not carry with it a guarantee of salary." (*Id*.) (underline added).

27.     An appointment to Adjunct Assistant Professor, in and of itself, does not ensure or guarantee that the appointee will actually be assigned to teach in any given semester(s). (Exh. A, ¶ 24). For example, the Busch School appointed two other persons to be Adjunct Assistant Professors for the academic year beginning August 20, 2019, together with Plaintiff. (*Id*.). The two instructors taught courses in the fall of 2019 and spring of 2020, but not summer of 2020. (*Id*.). Then the Busch School of Business appointed three Adjunct Assistant Professors for the academic year beginning August 20, 2020. Of those three, one taught in fall 2020 and spring 2021, but not summer 2021. (*Id*.). Of the other two, one taught in fall 2020 but not spring or summer 2021, and the other taught in spring 2021 but not fall 2020 or summer 2021. (*Id*.).

28.     Nor does such appointment, in and of itself, guarantee any particular compensation to the appointee. Instead, compensation is determined by and based on actual courses taught, with each course governed by its own "Contract Appointment to Instruction."  (Exh. A, ¶ 25).

29.    The decision to assign a faculty member to teach a particular course is within the discretion of the cognizant Dean. (Exh. A, ¶ 26).

30.    Following his appointment for one year as an Adjunct Assistant Professor, Plaintiff was assigned to teach three courses during the Fall 2019 semester, from August 26, 2019 to December 14, 2019. (Exh. A, ¶ 27; Exhibit A-4 – Contract Appointments to Instruction for Fall 2019 Courses; *see also* Exh. B, ¶ 5).  The "Contract Appointment to Instruction" for each of those three courses provided for $6,000.00 of salary per course. (*Id*.). Plaintiff taught all three of those courses and was paid all salary therefor. (Exh. A, ¶ 27; Exhibit A-5 – CUA's Cardinal Faculty and Staff HR - Payroll System for Fall 2019 and Spring 2020 Courses; *see also* Exh. B, ¶ 5).

31.    Similarly, Plaintiff was assigned to teach two courses during the Spring 2020 semester, from January 13, 2020 to May 9, 2020. (Exh. A, ¶ 28; Exhibit A-6 – Contract Appointments to Instruction for Spring 2020 Courses; *see also* Exh. B, ¶ 6).  The "Contract Appointment to Instruction" for each of those courses also provided for $6,000.00 per course. (*Id*.). Plaintiff taught both and was paid all such salary. (Exh. A, ¶ 28; Exh. A-5; *see also* Exh. B, ¶ 6).

32.    Going into the Summer 2020 semester, Plaintiff was scheduled to teach two courses. (Exh. A, ¶ 29; Exhibit A-7 – Contract Appointments to Instruction for Summer 2020 Courses; *see also* Exh. B, ¶ 7). The Summer 2020 semester consisted of two sessions, with the first running from May 18, 2020 to June 28, 2020 and the second running from June 29, 2020 to August 1, 2020. (Exh. A, ¶ 29; Exh. B, ¶ 7). Plaintiff's courses were originally scheduled to begin on May 18, 2020, and Plaintiff was to be paid $4,000.00 per course. (Exh. A, ¶ 29; Exh. A-7; Exh. B, ¶ 7).

33.    On May 5, 2020, CUA received an anonymous complaint "from a student at another university" outside CUA regarding certain social media activity by Plaintiff. (Exh. B, ¶ 8). The complainant referred CUA to Plaintiff's Twitter account and to certain web links for particular

8

posts Plaintiff had made, which the complainant characterized as involving racism, specifically https://twitter.com/johntieso/status/1257401977044115456?s=12, https://twitter.com/johntieso/status/1248248898826563584?s=21, and https://twitter.com/johntieso/status/101959129398968 3200?s=21. (Exh. B, ¶ 8; Exhibit B-1 – Anonymous Complainant dated May 5, 2020).

34.    Copies of the Twitter posts linked in the anonymous complaint are included in Exhibit B-2.  (*See* Exhibit B-2 – Twitter Posts referenced by Anonymous Complainant ). They include cartoon depictions of Michelle Obama and Melania Trump, comments related to susceptibility of "ethnically black" persons to COVID-19, and a suggestion that "perhaps [President Obama] might consider staying in Africa and giving all his money to his people." (*Id.*).

35.    That same day, CUA was also contacted by a local media reporter who inquired regarding Plaintiff's Twitter account.  The local media reporter told CUA that five CUA students had also made similar complaints about Plaintiff. (Exh. B, ¶ 9).

36.    On the morning of May 6, 2020, Dean Abela spoke briefly with Mr. Tieso to let him know of the complaint and to suggest that he take down his Twitter account for the time being. Plaintiff agreed and took the account down that morning. Later that month, Plaintiff's Twitter account was reactivated, and he began to post/tweet again. Dean Abela had no further discussion with Plaintiff about the Twitter account following the May 6th phone call. (Exh. B, ¶ 10).

37.    Over the next couple weeks CUA was contacted by others about Plaintiff, including alumni and the parents of a student. (Exh. B, ¶ 11).

38.    In light of a report of possible racial comments being made in the classroom by Plaintiff,  CUA's Chief Ethics and Compliance Officer, Vin Lacovara, was tasked in the May 16-19, 2020 timeframe with investigating the complaints against Plaintiff in context with CUA's policies and procedures. (Exh. B, ¶ 12).

39.     The investigation was conducted at the direction of CUA's General Counsel for the purpose of gathering information so that Counsel could provide advice to CUA. (Exh. B, ¶ 13).

40.     At that same time, when Dean Abela realized on May 16, 2020 that Plaintiff was scheduled to begin teaching two courses during the Summer 2020 semester, he decided to postpone those courses to allow time for CUA's investigation to be completed. (Exh. B, ¶ 14).

41.     On May 18, 2020, Harvey Seegers, Associate Dean of the Busch School of Business, acting on behalf of Dean Abela, emailed Plaintiff stating:

> [Dean Abela] has decided to postpone your Session One Summer Courses to Summer Session Two. His office has received additional complaints, some from alumni, regarding your Twitter comments. Accordingly, an investigation will be conducted by the Provost's Office to determine the facts. [Dean Abela] has determined to suspend your teaching pending completion of the investigation.

(Exh. B, ¶ 15; *see also* Compl., at Exhibit B). Plaintiff's two Summer 2020 semester courses were rescheduled for the Second Session, to begin on June 29, 2020. (Exh. B, ¶ 16; Exh. A, ¶ 30).

42.     During the course of the investigation, on or about June 11, 2020, Mr. Lacovara contacted and offered Mr. Tieso an opportunity to be interviewed and heard.  Mr. Tieso declined that offer. (Exh. B, ¶ 17; *see also* Compl., at Exhibit H). On or about June 18, 2020, the investigation was completed. (Exh. B, ¶ 18).

43.     On June 23, 2020, Dean Abela emailed Plaintiff, stating:

> We have completed our investigation of the recent complaints we received about your Twitter activity. We have concluded that several of your tweets, including those about Barack Obama, Michelle Obama and Hillary Clinton, would be interpreted by a reasonable person to be racist and/or sexist, especially in the context of the general tone of your tweets, and inconsistent with the respect for human dignity that is at the core of the mission of the Busch School of Business. It's worth noting the important distinction between your delivering a vigorous and forceful argument for a position on the one hand, which we support, and your delivering one that is spiteful, degrading, and lacking in charity on the other, which we do not support or accept.  Unfortunately your tweets seem to be very much of the latter kind.

10

> As you know, we expect all faculty in the Busch School of Business not only to be great classroom teachers, as you have been, but also to be great role models for our students. Your Twitter activity as I have described it above is inconsistent with being such a role model, and therefore you will not be teaching any future classes, and I will not be renewing your teaching appointment.

(Exh. B, ¶ 19; *see also* Compl., at Exhibit I).

44.     Plaintiff did not teach either of the assigned Summer 2020 courses; however, he was paid the full $4,000.00 for each course ($8,000 total for the 2020 Summer semester).  All compensation owed to Plaintiff under any contracts with CUA have been paid by CUA to Plaintiff, and no compensation has been withheld from him.[3] (Exh. B, ¶ 20-21; Exh. A, ¶¶ 31-33; Exhibit A-8 – CUA's Cardinal Faculty and Staff HR - Payroll System for Summer 2020 Courses).

45.     On August 19, 2020, Plaintiff's appointment as an Adjunct Assistant Professor expired, per the terms of the appointment letter and Section II-G-1.185 of the Faculty Handbook. (Exh. B, ¶ 22; Exh. A, ¶¶ 34; Exh. A-3; Exh. A-2, at § II-G-1.185).

46.     Throughout his time associated with CUA, Plaintiff only taught courses at CUA's campus in the District of Columbia.  He never taught courses at CUA's new location in Alexandria, Virginia or any other location outside of D.C. or in a fully online mode. (Exh. A, ¶¶ 35).

### III.   STANDARD OF REVIEW

#### A.   Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) allows dismissal for "lack of subject matter jurisdiction." If a court finds that it does not have subject matter jurisdiction over the case or

---

[3] After Plaintiff's Summer 2020 courses were postponed, enrollment in one of the courses fell to only three students. Pursuant to its policy related to class sizes, (*see* Exhibit A-9 – CUA Summer 2020 Compensation Guidelines), CUA sought to adjust Plaintiff's pay for that course from $4,000.00 to $2,000.00. In late May 2020, CUA sent Plaintiff a Revised Contract Appointment for Instruction which Plaintiff promptly rejected. Ultimately, even though Plaintiff never taught the course, he was still paid the full $4,000.00 rate. (Exh. A, ¶ 33; Exhibit A-10 – Email to Plaintiff dated May 29, 2020 with Revised Contract Appointment to Instruction; Exhibit A-11 – Email from Plaintiff to CUA dated May 29, 2020).

controversy, it must dismiss the action. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). In a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the burden rests with the plaintiff, as the party asserting jurisdiction, to prove that federal jurisdiction is proper. *See Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc.*, 914 F. Supp. 1335, 1338 (E.D. Va. 1996) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, (1936)).

B.      Failure to State a Claim Upon Which Relief Can Be Granted

When considering a motion under Fed. R. Civ. P. 12(b)(6), a court "must accept the factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018). However, courts need not "accept as true a legal conclusion couched as a factual allegation." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss, the factual allegations set forth in the complaint must be sufficient to "'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" *Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough." *Gibbs v. Elevate Credit, Inc.*, Civil Action No. 3:20cv632, 2021 U.S. Dist. LEXIS 200197, at *36 (E.D. Va. Oct. 17, 2021) (citing *Twombly*, 550 U.S. at 555). Where a copy of a written instrument is attached as an exhibit to the complaint or incorporated by reference, the instrument is part of the complaint, and a court may consider it. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). Moreover, "a court may consider official public records, documents central to [plaintiff's] claim, and documents

12

sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed." *Gibbs v. Elevate Credit, Inc.*, Civil Action No. 3:20cv632, 2021 U.S. Dist. LEXIS 200197, at *37 (E.D. Va. Oct. 17, 2021) (quoting *Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396-97 (4th Cir. 2006)).

    C.    <u>Summary Judgment</u>

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party," *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012), and a fact is material if it "might affect the outcome of the suit under the governing law," *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011) (internal quotation marks omitted).  When deciding a motion for summary judgment, a court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes such a showing, the non-moving party must set forth properly supported, specific facts which show that "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986).  The non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. Where the record as a whole "could not lead a rational trier of fact to find for

the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991).

IV.    **ARGUMENT**

A.    <u>This Court lacks subject matter jurisdiction because the Complaint fails to state a viable Constitutional or federal claim upon which relief can be granted or, alternatively, because any such claim is subject to summary judgment in CUA's favor, and the entire Complaint must be dismissed as a result.</u>

Plaintiff alleges original jurisdiction based solely on the federal question doctrine under 28 U.S.C. § 1331. (Compl., at p. 2). According to Plaintiff, the Court has jurisdiction because the Complaint alleges (a) violations of Constitutional free speech, Executive Order 13864, and 34 C.F.R. 75.500 in Count I and (b) violations of the Due Process Clause of the Constitution in Count II.   However, neither of those counts actually states a Constitutional or federal claim on which relief can be granted and are otherwise subject to summary judgment, requiring both to be dismissed on such theories.   Once dismissed, the Court would lack original jurisdiction as there will no longer be any federal question before the Court.   Count III, meanwhile, is predicated entirely on supplemental jurisdiction under 28 U.S.C. § 1367, which case law makes clear should also be dismissed if the Court has dismissed all claims over which it has original jurisdiction.

1.    *Count I fails to state a Constitutional or federal claim upon which relief can be granted for violation of free speech, and any contention under the Constitution or federal regulation is otherwise subject to summary judgment.*

Under Count I, Plaintiff claims his "termination"[4] by CUA was a violation of his "constitutional right to freedom of speech at a public university." (Compl. ¶ 45).  Alternatively, he

---

[4] An overriding fault with Plaintiff's claims is that he was <u>*not*</u> terminated. As more fully explained in relation to the breach of contract claim in Section IV(C), Plaintiff was appointed as an Adjunct Assistant Professor for a one-year term, he was paid all compensation for all courses he was assigned to teach through the end of that term (even though he did not actually teach two of them), his appointment expired at the end of the term, and he was not offered a subsequent appointment. There is no basis on which Plaintiff can

asserts that his "termination" was a violation of "[F]ederal Regulations issued by the Department of Education and Executive Order 13864." Neither theory states a claim that is plausible on its face.

Regarding the Constitutional theory, "[t]he First Amendment's protection of free speech is a guarantee only against abridgment by government, federal or state." *Hudgens v. N.L.R.B.*, 424 U.S. 507, 513 (1976). As such, "[i]n order for the First Amendment to apply, the challenged conduct must be deemed 'state action.'" *Vaynberg v. Seton Hall Univ.*, 2010 U.S. Dist. LEXIS 112634, at *14-15 (D.N.J. Oct. 21, 2010) (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 838-43 (1982) (affirming dismissal of First Amendment discrimination claim against private school because defendant's conduct was not "state action"). Thus, it is fundamental that "the First Amendment does not apply to private employers" and that "a cause of action [against a private employer] based directly on the First Amendment…would be too insubstantial to invoke federal question jurisdiction…" *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 817 n.5 (4th Cir. 2004).

Here, it is undisputed that CUA is not a public university. It is a private university and a private employer. As such, the First Amendment plainly does not apply to CUA, and any attempt to allege that it does fails to state a claim upon which relief can be granted under Rule 12(b)(6). Alternatively, CUA is entitled to summary judgment on any such a claim because Plaintiff's inability to prove state action constitutes a "complete failure of proof concerning an essential element of [his] case," which "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23. Knowing that CUA is a private institution, Plaintiff attempts to characterize CUA as a "public university" subject to the First Amendment based on the fact that it receives "public funding" from the federal government. (*See* Compl. ¶¶ 29-34). However, a college or university is

---

allege that his appointment was terminated prior to the end of the term or that CUA breached any obligations to him.

not considered a state actor merely because it receives some form of state financial assistance. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 840 (1982). "Receipt of government funds is insufficient to convert a private university into a state actor, even where 'virtually all of the school's income [i]s derived from government funding.'" *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1013 (9th Cir. 2020) (quoting *Rendell-Baker*, 457 U.S. at 840).[5] Any contention by Plaintiff that CUA was converted to a state actor by virtue of receiving government funding fails to state a claim with any plausibility and is alternatively subject to summary judgment in favor of CUA.

As for Plaintiff's theory of a federal claim under Executive Order 13684 and 34 C.F.R. § 75.500, such a theory also fails to state a claim on which relief can be granted. Plaintiff asserts, "Executive Order 13864 states the standards for both private and public universities regarding freedom of speech. Public universities must uphold the fundamental rights guaranteed in the First Amendment and private institutions must comply with their stated institutional policies regarding freedom of speech and references 34 CFR part 75." (Compl., ¶ 33). However, Executive Order 13864 does not create a private cause of action. In fact, it explicitly denies the creation of a private cause of action where it states, "[t]his order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against…any other person." Exec. Order No. 13864(6)(c).

---

[5] The Fourth Circuit has "recognized four <u>exclusive</u> circumstances under which a private party can be deemed to be a state actor: (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen." *DeBauche v. Trani*, 191 F.3d 499, 507-08 (4th Cir. 1999) (citation omitted) (emphasis added). "If the conduct does not fall into one of these four categories, then the private conduct is not an action of the state." *Id*. Other than the allegation of receiving government funding, the Complaint makes no allegations with respect to any of these four "exclusive circumstances."

Moreover, "[a]s a general rule, there is no private right of action to enforce obligations imposed on executive branch officials by executive orders." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1338 (4th Cir. 1995) (quotations and citations omitted). "[A]n executive order is privately enforceable only if it was intended to create a private cause of action." *Id.* at 1339 (citation omitted). By its plain language, Executive Order 13864 was implemented to impose obligations on various heads of executive agencies, the Secretary of Education, and the Secretary of the Treasury to advance the Executive Order's stated purposes related to improving free inquiry, transparency, and accountability in educational institutions.  Nothing in Executive Order 13864 indicates an intent to create a private cause of action and, as stated above, the Order expressly states it is not intended to do so.

Meanwhile, the federal regulations set forth in 34 C.F.R. § 75.500 were enacted by the Secretary of the Department of Education ("Secretary") specifically to effectuate Executive Order 13864.[6]  For this reason alone, 34 C.F.R. § 75.500 cannot serve as the basis for a federal claim by a private party when the Executive Order from which it is derived, and which it is implementing, expressly disclaims any private cause of action.  A review of the regulation further confirms this result.  Part 75 of C.F.R., Title 34, governs "Direct Grant Programs" and applies to "each direct grant program of the Department of Education." 34 C.F.R. § 75.1.  In 34 C.F.R. § 75.500, the Secretary codified the standards for free speech articulated in the Executive Order (i.e., that public universities must comply with the First Amendment and private universities with their own stated institutional policies) as a condition that grantee institutions must meet in order to be eligible for the covered grants. Just like the authority for determining who is eligible for a grant under 34 C.F.R. § 75 is vested in the Secretary, *see*, *e.g.*, § 75.200 (explaining that it is the Secretary who

---

[6]  *See* https://mobile.reginfo.gov/public/do/eAgendaViewRule?pubId=202010&RIN=1840-AD45.

determines selection criteria and who selects recipients), the Secretary also holds the authority for determining if an institution is not in compliance with 34 C.F.R. § 75.500 and what, if anything, should happen with a non-compliant institution. *See, e.g.*, 34 C.F.R. 75, Subpart G (titled "What Procedures Does the Department Use to Get Compliance?"); § 75.900(b) (confirming the Secretary's authority to enforce the regulations of the Department); and § 75.901 (setting forth the manner in which the Secretary is permitted to suspend, terminate, or resolve disputes). The authority for administering and enforcing the regulations associated with Direct Grant Programs under 34 C.F.R. Part 75 rests with the Secretary, and 34 C.F.R. § 75.500 suffers the same infirmity as the Executive Order itself in not providing any private cause of action by a professor against a university for violation of free speech.  Individually and collectively, Executive Order 13864 and 34 C.F.R. § 75.500 fail to provide a basis on which Plaintiff can state a plausible claim.

To the extent Count I is based on an alleged violation of the Constitutional right to free speech or on Executive Order 13864 and 34 C.F.R. § 75.500, it fails to state a claim on which relief can be granted and is otherwise subject to summary judgment in CUA's favor.

> 2. *Count II fails to state a Constitutional or federal claim upon which relief can be granted for violation of due process, and any such contention under the Constitution or federal regulation is otherwise subject to summary judgment.*

Similarly, Plaintiff is not entitled to due process under the United States Constitution.  "It is well-settled that to state a claim for violation of procedural due process, a plaintiff must allege: (1) a cognizable liberty or property interest; (2) deprivation of that interest by state action; and (3) that the procedures employed were constitutionally inadequate." *Graves v. Depolo*, No. 1:10cv1129, 2011 U.S. Dist. LEXIS 158151, at *27 (E.D. Va. Mar. 9, 2011).

First, Plaintiff cannot allege a plausible claim of state action against CUA.  The Fourteenth Amendment only prohibits "*any State*" from "depriv[ing] any person of life, liberty, or property,

without due process of law." U.S. Const. amend. XIV, § 1 (emphasis added). As such, private universities are "not ordinarily obligated to comply with constitutional due process requirements." *Heineke v. Santa Clara Univ.*, 965 F.3d 1009, 1012; *see also George v. Averett Univ. of Danville*, No. 4:19-cv-00008, 2019 U.S. Dist. LEXIS 119600, at *5-6 (W.D. Va. July 18, 2019) ("Private institutions are not bound by the Due Process requirements of the 14th Amendment"); *Doe v. Washington & Lee University*, No. 6:14-CV-00052, 2015 U.S. Dist. LEXIS 102426, 2015 WL 4647996, at *8 (4th Cir. Aug. 5, 2015) (holding private universities are not bound by the Constitution's due process requirements in disciplinary hearings). As CUA is a private university, the Due Process Clause of the Constitution is not implicated in its decisions. Because CUA is a private university and private employer, "any claim to procedural due process fails due to lack of state action." *See Mickens v. Lockheed Martin Corp. Mission Sys. & Sys. (MS2)*, No. 1:11cv1117 (LMB/TCB), 2012 U.S. Dist. LEXIS 93209, at *23 (E.D. Va. July 5, 2012) (citing *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011)).[7] Plaintiff cannot plead state action by CUA with any plausibility, and CUA is otherwise entitled to summary judgment on any such claim.

In addition, "[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains free as before to seek another." *Bd. of Regents v. Roth*, 408 U.S. 564, 575 (1972). In *Roth*, the plaintiff professor (of a *public* university, no less) was told that he would not be rehired at the end of his one-year term. *Id*. at 568. He claimed the decision not to rehire him was to punish him for critical statements he made about the university, and he alleged the university's lack of notice and hearing violated his right to due process. *Id*. The Court disagreed, explaining that "[t]he Fourteenth Amendment's procedural protection of property

---

[7] As set forth in Section IV(A)(1) related to Count I, any contention that CUA was a "state actor" for purposes of asserting this Constitutional Due Process claim due to the government funding that it receives has no basis or support in law. *Heineke*, 965 F.3d at 1013; *Rendell-Baker*, 457 U.S. at 840.

is a safeguard of the security interests that a person has already acquired in specific benefits." *Id*. at 576. Such a professor, the Court held, does not have "a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract." *Id*. at 578. And "[w]hatever may be a teacher's rights of free speech, the interest in holding a teaching job at a state university, *simpliciter*, is not itself a free speech interest." *Id*. at 575 n.14. As the recipient of a one-year term appointment with no entitlement to renewal, Plaintiff cannot plead any cognizable liberty or property interest with any plausibility.

Count II fails to state a Constitutional Due Process Clause claim on which relief could ever be granted and is otherwise subject to summary judgment in CUA's favor.

  3. *Because Counts I and II must be dismissed, this Court lacks subject matter jurisdiction, and the Court should also dismiss Count III pursuant to 28 U.S.C. § 1367(c)(3).*

The federal question doctrine under 28 U.S.C. § 1331 – Plaintiff's only asserted grounds for subject matter jurisdiction – requires a controversy arising under the Constitution or laws of the United States. Without Plaintiff's theories for violation of Constitutional or federal free speech or Due Process rights, there is no such controversy here. That is, there is no federal question and, therefore, no subject matter jurisdiction under 28 U.S.C § 1331. Meanwhile, the only jurisdictional basis asserted by Plaintiff over the contract claim in Count III is supplemental jurisdiction under 28 U.S.C. § 1367. Under subsection (c), however, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if…the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

The Fourth Circuit has explained that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished. Among the factors that inform this discretionary determination are convenience and

fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). "Ordinarily, when the federal claims are dismissed before trial,…the state claims should be dismissed [without prejudice] as well." *Darcangelo v. Verizon Communs., Inc.*, 292 F.3d 181, 196 (4th Cir. 2002) (quotations and citation omitted); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine…will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Under this well-settled law, if the Court dismisses or enters summary judgment on Counts I and II, it should decline to exercise supplemental jurisdiction solely over Count III and should dismiss that breach of contract claim, particularly where this action is in its infancy and no discovery has even begun to take place. Judicial economy, convenience, fairness, and comity all favor such dismissal. In addition, as explained in Section IV(C) below, the claim in Count III is purely a matter of contract interpretation under District of Columbia law, and it involves no underlying issues of federal policy.  When all federal claims have been dismissed, such factors "point toward declining to exercise jurisdiction over the remaining state-law claims," and dismissal of the state claim in Count III as the only remaining cause of action is what should "ordinarily" occur. *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7; *Darcangelo*, 292 F.3d at 196.

> B. <u>Counts I and II also fail to state a claim upon which relief can be granted under Plaintiff's remaining theories.</u>

Plaintiff posits two other non-Constitutional, non-federal theories for the free speech and due process claims, namely violation of accreditation standards and violation of the Faculty Handbook.  In Count I, as an alternative to the Constitutional free speech grounds, Plaintiff alleges his "termination" was in violation of "the standards of the university's accreditation requirements"

and CUA's "stated policy of free speech as pronounce [sic] publicly by the president of Catholic University and its written stated policies." Likewise, in Count 2, as an alternative to the Constitutional Due Process grounds, Plaintiff alleges that CUA violated "the standards developed by the America [sic] Association of University Professors due process standards" and "the ethic [sic] standards that Catholic University agreed to abide by with the MSCHE accreditation body standards for due process," as well as "its own policies regarding the due process for termination of a faculty member according to the *Faculty Handbook*." (Compl. ¶ 66). Neither of these other theories plead a free speech or due process claim on which relief can be granted.

1. *Plaintiff's theories based on violation of accreditation standards fail to state a claim on which relief can be granted.*

Regarding the Middle States Commission on Higher Education ("MSCHE"), Plaintiff alleges in the Complaint that "Catholic University is accredited through the Middle States Commission on Higher Education…and has agreed to adhere to MSCHE standards." (Compl. ¶ 39). In Count I, he claims CUA "fired [him] because of his ideas and perspectives" in violation of MSCHE standards. In Count II, Plaintiff claims CUA "breached the due process requirement of…the accreditation body MSCHE." (Compl., ¶ 64). MSCHE accreditation is simply inapplicable to any claim for violation of due process.

The basis of Plaintiff's theory related to the MSCHE is that he "is a third party beneficiary from the Agreement between Catholic University and MSCHE." (Compl., ¶ 62). That, of course, requires a contract between CUA and the MSCHE in the first place. *See Silberberg v. Becker*, 191 A.3d 324, 332 (D.C. 2018) (explaining that "[i]n order to sue for damages <u>on a contract claim</u>, a plaintiff must have either direct privity or third party beneficiary status" and that "[t]hird-party beneficiary status requires that <u>the contracting parties</u> had an express or implied intention to benefit directly the party claiming such status") (emphasis added). Not only does Plaintiff not

plead any facts to demonstrate there is a contract between CUA and the MSCHE, but in addressing a similar case the Fourth Circuit found that standards for accreditation did not constitute an enforceable contract between an educational institution and accreditation body, at least where the accreditation body could "alter the alleged 'contract' at will, and thus [was] not bound by its terms." *Prof'l Massage Training Ctr. v. Accreditation Alliance of Career Sch. & Colls.*, 781 F.3d 161, 181 (4th Cir. 2015).  Other courts have pointed out that accreditation standards "are akin to regulations established by an administrative body, rather than a contract governing a relationship between two entities." *Irani v. Palmetto Health*, No. 3:14-cv-3577, 2016 U.S. Dist. LEXIS 71547, 2016 WL 3079466, at *49 (D.S.C. July 1, 2016) (citation omitted); *see also Chicago Sch. of Automatic Transmissions, Inc. v. Accreditation Alliance of Career Schs. & Colls.*, 44 F.3d 447, 449 (7th Cir. 1994) (stating that "accrediting bodies are not engaged in commercial transactions for which state-law contract principles are natural matches. The 'contract' the School wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency").

The MSCHE's own policies make clear that there can be no contract between CUA and the MSCHE because mutuality is absent between the parties.  This is clear based on MSCHE's policy titled, "*Review of Commission Standards, Requirements of Affiliation, and Policies*," which "establishes [MSCHE'S] commitment to periodically evaluate the Standards for Accreditation and Requirements of Affiliation." *2022 Periodic Review of MSCHE Standards for Accreditation and Requirements of Affiliation*, MIDDLE STATES COMM'N HIGHER EDUC., https://www.msche.org/standards/2022-periodic-review-of-msche-standards-for-accreditation-and-requirements-of-affiliation/. (last visited Feb. 10. 2022).  And, pursuant to the MSCHE Bylaws, CUA is only entitled to "*comment* on policies that affect the substance of MSCHE

accreditation standards."  Mid-Atlantic Region Commission on Higher Education Bylaws 4.04(e),
MIDDLE STATES COMM'N HIGHER EDUC. (July 1, 2019), http://www.msche.org/wp-content/uploads/2019/07/20190701-MSCHE-bylaws.pdf (emphasis added).  While the MSCHE may be required to consider CUA's comments, it is under no obligation to honor or abide by them in creating or updating its accreditation standards and policies. The MSCHE is entitled to change its policies unilaterally based on its own periodic review process.  There is no contract between CUA and MSCHE and, therefore, there can be no third-party beneficiaries.[8]

Plaintiff cannot plausibly plead that the MSCHE accreditation standards constitute a contractual agreement between CUA and MSCHE and without a contract, there cannot be a third-party beneficiary. There is no other basis on which Plaintiff can base a private cause of action under the MSCHE standards and, absent a contractual obligation between CUA and MSCHE, Counts I and II fail to state a claim upon which relief can be granted based on alleged violated CUA's accreditation by the MSCHE.

As for the American Association of University Professors ("AAUP"), Plaintiff summarily claims in Count II that CUA violated "the standards developed by the America [sic] Association of University Professors due process standards" (Compl., ¶ 66). Other than this conclusory allegation, there is no other reference whatsoever in Count II to any standards of the AAUP, due process or otherwise.  On this basis alone, Plaintiff fails to state a claim on which relief can be

---

[8] In reality, the MSCHE is "a voluntary, non-governmental membership association." (*See* https://www.msche.org/about-us/). MSCHE "accreditation is an expression of confidence in an institution's mission and goals, its performance, and its resources. An institution is accredited when the educational community has verified that its goals are achieved through self-regulation and peer review." (Compl., at Exhibit S, p. 2).  "Once eligibility is established, an institution then must demonstrate on an ongoing basis that it meets the Standards for Accreditation." (*Id.*).  That is, an accredited institution has demonstrated to the MSCHE that it meets the association's standards.  The risk from failing to maintain one or more standards is loss of accreditation by the MSCHE, not a private cause of action by someone like Plaintiff.

granted based on AAUP due process standards.[9] Moreover, unlike the MSCHE with whom CUA

at least has some connection viz-a-viz its accreditation, Plaintiff makes no connection whatsoever

between CUA and the AAUP.  Nor could he even possibly do so. There is no language in the

Faculty Handbook either endorsing, referencing, or even mentioning the AAUP.  CUA does not

claim in the Faculty Handbook to abide by the due process standards set forth by the AAUP, nor

does Plaintiff point to any contractual obligation CUA has with the AAUP.  CUA's due process

obligations to its faculty members are exclusively governed by the due process standards set forth

in its Faculty Handbook.  As a matter of law, Plaintiff cannot bring a claim for violation of due

process standards by which CUA does not abide by.   *See Collier v. Bradley Univ.*, 113 F. Supp.

2d 1235, 1238 (C.D. Ill. 2000) (finding that "absent some legislative mandate or contractual

obligation, a private university "has every right not to use the AAUP standards of due process.").

Like the MSCHE grounds, Counts I and II fail to state a claim on which relief can be

granted based on violation of AAUP standards for free speech or due process.

> 2.      *Plaintiff's theories based on violation of the Faculty Handbook fail to state a claim on which relief can be granted.*

Plaintiff's only remaining theory under Counts I and II is that CUA violated its own

policies for free speech or academic freedom (Count I) and due process (Count II) in the Faculty

Handbook. Given that Plaintiff expressly alleges that the Faculty Handbook is part of the contract

between him and CUA, this remaining theory is nothing more than a breach of contract claim –

i.e., breach of the Faculty Handbook.  Assessing whether CUA breached the Faculty Handbook

does not implicate federal law in any way; rather, it is a matter of state law. (*See* Section IV(C),

---

[9] While Plaintiff refers in Count I to certain principals espoused by the AAUP, he does not otherwise plead that CUA somehow violated any AAUP standard(s) for free speech. As such, Plaintiff has similarly not pleaded any claim on which relief can be granted based on "AAUP free speech standards."

*infra*). Thus, Plaintiff cannot plausibly allege a federal-based free speech or due process claim based on this theory.

In fact, this theory as alleged in Counts I and II is duplicative of the actual breach of contract claim asserted in Count III.  In Count I, Plaintiff alleges CUA improperly terminated him based on the tweets he posted in violation of the Faculty Handbook's provision for academic freedom and "freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge." (*See*, *e.g.*, Compl., ¶¶ 73-74). This is akin to Plaintiff's claim in Count III that he was dismissed by CUA without proper cause. (*See*, *e.g.*, Compl., ¶¶ 73-74). Count II alleges CUA "breached the due process requirement of the Contract," (see Compl., ¶ 64), which is exactly Plaintiff asserts in Count III. (Compl., ¶¶ 86-101).  Accordingly, to the extent Counts I or II were to somehow survive on Plaintiff's "breach of the Faculty Handbook" theory, they are subject to summary judgment in CUA's favor as set forth in Section IV(C) below.

C.    <u>CUA is entitled to summary judgment on Plaintiff's breach of contract claim in Count III, and on Counts I and II to the extent they are construed as breach of contract claims</u>.

Count III alleges that CUA breached its contract with Plaintiff.  As set forth above, there are no claims over which this Court has original jurisdiction, and the Court should dismiss Count III pursuant to 28 U.S.C. § 1367(c)(3). Alternatively, based on the indisputable facts, CUA is entitled to judgment as a matter of law on Count III because Plaintiff cannot establish that CUA breached any duty to Plaintiff or that Plaintiff was damaged. Insofar as Counts I and II assert breach of contract claims as well, they are subject to summary judgment on the same grounds.

Under District of Columbia law,[10] "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of

---

[10]    District of Columbia law applies to Count III because "[a] federal court exercising supplemental jurisdiction applies the choice of law rules of the forum state, in this case, Virginia." *Baudean v. Pearson*

the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009) (citing *San Carlos Irrigation & Drainage District v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)).  "It is a longstanding principle in civil law that there can be no monetary recovery unless the plaintiff has suffered harm. [M]ere breach without proof of monetary loss is *injuria absque damno, i.e.*, a wrong which results in no loss or damage, and thus cannot sustain an action." *Id.* (quotations and citations omitted).

With respect to the first and second elements, it is undisputed that the contract at issue is the September 18, 2019 letter appointing Plaintiff as an Adjunct Assistant Professor for one year from August 20, 2019 to August 19, 2020.  Insofar as the appointment letter states that Plaintiff's "appointment is made subject to the *Faculty Handbook*," it is further undisputed that both Plaintiff and CUA were obligated to abide by the terms of the Faculty Handbook. (Compl., ¶ 12).

Regarding the third element, the indisputable facts demonstrate that CUA has not breached any duty to Plaintiff by not renewing or rehiring Plaintiff at the end of his term.  Plaintiff alleges that CUA "failed to be abide by the terms of the Contract" by refusing to "honor the proceeding required for dismissal for cause per II-G-7 of the Faculty Handbook" and by failing to involve the Academic Senate. (Compl., ¶¶ 82-83 and 96-100.). The fundamental flaw in Plaintiff's stated cause of action is his assertion that he was a member of the Regular Faculty, followed by his contention that he was even entitled to the due process provisions he claims were breached.

Plaintiff claims that "[he], as an Assistant Professor, was a member of the Faculty at the time of his termination." (Compl., ¶ 72; *see also* ¶ 6 (alleging "[h]e was promoted to Assistant

---

*Educ., Inc.*, 2015 U.S. Dist. LEXIS 75822, *13 (E.D. Va. 2015) (Judge M. Hannah Lauck) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). In this regard, Virginia law provides that "[a] contract breach is a performance issue and, thus, is regulated by the law of the place of performance." *Id.*, at *18 (citations omitted).  Plaintiff's contract with CUA was to teach at its District of Columbia campus, and the D.C. campus is the only location where Plaintiff performed services. (SF #49). Accordingly, the District of Columbia law governs the contract between CUA and Plaintiff.

Professor"); ¶ 8 (alleging "[h]e was promoted…from Lecturer to Assistant Professor…"); ¶ 85 (alleging he "was fulfilling his responsibilities under the Contract as an Assistant Professor"); and p. 25 (requesting reinstatement "to his position as Assistant Professor")).  Elsewhere in the Complaint, Plaintiff correctly acknowledges he was only an _Adjunct_ Assistant Professor. (*See* Compl., ¶¶ 1 and 13).  The undisputed facts demonstrate that the latter is correct. Plaintiff's appointment letter states he was extended "an offer of appointment as _Adjunct_ Assistant Professor." (SF # 25-27) (emphasis added). The Faculty Handbook makes clear that the Regular Faculty does _not_ include those appointed in Adjunct capacities, (*see* § II-A-1.004 (defining "regular membership in a Faculty" as including only those appointed with tenure, term appointments probationary for tenure, and contract appointments without tenure)), and that faculty appointed in Adjunct capacities are among those "[o]thers…associated with a Faculty," i.e. the Associated Faculty rather than the Regular Faculty. (SF #14-21).

The Faculty Handbook states in unequivocal terms that "[a]ssociation with a Faculty, regardless of length of service or type of appointment (full-time or part-time), _does not entitle the appointee to regular membership of a Faculty_…" (SF # 20 (quoting Faculty Handbook, § II-A-1.005)). Likewise, Section II-B-1.016 explains, "Regular membership in a Faculty includes appointments with continuous tenure, (B-2), appointments probationary for tenure (B-3), and contract appointments without tenure (B-4). _All other appointments to association with a Faculty, as described in (B-5-7)_, regardless of length of term or extent of duties, full-time or part-time, _do not confer regular membership in a Faculty_" (*Id*. (quoting Faculty Handbook, § II-B-1.016)). While Plaintiff alleges without any basis that "[he] was a contract appointment without tenure" pursuant to Section II-B-4, the position of Adjunct Professor is clearly set forth in _Section II-B-6_ (titled "Faculty Associates"), specifically subsection .045. (SF #21).  It is indisputable that Plaintiff

was a member of the Associated Faculty, not the Regular Faculty. (SF #24).

What flows from that indisputable fact is that Plaintiff was not entitled to the due process procedures in place for Regular Faculty. First, Plaintiff contends CUA was required to give him notice of non-renewal under Sections II-B-3.025-030 and II-C-7. (Compl., ¶¶ 92-94). Those sections of the Faculty Handbook pertain to faculty appointments probationary for tenure and contract appointments without tenure, which are categories of Regular Faculty. (SF #15-16). As explained above, that is not Plaintiff. Second, Plaintiff asserts that he was entitled to the due process requirements of Section II-G-7, titled "Dismissal for Cause." (Compl., ¶¶ 75-82 and 86). Section II-G-7 pertains only to members of the faculty with tenure or whose term appointment has not expired, which again are categories of Regular Faculty. (SF #15-16). Because Plaintiff was not a member of the Regular Faculty, the procedures of Section II-G-7 did not pertain to him.

Plaintiff alleges that he "was fired prior to the expiration of the date stated in his Contract." (Compl. ¶ 85).  While Plaintiff was informed on June 23, 2020, that he would no longer teach any classes and his contract would not be renewed the following year,  he was not fired.  (SF #23, 25-26, and 45).  In fact, CUA paid Plaintiff's full salary throughout the entirety of his contract.  (SF #30-31 and 44).  Plaintiff's appointment, as a member of the Associated Faculty, was to terminate automatically on August 19, 2020 without further notice, and that is when it in fact terminated. (SF #23, 25-26, and 45). In this regard, given that he was paid all compensation to which he was entitled, it is impossible for Plaintiff to prove any monetary loss due to any purported breach of contract, and Plaintiff "thus cannot sustain an action." *Tsintolas Realty Co.*, 984 A.2d at 187.

Finally, Plaintiff contends that Article I of the Constitution of the Academic Senate creates a "shared responsibility" "for the academic governing of the University" between the President and Academic Senate. (Compl. ¶ 98). Plaintiff alleges that he was "a third-party beneficiary of the

shared responsibility," (Compl. ¶ 98), and that  President John Garvey, "in failing to forward the demand to be heard in a formal hearing before the Faculty, has caused Catholic University to breach the contract."  (Compl. ¶ 99).  However, in support of this argument, Plaintiff again relies on Section II-G-7 of the Faculty Handbook, governing "Dismissal for Cause" of faculty members with tenure or whose appointment term has not expired, both of which are Regular Faculty.  As explained above, those provisions of the Faculty Handbook do not apply to Plaintiff and cannot form the basis of his breach of contract claim.

Ultimately, Plaintiff, as an Adjunct Assistant Professor, was an Associated Faculty member and was never part of the Regular Faculty. (SF #14-21 and 24).  Per the terms of the appointment letter and the Faculty Handbook, Plaintiff's appointment, effective August 19, 2019, "[was] for one academic year." SF #23, 25-26, and 45. Plaintiff enjoyed only "such privileges as the host Department of Faculty may extend." (SF #19). Plaintiff was not entitled to the same privileges and rights as the Regular Faculty. (SF #18-20). Specifically, neither Section II-E nor Section II-G of the Faculty Handbook, as alleged by Plaintiff, conferred any rights on him, (SF #22-23), and none of the Handbook provisions on which Plaintiff attempts to rely were applicable to him. By the terms of Plaintiff's appointment letter and the Faculty Handbook, no such process was due to Plaintiff regarding CUA's decision not to renew his contract.

Based on the indisputable facts, CUA is entitled to summary judgment as to Count III and, to the extent they survive as breach of contract claims, on Counts I and II as well.

V.     **CONCLUSION**

Defendant, The Catholic University of America, respectfully requests that this Honorable Court grant the Motion to Dismiss, or in the Alternative, for Summary Judgment, and enter an Order dismissing, or entering summary judgment in CUA's favor on, all counts in the Complaint.

Respectfully Submitted,

Dated: February 15, 2022

_____ */s/ Stephen B. Stern* _____
Stephen B. Stern, VA Bar No. # 40300
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, MD 21401
Phone:  (410) 216-7900
Facsimile: (410) 705-0836
stern@kaganstern.com


_____ */s/ Michael J. Marinello* _____
Michael J. Marinello, *pro hac vice*  pending
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, MD 21401
Phone:  (410) 216-7900
Facsimile: (410) 705-0836
marinello@kaganstern.com

*Attorneys for Defendant, The Catholic University of America*


## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2022, I filed the foregoing using the Clerk's CM/ECF system, which will provide notice to all counsel of record.


_____ */s/ Stephen B. Stern* _____
Stephen B. Stern, VA Bar No. # 40300