

DEFENDANT'S
EXHIBIT

A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN TIESO,                         )
                                  )
          Plaintiff,             )
                                    )         Civil Action No.
        v.                      )         1:22-CV-00031 (PTG-JFA)
                                    )
THE CATHOLIC UNIVERSITY     )
OF AMERICA,                    )
                                    )
          Defendant.         )

## AFFIDAVIT OF J. STEVEN BROWN

DISTRICT OF COLUMBIA, TO WIT:

I, J. Steven Brown, am over 18 years of age, competent to testify, and have personal knowledge of the facts set forth herein.

1.      I am the Senior Vice Provost for Academic Administration and Dean of Graduate Studies at The Catholic University of America ("CUA").

2.      In my capacity as Senior Vice Provost, I supervise the administrators and staff in the Office of the Provost, including the Academic Budgets team. I also handle graduate academic programs and appeals and am the *ex officio* chair of the Committee on Appointments and Promotions of the Academic Senate, the university-wide committee responsible for conducting reviews for appointment and promotion.

3.      CUA is a private, nonprofit institution incorporated in the District of Columbia.

4.      CUA has a Faculty Handbook which is comprised of four parts. Part I discusses the organization of CUA and includes copies of CUA's Bylaws and other historical and current governing documents. Part II governs appointments and promotions of faculty members. Part III governs policies, procedures, and services, such as faculty duties, contracts and compensation,

1

clergy and religious provisions, intellectual property and other general campus policies. Part IV consists of the Canonical Statutes of the Ecclesiastical Schools of CUA. Parts I and II of the Faculty Handbook are attached hereto as <u>Exhibits A-1 and A-2</u>.

5. As reflected in Part I of the Faculty Handbook, CUA's educational mission is uniquely characterized by its identity as a Catholic institution. For example, as stated in CUA's Mission Statement:

> As the national university of the Catholic Church in the United States, founded and sponsored by the bishops of the country with the approval of the Holy See, The Catholic University of America is committed to being a comprehensive Catholic and American institution of higher learning, faithful to the teachings of Jesus Christ as handed on by the Church.

> Dedicated to advancing the dialogue between faith and reason, The Catholic University of America seeks to discover and impart the truth through excellence in teaching and research, all in service to the Church, the nation and the world.

6. CUA is organized into twelve Schools of the University, one of which is the Tim and Steph Busch School of Business and Economics ("Busch School of Business").

7. While the operations of CUA are overseen by its Board of Trustees, the day-to-day affairs of CUA are led by the President, John Garvey, Esq., and several other senior administrators, together with the Academic Senate which, pursuant to the university's Bylaws, shares with the President immediate responsibility for academic governing of CUA.

8. The Academic Senate is comprised of the President, the Provost, the Vice Provost and Dean of Graduate Studies, the Vice Provost and Dean of Undergraduate Studies, the Deans of the various Schools, other administrative officials, representatives of the student bodies, and delegates elected by the faculties of the various Schools.

9. Among the senior administrators assisting the President is the Provost, Dr. Aaron Dominguez, who sits as the chief academic officer and oversees the academic life of the

University's twelve schools, as well as its libraries, University Press, and its research centers. Dr. Dominguez is assisted by several Vice Provosts, including myself as the only "senior Vice Provost," and an Assistant Provost.

10.     Reporting to the Provost are the Deans of each of the twelve CUA Schools. The Deans are responsible for the proper function of their respective Schools, including but not limited to: strategic planning; admitting students to the School; maintaining the School's programs; and managing the School's budget and policies. In addition, the Deans, in conjunction with the Senior Vice Provost, handle faculty appointments, reappointments, promotions, and tenure for their respective Schools.

11.     Three Schools are further broken down into Departments, which are led by Chairs. The Busch School of Business is not one of those schools.

12.     There are two categories of faculty at CUA: (a) regular members of Faculty ("Regular Faculty"); and (b) "others associated with the Faculty" ("Associated Faculty").

13.     The Regular Faculty consists of faculty who have been appointed to "regular membership in a [School] Faculty," at a specific rank of Instructor, Assistant Professor, Associate Professor, or Ordinary Professor. (*See* Exh. A-2, at Sections II-A-1.001 and .004). Members of the Regular Faculty are appointed by the President of CUA following the "Procedures for Appointment and Qualification" set forth in Section II-C of the Faculty Handbook.  The Regular Faculty generally consists of full-time faculty members.

14.     As stated in Section II-A-1.004 of the Faculty Handbook, "Appointments to regular membership in a Faculty are of three kinds: appointments with continuous tenure [i.e., indefinite, tenured instructors or professors], term appointments probationary for tenure [i.e., probationary, tenure-track instructors or professors], and contract appointments without tenure [i.e., a non-tenure

track, full-time teaching position]." (*See* Exh. A-2, at Section II-A-1.004; *see also* Section II-B-1 through II-B-5).

15.     Members of the Regular Faculty enjoy certain rights and privileges commensurate with such appointment.  For example "the privileges of voting and serving in an administrative capacity within the Faculty (i.e., as dean or chair, or as associate dean or chair)…are enjoyed only by regular members of a Faculty…" (*See* Exh. A-2, at Section II-A-1.005).

16.     The Associated Faculty, meanwhile, consists of non-regular members of the Faculty who are "associated with a [School] Faculty" in one of several positions. As described in Section II-A-1.005, "Others may be associated with a Faculty (a) as Professors Emeriti; (b) in Research, Visiting, or Adjunct capacities, as designated by the prefix to the professional title; (c) as Lecturers; (d) as Research Associates, Clinical Associates, or Visiting Scholars; or (e) as Teaching or Research Assistants." (*See* Exh. A-2, at Section II-A-1.005).

17.     Associated Faculty members specifically enjoy fewer rights and privileges than the Regular Faculty. The rights and privileges bestowed upon Associated Faculty members are at the discretion of their respective Deans.

18.     As stated in Section II-A-1.005, "Association with a Faculty, regardless of length of service or type of appointment (full-time or part-time), does not entitle the appointee to regular membership of a Faculty except through the procedures for recruitment and appointment of Faculty as provided in Section C, Procedures for Appointments and Promotions." Similarly, as stated in Section II-B-1.016, "All other appointments to association with a Faculty, as described in (B-5-7), regardless of length of term or extent of duties, full-time or part-time, do not confer regular membership in a Faculty." (*See* Exh. A-2, at Section II-A-1.005 and II-B-1.016).

19.     Certain of the Associated Faculty positions are more fully described in Section II-B-6 of the Faculty Handbook.  Regarding adjunct professors, Subsection .045 provides, in relevant part:

> An adjunct appointment at any of the four professorial ranks [i.e., Instructor, Assistant Professor, Associate Professor, or Professor] may be made on recommendation of the cognizant Dean and Department or School Faculty and upon approval of the Committee on Appointments and Promotions of the School…An adjunct appointment is for part-time service. The appointment is for one academic year and may be renewed on the recommendation of the cognizant Dean and Department or School Faculty.

20.     Section II-E of the Faculty Handbook governs "Appeals from Adverse Decisions." By its own language, this section applies only to Regular Faculty.  First, it provides for appeals only by "members of the Faculty" and does not apply for appeals by others "associated with the Faculty." Second, it provides for appeals only related to "decisions made by the University on promotion, tenure and reappointment to probationary or contract terms," which are the three categories of Regular Faculty (as set forth in Section II-A-1.004, which describes the three kinds of Regular Faculty as appointments with continuous tenure, term appointments probationary for tenure, and contract appointments without tenure).

21.     Section II-G of the Faculty Handbook governs "Termination of Appointments." Whereas Section II-G provides for procedures and certain due process for dismissal with cause of a Regular Faculty member with tenure or whose term appointment has not expired, it provides the following with respect to Associated Faculty:

> Probationary appointments and appointments as Faculty associates are for stated terms. A probationary appointment is terminated at the end of the stated term if timely notice of non-renewal is given, in accordance with the schedule set forth in…[Section] B.3 025-30 [pertaining to "Appointments Probationary for Tenure"]. An appointment as a Faculty associate is terminated automatically at the end of the stated term without further notice.

(*See* Exh. A-2, at Section II-G-1.185).

22.     John Tieso ("Mr. Tieso") did not fall within any of the three kinds of Regular Faculty appointments, and at no time was he ever appointed to regular membership of a Faculty.

23.     Instead, from August 2013 through August 2019, Mr. Tieso was "associated" with the Faculty of several CUA Schools as a Lecturer. On September 18, 2019, Mr. Tieso was appointed, effective August 19, 2019, as an Adjunct Assistant Professor and associated with the Busch School of Business in such capacity for a one-year term through August 19, 2020. Mr. Tieso's appointment letter is attached hereto as Exhibit A-3.

24.     An appointment to Adjunct Assistant Professor, in and of itself, does not ensure or guarantee that the appointee will actually be assigned to teach in any given semester(s). For example, the Busch School appointed two other persons to be Adjunct Assistant Professors for the year beginning August 20, 2019, together with Mr. Tieso. The two instructors taught courses in the fall of 2019 and spring of 2020, but not summer of 2020.  Then the Busch School of Business appointed three Adjunct Assistant Professors for the year beginning August 20, 2020. Of those three, one taught in fall 2020 and spring 2021, but not summer 2021. Of the other two, one taught in fall 2020 but not spring or summer 2021, and the other taught in spring 2021 but not fall 2020 or summer 2021.

25.     An appointment to Adjunct Assistant Professor, in and of itself, also does not ensure or guarantee any particular compensation to the appointee.  Instead, the appointee's compensation is determined by and based on actual courses taught, with each course governed by its own "Contract Appointment to Instruction."

26.     The decision to assign a faculty member to teach a particular course is within the discretion of the cognizant Dean.

27.     Following his appointment to the one-year term as an Adjunct Assistant Professor, Mr. Tieso was assigned to teach three courses during the Fall 2019 semester, from August 26, 2019 to December 14, 2019.  The "Contract Appointment to Instruction" for each of those three courses provided for $6,000.00 of salary per course. The "Contract Appointment to Instruction" for each of the three Fall 2019 courses are attached hereto as Exhibit A-4.  Mr. Tieso taught all three of those courses and was paid all salary therefor. Attached hereto as Exhibit A-5 is the pay report from CUA's Cardinal Faculty and Staff HR - Payroll System reflecting payment to Mr. Tieso for the Fall 2019 semester courses.

28.     Similarly, Mr. Tieso was assigned to teach two courses during the Spring 2020 semester, from January 13, 2020 to May 9, 2020.  The "Contract Appointment to Instruction" for each of those two courses also provided for $6,000.00 of salary per course. The "Contract Appointment to Instruction" for each of the two Spring 2020 courses are attached hereto as Exhibit A-6.  Mr. Tieso taught both of those courses and was paid all salary therefor. (*See* Exhibit A-5).

29.     Going into the Summer 2020 semester, which ran from May 18, 2020 to August 1, 2020, Mr. Tieso was scheduled to teach two courses.  The Summer 2020 semester consisted of two sessions, with the first session running from May 18, 2020 to June 28, 2020 and the second session running from June 29, 2020 to August 1, 2020.  Mr. Tieso's two courses were originally scheduled to begin on May 18, 2020 and to run through both sessions until August 1, 2020, and he was to be paid $4,000.00 per course. The "Contract Appointment to Instruction" for each of the two Summer 2020 courses are attached hereto as Exhibit A-7.

30.     In light of the complaint against Mr. Tieso and subsequent investigation, his two Summer 2020 semester courses were rescheduled for the Second Session, to begin on June 29, 2020.

31.     Ultimately, Mr. Tieso did not teach either of the courses he was scheduled to teach in the Summer 2020 semester; however, he was paid the full $4,000.00 for each course ($8,000 total for the 2020 Summer semester). Attached hereto as <u>Exhibit A-8</u> is the pay report from CUA's Cardinal Faculty and Staff HR - Payroll System reflecting payment to Mr. Tieso for the Summer 2020 semester courses.

32.     All compensation owed to Mr. Tieso under any contracts with CUA has been paid to him by CUA, and no compensation has been withheld from him.

33.     In fact, when Mr. Tieso's two Summer 2020 semester courses were postponed from the First Session to the Second Session, enrollment in one of the courses fell to only three students. Under CUA pay policy, faculty compensation per course is determined, in part, by the size of the class. See, for example, CUA's Summer 2020 Compensation Guidelines attached hereto as <u>Exhibit A-9</u>. Pursuant to the policy, CUA actually sought to adjust Mr. Tieso's pay for the three-student course from $4,000.00 to $2,000.00. In late May 2020, CUA sent him a Revised Contract Appointment for Instruction which Mr. Tieso promptly rejected indicating an intent not to even teach the course. The email and "Revised Contract Appointment for Instruction" are attached hereto as <u>Exhibit A-10</u>, and Mr. Tieso's response email is attached hereto as <u>Exhibit A-11</u>. Nevertheless, Mr. Tieso was still paid the full $4,000.00 rate for the course, even though he never taught the course.

34.     On August 19, 2020, Mr. Tieso's appointment as an Adjunct Assistant Professor expired per the terms of his appointment letter and Section II-G-1.185 of the Faculty Handbook.

35.     Throughout his time associated with CUA, Mr. Tieso only taught courses at CUA's campus in the District of Columbia. He never taught any courses at CUA's new location in

Alexandria, Virginia,  or in any other location outside of the District of Columbia or in a fully online mode.

36.    The attached documents, as set forth in the Index of Exhibits to this affidavit (Exhibits A-1 through A-11), are true and accurate copies of records that are maintained by The Catholic University of America.

   **I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT UPON
PERSONAL KNOWLEDGE THE CONTENTS OF THE FOREGOING AFFIDAVIT ARE
TRUE AND CORRECT.**

_____        15 February 2022
J. Steven Brown                         _____
                                        Date

10

**Index of Exhibits to the**
**Affidavit of J. Steven Brown**

<u>Exhibit</u>      <u>Document</u>

A-1        Faculty Handbook, Part I

A-2        Faculty Handbook, Part II

A-3        Appointment Letter dated September 18, 2019

A-4        Contract Appointments to Instruction for Fall 2019 Courses

A-5        CUA Pay Report for Fall 2019 and Spring 2020 Courses

A-6        Contract Appointments to Instruction for Spring 2020 Courses

A-7        Contract Appointments to Instruction for Summer 2020 Courses

A-8        CUA Pay Report for Summer 2020 Courses

A-9        CUA Summer 2020 Compensation Guidelines

A-10      Email to Mr. Tieso dated May 29, 2020 with Revised Contract Appointment to Instruction

A-11      Email from Mr. Tieso to CUA dated May 29, 2020

# EXHIBIT A-1

# THE CATHOLIC UNIVERSITY OF AMERICA

DEFENDANT'S
EXHIBIT

A-1

## FACULTY HANDBOOK

### PART I

## THE GOVERNMENT OF THE UNIVERSITY

Approved by the Board of Trustees December 2017

Approved by the Board of Trustees December 2016

Additional History

# PREAMBLE

The *Faculty Handbook* defines the relationship between The Catholic University of America and those individuals appointed to its faculties. The stated provisions of the *Faculty Handbook* are also subject to and, therefore, interpreted in the light of the following, where applicable:

1. the provisions of civil law;

2. the provisions of ecclesiastical law;

3. the provisions of the Ecclesiastical Statutes of The Catholic University of America as they relate to ecclesiastical faculties and to those matters governed by these statutes or by the norms of the Apostolic See pertinent to ecclesiastical programs of study;

4. the By-Laws of The Catholic University of America.

The stated provisions of the *Faculty Handbook* are subject to modification as warranted. They are also subject to regular review by the Academic Senate of The Catholic University of America and the Fellows and/or Board of Trustees, as applicable in the Bylaws, every five years, which period commences at the time of the most recent approval and promulgation of the *Faculty Handbook* by the Board of Trustees.

Any alterations, modifications, or changes to the stated provisions of the *Faculty Handbook* are subject to approval by the Fellows and/or the Board of Trustees, as applicable in the Bylaws, following appropriate consultation of the Academic Senate and the President.

It is the responsibility of the Administration of The Catholic University of America to announce such alterations, modifications, or changes to or interpretation of the stated provisions of the *Faculty Handbook* and their effective date to the administration, staff and faculties of the University.

It is the responsibility of the administration, staff and faculties of The Catholic University of America to be familiar with and to observe the stated provisions of the *Faculty Handbook*.

The *Faculty Handbook* contains four parts, devoted respectively to the Government of the University (Part I), Faculty Appointments and Promotions (Part II), General Information about Policies, Procedures, and Services (Part III), and the Canonical Statutes of the Ecclesiastical Faculties of The Catholic University of America (Part IV). Part I was approved in its present form by the Board of Trustees in 2016; Part II in 2017; Part III in 2001, and Part IV in 2017. This edition incorporates amendments adopted since those dates.

## A.      The Organization of the University

**Section 1: Introduction**                                             *Revised December 2016*

The Catholic University of America was founded under the auspices of the Roman Catholic Church in the United States of America. From its inception, it has been supported by American Catholics who, through their Bishops, have made generous financial contributions to maintain a national center of academic excellence not only in the sacred sciences but in the arts and sciences generally and in selected professional fields.

The official history of the University dates from 1866 when the Bishops of the United States, meeting in the Second Plenary Council of Baltimore, expressed their earnest desire to have under Catholic auspices a university where "all the letters and sciences, both sacred and profane, could be taught." During the Third Plenary Council in 1884, the Bishops proposed to establish with a gift of $300,000 from Miss Mary Gwendoline Caldwell of Newport, Rhode Island, a school of higher studies in theology as "a kernel or bud from which, with the help of God's grace, there would blossom forth in its own time a complete university." Pope Leo XIII formally approved the project of a national university on April 10, 1887 (commemorated annually as Founder's Day). Civil incorporation was obtained immediately thereafter. Later in the same year, Pope Leo named John Joseph Keane, Bishop of Richmond, as Rector, and in 1889, in a letter to James Cardinal Gibbons, Archbishop of Baltimore, and his brother Archbishops and Bishops, the Pope confirmed the original Constitutions which placed the University under the jurisdiction of the American Hierarchy, subject to the approval of the Holy See, with pontifical status.

Classes opened in Caldwell Hall on November 13, 1889, with Cardinal Gibbons as Chancellor, Bishop Keane as Rector, and a distinguished Faculty of eight professors. The University then had only the School of Sacred Sciences. In 1895 the Schools of Philosophy and Social Science were opened in McMahon Hall, which had been built from proceeds of a gift of land valued at $400,000 from the Right Reverend James McMahon of New York City. Like The Johns Hopkins University, founded in 1876, and Clark University, founded in 1883, The Catholic University of America was conceived and established as a graduate school somewhat on the model of contemporary German universities. Today its academic complex includes twelve Schools[1].

The Certificate of Incorporation given to the University by the District of Columbia in 1887 (Appendix, n. 2) was amended by the Congress of the United States in 1928 (Appendix, n. 4), to extend the services of the University to institutions which it might accept for affiliation and to expand in various particulars the authority of the Board of Trustees. In 1964, by action of the Board, the University filed a Statement of Election to accept the provisions of the District of Columbia Nonprofit Corporation Act (Appendix, n. 5). These documents constitute the civil charter of the University. The Congressional Charter of the University was reaffirmed in filings made pursuant to the new DC non-profit law in December 2013.

---

[1] For histories of successive administrations of The Catholic University of America, see John Tracy Ellis, *The Formative Years of The Catholic University of America* (Washington: American Catholic Historical Association, 1946); Patrick H. Ahern, *The Catholic University of America, 1887-1896. The Rectorship of John J. Keane* (Washington: The Catholic University of America Press, 1949); Peter E. Rogan, S.S.J., *The Catholic University of America, 1896-1903. The Rectorship of Thomas J. Conaty* (Washington: The Catholic University of America Press, 1949); Colman J. Barry, O.S.B., *The Catholic University of America, 1903-1909. The Rectorship of Denis J O'Connell* (Washington: The Catholic University of America Press, 1950); Blase Dixon, T.O.R., "The Catholic University of America, 1909-1928. The Rectorship of Thomas Joseph Shahan" (unpublished doctoral dissertation, The Catholic University of America, 1972); H. Warren Willis, "The Catholic University of America, 1928-1935. The Rectorship of James Hugh Ryan" (unpublished doctoral dissertation, The Catholic University of America, 1972); and C. Joseph Nuesse, *The Catholic University of America: A Centennial History* (Washington: The Catholic University of America Press, 1990).

The Constitutions approved by Pope Leo XIII were revised in 1926 and again in 1937, when they were designated as Statutes. Subsequent modifications were included in a new edition in 1964. In view of the University's pontifical status, explicit recognition was given to the Apostolic Constitution *Deus Scientiarum Dominus* of 1931, and to the *Ordinationes* of the Sacred Congregation of Seminaries and Universities attached to it. These documents were replaced in 1979 by a new Apostolic Constitution, *Sapientia Christiana*, and accompanying *Ordinationes* of the (renamed) Sacred Congregation for Catholic Education, intended to take into account the Declaration of Vatican Council II, *Gravissimum educationis*, and other developments. The Apostolic Constitution and the Norms of Application govern the conduct of ecclesiastical studies having canonical effects.

With the approval of the Holy See, the former Statutes were superseded at the beginning of 1970 by the civil Bylaws that are now the effective governing document of the University. In December 2016 the Bylaws were amended to create a two-tiered governance structure comprised of Fellows and the Board of Trustees. By provision of these Bylaws, their full force and effect is extended to the Constitution of the Academic Senate and the *Faculty Handbook* when these documents are duly approved by the Fellows and/or the Board of Trustees, as applicable. The Bylaws give recognition also to the Special Statutes for Pontifical Schools which provide that courses, programs and degrees having canonical effects shall be conducted according to norms and regulations promulgated by the Holy See.

### Section 2: The Board of Trustees                                   *Revised December 2016*

The civil charter and the Bylaws place in the Fellows and the Board of Trustees ultimate responsibility for governance and sole responsibility for fiscal affairs of the University. The University's governance structure is intended to perfect and make permanent the University's essential character as a Catholic and American institution of higher learning and its role as the national university of the Catholic Church while permitting greater lay responsibility and support for the University. The responsibility for governance and oversight of the operations of the University resides in the first instance in the University's Board of Trustees. The Fellows serve as the members of the University and hold certain retained powers designed to preserve the ecclesiastical patrimony of the University. The Board of Trustees is empowered to create any new school or department or to eliminate any existing school or department after first consulting with the Academic Senate and the administration of the University through the University President. All powers not reserved to the Fellows of the University shall be vested in the Board of Trustees and the business of the University shall be managed and exercised by the Board of Trustees to the extent not reserved to the Fellows, subject to any limitation set forth in the Articles of Incorporation or the Bylaws.

The Fellows, who are also trustees, serve as the members of the University and hold certain retained powers. There shall be Cardinal Fellows, Bishop Fellows, Appointed Fellows, and *Ex Officio* Fellows, who shall be the Chairman of the Board of Trustees, the President of the University, the Chancellor of the University, and the President of the U.S. Conference of Catholic Bishops.

The Bylaws provide for attendance at meetings of the Board of three representatives of the Faculties, who participate without vote, and for attendance at meetings of the Executive Committee of one of these representatives, again without vote. Each representative is elected for a three year term and may be re-elected for only one consecutive term. By decision of the Academic Senate, the representatives are elected by and from each of three groups of Faculties, namely, the School of Arts and Sciences, the Ecclesiastical Schools (Canon Law, Philosophy, and Theology & Religious Studies), and the Professional Schools (Architecture & Planning, Business and Economics, Engineering, Law, Metropolitan School of Professional Studies, Music, Nursing,

4

and Social Service). The Provost solicits nominations from committees elected for the purpose by the respective Faculties and conducts the elections by mail ballot. A majority of votes cast is required for election, but in the event that a third ballot is required, a simple majority suffices.

The President of The Catholic University of America Alumni Association is also invited to participate in meetings of the Board of Trustees as a non-voting representative of the alumni.

### Section 3: Executive Officers                                                *Revised December 2016*

Officers. The officers of the University shall be a Chairman, a President, a Vice Chairman, a Chancellor, a Secretary, a Treasurer, a Provost and a Vice President for Finance, and, in the discretion of the Board of Trustees, such other officers or assistant officers as may be deemed necessary or advisable to carry out the business of the University. No person may hold more than one office except that the same person may hold the office of Treasurer and Vice President for Finance. The officers shall have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as may be lawfully provided in the Bylaws or by resolution of the Board of Trustees consistent with the Bylaws.

Election and Appointment; Term. The Board of Trustees shall elect the Chairman and the Vice Chairman at the annual meeting of the Board of Trustees to serve for a term of three (3) years or until his or her successor is elected. The Chairman and the Vice Chairman shall take office upon conclusion of the annual meeting at which he or she is elected. The Board of Trustees shall recommend and the Fellows shall appoint the President as provided in the Bylaws; the Board shall appoint the Secretary and Treasurer upon recommendation of the President. The President shall appoint the Vice President for Finance whenever a vacancy occurs in that office. As provided in section 1.5 of the Bylaws, the Chancellor shall be that individual serving as the Archbishop of Washington, who shall serve ex officio during his tenure in such office. Any other officer or assistant officer shall be appointed or elected and shall serve such terms as the Board of Trustees shall direct. The Chairman, President, and Vice Chairman may resign at any time upon written notice to the Board of Trustees, and no acceptance of resignation shall be necessary to make it effective. The Vice President for Finance, Treasurer, the Secretary, and any other officer may resign at any time upon written notice to the President, and no acceptance of resignation shall be necessary to make it effective.

Removal. The Board of Trustees may remove the Chairman, the President, the Vice Chairman, the Treasurer, and the Secretary at any time, with or without cause. The President may remove any officer or assistant officer appointed by the President at any time, with or without cause.

Chairman. The Chairman shall be a member of the Board of Trustees. The Chairman, if present, shall chair all meetings of the Board of Trustees.

President. The President shall be the chief executive officer of the University on a full-time basis and will be responsible for the supervision and operation of all its affairs, under the direction and control of the Chairman and the Board of Trustees in accordance with the University's Bylaws.  The President is appointed by the Fellows upon the recommendation of the Board of Trustees, after a report of a search committee that must include at least three members of the faculties, elected by procedures.  The President confers civil degrees earned in course on the recommendations of the cognizant Faculties and the Academic Senate and honorary degrees either on the recommendation of the Academic Senate or his own recommendation when approved by the Board.

Vice Chairman. The Vice Chairman shall be a member of the Board of Trustees. In the case of the disability or death of the Chairman, the Vice Chairman shall carry out the duties of the Chairman.

Chancellor. The Chancellor of the University shall have those duties and responsibilities as set forth in section 1.5 of the Bylaws.  The Chancellor shall be that individual serving as the Archbishop of Washington, who shall serve ex officio during his tenure in such office. The Chancellor shall serve as a liaison between the University and the United States Conference of Catholic Bishops and the Holy See. He confers ecclesiastical degrees earned in course on the recommendations of the cognizant Faculties and the Academic.

Secretary. The Secretary shall be an employee of the University who shall be elected by the Board of Trustees upon recommendation of the President. If the Secretary ceases to be an employee of the University during his or her term as Secretary, he or she shall no longer be eligible to continue to serve as the Secretary. The Secretary shall be responsible for ensuring that a faithful record of all meetings of the Board of Trustees is kept, notice of time and plan for holding special meetings of the Board of Trustees as specified in these Bylaws is given, and all documents entrusted to his or her care are filed and safely kept. The books and papers kept by the Secretary shall be subject at all times to inspection by the Fellows, the Board of Trustees, the President, or any duly authorized committee of the Board of Trustees.

The Provost. The Provost is the chief academic officer and acts for the President in his absence.  The Provost is responsible for liaison with the Committee on Academic Affairs of the Board of Trustees.  The Provost has continuing general responsibility for the coordination and development of all academic units and programs. On behalf of the President, the Provost receives recommendations for academic appointments and for sabbatical and other leaves of absence and issues the official letters of appointment or leave.  The Provost exercises general supervision of procedures leading to recommendations for appointments with continuous tenure and receives appeals for reconsideration of recommendations against reappointment.  The Provost approves applications to external agencies for funding of instructional, research, and service programs.

Treasurer. The Treasurer shall keep the Board of Trustees informed of all material matters pertaining to the business and financial affairs of the University.  Through the Finance Committee, the Treasurer shall render regular reports to the Board of Trustees.

Vice President for Finance. The Vice President for Finance/Treasurer shall be the chief financial officer and administrative officer of the University under the President in charge of the business and financial affairs of the University and its various divisions.  The Vice President for Finance shall report to and be responsible to the President and shall keep the President informed of all material matters pertaining to the business and financial affairs of the University.  The Vice President for Finance shall be the officer charged with the supervision of the activities of all other staff members in the areas of business and financial management.  The financial records of the University kept by the Vice President for Finance shall be subject at all times to inspection by the Fellows, the Board of Trustees, the President, the Treasurer or any duly authorized committee of the Board of Trustees.

The Board of Trustees may in its discretion or upon the recommendation of the Trusteeship Committee designate as a Trustee Emeritus or Emerita any individual who is a former member of the Board of Trustees or an Appointed Trustee whose term is expiring. Designation of an individual as a Trustee Emeritus or Emerita shall be dependent upon the needs and best interests of the University at that time. A Trustee Emeritus or Emerita shall be invited to all functions of the University to which Trustees are invited, including meetings of the Board of Trustees, and may participate in Board of Trustees' discussions, but shall not have the power to vote. At the discretion of the Board of Trustees or the Chairman, Trustees Emeriti or Emeritae may serve on

6

committees of the Board of Trustees, other than the Executive Committee, and may also be asked to participate in other University activities from time to time. Any Trustee Emeritus or Emerita appointed to serve on a committee of the Board of Trustees may vote on any matter to be presented to the Board of Trustees or Executive Committee as a recommendation of such committee, but may not vote on any matter in which the committee is exercising the final authority of the Board of Trustees. The attendance of any Trustee Emeritus or Emerita appointed to any committee at any meeting of that committee shall not count towards the establishment of a quorum for the transaction of business by such committee. A Trustee Emeritus or Emerita shall serve until death, incapacity, resignation, or removal.

**Section 4: Academic Senate**                                                      *Revised June 2006*

The Academic Senate shares with the President the immediate responsibility for academic governing of the university by establishing, maintaining, supervising, and in general being responsible for the academic policies of the University. Its Constitution and any amendments, as approved by the Board of Trustees, is in full force and effect binding on the Faculty of the University. The Constitution which is given below in Part B, Current Governing Documents, determines the membership of officers of administration, deans, faculty delegates, students, and others.

Elections of delegates from the Faculties, in proportion to the number of regular faculty members, are held in the individual schools during the month of March for three year terms beginning the following September 1. Deans send notices of the election at least two weeks in advance. Elections are by secret ballot, absentee ballots are excluded, and a simple majority is required. In the event of a vacancy before the expiration of a regular term, a delegate is elected for the remainder of the term.

The Associate Provost, University Libraries and one professional member of the Library Staff elected by the Staff are members of the Senate. Student delegates are elected annually under the auspices of the Graduate Student Association and the Undergraduate Student Government. Both representatives of the Libraries and student representatives have full voting rights, except in passing on the qualifications of faculty members proposed for rank or tenure. The Registrar is a non-voting member of the Senate.

The three faculty representatives elected as non-voting members of the Board of Trustees also serve as members of the Academic Senate, without vote but with the right to propose and second motions. In addition, the Senate may annually, by two-thirds vote, invite non-voting participation by other persons.

**a. Committees of the Academic Senate**

Ordinarily, the Chair of each standing committee of the Academic Senate is appointed from the membership, but other members may be appointed from any part of the University. Members serve for one year and may be reappointed. The standing committees are listed here in alphabetical order.

The Committee on Academic Freedom and Tenure investigates and reports to the Academic Senate any policy that may affect academic freedom and/or tenure.

The Committee on Appointments and Promotions examines all applications for appointment, promotion, and tenure on which the Academic Senate must pass and makes recommendations for their disposition.

The Committee on Budget and Planning participates in an advisory capacity in the preparation of the

University's annual operating budget and in the formulation and interpretation of the Administration's budgetary policies.

The Committee on Committees and Rules appoints the chair and members of all other standing committees, except the Committee on Budget and Planning and, unless the appointment is made by the Academic Senate itself, all special committees. It also serves as a nominating committee to submit names of candidates for election as officers of the Senate. The committee continuously evaluates and proposes changes in the rules of the Senate. Its members are elected directly by the Academic Senate and include the Vice Chair of the Senate *ex officio*.

The Committee on Educational Policy considers and reports on any academic matters referred to it, conducts studies and reports on legislation or administrative policies involving questions of educational policy and students.

The Committee on Faculty Economic Welfare makes recommendations to the Academic Senate concerning the economic welfare of faculty members.

The Committee on the *Faculty Handbook* prepares revisions of the *Handbook* for approval by the Academic Senate.

The Committee on Failing Grades hears appeals of failing grades upon petition when procedures in the cognizant School have been exhausted.

The Committee on Honorary Degrees recommends nominees for honorary degrees for consideration by the Academic Senate.

The Committee on Libraries advises the Academic Senate concerning the holdings, facilities, policies, and services of University libraries.

The Committees of the Academic Senate are discussed in greater detail in the Policy on Academic Senate Committees.

### b. The Graduate Board

The Academic Senate has delegated to the Graduate Board general supervision over all matters relating to graduate study, for example, standards of admission, programs of study, and requirements for degrees. The Graduate Board reports to the Academic Senate its recommendations on these matters.

The Vice Provost and Dean of Graduate Studies is the Chair of the Graduate Board *ex officio*. Members are appointed by the Academic Senate upon the joint recommendation of the Chair of the Graduate Board and the Dean of the School from which the appointment is made. Each School is represented on the Graduate Board by a number of members equal to the number of its faculty delegates in the Academic Senate. Deans are eligible for membership on the Graduate Board. The terms of office coincide with those of the delegates to the Academic Senate.

### c. The Undergraduate Board

The Academic Senate has delegated to the Undergraduate Board general supervision over specific matters

relating to undergraduate study, parallel to the responsibilities of the Graduate Board (above). The Undergraduate Board reports its recommendations to the Academic Senate. The Vice Provost and Dean of Undergraduate Studies is the Chair of the Undergraduate Board ex officio. Members are appointed by the Academic Senate upon the joint recommendation of the Chair of the Undergraduate Board and the Dean of the School from which the appointment is made. Each School is represented on the Undergraduate Board by a number of members equal to the number of its faculty delegates in the Academic Senate. Deans are eligible for membership on the Board. The terms of office coincide with those of the delegates to the Academic Senate.

### Section 5: The Faculties                                    *Revised December 2016*

As a corporate entity, a Faculty is a body of teachers empowered to act in such matters as the appointment and promotion of its members, the admission of students, the prescription of curriculum requirements, and the recommendation of candidates for degrees. The term, however, is often used unofficially to denote the body of teachers in the entire institution or in a component part of a Faculty, such as a Department.

Only those who hold appointments in faculty rank (i.e., the rank of Instructor or higher rank) are members entitled to vote on matters before a Faculty. Requirements and procedures for appointments as members and associates of a Faculty are explained in Part II of this *Faculty Handbook*. It will be noted that privileges of participation in meetings without the right to vote may be extended to associates and to students and that in certain matters, especially in appointments and promotions and in consultations prior to the appointment of a Dean or Chair of a Department, separate votes may be required of tenured members of a Faculty or of those higher in rank than a candidate for appointment or promotion.

There are at present twelve Schools of the University and a Metropolitan College. In order of establishment, the Schools are Theology and Religious Studies (1889), Philosophy (1895), Columbus School of Law (1899), Arts and Sciences (1906), Canon Law (originally established in 1923, re-established in 2002), Engineering (1930), the National Catholic School of Social Service (1934), Nursing (1935), the Benjamin T. Rome School of Music (1965), Architecture and Planning (1992), the Metropolitan School of Professional Studies (1979), and the Tim and Steph School of Business and Economics (2013). Each School is administered by a Dean who reports to the Provost and the President.

Two Schools are subdivided into departments. Each Department is administered by a Chair who is responsible to the Dean and Faculty of the Department. The School of Arts and Sciences has Departments of Anthropology, Art, Biology, Chemistry, Drama, Education, English Language and Literature, Greek and Latin, History, Mathematics, Media and Communication Studies, Modern Languages and Literatures, Physics, Politics, Psychology, Semitic and Egyptian Languages and Literatures, and Sociology, as well as Programs in Biochemistry, Comparative Literature, and Irish Studies. The Academic Council of the School, composed of the Chairs of the Departments with the Dean presiding, is the standing committee of the Faculty with primary responsibility for the administration of the School.

The School of Engineering has Departments of Biomedical Engineering, Civil Engineering, Electrical Engineering and Computer Science, and Mechanical Engineering, as well as a Program in Engineering Management. The Chairs of the Departments constitute the Executive Committee of the School, over which the Dean presides. The University also offers interdisciplinary programs in Early Christian Studies and in Medieval and Byzantine Studies.

**Section 6: Membership in Consortia**                                        *Issued 1964*
                                                                  *Revised December 2016*

In 1964, the five private universities in the District of Columbia organized the Consortium of Universities to coordinate the use of their respective facilities and resources for the enrichment of their graduate programs. The privileges of the student interchange thus inaugurated have since been extended to undergraduates as well. The Consortium now consists of 18 institutions: American University, Catholic University of America, Gallaudet University, George Mason University, Georgetown University, George Washington University, Howard University, Marymount University, Montgomery College, National Defense University, National Intelligence University, Northern Virginia Community College, Prince George's Community College, Trinity Washington University, Uniformed Services University of Health Sciences, University of the District of Columbia, and University of Maryland at College Park.

A student in an approved degree program may follow courses at other participating institutions that are not offered at this University, subject to the approval of the cognizant Dean and in accord with regulations for registration.

In a faculty exchange arranged through the Consortium, each participating member retains appointment in the home institution under its regulations. Grading systems, class hours, and related matters are regulated by the institution offering the course, which is expected to supply also office facilities, clerical support, and parking space. The participating faculty are expected to maintain office hours at each institution in which they teach.

The School of Theology and Religious Studies participates in the Washington Theological Consortium, founded in 1967 with the University as one of the original member institutions. This Consortium fosters ecumenical academic cooperation through faculty committees, team-taught courses, publication of library guides, cross-listing of course offerings, and student interchange.

## B.      Current Governing Documents

**Section 1: Mission Statement**                                  *Issued December 2006*

In the reorganization of the University's governance in the late 1960s the formulation of institutional mission found in the 1937 "Statutes of The Catholic University of America" (Appendix, n. 6) was reconsidered in the light of the Second Vatican Council (1962-1965). University-wide discussions in academic year 1967-1968 resulted in a "Statement of Objectives," regularly referred to as the "Aims of the University" and published in each issue of the *Announcements* since its adoption.

The statement was prepared by the Academic Senate and, after further mutual discussion, adopted by both that body and the Board of Trustees in 1968. In 1970 the Apostolic See, by action of the Roman Congregation for Catholic Education, approved the statement of aims, along with the Bylaws of the University completed in 1969 (below).

To complement the statement of aims approved by the Board of Trustees on July 26, 1968, the Academic Senate prepared a second document, "Goals of The Catholic University of America" (Appendix, n. 8). It was intended to develop operational goals from the basic institutional aims enunciated in the 1968 statement of aims and was approved by the Senate in the same year. This document was not acted upon by the Board of Trustees at that time but was included in the *Faculty Handbook* for a number of years.

After deliberations in academic years 1977-1978 and 1978-1979 and in consultation with the Faculties, the Academic Senate produced a revision of the 1968 "Goals of the University," and this document was submitted to the Board of Trustees on September 6, 1979. With further revision by a joint committee of the two bodies, the text was approved by the Academic Senate on May 7, 1980, and by the Board of Trustees on June 21 of that year.

Finally, in the wake of a University Self-Study in 1988-1989 and a visit on behalf of the Middle States Commission on Higher Education in 1990, the possibility of combining the two statements, with any necessary revisions, into a single mission statement was studied. On November 21, 1991, the Academic Senate voted to incorporate the two documents, of 1968 and 1980, into a single mission statement but without change in either document.

At its meeting on December 12, 2006, the Board of Trustees of The Catholic University of America approved the following revised "**Mission Statement**" for the university:

> *As the national university of the Catholic Church in the United States, founded and sponsored by the bishops of the country with the approval of the Holy See, The Catholic University of America is committed to being a comprehensive Catholic and American institution of higher learning, faithful to the teachings of Jesus Christ as handed on by the Church. Dedicated to advancing the dialogue between faith and reason, The Catholic University of America seeks to discover and impart the truth through excellence in teaching and research, all in service to the Church, the nation and the world.*

This revised statement replaces the two documents --- "Statement of Aims" and "Statement of Goals" --- that were combined as a mission statement and approved by the Board of Trustees in 1980. While those two documents have been replaced by a single, concise, updated statement comparable to those used by other institutions of higher learning, they still contain elements important to understanding the historic mission of The Catholic University of America. The academic senate has requested that they continue to be documents of reference for the university and the president has approved that request. They are presented here in their approved formulation:

## AIMS OF THE UNIVERSITY

The Catholic University of America is a community of scholars, both faculty and students, set apart to discover, preserve and impart the truth in all its forms, with particular reference to the needs and opportunities of the nation.  As a university, it is essentially a free and autonomous center of study and an agency serving the needs of human society.  It welcomes the collaboration of all scholars of good will who, through the process of study and reflection, contribute to these aims in an atmosphere of academic competence where freedom is fostered and where the only constraint upon truth is truth itself.

As a Catholic university, it desires to cultivate and impart an understanding of the Christian faith within the context of all forms of human inquiry and values.  It seeks to ensure, in an institutional manner, the proper intellectual and academic witness to Christian inspiration in individuals and in the community, and to provide a place for continuing reflection, in the light of Christian faith, upon the growing treasure of human knowledge.

As a member of the American academic community, it accepts the standards and procedures of American institutions and seeks to achieve distinction within the academic world.

Faithful to the Christian message as it comes through the Church and faithful to its own national traditions, The Catholic University of America has unique responsibilities to be of service to Christian thought and education in the Catholic community as well as to serve the nation and the world.

## GOALS OF THE UNIVERSITY

The Catholic University of America was founded in the name of the Catholic Church in the United States by Pope Leo XIII and the bishops of this country as a national institution of learning. Given its origins and the historic role of its ecclesiastical faculties, this university has a responsibility to the Church in the United States that is special to it: It is called to be an intellectual center of highest quality, where the relation between revealed truth and human truth can be examined in depth and with authority. It seeks, moreover, to do this in the light of the American experience. It is for this reason that, from its inception, the university has enjoyed a unique relationship with the Holy See and the entire Catholic community.

Established as a center for graduate study, The Catholic University of America has evolved into a modern American university, committed not only to graduate but also to undergraduate and professional education and to the cultivation of the arts. At every level, the university is dedicated to the advancement of learning and particularly to the development of knowledge in the light of Christian revelation, convinced that faith is consistent with reason and that theology and other religious studies themselves profit from the broader context of critical inquiry, experimentation and reflection.

The university aims at achieving and maintaining in higher education a leading place among Catholic and other privately endowed, research-oriented institutions of comparable size, purpose and tradition. In particular, it seeks to maintain a position of special excellence in the fields of theology, philosophy and canon law.

The Catholic University of America gives primacy to scholarship and scientific research and to the training of future scholars through its graduate programs, not only in order to advance scientific work but also because it recognizes that undergraduate and professional education of high quality also demands the presence of a faculty that combines teaching and professional activity with fundamental scholarship. The university seeks the advancement of knowledge within a context of liberal studies, a context which reflects both its concern for the whole person and the distinctive wisdom to which it is heir as a Catholic institution. This dimension of learning is reflected particularly in its undergraduate programs where religious studies and philosophy are regarded as integral to curricula that include requirements in the arts and humanities, language and literature, and the natural and social sciences. Through its professional programs, the university seeks to educate men and women who can represent their respective professions with distinction and who are formed by the learning and values inherent in its academic and Catholic traditions. In selecting disciplines or fields of specialization to be supported at an advanced level of study and research, the university accords priority to religious and philosophical studies and to those programs which advance the Catholic tradition of humanistic learning and which serve the contemporary and future needs of society and the Church. In supporting particular programs, the university takes into account the present and potential quality of programs, making an effort to maintain present academic strengths, especially when these are not represented elsewhere.

The university recognizes that its distinctive character ultimately depends on the intellectual and moral quality of its members. To create an environment that is intellectually stimulating and characterized by the generosity and mutual support required for collegial life and personal growth, the university seeks men and women who are not only professionally competent but who also can contribute to its Catholic, moral and cultural milieu. The university seeks to preserve its tradition of collegial governance, fostering a climate within which all members of the university community have sufficient opportunities to influence deliberation and choice.

Though a research and teaching institution, the university recognizes that it is part of a larger community to which it has certain obligations consistent with its character. Its presence in the nation's capital and its unique relationship with the Catholic Church in America provide it with opportunities for influencing the resolution of the crucial issues of our time. In providing information and criteria by which public policy is shaped and measured, the university seeks to be of special service to the nation. Similarly, it seeks to be of service to the Church, not only through the preparation of clergy and other leaders for specific roles in the Church, but also through factual investigations and discussions of principles which influence policy. Thus, in dialogue and cooperation with contemporary society, The Catholic University of America sees itself as faithful to the challenge proposed by the Second Vatican Council for institutions of higher learning, namely, to put forth every effort so that "the Christian mind may achieve . . . a public, persistent, and universal presence in the whole enterprise of advancing higher culture" (***Gravissimum educationis***, n. 10) *(approved by the Board of Trustees on June 21, 1980)*

### Section 2: The University's Catholic Identity

*Issued June 2006*
*Revised April 11, 2007*

The very name of the University and its historic relationship to and within the Catholic Church from the time of its establishment by the bishops make abundantly clear its Catholic nature and character. In addition to its Mission Statement, the University is guided with regard to its Catholic identity by the apostolic constitution on ecclesiastical universities and faculties Sapientia Christiana (1979), the 1983 Code of Canon Law (especially canons 807 - 821), the apostolic constitution Ex Corde Ecclesiae (1990), and The Application for Ex Corde Ecclesiae For The United States (USCCB 2001) and other relevant ecclesiastical documents that include, among others, the documents of the Second Vatican Council and other pronouncements of the Holy See and the United States Conference of Catholic Bishops governing Catholic higher education. The apostolic constitution Sapientia Christiana (1979) pertains specifically to the ecclesiastical faculties in the Schools of Canon Law, Philosophy, and Theology and Religious Studies, as do canons 815 through 821 of the 1983 Code of Canon Law. The apostolic constitution Ex Corde Ecclesiae (1990) pertains to all the other schools of the university and the university in its entirety as do canons 807 through 814.

Ex Corde Ecclesiae presents four essential characteristics of a Catholic university: (1) a Christian inspiration not only of individuals but of the entire university community; (2) continuing reflection in the light of the Catholic faith upon the growing treasury of human knowledge to which the university seeks to contribute by its own research; (3) fidelity to the Christian message as it is comes through the Church; and (4) an institutional commitment to the service of the people of God and of the human family (n. 13). The apostolic constitution goes on to state that: "In a Catholic university, therefore, Catholic ideals and principles penetrate and inform university activities in accordance with the proper nature and autonomy of these activities" (n. 14). And, further, "A Catholic University, therefore, is a place of research, where scholars scrutinize reality with the methods proper to each academic discipline, and so contribute to the treasury of human knowledge. In a Catholic university, research necessarily includes (a) the search for an integration of knowledge, (b) a dialogue between faith and reason, (c) an ethical concern, and (d) a theological perspective" (n. 15).

The founders of The Catholic University of America desired an internationally respected institution that accentuated the Catholic contribution to American culture and maintained the highest standards of academic research. The ideal of a Catholic university becomes a reality when the faculty at The Catholic University of America affirms and acts upon the principles contained in the University's Mission Statement. Each member of the faculty, indeed every employee of the university, regardless of his or her religious affiliation, is expected in virtue of their contract of employment to respect and support the University's Mission Statement. In addition, each member of the faculty has a responsibility to reflect on ways in which his or her research contributes to the University's identity, especially as described in Ex Corde Ecclesiae, whether in general or in specific, as is appropriate to the discipline in which the faculty member works. By themselves and in isolation from other academic units, the University's ecclesiastical faculties and its required courses in philosophy and theology cannot alone sustain the institution's religious identity. Promoting the institution's Catholic identity is the responsibility of the entire University community. Indeed, a candidate's willingness to respect and contribute to the mission of the University is a consideration in the tenure process.

The Catholic University of America aspires to the pursuit of knowledge through the lens of faith and reason. The University recognizes that no genuine question is outside the potential interest of a Catholic university. "[A]ccepting the legitimate autonomy of human culture and especially of the academic disciplines," a Catholic university "recognizes the academic freedom of scholars in each discipline in accordance with its own principles and proper methods, and within the confines of the truth and the common good." (n. 29) There are, however, areas of investigation that one might expect to be promoted at a Catholic university and other areas that one might not expect. These derive, most obviously, from the concerns of such an institution:

  (a) to transmit the heritage of Catholic thought and life to a new generation;
  (b) to advance an understanding of that heritage in itself; and
  (c) to relate that heritage to new problems, theoretical and practical, as these arise.

## Section 3: Statement on Academic Freedom

*Issued June 4, 1991*
*Reissued June 2006*

### Introduction to Statement on Academic Freedom

In 1990 the Middle States Commission on Higher Education, on the occasion of its reaffirmation of accreditation, invited the University to develop a statement concerning academic freedom. During the academic year 1990-1991 a Joint Task Force of the Board of Trustees and the Academic Senate developed such a document. After a series of revisions and consultation by the Senate with the Faculties, the following text was approved by the Academic Senate on March 28, 1991, and by the Board of Trustees on June 4, 1991.

### Statement on Academic Freedom - The Catholic University of America

The Catholic University of America affirms its commitment to academic freedom. In so doing, it reaffirms its commitment to the tradition of higher learning that is the heritage of both the Roman Catholic Church and the nation. It is a tradition grounded on respect for truth, social responsibility and individual rights. It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge.

In the tradition of American universities and in accord with Catholic teaching, The Catholic University of America upholds academic freedom as a fundamental condition for research and dissemination of information. The University is a center of discourse where inquiry is encouraged and discoveries are verified and refined by

14

the interaction of scholar with scholar. The Catholic University of America respects the right and responsibility of its faculty and students to conduct research, to publish their findings, and to discuss ideas according to the principles, sources and methods of their academic disciplines. These principles, sources and methods, as they develop over time, are not external to their respective disciplines. The University sanctions and encourages investigation of unexplored phenomena, advancement of knowledge, and critical examination of ideas, old and new. The University accepts the responsibility of protecting both teacher and student from being forced to deny truth that has been discovered or to assert claims that have not been established in the discipline.

Where the faculty is concerned, academic freedom presupposes, first of all, personal integrity in dealing with students, peers and officers of the university. Second, it presumes scholarly competence, observance of the professional standards of one's discipline, commitment to the stated mission of the University, and an openness to having one's ideas and findings subjected to the judgment of one's peers. Third, faculty members have a responsibility as professional scholars to be accurate and judicious in their public statements, and respectful of the opinions and responsibilities of others.

The Catholic University of America, from its establishment, has voluntarily embraced a special relationship with the Church. This relationship, with the mutual responsibilities involved, has been made an internal and constitutive part of its mission. Accordingly, priority is given to the study of Catholic theology and related disciplines. In the tradition of the Church, theology serves the Christian community by seeking to express the abiding truth of Christ in human terms and, thereby, to mediate between faith and culture. Theology contributes to an understanding of faith and becomes a means of communicating the Church's teachings to the community of believers and to society at large.

As an academic discipline, Catholic theology is the systematic reflection on the data of revelation expressed in Sacred Scriptures and Tradition as proclaimed, preserved and interpreted by the magisterium of the Church, and received by faith. The teachings of the magisterium are a necessary factor in ascertaining truth in the discipline of Catholic theology. The Catholic University of America affirms its commitment to safeguard the freedom that is necessary if theologians are to pursue the disciplined study of Christian faith in the Catholic tradition according to rigorous standards of scientific investigation. The University recognizes that scholars use diverse methods and sources to explicate the original deposit of faith and to discern patterns of doctrinal development over the centuries. The University also recognizes that freedom of inquiry, thought and expression is requisite to the advancement of knowledge and to the deepening of understanding in matters of faith.

As in the case of all other faculty members, the academic freedom of those engaged in theological disciplines presupposes personal integrity, scholarly competence, commitment to the mission of the University, observance of professional standards and openness to criticism from one's peers. In addition, Catholic theology acknowledges the singular responsibility of the Church's magisterium to safeguard the integrity of the Christian message, and to protect the faithful from erroneous teachings in faith and morals. Although the roles and responsibilities of theologians differ from those of bishops, theologians share a common goal with the magisterium in their service to the ecclesial community. Catholic theologians are expected to give assent to the teachings of the magisterium in keeping with the various degrees of assent that are called for by authoritative teaching. Differences arising over the interpretation and presentation of Church teaching are resolved through dialogue of scholars with members of the magisterium, with due recognition that final authority in matters of faith and morals lies with the magisterium. Such dialogue is carried on in accordance with established procedures in a spirit of Christian charity and mutual, professional respect.

The *Faculty Handbook* outlines the norms and procedures relating the academic freedom with regard to initial

15

appointment, tenured appointment and, where cause has been established, the dismissal of faculty members. In addition, Canonical Statutes govern appointments in the Ecclesiastical Faculties. These documents embody the institution's guarantees that its faculty enjoys the freedom of academic inquiry and expression that is central to its identity as a University authentically Catholic and distinctively American.

*Issued September 12, 1969*
*Revised December 12, 2006*

**Section 4: Bylaws of the University**                    *Revised December 14, 2010*
*Revised December 13, 2016*

### Introduction to the Bylaws

The revision of the University's governing documents was begun in 1967 as a result of the efforts of a newly appointed Special Committee on Survey and Objectives of the Board of Trustees. Dr. Carroll A. Hochwalt of St. Louis, Missouri, served as Chairman of the Committee that initiated a series of discussions intended to elucidate the University's purposes and character. Another Special Committee of which His Eminence, Lawrence Cardinal Shehan, Archbishop of Baltimore, was Chairman, undertook the revision of the papal statutes and the civil Bylaws then in effect. Their work resulted in the replacement of these instruments by a single document.

The Bylaws were approved by the Board of Trustees on September 12, 1969. The Holy See gave its approval to the Statement of Objectives, Historical Preface, and Bylaws on January 23, 1970, and they were promulgated by President Clarence C. Walton on February 6, 1970. The Bylaws were revised and approved by the Board of Trustees on December 14, 2010. The most recent revision of the Bylaws were approved by the Board of Trustees on December 13, 2016.

16

THE CATHOLIC UNIVERSITY OF AMERICA

AMENDED AND RESTATED BYLAWS

PREAMBLE

The University's governance structure is intended to perfect and make permanent the University's essential character as a Catholic and American institution of higher learning and its role as the national university of the Catholic Church while permitting greater lay responsibility and support for the University.  The responsibility for governance and oversight of the operations of the University resides in the first instance in the University's Board of Trustees.  The Fellows serve as the members of the University and hold certain retained powers designed to preserve the ecclesial patrimony of the University.

ARTICLE I
FELLOWS

1.1     Classes of Fellows.  The University shall have four classes of Fellows, as set forth below, who shall be the Members of the University.  All Fellows shall serve as Trustees of the University as provided in section 3.2(a) of these Bylaws.

(a)     Cardinal Fellows.  The University shall have as Cardinal Fellows all of the Cardinals serving as diocesan bishops in the United States.  A Cardinal Fellow shall serve ex officio during his tenure as a diocesan bishop.  No one shall be a Cardinal Fellow without his prior consent.

(b)     Bishop Fellows.  The University shall have four (4) Fellows who are designated as the Bishop Fellows.  Bishop Fellows shall be appointed by the Fellows to serve for terms of three years or until their successors are appointed.  A Bishop Fellow may serve two consecutive terms and thereafter shall not be eligible to serve as a Bishop Fellow until a year after the expiration of his second term.  Partial terms shall not count for purposes of the foregoing limitation.  Notwithstanding the foregoing, the Fellows in their discretion may reappoint any Bishop Fellow who has already served two consecutive terms for a single

17

additional three-year term, in recognition of the Bishop Fellow's extraordinary service and dedication to the University, if the Fellows determine that such reappointment would be in the best interests of the University. The initial Bishop Fellows of the University shall be appointed by the Cardinal Fellows and the Ex Officio Fellows.

(c)      Ex Officio Fellows.  The University shall have up to four (4) Ex Officio Fellows. The Ex Officio Fellows shall be those individuals who hold the official positions specified below within the organization named, unless they are otherwise Fellows of the University.

(i)      Chairman of the Board of Trustees of The Catholic University of America;

(ii)     President of The Catholic University of America;

(iii)    Chancellor of The Catholic University of America; and

(iv)     President of the United States Conference of Catholic Bishops.

An Ex Officio Fellow shall serve during his or her tenure in the specified office.

(d)      Appointed Fellows.  The University shall have two (2) Appointed Fellows, each of whom shall be an Appointed Trustee of the University at the time of his or her initial appointment as an Appointed Fellow.  Appointed Fellows shall be appointed by the Fellows, from a slate nominated by the Trusteeship Committee, to serve for terms of three years or until their successors are appointed.  An Appointed Fellow may serve two consecutive terms and thereafter shall not be eligible to serve as an Appointed Fellow until a year after the expiration of his or her second term.  Partial terms shall not count for purposes of the foregoing limitation.  Notwithstanding the foregoing, the Fellows in their discretion may reappoint any Appointed Fellow who has already served two consecutive terms and who continues to meet the eligibility requirements specified above for a single additional three-year term, in recognition of the Appointed Fellow's extraordinary service and dedication to the University, if they determine that such reappointment would be in the best interests of the University.  The initial Appointed Fellows of the University shall be

18

appointed by the Cardinal Fellows and the Ex Officio Fellows.

      1.2    <u>Retained Powers</u>.  The Fellows shall have the following retained powers, as set forth in the Articles of Incorporation:

      (a)    To ensure that the University maintains its essential character as a Catholic institution of higher learning in perpetuity and its role as the national university of the Catholic Church;

      (b)    To appoint Bishop and Appointed Fellows of the University, as provided by these Bylaws;

      (c)    To appoint Bishop and Appointed Trustees of the University, as provided by these Bylaws;

      (d)    To remove any Bishop Trustee or Appointed Trustee, with or without cause, at any time upon the vote of two-thirds of the Fellows then serving;

      (e)    To appoint the President of the University upon the recommendation of the Board of Trustees;

      (f)    To approve any disposition of all or substantially all of the assets of the University;

      (g)    To amend the Articles of Incorporation, these Bylaws, and the Canonical Statutes of the University (subject to any additional approvals required under canon law) upon the vote of two-thirds of the Fellows then serving;

      (h)    To approve dissolution and termination of the University.

      1.3    <u>Fellows' Oversight</u>.  The Fellows may in their discretion evaluate and audit the programs and services of the University at any time.

      1.4    <u>Compensation</u>.  No Fellow shall be entitled to any direct or indirect compensation related to that person's services as a Fellow.

      1.5    <u>Chancellor of the University</u>.  The Chancellor of the University shall be that individual serving as the Archbishop of Washington, who shall serve ex officio during his tenure in such office.  The Chancellor shall serve as a liaison between the University and the United States Conference of Catholic Bishops and the Holy See.  The Chancellor, in his relations with the ecclesiastical faculties, shall fulfill the

requirements under *Sapientia Christiana*, general norms, Art. 12-14, and Norms of Application, General Norms, Section II, Art. 8.

## ARTICLE II
## MEETINGS OF FELLOWS

2.1     <u>Annual Meeting</u>.  The annual meeting of the Fellows shall be held immediately before the annual meeting of the Board of Trustees.  The Chancellor of the University shall preside at all meetings of the Fellows and establish any committees of the Fellows that may be necessary.

2.2     <u>Special Meetings; Notice</u>.  Special meetings of the Fellows may be held within or without the District of Columbia and may be called at any time or place by the President, the Chancellor, or any five (5) Fellows.  Notice of special meetings of the Fellows shall be given to each Fellow not less than five (5) days before the meeting, by delivering the same to the Fellow in person or to the Fellow's residence or business address (or such other place as the Fellow may have directed in writing) by mail, messenger, telecopier, facsimile, electronic mail, or other means of written communication or by telephoning such notice to the Fellow.  Any such notice shall set forth the time and place of the meeting. A special meeting may be held at any time and place and without notice by unanimous written consent of all Fellows as described below or by the presence of all Fellows at each meeting.

2.3     <u>Quorum; Voting</u>.  A majority of the number of Fellows then serving shall constitute a quorum for the transaction of business at a meeting of the Fellows.  If a quorum is present when a vote is taken, the affirmative vote of a majority of the Fellows present is the act of the Fellows.

2.4     <u>Telephonic Meetings</u>.  Any Fellow may participate in a regular or special meeting by, and a regular or special meeting may be conducted through the use of, any means of communication by which all Fellows participating may simultaneously hear each other during the meeting.  A Fellow participating in a meeting by this means is deemed to be present in person at the meeting.

2.5     <u>Action Without Meeting</u>.  Action required or permitted to be taken at a meeting

of the Fellows may be taken without a meeting if the action is taken by all Fellows.  The action shall be evidenced by one or more written consents, which may be signed in counterparts, stating the action taken, signed by each Fellow either before or after the action is taken, and included in the minutes or filed with the corporate records reflecting the action taken.  Action taken under this section becomes effective when the last Fellow signs unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein provided the consent states the date of execution by each Fellow.

ARTICLE  III
TRUSTEES

3.1     General Powers.  The University shall have a Board of Trustees.  All powers not reserved to the Fellows of the University shall be vested in the Board of Trustees and the business of the University shall be managed and exercised by the Board of Trustees to the extent not reserved to the Fellows, subject to any limitation set forth in the Articles of Incorporation or these Bylaws.

3.2     Classes and Manner of Appointment.  The University's Board of Trustees shall consist of the three (3) classes of Trustees:  the Fellow Trustees, the Bishop Trustees, and the Appointed Trustees. All three classes of Trustees are necessary and integral to the operation of the Board of Trustees.

(a)     Fellow Trustees.  The University shall have one class of Trustees who are designated as the Fellow Trustees.  The Fellow Trustees shall be those individuals serving as Fellows of the University. Each Fellow Trustee shall serve ex officio during his or her tenure as a Fellow of the University.

(b)     Bishop Trustees.  The University shall have three (3) Trustees who are designated as the Bishop Trustees.  Only individuals who are not Fellows of the University and who are Bishops serving as diocesan bishops in the United States may serve as Bishop Trustees.  Any Bishop Trustee who ceases to serve as a diocesan bishop in the United States shall be deemed to have resigned his position as a Bishop Trustee immediately and the vacancy shall be filled by the Fellows in the manner set forth in section 3.3 of these Bylaws.  Bishop Trustees shall be appointed by the Fellows at an annual meeting of the Fellows

21

to serve for terms of three (3) years or until their successors are appointed.  A Bishop Trustee may serve two consecutive terms and thereafter shall not be eligible to serve as a Bishop Trustee until he has not served as a Bishop Trustee for a term of one year or more.  Partial terms shall not count for purposes of the foregoing limitation.  But the Fellows in their discretion may reappoint any Bishop Trustee whose term expires and who has already served two consecutive terms for a single additional three-year term, in recognition of the Bishop Trustee's extraordinary service and dedication to the University, if the Fellows determine that such reappointment would be in the best interests of the University.  No individual shall be appointed as a Bishop Trustee without his prior consent.

(c)      Appointed Trustees.  The University shall have not fewer than twenty (20) and not more than forty (40) Trustees who are designated as the Appointed Trustees.  At all times no fewer than 90 percent of the Appointed Trustees of the University shall be members of the Roman Catholic Church.  All Appointed Trustees shall be committed to preserving the University's Catholic identity.  Appointed Trustees shall be appointed by the Fellows, from a slate nominated by the Trusteeship Committee, to serve for terms of three (3) years. Clergy and professed religious are eligible to serve as Appointed Trustees. At the first annual meeting of the Board of Trustees, the number of Appointed Trustees shall be divided into three (3) groups with each group consisting of one-third of the total.  The terms of the Appointed Trustees in the first group shall expire at the first annual meeting of the Board of Trustees after their appointment; the terms of the Appointed Trustees in the second group shall expire at the second annual meeting of the Board of Trustees after their appointment; and the terms of the Appointed Trustees in the third group shall expire at the third annual meeting of the Board of Trustees after their appointment.  Thereafter, at each annual meeting of the Fellows, one group of Appointed Trustees shall be appointed by the Fellows for a term of three years to succeed those whose terms expire.  The Fellows may appoint additional Appointed Trustees in their discretion or upon recommendation of the Board of Trustees at any meeting of the Fellows.  An Appointed Trustee may serve two consecutive terms and thereafter shall not be eligible to serve as an Appointed Trustee

22

until he or she has not served as an Appointed Trustee for a term of one year or more.  Partial terms shall not count for purposes of the foregoing limitation.  Notwithstanding the foregoing, the Fellows in their discretion or upon recommendation of the Board of Trustees may reappoint any Appointed Trustee whose term expires and who has already served two consecutive terms for a single additional three-year term, in recognition of the Appointed Trustee's extraordinary service and dedication to the University, if it is determined that such reappointment would be in the best interests of the University.  No individual shall be appointed as an Appointed Trustee without his or her prior consent.

3.3     <u>Removal; Vacancies</u>.  The Fellows may remove any Bishop Trustee or Appointed Trustee, with or without cause, but only at a meeting called for that purpose, and the notice of the meeting must state that the purpose, or one of the purposes, of the meeting is the removal of the Bishop Trustee or the Appointed Trustee.  The removal of a Bishop Trustee or an Appointed Trustee shall be effective only upon the affirmative vote of two-thirds of the Fellows then serving.  A vacancy among the Bishop Trustees or the Appointed Trustees, including a vacancy resulting from the removal of a Bishop Trustee or an Appointed Trustee, may be filled by the affirmative vote of a majority of the Fellows at a meeting at which a quorum is present, and may, in the case of a resignation that will become effective at a specified later date, be filled before the vacancy occurs, but the new Bishop Trustee or Appointed Trustee may not take office until the vacancy occurs.  Any such election to fill a vacancy shall be for the unexpired term of such Bishop Trustee or Appointed Trustee.

3.4     <u>Annual and Regular Meetings</u>.  An annual meeting of the Board of Trustees (for the purpose of electing officers and carrying on such other business as may properly come before the meeting) shall be held in June of each year on such day or days as the Chairman, the President, or the Board of Trustees shall designate.  If an annual meeting is not held in June, a substitute annual meeting shall be called as promptly as possible in accordance with the notice provisions of section 3.6.  Any meeting so called shall be designated and treated for all purposes as the annual meeting.  The Board of Trustees shall also adopt a schedule of additional meetings, which shall be considered regular meetings.  The annual and regular meetings shall be

held, either within or without the District of Columbia, as the Chairman, the President, or the Board of Trustees shall designate from time to time. If no place is designated in a notice of a meeting, it shall be held at the principal office of the University.

      3.5    <u>Special Meetings</u>. Special meetings of the Board of Trustees may be called by the Chairman, the President, or one-fifth (1/5) of the Trustees and shall be held at such times and such places, within or without the District of Columbia, as the person or persons calling the meetings shall designate. If no such place is designated in the notice of a meeting, it shall be held at the principal office of the University.

      3.6    <u>Notice of Meetings</u>. No notice need be given of the annual or regular meetings of the Board of Trustees. Notice of special meetings of the Board of Trustees shall be given to each Trustee not less than five (5) days before the meeting, by delivering the same to the Trustee in person or to the Trustee's residence or business address (or such other place as the Trustee may have directed in writing) by mail, messenger, telecopier, facsimile, electronic mail, or other means of written communication or by telephoning such notice to the Trustee. Any such notice shall set forth the time and place of the meeting.

      3.7    <u>Waiver of Notice</u>. A Trustee may waive any notice required by law, the Articles of Incorporation, or these Bylaws before or after the date and time stated in the notice, and such waiver shall be the equivalent to the giving of such notice. Except as provided in the next paragraph of this section, the waiver shall be in writing, signed by the Trustee entitled to the notice, and filed with the minutes or corporate records. A Trustee's attendance at or participation in a meeting waives any required notice to the Trustee of the meeting unless the Trustee at the beginning of the meeting or promptly upon arrival objects to holding the meeting or transacting business at the meeting and does not thereafter vote for or assent to action taken at the meeting.

      3.8    <u>Quorum; Voting</u>. One-third of the number of Trustees then serving shall constitute a quorum for the transaction of business at a meeting of the Board of Trustees. If a quorum is present when a vote is taken, the affirmative vote of a majority of the Trustees present is the act of the Board of Trustees. A Trustee

24

who is present at a meeting of the Board of Trustees when corporate action is taken is deemed to have assented to the action unless the Trustee (i) objects at the beginning of the meeting, or promptly upon arrival, to holding it or transacting specified business at the meeting; or (ii) votes against, or abstains from, the action taken.

3.9     Telephonic Meetings.  The Board of Trustees may conduct a meeting or permit any or all Trustees to participate in a committee meeting or special meeting, but not a regular meeting, through the use of any means of communication by which the Trustees participating may simultaneously hear each other during the meeting.  A Trustee participating in a meeting by this means is deemed to be present in person at the meeting.

3.10    Action Without Meeting.  Action required or permitted to be taken at a Board of Trustees' meeting may be taken without a meeting if the action is taken by all members of the Board.  The action shall be evidenced by one or more written consents, which may be signed in counterparts, stating the action taken, signed by each Trustee either before or after the action is taken, and included in the minutes or filed with the corporate records reflecting the action taken.  Action taken under this section becomes effective when the last Trustee signs unless the consent specifies a different effective date, in which event the action taken is effective as of the date specified therein provided the consent states the date of execution by each Trustee.

3.11    Compensation.  No Trustee shall be entitled to any direct or indirect compensation related to that person's services as a Trustee.

3.12    Resignations.  An Appointed Trustee shall tender his resignation to the Chairman, the President, or the Secretary immediately upon any significant change in his or her employment or professional status (other than voluntary retirement).  The Board of Trustees shall accept such resignation if it determines that it is in the best interests of the University.  An Appointed Trustee tendering his or her resignation shall not participate in the Board's decision.  Any Trustee may resign at any time by delivering written notice to the Chairman, the President, or the Secretary.  A resignation shall be effective when

25

delivered, unless the notice specifies a later effective date.

3.13    Participation of Non-Trustees.  The Board of Trustees shall permit the attendance at meetings of the Board of Trustees of the Vice Presidents of the University representing the major divisions or operations of the University, as well as other persons upon invitation of the Chairman or the President.  Any such Vice President attending a meeting of the Board of Trustees may participate in discussions with the Board of Trustees as appropriate but shall not have the right to vote on any matter.  In addition, the Board of Trustees shall permit the attendance at meetings of the Board of Trustees of four (4) observers, three (3) of whom shall be faculty representatives selected by the faculty and one (1) of whom shall be the President of the national alumni association of the University.  Any such observer attending a meeting of the Board of Trustees may participate in discussions with the Board of Trustees as appropriate but shall not have the right to vote on any matter.

3.14    Executive Sessions.  Notwithstanding any other provisions of these Bylaws, the Chairman may call an executive session of the Board of Trustees as part of any annual, regular, or special meeting of the Board.  Trustees Emeriti, officers, employees, staff, and any other guests in attendance shall be excused from executive sessions; provided, however, that the Chairman may request that any person otherwise excused be invited to remain during all or any part of the executive session.

ARTICLE IV
COMMITTEES

4.1    Committees.  The Board of Trustees shall have the committees set forth in this Article. The Board of Trustees may also create one or more additional committees and appoint members of the Board of Trustees to serve on them.  Unless otherwise provided in these Bylaws, each committee shall have three (3) or more members who serve at the pleasure of the Board.  Subject to the approval of the Board and except as otherwise provided in these Bylaws, the Chairman, in consultation with the President, shall appoint all committee members after solicitation of Trustee preferences and shall designate a Chairman of each

26

committee.

4.2     Authority of Committees.  Each committee may exercise the authority specified by the Board of Trustees except that a committee may not exercise any power retained by the Fellows as set forth in the Articles of Incorporation or approve any action which by law requires approval of the Board of Trustees rather than a committee of the Board of Trustees.

4.3     Executive Committee.  The University shall have an Executive Committee, which shall have full authority to act in all situations for the Board of Trustees between meetings of the Board, except those reserved to the full Board and those specified in section 4.2 of these Bylaws.  The Executive Committee shall consist of the Chairman of the Board, who shall serve as the Chairman of the Executive Committee, the Vice Chairman, the President, the Chancellor, the Chairman of the each of the committees set forth in this Article, and three (3) additional Trustees elected by the Board of Trustees to serve for a term of three (3) years.  The Executive Committee shall review and recommend to the Board of Trustees any policies necessary or appropriate to carry out the business and operations of the University and not under the purview of any other committee of the Board of Trustees, including personnel policies.  The Executive Committee shall also review the President's performance annually and recommend to the Board of Trustees the compensation of the President.

4.4     Finance Committee.  The Board of Trustees shall have a Finance Committee, consisting of at least six (6) Trustees.  The Finance Committee shall be responsible for preparation of the annual budget for approval by the Board of Trustees, review of fiscal year expenditures, and review of policies and procedures for the University's financial operations.  In addition, the Finance Committee shall provide general oversight of the security, funding, and investment management of all of the University's endowment and investment assets and shall periodically review all investment policies of the University.  The Finance Committee shall also oversee enrollment matters for the University either directly or through the establishment of a subcommittee for this purpose.

27

4.5     Audit Committee.  The Board of Trustees shall have an Audit Committee consisting of at least three (3) Trustees, none of whom shall be officers of the University and at least one of whom shall have substantial financial expertise.  The Audit Committee shall regularly review the adequacy of the University's internal financial controls, review with the University's independent public accountants the annual audit program and the University's financial statements, recommend the selection of the University's independent public accountants, and review the University's Compliance and Ethics Program.

4.6     Trusteeship Committee.  The Board of Trustees shall have a Trusteeship Committee consisting of the Chancellor and at least four (4) additional Trustees (at least one of whom shall be a lawyer if possible).  The Vice Chairman of the Board shall serve as the Chairman of the Trusteeship Committee.  The Trusteeship Committee shall be responsible for board development, consisting of a series of educational activities, including orientation designed to help Trustees clarify and carry out their responsibilities, and development of a Trustee Handbook setting forth the qualifications for and expectations of Trustees and other matters related to service on the Board of Trustees. The Trusteeship Committee shall also oversee the Board of Trustees' adherence to its governing documents, adopted policies, and best practices in higher education governance, and recommend changes to the Articles of Incorporation and these Bylaws. In addition, the Trusteeship Committee shall, after solicitation and consideration of individuals from the Trustees, recommend to the Fellows the names of individuals for appointment as Appointed Fellows or Appointed Trustees of the University.

4.7     Academic Affairs Committee.  The Board of Trustees shall have an Academic Affairs Committee, which shall provide oversight to and encourage improvement of the faculty and academic programs of the University and recommend tenure for approval by the Board of Trustees.

4.8     Advancement Committee.  The Board of Trustees shall have an Advancement Committee, which shall provide oversight to the University's fundraising, public relations, alumni affairs, and related activities.

28

4.9     Seminary Committee.  The Board of Trustees shall have a Seminary Committee, which shall meet regularly with the Rector of Theological College to ascertain the status of the seminary in terms of number of men in attendance, the number ready for ordination, and specific formation issues that may arise from time-to-time.  The Seminary Committee shall work closely with both the University's academic programs and the Sulpician Fathers to insure that the education and preparation for the priesthood are optimal.

4.10     Student Affairs Committee.  The Board of Trustees shall have a Student Affairs Committee, which shall provide oversight in connection with the well-being of the University's students.

4.11     Participation of Others on Committees.  The Chairman, Vice Chairman, and President may attend and participate in any meeting of any committee set forth in this Article IV or otherwise established by the Board of Trustees.  The Chairman, Vice Chairman, and President may vote on any matter coming before the committee at such meeting and his or her attendance at such meeting shall count towards the establishment of a quorum for the transaction of business by such committee. The Chairman may appoint one or more officers or other individuals who are not Trustees to serve on any committee of the Board other than the Executive Committee and the Trusteeship Committee.   Any such officer or other individual appointed to any committee may vote on any matter to be presented to the Board of Trustees or Executive Committee as a recommendation of such committee, but may not vote on any matter in which the committee is exercising the final authority of the Board of Trustees.  The attendance of any such officer or other individual appointed to any committee at any meeting of that committee shall not count towards the establishment of a quorum for the transaction of business by such committee.

4.12     Committee Meetings; Miscellaneous.  To the extent not otherwise provided in these Bylaws or by direction of the Board of Trustees, the provisions of these Bylaws which govern meetings, action without meetings, notice and waiver of notice, and quorum and voting requirements of the Board of Trustees shall apply to committees of Trustees and their members as well.

29

ARTICLE V
OFFICERS

5.1     Officers.  The officers of the University shall be a Chairman, a President, a Vice Chairman, a Chancellor, a Secretary, a Treasurer, a Vice President for Finance, a Provost, and, in the discretion of the Board of Trustees, such other officers or assistant officers as may be deemed necessary or advisable to carry out the business of the University.  No person may hold more than one office except that the same person may hold the office of Treasurer and Vice President for Finance.  The officers shall have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as may be lawfully provided in these Bylaws or by resolution of the Board of Trustees consistent with these Bylaws.

5.2     Election and Appointment; Term.  The Board of Trustees shall elect the Chairman and the Vice Chairman at the annual meeting of the Board of Trustees to serve for a term of three (3) years or until his or her successor is elected.  The Chairman and the Vice Chairman shall take office upon conclusion of the annual meeting at which he or she is elected.  The Board of Trustees shall recommend and the Fellows shall appoint the President as provided in the Articles of Incorporation; the Board shall appoint the Secretary and Treasurer upon recommendation of the President.  The President shall appoint the Vice President for Finance whenever a vacancy occurs in that office.  As provided in section 1.5 of these Bylaws, the Chancellor shall be that individual serving as the Archbishop of Washington, who shall serve ex officio during his tenure in such office. Any other officer or assistant officer shall be appointed or elected and shall serve such terms as the Board of Trustees shall direct.  The Chairman, President, and Vice Chairman may resign at any time upon written notice to the Board of Trustees, and no acceptance of resignation shall be necessary to make it effective.  The Vice President for Finance, Treasurer, the Secretary, and any other officer may resign at any time upon written notice to the President, and no acceptance of resignation shall be necessary to make it effective.

5.3     Removal.  The Board of Trustees may remove the Chairman, the President, the Vice

Chairman, the Treasurer, and the Secretary at any time, with or without cause.  The President may remove any officer or assistant officer appointed by the President at any time, with or without cause.

5.4     Chairman.  The Chairman shall be a member of the Board of Trustees. The Chairman, if present, shall chair all meetings of the Board of Trustees.

5.5     President.  The President shall be the chief executive officer of the University on a full time basis and will be responsible for the supervision and operation of all its affairs, under the direction and control of the Chairman and the Board of Trustees in accordance with the University's Articles of Incorporation and these Bylaws.

5.6     Vice Chairman.  The Vice Chairman shall be a member of the Board of Trustees.  In the case of the disability or death of the Chairman, the Vice Chairman shall carry out the duties of the Chairman.

5.7     Chancellor.  The Chancellor of the University shall have those duties and responsibilities as set forth in section 1.5 of these Bylaws.

5.8     Secretary.  The Secretary shall be an employee of the University who shall be elected by the Board of Trustees upon recommendation of the President.  If the Secretary ceases to be an employee of the University during his or her term as Secretary, he or she shall no longer be eligible to continue to serve as the Secretary.  The Secretary shall be responsible for ensuring that a faithful record of all meetings of the Board of Trustees is kept, notice of time and plan for holding special meetings of the Board of Trustees as specified in these Bylaws is given, and all documents entrusted to his or her care are filed and safely kept.  The books and papers kept by the Secretary shall be subject at all times to inspection by the Fellows, the Board of Trustees, the President, or any duly authorized committee of the Board of Trustees.

5.9     Treasurer.  The Treasurer shall keep the Board of Trustees informed of all material matters pertaining to the business and financial affairs of the University. Through the Finance Committee, the Treasurer shall render regular reports to the Board of Trustees.

5.10     Vice President for Finance.  The Vice President for Finance/Treasurer shall be the chief

31

financial officer and administrative officer of the University under the President in charge of the business and financial affairs of the University and its various divisions.  The Vice President for Finance shall report to and be responsible to the President and shall keep the President informed of all material matters pertaining to the business and financial affairs of the University.  The Vice President for Finance shall be the officer charged with the supervision of the activities of all other staff members in the areas of business and financial management.  The financial records of the University kept by the Vice President for Finance shall be subject at all times to inspection by the Fellows, the Board of Trustees, the President, the Treasurer or any duly authorized committee of the Board of Trustees.

5.11  <u>Provost</u>. The Provost is the chief academic officer and acts for the President in his absence. The Provost is responsible for the coordination and development of all academic units, programs, policies, and procedures.

ARTICLE VI
TRUSTEES EMERITI OR EMERITAE

The Board of Trustees may in its discretion or upon the recommendation of the Trusteeship Committee designate as a Trustee Emeritus or Emerita any individual who is a former member of the Board of Trustees or an Appointed Trustee whose term is expiring.  Designation of an individual as a Trustee Emeritus or Emerita shall be dependent upon the needs and best interests of the University at that time.  A Trustee Emeritus or Emerita shall be invited to all functions of the University to which Trustees are invited, including meetings of the Board of Trustees, and may participate in Board of Trustees' discussions, but shall not have the power to vote.  At the discretion of the Board of Trustees or the Chairman, Trustees Emeriti or Emeritae may serve on committees of the Board of Trustees, other than the Executive Committee, and may also be asked to participate in other University activities from time to time.  Any Trustee Emeritus or Emerita appointed to serve on a committee of the Board of Trustees may vote on any matter to be presented to the Board of Trustees or Executive Committee as a recommendation of such committee, but may not vote on any matter in which the

committee is exercising the final authority of the Board of Trustees.  The attendance of any Trustee Emeritus or Emerita appointed to any committee at any meeting of that committee shall not count towards the establishment of a quorum for the transaction of business by such committee.  A Trustee Emeritus or Emerita shall serve until death, incapacity, resignation, or removal.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

7.1     Interpretation.  For the purpose of construing these Bylaws, unless the context indicates otherwise, words in the singular number shall be deemed to include words in the plural and vice versa.

7.2     Amendments.  These Bylaws may be amended or repealed, and new Bylaws may be made, at any meeting of the Fellows as provided in the Articles of Incorporation; provided, however, the Board of Trustees may recommend to the Fellows at any time amendments to the Bylaws for consideration.

7.3     Application of Canon Law.  No provision of these Bylaws shall supersede any limitation or requirement imposed on the University, the Fellows, the Board of Trustees, or the University's officers by the Canon Law of the Roman Catholic Church and the Canonical Statutes of the Ecclesiastical Schools of the University.

**Section 5: Constitution of the Academic Senate**   *Issued November 21, 1970*
*Revised June 2006*
*Approved December 13, 2016*

### Introduction to the Constitution of the Academic Senate

During academic years 1968 1969 and 1969 1970 the Academic Senate prepared a constitution, which would define its role and procedures in the academic governance of the University, as these had previously been defined in the 1937 Statutes and earlier documents. The document adopted by the Academic Senate on June 3, 1970, was then submitted to the Board of Trustees and, after certain revisions reached by common agreement of the two bodies, was approved by the Board on November 21, 1970.

The Constitution of the Academic Senate, approved by the Board of Trustees, has the same force of law as do the Bylaws. The original text of the Constitution has since been amended by the Senate, with the revisions ratified by the Board of Trustees, principally in order to reflect organizational changes in the University and in the titles of officers of administration. The following text incorporates these amendments.

### CONSTITUTION OF THE ACADEMIC SENATE
### THE CATHOLIC UNIVERSITY OF AMERICA

#### Article I

The Academic Senate shares with the President the immediate responsibility for the academic governing of the University by establishing, maintaining, supervising, and in general being responsible for the academic policies of the University.

#### Article II

The voting members of the Academic Senate shall consist of; the President; the Provost; the Vice Provost and Dean of Graduate Studies; the Vice Provost and Dean of Undergraduate Studies; the Deans of the several Faculties; delegates elected by the several Faculties in the proportion of one delegate for each Faculty, a second delegate for each Faculty having thirty or more full time members and an additional delegate for every forty full-time members beyond the number of thirty; two delegates elected by the Faculty of Arts and Sciences to represent baccalaureate programs of the School of Arts and Sciences. In addition, voting members shall include the Associate Provost, University Libraries and one professional librarian elected by the professional library staff, two graduate students appointed by the Graduate Student Association, and three undergraduate students appointed by the Undergraduate Student Government, who shall have full voting rights as Academic Senators except in passing upon the qualifications of faculty members proposed for rank or tenure. Delegates elected to the Academic Senate by the several Faculties shall hold office for a period of three years. They may be re-elected. Student delegates shall be elected annually.

In the election of Faculty Delegates to the Senate, all full time Faculty members are eligible for election and each has a deliberative vote. Faculty delegates to the Trustees shall be ex officio, non-voting members of the Academic Senate. The Registrar shall be an ex-officio, non-voting member of the Academic Senate. The Academic Senate may annually by a two thirds vote invite non-voting participation by such persons it deems will contribute to its effectiveness.

## Article III

The Academic Senate shall annually elect a Chairman and a Vice Chairman from among its voting membership, except that the President of the University shall be ineligible for election.

The duties of the Chairman are to preside over the Senate, and to exercise his right to vote when his vote would decide the outcome of an issue, or in all cases of secret ballot. The President of the University and the Chairman, or at his written request, the Vice Chairman, shall be ex officio members of all committees.

The duties of the Vice Chairman are to prepare an agenda, to preside at all meetings in the absence of the Chairman, and to be a member of the Committee on Committees and Rules.

The Academic Senate shall elect annually one of its members as Secretary. The election of Senate officers shall be held at the second meeting of each academic year.

## Article IV

The Academic Senate shall meet at least once each month during the academic year, and in addition when either the President, the Chairman, or one third of the Senate requests a meeting. All meetings shall be conducted according to the current edition of Robert's Rules of Order, with the addition that, unless two thirds of the members present and in no case less than a majority of the membership agree to suspend the rule, no substantive matter shall be acted upon which has not been presented to the membership at least one week in advance of the meeting at which action is to be taken.

## Article V

The Academic Senate may consider any matter which it deems to involve the welfare of the University.

## Article VI

The Senate, through the President, may present to the Board of Trustees such matters as it may consider proper. The report of any action of the Board on these matters shall be made to the Senate by the President.

## Article VII

No School, Department or like organizational component shall be created, rearranged, or terminated without the prior consultative vote of the Senate.

## Article VIII

It shall be the responsibility of the Academic Senate to authorize, review, and terminate programs of study and to evaluate the academic standards of existing programs.

## Article IX

The Academic Senate shall determine minimum academic standards and policies of admission, and insure the application of these.

## Article X

The Academic Senate shall determine the minimum requirements for degrees and shall approve the names of all candidates for academic degrees.

### Article XI

The Academic Senate shall set the minimum standards for faculty appointments, promotions, and tenure.

### Article XII

The Academic Senate, after consultation with the Department, School, and Dean concerned, shall pass upon the academic qualifications of all persons proposed for appointment or promotion to the ranks of Associate Professor and Ordinary Professor, and upon all persons proposed for tenured positions.

### Article XIII

The Academic Senate shall communicate its decision on appointments, promotions, and tenure to the President for implementation, and where appropriate for transmission by him to the Board of Trustees. In the event that the President or the Board of Trustees fails to implement the decision of the Senate, the Senate may request a joint committee of the Senate and the Trustees to review the matter.

### Article XIV

The enactments of the Senate require the President's approval for validity. If this is not forthcoming, the Senate may require by subsequent vote that the matter be submitted to the Board of Trustees.

### Article XV

It is the responsibility of the delegates to the Academic Senate to report the actions of the Senate to their respective constituents.

### Article XVI

The Academic Senate shall maintain and empower standing committees which shall report periodically to the Senate. In addition, it may appoint special committees.

### Article XVII

There shall be a Graduate Board to exercise general supervision over all matters delegated to it by the Academic Senate relating to graduate study; for example, standards of admission, requirements for degrees, and programs of study, and to report to the Senate recommendations on matters relating to graduate policy. The Vice Provost and Dean of Graduate Studies.

Members are appointed by the Senate upon joint recommendation of the Vice Provost and Dean of Graduate Studies and the Dean of the School concerned. Each School involved with Graduate education shall be represented on this Board by a number of members equal to its number of Faculty delegates in the Senate. The terms of membership shall coincide with those of the delegates to the Senate. Deans shall be eligible for membership on the Graduate Board.

### Article XVIII

There shall be an Undergraduate Board to exercise general supervision over all matters delegated to it by the Academic Senate relating to undergraduate study (for example, standards of admission, requirements for degrees, and programs of study). The Undergraduate Board shall report to the Academic Senate recommendations on matters relating to undergraduate policy. The Vice Provost and Dean for Undergraduate Studies shall chair the Undergraduate Board.

The Academic Senate appoints members to the Undergraduate Board upon joint recommendation of the Vice Provost and Dean for Undergraduate Studies and the Dean of the School concerned. Each school involved with undergraduate education shall be represented on this Board by a number of members equal to its number of Faculty delegates in the Academic Senate. The terms of membership shall coincide with those of the delegates to the Senate. Deans shall be eligible for membership on the Undergraduate Board.

**Article XIX**

A revision or amendment of this Constitution may be made by a two thirds majority of the members of the Senate present and voting, subject to ratification by the Board of Trustees, provided that the proposed revision or amendment is submitted and circulated to the membership two weeks in advance of the meeting at which action is to be taken.

## C.    Appendix: Historical Documents

*Approved by The Holy See/Pope Leo XIII*

**Section 1: Papal Approval of the University**                                                                      *April 10, 1886*

**Papal Approval of the University**

In response to the proposal of the American bishops assembled at the Third Plenary Council of Baltimore (1884) to establish a new university, Pope Leo XIII issued a letter of approval entitled, *Ouod in novissimo conventu*, on Easter Sunday, April 10, 1887. In this letter Pope Leo linked the project with the venerable Catholic view of the harmony of faith and reason and with the nineteenth-century scholastic revival in Europe to which he had given strong impetus. His letter emphasized in particular the pontifical character of the foundation.

*To Our Beloved Son James Gibbons, Cardinal of the Holy Roman Church of the Title of Santa Maria in Trastevere, and by Apostolic Dispensation Archbishop of Baltimore:*

*Beloved Son, Health and Apostolic Benediction.*

*What Our Venerable Brethren, the Bishops of North America, assembled in the last Council of Baltimore, in the year 1884, proposed concerning the establishment of a University in your Republic, We learn from your joint letter of October 25th of last year that yourself and the other Bishops of the United States are now anxious to put into practical effect. And We have been especially rejoiced by this admirable manifestation of your faith, and by the sincere homage of your affection towards this Apostolic See, to whose patronage and care you have commended the University from its very first beginnings. For it has ever been the glory of the Pastors of the Church, and especially of her Supreme Pontiffs, earnestly to promote true knowledge, and studiously to provide that in her schools the sciences, and especially those of theology and philosophy, should be taught in conformity with divine faith, so that the forces of revelation and reason combined should form an invincible bulwark of faith. Hence Our Predecessors, always ardently solicitous for the education of Christian people in the past, spared no pains nor labor to found in the principal cities of Europe those celebrated institutions of learning, that is to say, those Universities which, in the middle ages and in the centuries following, enriched Church and State with multitudes of men of learning. For this same end, from*

37

*the moment that the government of the Church was committed to Us, We have labored assiduously for the revival of learning, and directed our efforts especially to the restoration of the teachings of Saint Thomas and to establish them in the place of honor they held in the past; with this aim in view that, in the cultivation of the more important studies, while full account should be taken of all the results which the industry of learned men has skillfully and wisely attained to in recent times, the system of philosophy should be shaped according to the noble wisdom of the ancients, and follow with docile zeal in the footsteps of the Angelic Doctor. For there was no doubt what ever in Our mind that, this revival of the sciences once effected, the study even of letters and of the other branches of human learning, joined with regard for religion, would redound greatly to the advantage of civil society.*

*The importance of this is made manifest by the dangers to which youth is exposed in European countries in our days; and your own acquaintance with the condition of things in North America cannot but have convinced you likewise of its very grave moment. For the unlimited license of thought and of writing, to which erroneous notions concerning both divine and human things have given rise not only in Europe but also in your country, has been the root and source of unbridled opinions; while on the other hand, with religion banished to a great extent from the schools, wicked men audaciously strive, by the craft of fallacious wisdom, to extinguish the light of faith in the minds of the young, and to enkindle therein the flames of irreligion. Wherefore it is necessary that youth be nourished more carefully with sound doctrine, and that those young men especially who are being educated for the Church, should be fully armed to fit them for the task of defending Catholic truth.*

*We therefore most gladly welcome and heartily approve your project for the erection of a University, moved as you are by a desire to promote the welfare of all and the interests of your illustrious Republic. But in order that this noble institute may be happily established and conducted to ever increasing prosperity, it must remain under the authority and protection of all the Bishops of the country, in such a way that its whole administration shall be directed by them through certain Bishops selected for that purpose, whose right and duty it shall be to regulate the system of study, to make rules of discipline, to select the professors and other officials of the University, and to ordain whatever else pertains to its best government. And it is fitting that whatever shall be established concerning all these things shall be presented to this Apostolic See for its approval. But as to the choice of the city in which the University is to be erected, We desire that counsel be taken with all the Bishops of the United States, and that the question be decided after the opinion of all has been asked.*

*Go on therefore, Beloved Son, together with all Our other Venerable Brethren the Bishops of the United States, to carry to perfection with one mind what you have begun; and let not any one of you be deterred by any difficulty or labor, but let all take courage from the assured hope that they will receive an abundant return for their cares and solicitudes, having laid the foundations of an institute destined to provide the Church with worthy ministers for the salvation of souls and the propagation of Religion, and to give to the Republic her best citizens. And we earnestly beseech Almighty God, that He would send forth upon you Wisdom that sitteth by His throne, that she may direct the minds and hearts of you all; and as a pledge of the divine gifts, and a mark of Our good will, We most lovingly bestow upon you, Our Beloved Son, and upon all Our Venerable Brethren the Archbishops and Bishops of the United States, and upon all others who will aid you in this work by their liberality, the Apostolic Benediction.*

*Given in Rome, at Saint Peter's, this 10th day of April 1887, in the tenth year of Our Pontificate.*

*LEO XIII, POPE*

**Section 2: <u>Certificate of Incorporation</u>**

**Section 3: Canonical Establishment of the University**

*Approved by The Holy See/Pope Leo XIII*
*March 7, 1889*

### Canonical Establishment of the University

The 1887 letter of approval of Pope Leo XIII was followed two years later by an apostolic letter of the pope entitled, Magni nobis gaudi, and dated March 7, 1889, the feast of Saint Thomas Aquinas. By this letter the pope canonically established the University, noting that its opening (in the fall of 1889) came in the centennial year of the establishment of the American hierarchy. Since the dioceses of the United States were still considered "mission territory," the University fell within the competence of the Roman Congregation for the Propagation of the Faith, and it was to this body that the original constitutions (later called statutes) of the University had been submitted for approval.

*To Our Beloved Son, James Cardinal Gibbons, of the Title of St. Mary in Trastevere, Cardinal Priest of the Holy Roman Church, Archbishop of Baltimore: and to Our Venerable Brethren, the Archbishops and Bishops of the United States of North America.*

*Beloved Son and Venerable Brethren, Health and Apostolic Benediction:*

*We find cause for great joy in the zeal with which you devote yourselves to the preservation of the Catholic religion and to the interests of your dioceses; to the providing of such equipment as may secure the proper formation of youth, both clerical and lay, and the teaching of all knowledge, sacred and profane, according to the rule of faith. Consequently, your letters towards the end of last year gave us great pleasure, since in them you informed us that the work of founding a University in the city of Washington is progressing successfully, so that through your care all things are prepared for the opening of the Theological School this year. From our Venerable brother, John Keane, Titular Bishop of Jasso, the Rector of the University, whom you sent to us, we have gladly received the statutes and regulations of the University, submitted by you to our authority and judgment. And in this matter we deem worthy of all praise your resolution to commemorate the centenary of the establishment of your hierarchy by making the opening of the University a monument and perpetual memorial of that most auspicious event. Desiring, therefore, to secure the fulfillment of your righteous wishes, we committed the examination of the Constitutions of your University, which had been referred to us, to the Cardinals of the Congregation for the Propagation of the Faith, that they might report to us concerning them. Having heard their opinion, we willingly grant your request, and by our authority approve by these present letters the statutes and regulations of your University, and endow it with the rights proper to a lawfully constructed University. We grant, therefore, to your University power to confer academic degrees on students who shall have passed satisfactory examinations, and likewise to confer the doctorate in philosophy, theology, pontifical law, and those other studies in which the different degrees and the doctorate are usually conferred, whenever the teaching of these branches shall have been established. And we wish that you, Beloved Son, and you, Venerable Brethren, should exercise watchful care over the proper direction of studies, the preservation of discipline among the students in your University, either in person or through Bishops chosen by you to attend to this duty. And since, moreover, the See of Baltimore is foremost among the See of the United States, we confer on the Archbishop of Baltimore and his successors the office and authority of Chancellor. We desire, in addition, that the plan or courses of studies, or the program of the branches taught in your University, especially in so far as they relate to philosophy*

39

*and theology, shall be submitted to the Apostolic See for recognition and approval, and that all the departments of the University may be so ordered that young clerics and laymen may have an equal opportunity of fully satisfying their laudable desire for knowledge. We wish that among these departments there should be founded a school of Pontifical Law and Public Ecclesiastical Law, since we realize the great importance of these studies, especially at the present time. We exhort you all that you should take care to affiliate with your University your seminaries, colleges, and other Catholic institutions, according to the plan suggested in the Constitution, in such a manner, however, as not to destroy their autonomy. In order that a greater number may enjoy more abundantly the benefits of the teaching of the University in its various departments, let these schools, and especially the Schools of Philosophy and Theology, be thrown open, not only to those who have completed their studies according to the decrees of the Third Plenary Council of Baltimore, but also those who wish to begin or to continue their studies. Since, however, this University not only tends to the greater honor of your country, but also promises rich and salutary results both for the spread of sound doctrine and the defense of the Catholic religion, we have every reason for trusting that the faithful of America, with their wonted magnanimity, will not allow you to lack the help of their generosity for the glorious completion of this work now begun. And as the University at Washington is established by these our letters, we decree that no other institution of this nature shall be undertaken by anyone without consulting the Apostolic See. We believe that these present declarations and ordinances of ours will be a clear proof of the zeal and solicitude with which we desire that the glory and prosperity of the Catholic religion in your country may be advanced from day to day. We earnestly implore the most Merciful God, from whom comes every good and perfect gift, that He may direct your undertakings to a prosperous and happy outcome, and as a presage of all celestial gifts we most lovingly impart our Apostolic Benediction as a token of our sincere affection for you, Beloved Son, for you, Venerable Brethren, and for all the clergy and the faithful over whom you preside.*

*Given at Rome, at St. Peter's, on the seventh day of March, Feast of St. Thomas Aquinas, 1889, the twelfth year of our Pontificate.*

*LEO PP. XIII*

*Approved by U.S. Congress*
*April 3, 1928*

**Section 4: Act of Congress**

## Act of Congress

Amendment of the Certificate of Incorporation became necessary as a result of developments during the University's fourth decade. Pope Pius XI, under date of April 25, 1922, sent an Apostolic Letter to the bishops of the United States urging the development of the university as a temple of knowledge side by side with the temple of prayer that was to become the Basilica of The National Shrine of the Immaculate Conception. All the bishops were asked to interest themselves in presenting a plan for the development of the university.

Archbishop Michael J. Curley, who had succeeded to the See of Baltimore after Cardinal Gibbons' death in 1921, consulted the Faculties in his role as Chancellor. Reorganization took shape in the revised Constitution that was approved by the Holy See in 1926. This revision increased the number of trustees and required amendment of the Certificate of Incorporation, which was accomplished, together with further specification of the authority of the Board, by Act of Congress in 1928

*Public Law No. 235, 70th Congress (S. 2310)*

*Act of April 3, 1928, ch. 312, 45 Stat.402*

*An Act Supplementary to, and amendatory of, the incorporation of the Catholic University of America, organized under and by virtue of a certificate of incorporation pursuant to class 1, chapter 18, of the Revised Statutes of the United States relating to the District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the incorporation of the Catholic University of America under chapter 18, Revised Statutes of the United States relating to the District of Columbia, be, and the same is hereby, approved and confirmed.*

*Section 2. That in addition to the rights, duties, and obligations enjoyed and imposed by chapter 18 of the Revised Statutes of the District of Columbia the said university may enter into affiliated agreements with any institutions of learning within or outside of the District of Columbia, for the purpose of giving to students of such institutions the educational facilities of said university, upon such terms as are mutually agreed upon by the said university and the affiliated institutions.*

*Section 3. That said university shall have, and is hereby given, the power to increase the number of its trustees from time to time by a two-thirds vote of the whole number of the trustees at the time such vote is taken to a number not exceeding fifty.*

*In case of the increase of the number of trustees a certificate stating the number of the board and the time when it shall go into effect, and that the action so taken was by a two-thirds vote as required by this Act, shall be filed with the Recorder of Deeds of the District of Columbia.*

*Section 4. The said board of trustees shall have, and are hereby given, full power and authority, by a vote of two -thirds of its members, to adopt and change by-laws for the conduct of the business and educational work of said university, to fix the time of meetings, regular and special, and the form of notice to be given; they may appoint an executive committee, composed of trustees, designate the number and chairman thereof, with such powers and authority as are usually exercised by an executive committee, and which shall be conferred by the board subject always to. the control of the board of trustees; they may create and establish schools and departments of learning to be connected with and become a part of said university, and establish such scholastic boards and officers as may be required for academic operation and direction in education; they may receive, invest, and administer endowments and gifts of money and property absolute or subject to payments by way of annuities during the life of the donor, for the maintenance of educational work by said university and by any department or chair thereof, now established or which may hereafter be created or established by said university, and they shall have all of the powers and authority heretofore granted to or invested in the trustees of said university by chapter 18 of the Revised Statutes of the United States relating to the District of Columbia.*

*Section 5. That nothing in this Act contained shall be so construed as to prevent Congress from altering, amending, or repealing the same.*

41

**Section 5: Election to Accept District of Columbia Non-profit Corporation Act**

*Approved by Board of Trustees*
*Issued June 29, 1964*

### Election to Accept District of Columbia Non-profit Corporation Act

In 1964, after action by the Board of Trustees, the University filed a Statement of Election to Accept the District of Columbia Non-profit Corporation Act. The occasion for this action was the need for provisions by which the former Catholic Sisters College could be merged with the university. An effect of the action was to broaden substantially the corporate powers of the university.

*To: The Recorder of Deeds, D.C.*
*Washington, D. C.*

*Pursuant to the provisions of the District of Columbia Nonprofit Corporation Act, the undersigned corporation elects to avail itself thereto.*

*FIRST: The name of the corporation is The Catholic University of America.*

*SECOND: A resolution recommending that the corporation accept the District of Columbia Non-profit Corporation Act, was adopted in the following manner: The resolution was adopted at a meeting of the Board of Trustees held on March 31, 1964 and received the vote of a majority of the Trustees in office, there being no members having voting rights in respect thereof.*

*THIRD: The purpose or purposes which it will hereafter pursue are maintaining an institution of learning in the District of Columbia of the rank of a University.*

*FOURTH: The corporation is not to have members.*

*FIFTH: The manner of the election of Trustees shall be as provided in the By-Laws.*

*SIXTH: Provisions for the regulations of the internal affairs of the corporation shall be as provided in the By-Laws. Provisions for distribution of assets on dissolution or final liquidation shall be in accordance with the provisions of law.*

*SEVENTH: The address, including street and number, of its registered office in the District of Columbia is 620 Michigan Avenue, N. E., and the name of its registered agent at such address is Rt. Rev. Msgr. James A. Manger.*

*EIGHTH: The names and respective addresses, including street and number of its officers and directors are:*

*Francis Cardinal Spellman, Trustee*

*John J. Deaden, Trustee*
*James Francis Cardinal McIntyre, Trustee*

*John J. Krol, Trustee*

*Richard Cardinal Cushing, Trustee*

*James P. Davis, Trustee*

*Albert Cardinal Meyer, Trustee*

*Paul J. Hallinan, Trustee*

*Trustee Joseph Cardinal Ritter, Trustee*

*James E. Kearney, Trustee*

*Patrick A. O'Boyle, President*

*Jerome D. Hannan, Secretary*

*Karl J. Alter, Trustee*

*Bryan J. McEntegart, Trustee*

*Edward D. Howard, Trustee*

*John J. Russell, Trustee*

*Joseph T. McGucken, Trustee*

*Ambrose Senyahyn, Trustee*

*Joseph F. Rummel, Trustee*

*William J. McDonald, First Vice President*

*John A. Floersh, Trustee*

*Joseph B. McAllister, Second Vice President*

*Robert E. Lucey, Trustee*

*James A. Magner, Assistant Secretary Treasurer*

*Urban J. Vehr, Trustee Lewis L. Guarnieri, Treasurer*

*Paul Shulte, Trustee*

*Thomas W. Pangborn, Trustee*

*Lawrence J. Shehan, Trustee*

*Andrew P. Maloney, Trustee*

*Gerald T. Bergan, Trustee*

*James Keelty, Trustee*

*Gerald T. Bergan, Trustee*

*John A. Coleman, Trustee*

*Thomas A. Connolly, Trustee*

*John McShain, Trustee*

43

*Edward J. Hunkeler, Trustee*

*John Walter Clarke, Trustee*

*Thomas A. Boland, Trustee*

*Charles P. Maloney, Trustee*

*Henry J. O'Brien, Trustee*

*Dr. Carroll A. Hochwalt, Trustee*

*James J. Byrne, Trustee*

*John J. Drummey, Trustee*

*Leo Binz, Trustee*

*Daniel J. Donahue, Trustee*

*William E. Cousins, Trustee*

*DATE June 29, 1964*

*ATTEST: THE CATHOLIC UNIVERSITY OF AMERICA*

*(James A. Magner) By (Joseph B. McAllister)*

*Approved by Holy See/Pope Pius XI*
*Issued 1937*

**Section 6: The Pontifical Statutes of 1937**

## The Pontifical Statutes of 1937

After Pope Pius XI promulgated the apostolic constitution *Deus Scientiarum Dominus* on May 24, 1931, for the governance of ecclesiastical faculties and universities, a revision of the 1926 constitutions was undertaken. The statutes approved in 1937 began with a statement of aims expressive of the University's understanding of its historic mission.

Article. 1 The aim of the Catholic University of America is to search out truth scientifically, to safeguard it, and to apply it to the molding and shaping of both private and public life. With this aim in view the University imparts, carefully cultivates and promotes learning, and furnishes both students and teachers with the means for scientific research and study, and so directs them that they may properly fulfill their duties toward God, Church, and Country.

Article. 2 The University must look to the welfare not only of the students enrolled but also of all the faithful in the United States of America, and hence it should be of help and assistance to Schools, Colleges, and Seminaries, especially by training teachers who shall be qualified to instruct Catholic youth in these Institutions. Thus the University should be a national center of Catholic culture, and should be held as such by all.

Article. 3 The University shall keep in touch with other Universities and scientific Institutes in all matters pertaining to the increase of knowledge and to the perfecting of educational methods, but particularly in whatever pertains to the maintenance of social order by moral influence.

44

# EXHIBIT A-2

DEFENDANT'S
EXHIBIT

A-2

# THE CATHOLIC UNIVERSITY OF AMERICA

## FACULTY HANDBOOK

### PART II

### APPOINTMENTS AND PROMOTIONS

Approved by the Academic Senate May 10, 2017;
by the Board of Trustees June 6, 2017

Approved by the Academic Senate December 15, 2016;
by the Board of Trustees January 18, 2017.

Approved by the Academic Senate February 18, 2010;
by Board of Trustees September 2010.

**Additional History**

**Additional References**

Faculty Appointment Forms

Memorandum - External Consultation for Applications for
Tenure or Promotion to Ordinary Professor

# Section A.  Appointment to a Faculty

<u>II-A-1</u>        **Faculty membership**

**.001**    Membership in the Faculty of a School or Department is held by persons with valid
appointments to one of the four generally recognized Faculty ranks, namely,  Ordinary
Professor, Associate Professor, Assistant Professor, or Instructor.

**.002**    Distinguished Professors not attached to a School or Department may be appointed  to
Faculty membership according to norms applicable for the appointment of Ordinary
Professors (*D-3.145*), provided each such appointment is specifically approved by the
Academic Senate.

**.002a**   The Chancellor of the University by virtue of office shall have the title, The  Cardinal
William Baum University Professor, and, unless otherwise approved by the appropriate
voting bodies according to the norms applicable for faculty  appointments and the
awarding of continuous tenure, without membership in a specific School or Department
and without tenure.

**.002b**  The President of the University by virtue of office shall have the title, The Bishop  John J.
Keane University Professor, and, unless otherwise approved by the  appropriate voting
bodies according to the norms applicable for faculty  appointments and the awarding of
continuous tenure, without membership in a  specific School or Department and without
tenure.

**.003**    For purposes of procedures outlined below for appointments and promotions, Ordinary
Professors and Associate Professors will be referred to as Senior Faculty;  Assistant
Professors and Instructors as Junior Faculty.

**.004**    Appointments to regular membership in a Faculty are of three kinds: appointments  with
continuous tenure, term appointments probationary for tenure, and contract appointments
without tenure. Contract appointments without tenure are  distinguished by a prefix or
suffix to the professorial title as appropriate to the academic field  and function (e.g.
"Clinical," "Teaching," or "of Practice").

**.005**    Others may be associated with a Faculty (a) as Professors Emeriti; (b) in Research,
Visiting, or Adjunct capacities, as designated by the prefix to the professorial title; (c) as
Lecturers; (d) as Research Associates, Clinical Associates, or Visiting  Scholars; or (e) as
Teaching or Research Assistants. In each case, an appointee has  such privileges as the
Department or School may grant, except the privileges of  voting and serving in an
administrative capacity within the Faculty (i.e., as dean or chair, or as associate dean or
chair), which are enjoyed only by regular members of a  Faculty as defined in the
paragraphs above. Association with a Faculty, regardless of  length of service or type of

appointment (full-time or part-time), does not entitle the appointee to regular membership in a Faculty except through procedures for  recruitment and appointment of Faculty as provided in *Section C. Procedures for Appointments and Promotions*.

**.006**   Policies and procedures governing the prerogatives of membership and of rank in a Faculty, or of other association with a Faculty, are derived from and are administered within the context of collegial relationships in which the Academic Senate is empowered to "share with the President the immediate responsibility for the academic governing of the University by establishing, maintaining, supervising and  in general being responsible for the academic policies of the University" (*Bylaws II,  6*). The specific requirements for each rank or title and the procedures for  appointment and promotion are those recommended by the Academic Senate  (*Constitution of the Academic Senate, Art. XI-XIII*).  They are set out in *Section D. Criteria for Reviews*.

## II-A-2   **Joint Appointments**

**.007**   An appointment may be held simultaneously in two or more Schools or in two or  more Departments within the same School, provided that the usual procedures of  consultation within the Schools or Departments concerned are observed.  A joint  appointment must be to a single academic rank, the title to be agreed upon by all  parties. The appointee enjoys full rights in each of the Schools and/or Departments  in which the joint appointment is held.

**.008**   All subsequent proposals concerning the appointee pertaining to reappointment, promotion, tenure, and retirement, must be agreed upon by each of the Schools  and/or Departments in which the appointment is held if the joint appointment is to be continued.

## II-A-3   **Authority for Appointment**

**.009**   Appointments to Faculty rank and to the associated positions named above are made  by the President (*Bylaws VIII, 1*), ordinarily through delegation of authority to the Provost, subject to the following requirements for consultation or approval:

**.010**   The Academic Senate and the Board of Trustees must approve appointments with continuous tenure and conferral of the title Professor Emeritus or Emerita.

**.011**   The Academic Senate must approve appointments to senior Faculty rank.

**.012**   Appointments and reappointments of Faculty to junior Faculty rank may be made  after consultation with the cognizant Faculty as provided in *C-6., C-7*.

**.013**   Appointments of Lecturers, Research or Clinical Associates, Visiting Scholars and Teaching or Research Assistants may be made upon the recommendation of the  Chair of the Department, if the School is departmentalized, and the Dean of the School, who for

4

this purpose act on behalf of their Faculty.

**.014**   When time does not allow completion of all required procedures for an initial appointment, the President, after consultation with the cognizant Dean, may issue  an appointment *ad interim* to a rank that is appropriate and consistent with the  prescribed criteria for rank.  Such an appointment may not be extended beyond a  single one-year term, during which term the appointee has the rights and obligations proper to the rank.

**.015**   The terms and conditions of every appointment, in addition to the regulations of this *Faculty Handbook*, are those set forth in writing in the official letter of appointment issued by the Provost, copies of which are supplied to the appointee and the  cognizant Chair and Dean.

5

# Section B. Categories and Terms of Appointment

<u>II-B-1</u>       <u>**Categories of Appointment**</u>

**.016**    Regular membership in a Faculty includes appointments with continuous tenure (*B-2*), appointments probationary for tenure (*B-3*), and contract appointments without tenure (*B-4*). All other appointments to association with a Faculty, as described in (*B-5-7*), regardless of length of term or extent of duties, full-time or part-time, do not confer regular membership in a Faculty. Unless specifically provided for in this Handbook and arranged for by prior mutual agreement, these appointments do not count as time in service toward acquisition of tenure.

<u>II-B-2</u>       <u>**Tenured Appointments**</u>

**.017**    A tenured Faculty appointment is a permanent appointment to a School of this University, or, if the School is departmentalized, to a particular Academic Department of the School. In the case of a joint appointment, tenure applies to the position as mutually agreed upon by the academic units involved. A Distinguished Professor (*cf. A-1.002*) with tenure holds an appointment in the University at large. In the event that the University is reorganized through mergers or other restructuring of academic units, the tenured appointment of an affected Faculty member continues in the successor academic unit. If the reorganization results in the abolition of a particular academic unit, tenured faculty appointments may be terminated according to provisions in *H-8*.

<u>II-B-3</u>       <u>**Appointments Probationary for Tenure**</u>

**.018**    An appointment probationary for tenure is an appointment to a Faculty for a term of one or two years, and is subject to renewal up to a maximum of seven years of service, whether continuous or, if not continuous, in the aggregate, at this University. In determining the maximum duration of probationary status the following shall apply:

**.019**    (a) Appointments *ad interim* are included;

**.020**    (b) Appointments as Visiting Faculty are included beyond the first year;

**.021**    (c) Time spent on Leave of Absence and parental leave is excluded;

**.022**    (d) Maximum duration is extended by one year for each new child.

**.023**    (e) In extraordinary cases, pursuant to a written agreement signed by the appointee and the Provost, the period during which the appointee provides at least half-time service in non-academic duties may be excluded; for example, Deans, or Assistant or Associate Deans, may qualify under this rule, but in no case may such extension run for more than

four years.

**.024**   (f) Part time service shall be accounted for tenure extension as defined in the Policy of the University. See also Part III B-8.

**.025**   Probationary appointments are for the term stated in the official letter of  appointment and, subject to the requirements of this article, end on the date  specified unless a new letter of appointment is issued prior to such terminal date.  Written notice that a probationary appointment will not be renewed or that the term  of an existing probationary appointment is to be amended will be given:

**.026**   (a) By March 1 of the first academic year of service if the appointment expires at  the end of that academic year, or at least three months in advance of its  expiration if this occurs at some other time during the year;

**.027**   (b) By December 15 of the second academic year of service if the appointment  expires at the end of the academic year, or at least six months in advance of the  expiration of the appointment if this occurs at some other time during the year;

**.028**   (c) At least twelve months before the expiration of an appointment, if this occurs  after two or more years of service at the University.

**.029**   The notice of non-renewal shall be in standard form and need not state reasons for  the decision, except as provided in *C-12*.

**.030**   If the University fails to provide timely notice under this article, the appointment is  extended under existing terms and conditions for a period equivalent to an  additional academic year. An extension under this provision, even if the time of  service in probationary status then exceeds seven years, does not automatically  entitle the Faculty member to an appointment with continuous tenure.

<u>II-B-4</u>        **<u>Contract Appointments Without Tenure</u>**

**.031**   On the recommendation of the cognizant Faculty and with the approval of the  Provost, and based on a written description of the teaching and related duties, a  Faculty position involving full-time teaching in a clinical or professional skills  program or to support particular instructional needs in other programs may be  designated as a non-tenure track ("Contract") position.   Titles associated with  contract positions shall be appropriately distinguishing, such as "Assistant Teaching Professor" or "Assistant Professor of Practice," as determined by the Provost in consultation with the  relevant/cognizant Dean or Chair. The Academic Senate may set specific limits on  the number of contract appointments authorized in a particular academic unit.

Professors of Practice serve the teaching mission of the University in at least one of three

ways:

    a.  Those whose primary responsibility is to teach full-time with limited additional duties determined by the Dean or Department Chair; or

    b.  Those whose primary responsibility is to teach with additional duties as determined by the Dean or Department Chair; or

    c.  Those whose primary responsibility is to teach with additional commitments to scholarship or practice as required by the profession and determined by the Dean or Department Chair.

Delineation of said manner of service may be noted in the appointee's contract

**.032**  The initial appointment shall be for one or two years.  Reappointments through the sixth year shall generally be for two years. Exceptions to this shall be made in consultation with the Provost.  Renewal for successive terms follow the same procedures as apply to Faculty with appointments probationary for tenure.  After six years of continuous service, subsequent  reappointments shall be for periods between three and five years, but without continuous  tenure. If the appointment is not renewed, written notice of non-renewal shall be  given as provided in *B-3.025-030*.

**.033**  Contract appointments may be made at the level of Instructor, Assistant Professor, Associate Professor or (in the schools of Architecture, Business and Economics, Law, Music, Nursing, Social Service, and Theology and Religious Studies only) Ordinary Professor. A Faculty member with a Contract appointment is  accorded parity of benefits, perquisites, governance, and  voting rights with other Faculty of comparable rank with the following exceptions:

    a.  Sabbaticals shall normally not be offered but may be negotiated on a case-by-case basis with the Dean and the approval of the Provost

    b.  Contract faculty do not have voting rights for tenure decisions or reappointment.

Contract appointments with a doctoral degree may serve on doctoral boards in accordance with individual school policies.

**.034**  A Faculty member with a Contract appointment may apply for an appointment probationary for tenure, if a vacancy exists, under normal procedures for  recruitment and appointment. In such a case, time served in the Contract position  beyond the first year may be counted toward the maximum allowable period of probationary service (*B-3.018-022*).

Any time served in the Contract position beyond the first year that would be counted

toward fulfillment of the period probationary for tenure must in such a case be agreed to in writing by the Provost, cognizant Dean, and the former Contract member of the faculty at the time of initial appointment to the tenure-track position.

In the event the outcome of the tenure review of a former Contract member is negative, the Faculty member shall not be eligible for subsequent reappointment to the Contract position; however, if the faculty member applies for tenure upon beginning the tenure-track position, and tenure is denied, the terms of the current Contract appointment shall be honored.

If the Contract appointment is ending and the faculty member applies for tenure at the time of hire into the tenure-track position, and tenure is then denied, the Faculty member shall be offered a one-year nonrenewable contract.

**.035**   A Faculty member with an appointment probationary for tenure may apply for a Contract appointment, if a vacancy exists, under normal procedures for recruitment and appointment. However, a Faculty member in probationary status is not eligible to apply for such a change of status if that Faculty member has been reviewed for tenure with the result that tenure was not recommended.

## II-B-5   **Professors Emeriti**

**.036**   A title of honor, Professor Emeritus or Emerita, may be conferred upon a retiring or retired member of a Faculty by the Board of Trustees, on the recommendation of the School, the Academic Senate, and the President. The Academic Senate considers for recommendation retiring Ordinary Professors who have held regular membership in a Faculty at this University for at least ten years, or have served with notable distinction for a shorter period.

**.037**   A Professor Emeritus or Emerita is entitled to supporting services provided by the respective Department or School, depending on the availability, and may in the discretion of the Dean, participate without vote in Faculty meetings.

## II-B-6   **Faculty Associates**

**.038**   **Research Professor**. A research appointment at any of the four professorial ranks may be made on the recommendation of the cognizant Dean and Department or School Faculty and upon the approval of the Committee on Appointments and Promotions of the School. For the rank of Research Professor or Research Associate Professor the approval of the Committee on Appointments and Promotions of the Academic Senate is also required. A research appointment may be made for either full-time or part-time service. The appointment is for one academic year and may be renewed upon the recommendation of the Dean and Department or School Faculty. A research appointee must also be reviewed for reappointment periodically by the CAP of the School: every five years for

the rank of Research Professor, three years for the rank of Research Associate Professor, and two years for the rank of Research Assistant Professor. Promotion within the various research professorial ranks may be made through regular procedures for promotion in rank (*Section C. Procedures for Appointments and Promotions*) according to criteria applicable to research appointments (*Section D. Criteria for Reviews*).

**.039** A research appointment is distinguished from other academic appointments in that it usually carries no teaching duties and is normally supported by funds from sources other than the annual operating academic budget of the University.

**.040** A professor with a research appointment enjoys such privileges as the Department or Faculty may extend, except those of voting or serving as an officer of the Department or School.

**.041** <u>**Visiting Professor**</u>. A visiting appointment for one semester or less, at any of the four professorial ranks, may be made on the recommendation of the cognizant Dean, and in the case of departmentalized Schools, the Chair, provided that the appointee holds or has held comparable rank at another institution. A visiting appointment for more than one semester or of a person without comparable rank elsewhere requires the normal approvals of the Departmental or School Faculty, and of the Committee on Appointments and Promotions of the School. For an appointment at the rank of Associate or Ordinary Professor the approval of the Committee on Appointments and Promotions of the Academic Senate is also required.

**.042** A visiting professor is limited to a maximum of two consecutive years of service at this university.

**.043** A visiting professor enjoys such privileges as the Department or Faculty may extend, except those of voting or serving as an officer of the Department or School.

**.044** <u>**Exchange Professor**</u>. The title Visiting at the three professorial ranks is also used for an exchange professor, i.e. a person from another institution who replaces CUA Faculty temporarily through a reciprocal arrangement. Procedures for the appointment of exchange professors are the same as for other visiting professors (*B-6.*).

**.045** <u>**Adjunct Professor**</u>. An adjunct appointment at any of the four professorial ranks may be made on the recommendation of the cognizant Dean and Department or School Faculty and upon the approval of the Committee on Appointments and Promotions of the School. For the rank of Adjunct Professor or Adjunct Associate Professor the approval of the Committee on Appointments and Promotions of the Academic Senate is also required. An adjunct appointment is for part-time service. The appointment is for one academic year and may be renewed on the recommendation of the cognizant Dean and Department or School Faculty. An adjunct appointee must also be reviewed for reappointment periodically by the CAP of the School: every five years for the rank of

Adjunct Professor, three years for the rank of Adjunct Associate Professor, and two years for the rank of Adjunct Assistant Professor or Adjunct Instructor. Promotion within the various adjunct professorial ranks may be made through regular procedures for promotion in rank (*Section C. Procedures for Appointments and Promotions*) according to criteria applicable to adjunct appointments (*Section D. Criteria for Reviews*).

**.046**   An Adjunct Professor is distinguished from a Lecturer by specification of a Faculty rank for which the appointee possesses the required qualifications and by virtue of academic services rendered in addition to teaching, e.g., serving on dissertation committees.

**.047**   An Adjunct Professor enjoys such privileges as the host Department or Faculty may extend, except those of voting or serving as an officer of the Department or School.

**.048**   <u>**Lecturer**</u>.  A Lecturer is appointed on the recommendation of the cognizant Dean, and in the case of departmentalized schools, the Chair, for part-time teaching service without Faculty responsibilities beyond the courses assigned. The appointment may be made for one term or for one academic year without limitation as to the number of reappointments.  A Lecturer enjoys such privileges as the Department or Faculty may extend, except those of voting and serving as an officer of the Department or School. The title of "Distinguished Lecturer" or "Senior Lecturer" may be used to reflect the status of the appointee.

**.049**   <u>**Research or Clinical Associate**</u>. An appointment as Associate without distinction as to rank may be made on the recommendation of the cognizant Dean, and in the case of departmentalized schools, the Chair, to designate a person who assists in the execution of research, offers clinical service and instruction, or performs similar requisite services. An Associate is appointed for one year without limitation as to the number of reappointments, and enjoys such privileges as the Department or Faculty may extend, except those of voting and serving as an officer of the Department or School.

**.050**   <u>**Visiting Scholar**</u>.  An appointment of a Visiting Scholar or other Faculty Associate such as Artist-in-Residence or Judge-in-Residence may be made on the recommendation of the cognizant Dean, and in the case of departmentalized schools, the Chair, to designate a person invited to the University for a limited period of time, ordinarily no longer than one semester, with such functions and privileges as the Department or School may specify.

<u>II-B-7</u>        <u>**Teaching or Research Assistants**</u>

**.051**   A Teaching or Research Assistant is appointed on the recommendation of the cognizant Dean and, in the case of departmentalized schools, the Chair, and approved by the Dean of Graduate Studies. An Assistant is assigned to academic service in the classroom or laboratory or the equivalent, consonant with professional development and limited so as to allow reasonable progress in the completion of the appointee's degree program.  The appointment may be made for one semester or for one academic year and may be

11

renewed after review of the academic record, provided that the appointee continues to enroll as a degree student. An Assistant shares such privileges and responsibilities as the Department or Faculty may extend, except those of voting and serving as an officer of the Department or School.

# Section C.  Procedures for Appointment and Promotion

<u>II-C-1</u>          **Terminology and Qualifications**

**.052**   Reviews for appointment and promotion are conducted at the level of the Academic Department (if the School is departmentalized), the School, and the Academic Senate.

**.053**   At the level of the Department, the qualified Faculty (*below, .054-056*) acts as a committee of the whole.

**.054**   At the level of the School, reviews are conducted by the Committee on  Appointments and Promotions of the School, and, when required by procedures  outlined in this section, by the Faculty of the School.

**.055**   At the level of the Academic Senate, reviews are conducted by its Committee on Appointments and Promotions, and, when required by procedures outlined in this section, by the Academic Senate. When the Academic Senate acts for this purpose  (as defined in *.054-.055*),  only Senior Faculty are eligible to deliberate and vote on appointments to Faculty rank and on promotions, and only Tenured Senior  Faculty are eligible to deliberate and vote on appointments with continuous tenure.

**.056**   Ordinary and Associate Professors holding regular academic rank constitute Senior Faculty.  At every level of review only Senior Faculty are qualified to act on matters  of appointment to Faculty rank and of promotion.

**.057**   Only Tenured Senior Faculty act on matters of Faculty reappointment and of tenure.

**.058**   In departmentalized Schools with more than 100 Faculty members, Ordinary  Professors act on behalf and in the place of Senior Faculty in deliberations at the level of the School.

**.059**   **<u>Deliberative</u>** votes are votes of Faculty qualified (as defined above, *.054-058*) to act  in matters of conferral of faculty rank, reappointment, promotion, and tenure.  Deliberative votes are actions that determine the sequence of subsequent reviews.

**.060**   **<u>Consultative</u>** votes are expressions of opinion of all Faculty who hold regular  academic rank in the matter of recruitment and initial appointment of new Faculty members.

<u>II-C-2</u>          **Committees on Appointments and Promotions**

**.061**   Each School shall have a standing Committee on Appointments and Promotions  (CAP) consisting of five members, one or more alternates, and the Dean, who acts  as Chair of the Committee without vote. Only Tenured Senior Faculty members  are eligible to serve on the School CAP. Members of the CAP are nominated by  the Dean and must be approved by the Senior Faculty of the School. Members  serve for terms of three years,

and are ineligible for appointment to consecutive terms.  The proscription of appointment to consecutive terms does not apply to service as an alternate member.

**.062**  In order to avoid undue overlap between the review by the CAP and that by the  qualified Faculty as a whole, no more than half of the eligible members of the  Faculty may serve on the CAP of the School at one time.[1] If the number of eligible  members is fewer than nine but more than six, the CAP of the School shall consist of four members. If the number of eligible members is six or fewer, the CAP of the  School shall not be constituted and the eligible members of the Faculty shall act as  a committee of the whole.

**.063**  In departmentalized Schools, CAP members from the same Department as the  candidate under review shall withdraw from the case and shall be replaced by  alternates.

**.064**  The Academic Senate shall have a standing CAP, consisting of six members, one or more alternates, and the Dean of Graduate Studies, who acts as its Chair and is a voting member of the Committee. The members and alternates are elected by the Academic Senate from among Tenured Ordinary Professors of the Schools. Members serve terms of three years, and are ineligible for consecutive  appointment. The proscription of appointment to consecutive terms does not apply  to service as an alternate member; however, it does apply to those serving a  replacement term of more than one year (Academic Senate, May 12, 2004). In  electing CAP members, the Senate should seek a balanced representation of  School faculties and disciplines.

**.065**  Academic Senate CAP members shall be replaced by alternates if a candidate is  from the same School (if not departmentalized) or from the same Department (if  the School is departmentalized). If the candidate's appointment is to the same  academic unit as that of the Dean of Graduate Studies, the Dean shall continue to  act as the Chair of the Senate CAP but without vote.

**.066**  If a School or Senate CAP member withdraws from a case for any reason, an  alternate may replace that member only if the alternate is fully prepared to  participate in the deliberations.

**.067**  If the Dean of the School is the Faculty member under review, the CAP of the School shall elect one of its members to serve as Chair for the purpose of this  review.  The member so selected shall have the right to vote.

**.068**  Deliberations may not be concluded nor should a vote be taken by any reviewing  body unless a quorum of eligible voters is present. For this purpose, the following number of members constitutes a quorum: (a) for the CAP of a School, four; (b) for the CAP of the Academic Senate, five; (c) for Faculties and the Academic  Senate, one half of qualified

---

[1] In case the number of qualified faculty is odd, for the purpose of this calculation the number of eligible   members shall be increased by one.

members plus one; d) in departmentalized Schools with more than 100 Faculty members, one third of qualified members plus one.

II-C-3      **Procedures for Deliberation**

**.069**    All meetings held for the purpose of reviewing candidates shall be called with due notice.

**.070**    Voting is conducted by secret ballot.

**.071**    Votes are recorded as For, Against, or Abstaining.

**.072**    Absentee votes are not recorded.

**.073**    Decisions are made by majority vote, i.e. more than half of the votes cast, excluding blanks and abstentions.

**.074**    Any consultative vote is recorded and announced before deliberative voting is undertaken (*C-1. 059-060*).

**.075**    The votes of Ordinary Professors in departmental and school reviews are taken concurrently with those of all Senior Faculty but are recorded separately. For this purpose, Ordinary Professors who wish to have their vote recorded separately shall designate their rank on the ballots.

**.076**    Each reviewing body must keep minutes and other pertinent records arising from its deliberations. If the decision is negative, the minutes must include factors considered in the discussion. The minutes are not ordinarily forwarded to the next reviewing body but, if requested, the pertinent sections of the minutes must be made available.

II-C-4      **Confidentiality of Deliberations**

**.077**    Deliberations of Committees on Appointments and Promotions, Faculties, and the Academic Senate relating to an application for appointment, reappointment, promotion, or tenure shall be held in strict confidence. All communication with persons outside the reviewing body about its deliberations must be conducted only by the Chair of that body, in accordance with provisions stated below (*C-10, C-11*).

**.078**    Documents, records, and other materials pertaining to the review shall be securely maintained. At each stage of review, access to such materials is limited to members of the reviewing body.

II-C-5 **Representation**

**.079**   In a departmentalized School, the Chair of the candidate's Department shall appear before the School CAP in person to respond to questions. If that Chair is the Faculty member under review, the Faculty of the Department, shall designate another Senior Faculty member from the Department to act for this purpose.  If the Faculty of the Department is unable to decide upon a Senior Faculty member to appear before the School CAP, the Dean in consultation with the Faculty shall designate a Senior  Faculty member from the Department to act for this purpose.

**.080**   In a departmentalized School, the Chair of the candidate's Department shall appear before the School CAP in person to respond to questions. If that Chair is the Faculty member under review, the Faculty of the Department shall designate another Senior Faculty member from the Department to act for this purpose.

**.081**   The Dean of the School shall appear before the CAP of the Academic Senate to  respond to questions in person. In cases of Faculty members from a departmentalized School, the Chair of the Department shall also be available for this purpose if, in the  judgment of the CAP, additional specialized information is needed. If the Chair of the Department or the Dean of the School is the Faculty member under review, the  CAP may invite another Senior Faculty member from the Department or School to serve this function.

II-C-6 **Sequence of Reviews – Initial Appointment to a Faculty**

**.082**   Recruitment of candidates for appointment to a Faculty is the responsibility of the cognizant Department Chair or Dean of the School, although this responsibility is  shared with all members of the Faculty. An important consideration in the  recruitment of new Faculty is the preservation and advancement of the mission of the University as expressed in its statement of aims and goals, including reference  to its identity as a Catholic institution. Recruitment may be initiated only after  formal approval by the Provost, to ensure academic and budgetary authorization and  compliance with procedures for equal opportunity in employment. The Chair or the  Dean recommending the appointment must provide a statement indicating the  nature and extent of the search procedures, as well as the method to be employed in  the selection of a suitable candidate.  Prior to extending an invitation to a candidate  for an on-campus interview, the Dean or the Chair shall send the Curricular Vitae of  the candidate to the President and Provost for approval.  During the interview  process, the Chair or Dean shall discuss with the candidate the Catholic identity of  the University and the expectation that the candidate, if hired, will support the mission of the university.

Selection of Candidate(s)

**.083**   When a suitable candidate is identified, the Chair of the Department, or the Dean of  the School (if not departmentalized), submits the candidate to all regular Members  of the

Faculty for review and approval. If more than one suitable candidate is identified, a vote is taken to determine the order of preference among candidates qualified for appointment. Applications of proposed candidates are forwarded to the President for review as to suitability prior to inviting them for an interview.

Review of Credentials

.084   After the selection of the candidate(s) in departmentalized Schools, the Chair of the Department submits the credentials of the proposed candidate(s) to the Senior Faculty of the Department for a deliberative vote on faculty rank. In non-departmentalized Schools, the Dean submits to the CAP of the School the credentials of the proposed candidate(s) for review and a vote on faculty rank unless, as part of the review by the Faculty of the School, the CAP has already passed on the candidate(s) in the selection process (*see above, .081*).

Offer of Appointment

.085   Before negotiating the terms and conditions of the appointment with a candidate, the Chair of the Department or, if the School is not departmentalized, the Dean must receive authorization from the Provost to offer the appointment to that candidate. If the candidate agrees to the terms of the offer, he or she is invited to submit a formal application for the position.

Confirmation of Faculty Rank

.086   In a non-departmentalized School the application of the candidate is submitted to the CAP of the School and then to the Senior Faculty for review and deliberative vote.

.087   In a non-departmentalized School the application of the Faculty candidate is submitted to the CAP of the School and then to the Senior Faculty for review and deliberative vote. Unless information is presented that was not available at the time of the deliberative vote in .081, the outcome of the confirmatory deliberative vote is expected to be the same as the vote taken when the credentials were initially considered.

Appointment to Faculty

.088   If the appointment is to the rank of Instructor or Assistant Professor, an affirmative recommendation of the School and that of the Dean are required, which are then forwarded to the Provost for approval by the President.

.089   If the appointment is to the rank of Associate or Ordinary Professor, an affirmative recommendation of the School and that of the Dean are required, which are then submitted to the CAP of the Academic Senate. An affirmative recommendation of the Senate CAP is reported to the Senate for its review and vote, and the outcome of the

Senate's action is forwarded to the Provost for the approval by the President.

### II-C-7        Sequence of Reviews—Reappointment to Probationary or Contract Terms

.090    Reviews of Faculty for the purpose of recommending reappointment without continuous tenure are conducted at the level of the School. If the School is departmentalized, a review by the Department is also required.

.091    Reviews for reappointment shall be scheduled so as to meet the requirements for notice of non-renewal, as set forth above (*B-4. 025-030*). Accordingly, such reviews shall be conducted and concluded during the year prior to the last year of appointment then in force.  The schedule for reviews for reappointments is as follows:

a.    After an initial appointment to a term of one year the review for the first reappointment is conducted as soon as possible after the first semester of service.

b.    After an initial appointment to a term of two years, the review for the first reappointment is conducted during the third semester of full-time service.

c.    After the second reappointment of Faculty on a tenure-track or contract appointment, the review is conducted during the seventh semester of full-time service if all of the Faculty member's prior appointments had been for the usual two years. If the Faculty member has not had a sequence of two year appointments, the review for the second reappointment and subsequent reappointments is conducted during the year prior to the last year of the appointment then in force.

.092    In a non-departmentalized School, the review for reappointment is initiated by the Dean who submits the case to the CAP of the School. The results of the deliberation and the vote of the CAP are then presented to the Tenured Senior Faculty of the School. This vote constitutes the final recommendation of the School on the reappointment.

.093    In a departmentalized School, the review for reappointment is initiated by the Chair of the cognizant Department who submits the case to the Tenured Senior Faculty of the Department. The results of the deliberation and the vote of the Department are then presented to the CAP of the School. The vote of the CAP constitutes the final recommendation of the School on the reappointment.

.094    The recommendation of the School is transmitted to the Provost. If the recommendation is positive, the Provost forwards it to the President for approval. If the recommendation is negative, the Provost notifies the candidate of the decision.

<u>II-C-8</u>        <u>**Sequence of Reviews—Appointment with Continuous Tenure**</u>

**.095**   A proposal for an initial appointment with continuous tenure or for review prior to reappointment with continuous tenure is made by the Dean or, in departmentalized schools, by the Chair of the Department in which the candidate is to hold rank. If the candidate is to hold a joint appointment, the proposal is submitted by both Deans and/or Chairs, as the case may be.

**.096**   Tenure reviews of Faculty in probationary status are officially begun by application of the candidate which shall take place no later than the beginning of the eleventh semester of full-time service in the probationary period.

**.097**   At the option of the Faculty member holding a probationary appointment, the tenure review may be initiated prior to the eleventh semester of the probationary period. In such a case, if the outcome of the review is not favorable, the probationary service of the Faculty member is terminated in accordance with provisions for notice of non-renewal (*B-3. 025-030*).

**.098**   If neither the cognizant Department or School nor the candidate initiates a tenure review prior to the end of the first semester of the sixth year of the probationary period, the Provost notifies the President and the candidate that the candidate's appointment will not be renewed upon the expiration of the probationary period. No letter of appointment can be issued that extends a candidate's service beyond the last year of the probationary period unless the Board of Trustees has approved the conferral of tenure.

**.099**   In non-departmentalized Schools tenure reviews are conducted in the following order: (1) the CAP of the School; (2) the Tenured Senior Faculty of the School; (3) the CAP of the Academic Senate; (4) the Academic Senate.

**.100**   In departmentalized Schools with 100 Faculty members or fewer, tenure reviews are conducted in the following order: (1) the Tenured Senior Faculty of the Department; (2) the CAP of the School; (3) the Tenured Senior Faculty of the School; (4) the CAP of the Academic Senate; (5) the Academic Senate.

**.101**   In departmentalized Schools with more than 100 Faculty members, tenure reviews are conducted in the following order: (1) the Tenured Senior Faculty of the Department; (2) the CAP of the School; (3) the CAP of the Academic Senate; (4) the Academic Senate.

**.102**   The votes of each reviewing body are forwarded to the next reviewing body up to the level of the Academic Senate. When forwarding the votes of a Department or School, the Chair and/or the Dean may make their own separate recommendations to the next reviewing body.

**.103**    If any two reviewing bodies fail to recommend the candidate for tenure, the negative recommendation is considered conclusive, and the sequence of reviews is terminated at that point. In such a case, or if the Academic Senate fails to recommend tenure, the negative recommendation is transmitted to the Provost who notifies the President and the candidate of the decision.

**.104**    A positive recommendation of the Academic Senate is reported to the President who, upon appropriate review, approves or disapproves the appointment. If the President approves, he or she transmits through the Provost the recommendation to the Board of Trustees for final acceptance or rejection. If the President disapproves, he or she through the Provost notifies the candidate, the Academic Senate, and the cognizant Faculty.

**.105**    In the event the President or the Board of Trustees fails to approve the positive recommendation of the Academic Senate to grant continuous tenure, the Senate may request of the Board the formation of a joint Board-Senate committee, its members chosen by the respective bodies, to review the matter and to present its recommendation to the Board of Trustees which, in turn, will make the final determination.

<u>II-C-9</u>        <u>**Sequence of Reviews—Promotion in Rank**</u>

**.106**    The review process for promotion in rank is initiated by the Faculty member upon submission to a Department or School of a completed application. The candidate should notify the Office of the Provost in writing that the application has been submitted.

**.107**    In non-departmentalized Schools reviews for promotion in rank are conducted in the following order: (1) the CAP of the School, (2) the Senior Faculty of the School, (3) the CAP of the Academic Senate, and (4) the Academic Senate.

**.108**    In departmentalized Schools promotion reviews are conducted in the following order: (1) the Senior Faculty of the Department, (2) the CAP of the School, (3) the Senior Faculty of the School, (4) the CAP of the Academic Senate, and (5) the Academic Senate.

**.109**    Each successive reviewing body shall act upon the application with reasonable speed so that, barring exceptional circumstances, action on the application will be taken within one academic year from the date of submission of the formal application. In case of undue delay the applicant may petition the Provost for retroactive effect of the rank and salary if the promotion is approved.

**.110**    The votes of each reviewing body are forwarded to the next reviewing body up to the

level of the Academic Senate. When forwarding the results of deliberations in Departments or Schools, the Chairs and/or Deans may make their own separate recommendations to the next reviewing body.

**.111** If any two reviewing bodies fail to recommend the candidate for promotion, the negative recommendation is considered conclusive and the sequence of reviews is terminated at that point. In such a case, or if the Academic Senate fails to recommend promotion, the negative recommendation is transmitted to the Provost, who notifies the President and the candidate of the decision.

**.112** A positive recommendation of the Academic Senate is transmitted to the Provost for approval by the President.

**.113** Promotions in rank become effective at the beginning of the academic year following their approval by the President. If the review is concluded in the Department or the School before the end of the spring semester but other required stages of the review are not completed until the following academic year, the promotion is made effective retroactively as of the beginning of the academic year in which it is finally approved.

## II-C-10    Preparation and Sharing of Documents and Information

**.114** In cases of review for reappointment or tenure, the Dean or the Chair should advise the Faculty member of the time when decisions affecting renewal and tenure are ordinarily made so that the Faculty member has adequate time to prepare relevant documentation. In general, the final review and decision for all tenure cases is ordinarily made at the final Board meeting of the year, which is typically in June.

**.115** In addition to documentation required to be submitted in standard form, the Faculty member under review may submit such additional material as he or she believes is helpful to an adequate consideration of the case.

**.116** Documentation prepared by the Faculty member under review is submitted to the Chair of the Department or, in a non-departmentalized School, to the Dean. After the first reviewing body has concluded its deliberations, the Faculty member may submit additional material to the Dean, who shall include it in the set of documents to be considered by other reviewing bodies. If the School is departmentalized, a copy of such additional material must also be provided by the Faculty member to the Chair of the Department.

**.117** Each subsequent reviewing body must receive the dossier of materials reviewed by the previous body and is entitled to be informed of factors previously considered.

**.118** Each reviewing body, through its Chair, may seek additional information from any

source in writing, orally, or in person. If the reviewing body determines that such information differs materially from the record at hand, the reviewing body must reveal that information to the cognizant Dean. Unless doing so is inappropriate in light of the provisions of the *Faculty Handbook*, the Dean shall consult with the candidate and may also consult with other persons or groups including those that have reviewed the case previously. The Dean shall be given the opportunity by the reviewing body to respond to the information. Such additional consultation becomes part of the record of review. The obligation of confidentiality is to be respected by all parties.

**.119**   Unsolicited information received by a reviewing body, if material to the case in the judgment of the Chair of that body and if verified, must be included in the candidate's dossier. Such material must be clearly labeled as unsolicited. If the new information is included and in the judgment of the reviewing body differs materially from the record at hand, the reviewing body must reveal that information to the cognizant Dean. Unless doing so is inappropriate in light of the provisions of the *Faculty Handbook*, the Dean shall consult with the candidate and may also consult with other persons or groups including those that have reviewed the case previously. The Dean shall be given the opportunity by the reviewing body to respond to the information. Such additional consultation becomes part of the record of review. Unsolicited opinion submitted in support or in opposition to the candidate shall not be considered. The obligation of confidentiality is to be respected by all parties.

## II-C-11      Extramural Consultations

**.120**   Reviewing bodies considering a candidate for appointment or promotion to Ordinary Professor or for appointment with continuous tenure must establish the candidate's standing within the field in which the proposed appointment is to be held. For this purpose, a careful evaluation of the candidate's achievements will be undertaken in consultation with specialists outside as well as within the University. Such consultation should include the candidate's publications and professional activity and, where pertinent, the candidate's teaching and service record elsewhere. The extern specialists should include Faculty members from academic institutions of distinguished reputation.

**.121**   An expedited extramural consultation is appropriate in considering the appointment at the rank of Ordinary Professor of an external candidate for Provost, Dean or for the occupant of an endowed Chair. The extramural consultation for an external candidate with a distinguished record of scholarship may consist solely of testimony as set forth in letters of recommendation from external referees.

**.122**   External referees are chosen by the departmental Chair or the Dean of the School. In the event that the Chair or the Dean is the candidate for promotion or tenure, the Faculty of the Department or School shall designate a Senior Faculty member in the department or school to select external referees and to assume other administrative responsibilities

pertaining to the application. The candidate has the right to propose a limited number of names of externs for consideration; if such externs provide consultation, the fact that the candidate proposed them should be disclosed to reviewing bodies. In compiling the list of externs to be invited to review the case, the Chair or the Dean or a duly authorized Faculty member should consult other members of the Faculty, especially those with expertise in the pertinent area of research and scholarship. The Chair or the Dean or the duly authorized Faculty member should address requests for evaluation to the externs, asking each to comment on the quality, originality and significance of the candidate's scholarly productivity. Ordinarily, from six to eight evaluations of external referees should be obtained. An effort must be made to receive the same number of evaluations from those externs recommended by the candidate and those chosen by the School or Department.

**.123**  Insofar as the law allows, communications between reviewing bodies and external referees are strictly confidential and both the reviewing bodies and the consultants should be so informed.

**.124**  Successive reviewing bodies may seek additional extramural consultations whenever they deem it necessary.

## II-C-12    **Notification**

**.125**  At each level, the Chair of the reviewing body is informed of the outcome of subsequent reviews.

**.126**  Upon request by the candidate, the Dean or, in a departmentalized School, the Chair of the Department may inform the candidate orally of the outcome of the reviews.

**.127**  At the conclusion of all required reviews, the Provost notifies the candidate in writing of the decision.

**.128**  If the outcome of a reappointment review is positive, the Chair or the Dean may counsel the Faculty member, orally or in writing, with regard to his or her continuing development.

**.129**  If the outcome of a reappointment or tenure review is negative, the Dean or the Chair, at the request of the candidate, informs the candidate of the general reasons that contributed to the decision. Communication with the candidate about the outcome of the review is conducted orally, unless the candidate specifically requests that the reasons for the negative decision be stated in writing. Such a request by the Faculty member must be made within 30 business days of being informed of the decision (*see above .127*). The Provost must approve any written statement to the candidate.

**.130**  If the outcome of a review for promotion is negative, the Dean or the Chair may

counsel a Faculty member in regard to his or her continuing development toward future promotion. Communication with the candidate about the outcome of the review is conducted orally, unless the candidate specifically requests that the reasons for the negative decision be stated in writing. Such a request by the Faculty member must be made within 30 business days of being informed of the decision (*see above .127*). The Provost must approve any written statement to the candidate.

# Section D. Criteria for Reviews

<u>II-D-1</u>        **<u>Introduction</u>**

**.131**    The Academic Senate, when its acts are approved by the President, sets the  minimum standards for Faculty appointments, promotions, and tenure.

**.132**    The criteria prescribed by the Academic Senate for appointments and promotions  are to be followed as normal and normative by the reviewing bodies. The Faculties and their Committees on Appointments and Promotions have the responsibility and freedom to exercise their judgment in weighing the accomplishments of the candidate and in making recommendations for appointment and appropriate rank to the Academic Senate and to the President.

**.133**    It is not the purpose of these regulations to deprive the University of proper Faculty personnel at any appropriate rank, and it is recognized that different requirements  may be appropriate from time to time to maintain or advance the Faculty of one or more Schools. Accordingly, the Schools and Departments, or the President, may propose particular appointments and promotions that do not necessarily satisfy all of the stated criteria. Any exception or waiver of the criteria must be approved by the Committee  on Appointments  and Promotions of the Academic  Senate  and reported to and approved by the Academic Senate.

**.134**    Questions concerning the interpretation of the Academic Senate's regulations are referred to its Committee on Committees and Rules, which reports its conclusions  to the Senate for approval.

<u>II-D-2</u>        **<u>General Criteria for Faculty Rank</u>**

**.135**    A candidate for an academic appointment or promotion in rank must possess those personal and intellectual qualities normally expected in a teacher and director of students and must have a commitment to the aims and objectives of the University as set forth in this *Faculty Handbook* (*Part I*).

**.136**    The expectation of competency and satisfactory  performance as a teacher and  director of students is a requirement for appointment or promotion in any rank and,  whenever possible, must be verified before such appointment or promotion. In consideration of proposals for promotion, pertinent data about teaching  performance collected from members of the Faculty and students should be given  attention. In order to ascertain and register student opinion for this purpose, each  Department and School must provide for some documented means by which  students evaluate teaching.

**.137**    Research is fruitful and beneficial only as it becomes publicly available and subject  to reasonable evaluation and critique. This is chiefly accomplished through publication in

recognized scholarly journals, monographic series, books, or other recognized means of dissemination. Reports and articles consisting of critical analysis and conceptualization contributing to the development of the theoretical base of professional practice are recognized as research in professional disciplines. Irrespective of their format or the means by which they are disseminated, works presented in partial fulfillment of requirements for Faculty rank must exemplify and be appropriately recognized as exemplifying high standards of attainment in scholarship, creativity, or clinical or professional skill.

**.138**   The following are ordinarily not recognized as research for the purposes of appointment and promotion: mere data collection and collation; project reports not subject to normal refereeing; popularizations; simple book reviews; translations without critical apparatus or interpretation; and, in general, works requiring little or no original insight.

**.139**   If the doctoral degree is the normal degree for Faculty appointment, publications based on a candidate's doctoral dissertation are not considered unless significant additional research and/or analysis have been involved.

**.140**   The conscientious fulfillment of the duties and obligations of a member of the Faculties of the University is a necessary condition for appointment and promotion at any rank.

<u>II-D-3</u>          **<u>Specific Requirements for Faculty Rank</u>**

**.141**   **<u>Instructor</u>**. A candidate possessing the appropriate academic degree or training may be appointed to the rank of Instructor.

**.142**   **<u>Assistant Professor</u>**. Appointment or promotion to the rank of Assistant Professor may be made on fulfillment of one of the following criteria insofar as they may be taken as evidence of future academic achievement and advancement:

a.   Possession of the appropriate academic degree, ordinarily the terminal degree; or

b.   Research productivity; or

c.   Five years of full-time teaching experience in an institution of higher education with adequate evidence of distinctive ability as a teacher and director of students; or

Such professional experience as, in the particular field, may reasonably be considered the equivalent of the foregoing.[2]

---

[2] Specific detail explaining what is considered to be equivalent professional experience should be set forth in writing by the individual School and approved by the Academic Senate.

**.143**   **Associate Professor**.   Appointment or promotion to the rank of Associate  Professor requires:

a.   Sufficient experience, i.e., (i) four years of service as a regular Faculty member  in this  University or elsewhere; or (ii) acquisition by the candidate of such  professional experience as may reasonably be considered the equivalent of the teaching service;

b.   Possession of the appropriate academic degree, ordinarily the terminal degree;

c.   Demonstrated competence as a teacher; and

d.   Consistent research productivity, giving evidence of a high level of scholarly ability and the expectation of future recognition and advancement in academic achievement. Reasonable rates of publication on the part of a productive university scholar and teacher vary among fields of specialization, and such norms are to be given careful attention by the reviewing bodies. In case of  publications with multiple authors the candidate's contribution must be clearly  defined.

**.144**   In exceptional cases, appointment or promotion to the rank of Associate Professor  may be based primarily on:

a.   Outstanding and widely recognized achievement as a teacher and director of students; or

b.   Other extraordinary contribution or service to the academic aims of the University or the scholarly community at large; or

c.   Distinctive professional service related to the candidate's field of competence.[3]

d.   Even in these instances, however, some scholarly publication appropriate to the academic field is required if the candidate teaches at the graduate level.

**.145**   **Professor**. Appointment or promotion to the rank of Ordinary Professor requires:

a.   Four years in the rank of Associate Professor in this University or elsewhere, or such professional experience as may be reasonably considered its equivalent; and

b.   Fulfillment of the criteria listed above for the rank of Associate Professor; and

c.   Achievement of recognized standing in the academic field or profession,

---

[3] Distinctive professional service directly related to the candidate's field of competence is defined as a consistent   pattern of service on regional, state, national, or international levels recognized as outstanding in the field.

evidenced by continuing research productivity acknowledged as significant by the scholarly community at large (*C-11. 120-124*).

**.146**   Norms for Externs. An extern who has a Faculty rank at another institution shall ordinarily receive the same rank upon appointment to the Faculty or, upon review, a different rank, if warranted by the particular circumstances. When an extern is appointed to Faculty rank, the period of service required before eligibility for promotion may be determined in view of the qualifications presented. If in the appointment of an extern there is a variation from the requirements for interns, this should be stipulated at the time of appointment by the cognizant Dean and Committee on Appointments and Promotions of the School and the Academic Senate.

## II-D-4       Application of Equivalent Criteria

**.147**   In certain fields within the arts and within the professions, e.g. in the history of art or architecture, musicology, library and information science, or law, research is disseminated in the form of monographs, articles, or books, and is therefore generally subject to the same kind of evaluation as prescribed above (*D-2. 137-140*). To the extent that publication, i.e. making public of creative work or advancement in the practice of a profession, assumes a specifically different modality in the field, equivalent criteria may be appropriate, as specified below (*D5, D6*). When an appointment or promotion to Faculty rank is proposed on the basis of equivalent criteria, the appropriateness of such criteria to the Faculty position must be clearly stated.

## II-D-5       Equivalent Criteria for Architecture and the Arts

**.148**   For the rank of Assistant Professor, the candidate's work should manifest knowledge and skill showing professional competence in the field according to contemporary standards.

**.149**   For the rank of Associate Professor, the candidate's works must be recognized as significant by professional peers in the field outside the University. Works manifesting a superior skill and knowledge are exemplified in the paragraphs that follow (*.150-154*).

**.150**   Architectural Design: Executed or proposed architectural projects published in professional journals of national or international scope, projects recognized by regional or national awards, or work that has gained peer recognition for excellence in architecture (including contributions to the profession, history, technology, or theory), or allied disciplines.

**.151**   Fine Arts: Paintings, sculpture or other works properly belonging to disciplines related to the visual arts, such as ceramics, tapestry, etc., included by invitation or

juried in national or international exhibitions, acquired for public display at the initiative of a public building, institution or recognized gallery or museum.

**.152**   <u>Music</u>: Original compositions of substantial dimensions that have been performed professionally, and have received regional or national recognition; or professional engagements, other than those sponsored by this University, and evaluated by qualified externs as being of professional caliber. In all cases the work must give evidence of outstanding ability of a professional character. Recordings are subject to standard publication criteria.

**.153**   <u>Drama</u>: The writing of plays produced under professional management with professional actors; the performance of substantial roles in such productions; or the direction of, or design for, such productions.

**.154**   For promotion to the rank of Ordinary Professor, the candidate must demonstrate consistent high level of professional accomplishments. Committees should make an extended evaluation of the candidate's works in consultation with outside experts in order to ascertain the prominence of the candidate's standing in the field.

<u>II-D-6</u>        **Equivalent Criteria for Other Professional Fields**

**.155**   For the rank of Assistant Professor, equivalent professional experience is, if appropriate, licensing or certification required for entry into the profession, or five years of full-time experience in the profession.

**.156**   For the rank of Associate Professor, the candidate must fulfill the requirements of four years in previous rank (or such professional experience as may be reasonably considered its equivalent), possession of the appropriate academic degree, and competence as a teacher. In addition, the candidate must demonstrate consistent scholarly productivity or consistent high levels of professional competence, giving evidence of distinctive professional ability and the expectation of future recognition and advancement in the profession. Distinctive professional performance is demonstrated by a pattern of accomplishment in at least two of the following as determined by the Dean:

a.   Standing in one's field as evidenced by the achievement of an advanced level of professional qualification, such as specialty certification; or

b.   The development of innovative approaches, adopted by others in the profession, for the solution of professional problems; or

c.   Outstanding and widely recognized achievement as a teacher and director of students; or

    d.    Other extraordinary contributions or service to the academic aims of the University; or

    e.    Distinctive professional service directly related to the candidate's field of competence.[4]

**.157**    For the rank of Ordinary Professor, the candidate must demonstrate consistent research productivity and consistent high level of professional accomplishments, with distinction in one of the two areas. Committees must consult with outside experts in order to ascertain the prominence of the candidate's standing in one of the two areas.

## II-D-7    **Purpose of Tenure Review**

**.158**    The purpose of the procedures for tenure review (*C-8*) and the criteria outlined here is to insure that the conferral of continuous tenure is based in every case upon an explicit judgment of qualifications of the candidate and the need of the University. In each case, the University seeks to attract and retain the best-qualified Faculty member, taking into account the qualifications not only of the incumbent but also of others who may be available for the position. The responsibility for assessing and judging the qualifications of any candidate for appointment or reappointment falls primarily upon the Faculties and the Academic Senate and their respective Committees on Appointments and Promotions.

**.159**    In view of the permanent nature of any appointment that carries continuous tenure, the qualifications of each candidate for such appointment must be conscientiously evaluated in terms not only of individual merit, but also of the present and future needs of the individual Programs, Departments, and Schools of the University. The reviewing bodies must be satisfied that the candidate possesses superior qualifications, as stated in the criteria below. There is no presumption in favor of tenure. If there is reasonable doubt concerning the candidate's qualifications or suitability for the position, tenure should not be conferred.

## II-D-8    **Criteria for Tenure**

**.160**    Conferral of tenure requires consideration not only of the qualifications of the individual Faculty member, but also of the needs and purposes of the institution. The judgment must be based on an aggregate assessment of the duties that the candidate will be expected to carry, and no single factor should govern, although research and teaching are primary. The following are important factors to be considered in all recommendations:

---

[4] Distinctive professional service directly related to the candidate's field of competence is defined as a consistent pattern of service on regional, state, national, or international levels recognized as outstanding in the field.

a.    The purpose of the appointment in relation to the mission and needs of the Program, Department, School, and University;

b.    The candidate's present and projected competence and scholarly productivity at least at the level required of an Associate Professor (*D-3.143-144*), including his or her standing among scholars at comparable stages of their careers in the same field of specialization;

c.    The candidate's competence as a teacher, including where applicable ability as a director of dissertations or as a director of clinical or field training as well as such matters as the updating and introduction of new material into courses, the offering of new courses, and pedagogical soundness and effectiveness;

d.    The indications that the candidate is not merely competent at a minimal level but is one of the most qualified among those available for the position; accordingly, the reviewing bodies must explicitly weigh the candidate's qualifications against the advisability of seeking to recruit another Faculty member who might prove more promising and, in time, better qualified for tenure;

e.    The candidate's moral integrity, including respect for the ethical obligations of the teaching profession;

f.    The candidate's commitment to the stated aims and goals of the University, School and Department;

g.    The candidate's active participation in Departmental, School, and University activities and willingness to carry committee and other Faculty responsibilities;

h.    The candidate's ability to work in a collegial fashion with other members of the academic community, including students and other Faculty members;

i.    The candidate's participation in the activities of the appropriate learned societies and professional organizations, meetings, and conferences and, where applicable, professional registration, licensing, or certification.

**.161**   If at the time of consideration for tenure, a Faculty member is also being considered for promotion in rank, the promotion review should be conducted first. The reviewing bodies should consider the application for tenure on its own specific merits according to the criteria outlined above. Promotion in rank does not by itself imply the acquisition of a claim to continuous tenure.

<u>II-D-9</u>          **Probationary Term Reappointments**

**.162**   In considering a Faculty member in probationary status for reappointment, the reviewing bodies should be guided by the criteria specified for tenure reviews (*D-8*) insofar as they can be fairly applied in light of the period of service then completed by the candidate.

<u>II-D-10</u>          **Contract Appointments Without Tenure**

**.163**   For a contract appointment as Instructor or Assistant Professor in a clinical or skills position the candidate must meet the requirements for the rank as specified in (*D- 3. 141-142*).

**.164**   After a minimum of four years' service as Assistant Professor or its equivalent in professional practice, a Faculty member may be promoted or appointed to the rank  of Associate Professor according to criteria specified for the rank (*D-3. 143-144*).

**.165**   The criteria for renewal of a contract appointment are:

  a.   Satisfactory performance of the instructional and other duties specified in the  job description;

  b.   Recognition that the reappointment meets the needs of the Department, School  and University;

  c.   Where applicable, maintenance of appropriate professional license or other professional credentials.

<u>II-D-11</u>          **Faculty Associates**

**.166**   The criteria for appointment and promotion of Research, Adjunct, and Visiting Faculty to the several professorial ranks are the same as for regular Faculty members.

<u>II-D-12</u>          **Contract Appointment and Promotion to Ordinary Professor**

Appointment or promotion to the rank of Ordinary Professor for contract faculty (available in the schools of Architecture, Business and Economics, Law, Music, Nursing, Social Service, and Theology and Religious Studies only) requires:

  a.   Four years in the rank of Associate Professor in this University or elsewhere, or such professional experience as may be reasonably considered its equivalent; and

  b.   Fulfillment of the criteria listed above for the rank of Associate Professor; and either

c. Achievement of recognized standing in the academic field or profession, evidenced by continuing scholarly productivity acknowledged as significant by the scholarly community at large *(C-11. 120-124)*, or

d. Demonstration of consistent high level of professional accomplishments in at least two of the following areas: i) excellence in teaching; ii) expertise in contemporary practice; and/or iii) scholarship acknowledged as significant by those in the professor's field of expertise.  Committees will make an evaluation of the candidate's works in consultation with outside experts in order to ascertain the prominence of the candidate's standing in the field.

# Section E.  Appeals from Adverse Decisions

## Introduction

Part E specifies procedures for the appeal by members of the Faculty of decisions  made by the University on promotion, tenure and reappointment to probationary or  contract terms.  The procedures outlined are designed to eliminate from  consideration appeals that lack any arguable basis of merit.  These procedures then  provide for the disposition of  appeals that have some plausible basis to the most  appropriate Body within the University for resolution, and for procedures  to be  followed by this Body in evaluating and deciding these appeals.  Because these appeals often involve a complex mixture of issues, or the basis for the appeal is not  clear, the Provost has been given a significant measure of discretion to determine  the most appropriate Body or Bodies to which the matter should be referred.  The University believes that these procedures afford a proper balance between fairness  to the aggrieved individual who is appealing a determination and the imperatives  for efficient and accurate decision-making.

## II-E- 1        Grounds for Appeal

**.167**   A Faculty member may appeal an adverse decision affecting the following: the granting of tenure (*II-C-8*), promotion in rank (*II-C-9*), reappointment to probationary or contract terms (*II-C-7*) or termination of appointment based upon abolition of a School, Department, or Program (*II-H-8*). This appeal shall be in accordance with the procedures in this Subsection.

## II-E- 2        Appeals on Grounds of Inadequate Evaluation

**.168**   An appeal from an adverse decision shall be made in writing within 30 days after  the Faculty member receives notice of the adverse decision or within 30 days after receiving a written statement of reasons for the decision (*see II-C-12*). Grounds  for an appeal include: (1) unlawful discrimination in the evaluation of the file; (2) a violation of the procedures for evaluation of files as set forth in Part II, Section C, of this Handbook; (3) inadequate evaluation of the Faculty member's file; or (4) a violation of academic freedom in the evaluation of the file. An appeal may also  be based on any other grounds warranting the reversal of the adverse decision. The  appeal shall state with adequate specification of all relevant particulars the grounds  for the appeal and shall include a statement of the relevant facts supporting the grounds for appeal.

**.169**   In evaluating the appeal, the Provost may conduct such investigation or discussions with the Faculty member or others as he or she deems appropriate. After completing such investigations or discussions, the Provost shall make a determination respecting the appeal. Such determination shall be made within 30  days of the Provost having received the appeal. If the Provost determines that the  appeal is without merit, he or she shall advise the Faculty member in writing and  state the reasons for his determination denying the appeal. If the Provost  determines that there is reasonable

cause to believe that the appeal has merit, he or she shall proceed in the manner set forth in the following provisions.

**.170**    If the Provost determines that there is reasonable cause to believe that the adverse decision has merit and the decision may have been influenced by considerations that constitute unlawful discrimination, he shall ordinarily submit the file to the Equal Employment Officer of the University for advice. After receiving a report from the Equal Employment Office, the Provost will decide on an appropriate course of action.

**.171**    If the Provost determines that there is reasonable cause to believe that the adverse decision has merit and in making the adverse decision, a reviewing Body may have failed to follow the applicable procedures in Part II, Section C of the *Faculty Handbook*, he or she shall ordinarily submit the file to the Faculty Grievance Committee. In considering the appeal, the Faculty Grievance Committee shall follow its procedures as set forth in the *Faculty Handbook* (*see III-D-5*). At the conclusion of the proceeding, the Grievance Committee shall render an opinion on the merits of the appeal, and report in writing on its recommendations to the appropriate parties, including, if appropriate, to the President of the University.

    a.    If the Provost determines that there is reasonable cause to believe that the appeal has merit on any grounds other than those stated in the *Faculty Handbook (*see above *.168*), he or she will ordinarily follow the procedure outlined below.

    b.    If the adverse decision was made by the Academic Senate, the Provost shall follow the procedures in subsection *.174*, below.

    c.    If the conclusive recommendation leading to the adverse decision was made by the Committee on Appointments of Promotions (CAP) of the Academic Senate, the Provost shall follow the procedures in subsections *.172* and *.173*, below.

    d.    If the conclusive decision leading to the adverse decision was made by a Body within a School, the Provost shall follow the procedures in subsection *.173*, below.

    e.    Where the appeal includes multiple grounds, or where the basis for the appeal is not clear, the Provost has discretion to refer the appeal to the most appropriate Body, or, in his or her judgment, to more than one reviewing Body, either simultaneously or sequentially.

**.172**    If the Provost determines that there is reasonable cause to believe that the appeal has merit and if the adverse decision was made by the Academic Senate, the Provost shall treat the appeal as a request for reconsideration. The Provost shall transfer the file to the Chair of the Academic Senate, who will place the matter on the agenda of the next Academic Senate meeting for reconsideration. The Faculty member who filed the

appeal shall be given an opportunity to file supporting information or argument in writing with the Academic Senate.

**.173**   If the conclusive recommendation leading to the adverse decision was made by CAP of the Academic Senate, the Provost shall advise the Chair of the Academic Senate that the appeal is being referred to an Ad Hoc Committee of the Academic Senate and transfer the file to the Chair. The Academic Senate shall elect three tenured Ordinary Professors [who are Members of the Senate] to serve as Members of the Ad Hoc Committee, and shall designate one Member of the Committee to serve as Chair.

**.174**   The Ad Hoc Committee shall evaluate the appeal following the same procedures and applying the same criteria as govern tenure and promotion reviews by the CAP of the Academic Senate. After the Ad Hoc Committee completes its review, the Chair of the Ad Hoc Committee will report the Committee's opinion and its recommendations respecting the appeal to the Chair of the Academic Senate. The Academic Senate will then proceed to consider the matter in accordance with the procedures detailed in the *Faculty Handbook* (*II-C-8 and II-C-9*).

<u>II-E-3</u>        <u>**Appeals on Grounds of Academic Freedom**</u>

**.175**   If the conclusive recommendation leading to the adverse decision was made by a body within the School, the Provost will exercise his or her discretion in deciding whether to refer the matter to the CAP of the Academic Senate, or to the Dean of the School for further consideration within the School, or to take some other appropriate action. In exercising this discretion, the Provost shall take into account, among any other relevant factors, whether there is a reviewing Body within the School that has not yet considered the matter which is being appealed.

**.176**   Only one appeal may be filed with respect to a specific action of a School covered by this section.

# Section F.  Procedures for Appointment of Deans and Chairs

II-F-1 **Authority for Appointment of Deans**

**.177** The President appoints the Dean of each School after consultation with its Faculty. Ordinarily, a Dean is appointed for a term of four years without restriction as to reappointment (*Bylaws, Sec. VIII, Par. 2*).

II-F-2 **Duties of Dean of a School**

**.178** The Dean of a School is responsible to the President, the Provost, the Academic Senate, and the Faculty for the proper function of the School.  The Dean:

a.    Provides academic leadership to the School and fosters high academic  standards;

b.    Has general responsibility for the programs of the School, its course offerings,  and methods of instructions;

c.    In concert with the Faculty and Chairs of the Departments is responsible for the recruitment, retention and development of Faculty members;

d.    In matters of faculty appointment, reappointment, promotion, and tenure acts as prescribed in Part II of the *Faculty Handbook*;

e.    Admits students to the School;

f.    In consultation with the Faculty, is responsible for strategic planning and for the future direction of the School;

g.    Develops and manages the budget of the School;

h.    Collaborates with the Division of University Advancement in developing resources for the School;

i.    Presents an annual report to the President on the condition and progress of the School;

j.    Sets and maintains administrative policies;

k.    Ensures that University policies and regulations are carried out in the School;

l.    During the academic year presides at monthly meetings of the Faculty;

m.    Represents the Faculty at meetings of the Academic Senate;

n.    Presides in person or through a delegate at oral examinations for academic degrees;

o.    Remains available to members of the Faculty and students;

p.    Recruits, supervises and evaluates professional staff.

**.179**  In a School that is not departmentalized, the Dean is also responsible for duties that otherwise would be delegated to Chairs of Departments (*II-F-6. 183, Duties of the Chair of a Department*).

## II-F-3       Procedure for Appointment of Incumbent as Dean

**.180**  The procedure for the appointment of incumbent as Dean is as follows:

a.    Well in advance of the expiration of the term of office of a Dean, and after informal consultations with Faculty members and with the official student representative(s) of the School, the President will determine whether to reappoint the incumbent.

b.    If the President decides to reappoint the incumbent and the latter is willing to accept reappointment, the President shall without delay present the recommendation to the Faculty of the school for a written consultative vote, first of all the members and then of the tenured members of the Faculty. The results of the balloting will be announced to the Faculty. The President may proceed with the appointment or withdraw the recommendation, at his own discretion, but should not act contrary to the consultative vote without prevailing reasons, which the President shall explain to the Faculty.

c.    In the case of a sudden and unanticipated vacancy in the position of Dean, the President, in consultation with the Provost, shall appoint an Interim Dean. In such event, the President shall initiate the process of selection of a permanent Dean within a reasonable time.

## II-F-4       Procedure for Appointment of Non-Incumbent as Dean

**.181**  The procedure for the appointment of non-incumbent as Dean is as follows:

a.    If after informal consultation with Faculty members and with official student representatives, the President determines not to reappoint the incumbent as Dean he shall follow the following procedures.

b.    The President shall create a Search Committee comprising the following: two members, at least one of whom must be tenured and one of whom is a Member of the

School's Committee on Appointments and Promotions, nominated by and from the Faculty of the School; two members, at least one of whom must be tenured, nominated by the Committee on Committees and Rules of the Academic Senate; and one or two student representatives – one if the School enrolls only graduate students, two if it enrolls both graduate and undergraduate students – nominated by the Graduate Student Association and/or Undergraduate Student Government, respectively. The Provost shall recommend one representative of the Administration – normally a Vice Provost – who, when appointed by the President, will serve as Chairman of the Search Committee.

c.     Before the search for candidates is initiated, the President shall meet with the Faculty of the School and the Search Committee, either together or separately, to discuss the objectives and development of the School and the qualifications of the Dean. In these discussions, the President should make clear that one of the objectives on the search will be to determine an appropriate tenure status and faculty rank for the candidate selected.

d.     The Chair of the Search Committee shall see that adequate announcement of the vacancy is made to the University Faculties and Students and, if the search is to extend outside the University, to the academic community at large through advertisement or other appropriate methods. The Chairman will be responsible for all administrative matters.

e.     The Committee shall maintain strict confidentiality as it screens dossiers of candidates and conducts preliminary interviews with a selected few.

f.     At the end of the screening process, the Committee shall select a small number of candidates and recommend to the President that they be invited to the campus for more extensive interviews. After having selected this small number of candidates, the search committee shall gather information relevant to the appropriate tenure status and faculty rank of the selected candidates. The Search Committee should determine the kinds of information that are relevant on the basis of the provisions of Part II of this Handbook relating to granting of tenure and promotions. All documents concerning the qualifications of the candidates should be submitted to the President together with the results of the voting in the search.

g.     The President should review the list of candidates submitted by the Search Committee with the Committee and from among those submitted he shall invite candidates to the campus for informal meetings with the Faculty, the Committee on Appointments and Promotions of the School, the students and administrators. In these meetings, the tenure status and appropriate faculty rank of the candidate may be raised as an issue.

h.     Upon completion of the interviews, and after consultation with the Search

Committee, the President shall submit his recommendation to the Faculty for a written consultative vote. The recommendation shall include the name of the candidate and his or her proposed tenure status and faculty rank. The vote shall be conducted first among all faculty and then among tenured members of the faculty. The results of the votes shall be announced to the faculty.

i.   If the Faculty concurs in the recommendation of the President, the President shall proceed to appoint the Dean, with or without tenure, and with an appropriate faculty rank, in accordance with his or her recommendation. If the faculty does not agree to the recommendation of the President, the President may withdraw his or her recommendation or submit a modified recommendation. The President may not, however, act contrary to the consultative vote of the faculty without prevailing reasons, which he or she must present to the faculty.

j.   After the President has decided to appoint the Dean, he or she shall submit directly to the Academic Senate the proposed tenure status and (if required) the proposed faculty rank of the individual selected as Dean. The matter shall be handled expeditiously by the Senate.

## II-F-5     **Authority for Appointment of the Chair of a Department**

**.182**   The President appoints the Chair of a Department for a term of three years without restriction as to reappointment according to procedures outlined by the Academic Senate (*Bylaws, Sec. VIII, paragraph 3*). The procedures require the recommendation of the Dean, made after consultation with the Department. Ordinarily, the Chair is a tenured member of the Faculty.

## II-F-6     **Duties of the Chair of a Department**

**.183**   The Chair is responsible to the Department and to the Dean and the Faculty for the proper functioning of the Department. The Chair:

a.   Provides academic leadership to the Department and fosters high academic standards;

b.   Is responsible for the programs of the Department, its course offerings, and methods of instruction;

c.   In matters of faculty appointment, reappointment, promotion, and tenure acts as prescribed in Part II of the *Faculty Handbook*;

d.   Assigns faculty duties fairly and equitably, insuring that necessary time is provided for the development of new courses, direction of dissertations, research, and laboratory, editorial, administrative, or supervisory work;

e.    Plans for the future development of the Department;

f.    Prepares and manages the budget of the Department;

g.    Collaborates with the Division of University Advancement in developing resources for the Department;

h.    Prepares an annual report to the Dean on the state of the Department and recommendations for its progress;

i.    Supervises graduate assistants and departmental employees;

j.    During the academic year presides at monthly meetings of the Department;

k.    Represents the Department at meetings of the executive bodies of the School.

<u>II-F-7</u>        **Procedure for Appointment of the Chair of a Department**

**.184**   The procedures for the appointment of a Chair of Department are as follows.

a.    When a vacancy occurs, the Dean of the School shall recommend the appointment of a Department Chair to the President through the Provost. The position of Chair becomes vacant at the end of an incumbent's term of office, after resignation of an incumbent during his term of office, or by decision of the President for cause.

b.    In selecting a candidate for recommendation to the President, the Dean shall  consult with Faculty members of the Department and student representatives and provide opportunity for and give serious consideration to the vote of all regular Faculty members of the Department (*II-A-1 .004*).

c.    If the consultation and vote support the selection of an extern rather than a  member of the Faculty, and if the President so decides, the Dean should initiate a search procedure similar to the one described in the selection of a Dean.

d.    In the case of a sudden and unanticipated vacancy in the position of Chair, the President, on recommendation of the Dean and in consultation with the Provost, should appoint an Acting Chair.  In such event, the Dean should initiate the process of selection of a permanent Chair within a reasonable time.

# Section G – Termination of Appointments

### II-G-1          Expiration of Term

**.185**    Probationary appointments and appointments as Faculty associates are for stated terms. A probationary appointment is terminated at the end of the stated term if timely notice of non-renewal is given, in accordance with the schedule set forth in the *Faculty Handbook* (*see B-3. 025-030*). An appointment as a Faculty associate is terminated automatically at  the end of the stated term without further notice.

### II-G-2          Resignation

**.186**    A Faculty member who wishes to resign from the position shall do so by letter addressed to the Provost and to the Dean of the School, providing a copy of that letter to the President and, where applicable, to the Chair of the Department. The Provost, following discussion with the cognizant Dean, shall acknowledge the resignation by letter, also providing a copy of that letter to the President and, where applicable, to the Chair of the Department. Members of the Faculty  have an  obligation to give notice of resignation to the designated officials at a reasonable  time so as to allow the School or Department to make adequate provision for a  replacement, if such is required. Normally, such notice of resignation should be  given  before the end of the School year  preceding the Faculty  member's last semester of service.

### II-G-3          Retirement

**.187**    A Faculty member who wishes to retire from the position shall do so by letter addressed to the Provost and to the Dean of the School, providing a copy of that letter to the President and, where applicable, to the Chair of the Department. The Provost, following discussion with the cognizant Dean, shall acknowledge the retirement by letter, also providing a copy of that letter to the President and, where applicable, to the Chair of the Department. Members of the Faculties share with the University the mutual obligation of giving advance notice of termination of service in reasonable time, normally before the beginning of the last semester of  service.

### II-G-4          Termination for Medical Reasons

**.188**    A Faculty member's inability to discharge duties and obligations for medical  reasons may constitute grounds for the termination of the appointment.  A decision to terminate an appointment for medical reasons may be made by the Provost only when  there is clear and convincing  medical evidence that  the inability will continue beyond a reasonable time, and after appropriate consultation with (1) the Dean of the School,  (2) if necessary, impartial  medical  authority, and (3)  the  Faculty member concerned or a representative. The Faculty member may appeal  such a decision to the Academic Senate, which shall appoint a committee to review the decision and report its findings

through the Senate to the President for final action. In the case of a Faculty member with continuous tenure, final action by the Board of Trustees is required.

II-G-5 **Abolition of Position**

.189   Termination of an appointment with continuous tenure, or of a probationary appointment before the end of its specified term, may follow elimination of a position because of discontinuance of a Program, Department, or School (*see II-B-2.17; II-E-1.167; II-H-8*). If an appointment is terminated for this reason, the University will make every reasonable effort to transfer the affected individual to another suitable position. If the new position is academic, the transfer and the terms of the appointment are subject to the approval of the cognizant Department and/or School according to normal procedure (*Section C. Procedures for Appointments and Promotions*). Failing such transfer, notice or severance salary in lieu of notice will be given according to the schedule outlined in *B-3. 025-030* in the case of a probationary appointee, or for one year in the case of a tenured appointee. Should the position be reinstated within a period of two years, the previous incumbent, if tenured at the time of termination, will be offered reappointment. The Faculty member must accept reappointment within thirty days from the date of offer.

.190   The decision to terminate the services of a member of a Faculty because of abolition of the position held may be appealed as provided in *IIE-1.167*.

II-G-6 **Obligations of Clerics and Members of Religious Congregations and Communities**

.191   In issuing an appointment to a cleric or a professed religious of the Roman Catholic Church, the University recognizes not only the professional qualifications of the appointee but also the public effects of the appointee's status as an ordained cleric or professed religious, which include primary obligations to ecclesiastical superiors and observance of the provisions of Canon Law. If a Roman Catholic cleric loses clerical status under any canonical condition that requires his resignation from the University, or if such resignation is required as the result of an ecclesiastical process determining that he no longer may function as a Roman Catholic cleric, or if the cleric or a professed religious is recalled by his or her legitimate ecclesiastical superiors even without cause, the University's contractual obligations shall become void.

II-G-7   Dismissal for Cause

.192   Authority. Only the Board of Trustees may dismiss for cause a Faculty member with tenure or whose term appointment has not expired.

.193   Grounds for Dismissal. The University may, following due process specified below, dismiss a Faculty member for demonstrable incompetence or dishonesty in teaching or

research, for manifest neglect of duty, or for other adequate cause.

**.194**   Informal Resolution.  When there is reason to believe that there are grounds for the dismissal of a member of a Faculty who has tenure or whose term appointment has  not expired, the President or his or her representative will advise the Faculty  member of the alleged grounds and attempt through personal consultation to resolve the matter.

**.195**   Commencement and Notice of Dismissal Proceedings.  If the matter is not resolved informally, the President may commence formal dismissal proceedings by providing the Faculty member with a written statement of the grounds for dismissal. Such a statement must explain with particularity the factual bases of the alleged  grounds for dismissal. The written  statement  of  grounds  for  dismissal must also state that the Faculty member has the right to be heard by an Ad Hoc Hearing Committee of the Academic Senate. The President shall at the same time  notify in writing the officers of the Academic Senate that a proceeding for  dismissal has been instituted.

**.196**   Ad Hoc Committee of the Academic Senate. When the Academic Senate receives notice that a proceeding for dismissal has been instituted, it shall constitute an Ad  Hoc Hearing Committee consisting of five Tenured Senior Faculty members. One  of the committee members will be designated by the Senate to serve as Chair. The Senate will also designate, in ranked order, a number of alternates. Any appointee who cannot render an unbiased judgment will so notify the Chairperson of the Academic Senate and be relieved of service. The President and the Faculty  member  will  each have the right  to strike, without stating cause, two members  proposed for the Committee.

**.197**   Faculty Member's Response. When the Ad Hoc Hearing Committee has been constituted, the Chairperson of that Committee will (1) notify the Faculty member  and the President that a Committee has been formed; (2) identify its members; (3) and instruct the Faculty member to submit to this committee and the President a  written response to the President's stated Grounds for Dismissal within thirty days of  the notice. (4) advise the Faculty member that he or she may be  assisted or represented by counsel and/or by an academic advisor, at the  Faculty member's choice and expense, throughout the process, and (5) request the President, if he or she chooses, to designate a representative to participate in the proceedings.

**.198**   Notice of Hearing. The Committee shall notify  the Faculty  member and the President, by certified mail, not less than thirty days in advance of a scheduled hearing. If the Faculty member waives a hearing, the Committee will reach its conclusion based on the documentary evidence presented by the President and the Faculty member.

**.199**   Conduct of Hearing. The Committee, in consultation with the parties, shall decide whether the hearing will be public or private.  At the request of either party, or the Committee, a representative of a responsible educational association may attend the proceedings as an observer.

**.200**   Record of Hearing. A verbatim record of the hearing shall be taken, and, if requested, a printed copy shall be made available to the Faculty member without cost. The Faculty member and the President's representative will have the right to confront and cross-examine all witnesses. If a witness cannot or will not appear, but the Committee determines that the interests of justice so require, a written statement by that witness may be admitted in evidence. In such a case the Committee will identify the witness, disclose the statement, and if possible provide for interrogatories. In a hearing on charges of incompetence the testimony shall include that of qualified Faculty members from this or other institutions of higher education.

**.201**   Rules of Evidence. The Hearing Committee is not bound by strict legal rules of evidence, but may admit any evidence which it judges to be relevant, reliable, and probative on the issues involved.

**.202**   Burden of Proof. The burden of proving that there is adequate cause for dismissal rests with the President, and shall be satisfied only by clear and convincing evidence in the record considered as a whole.

**.203**   Access to Evidence. The Faculty member will be afforded an opportunity to obtain necessary witnesses and documentary or other evidence, and the University will, insofar as is reasonable, secure the cooperation of such witnesses and make available necessary documents and other evidence within its control. The Hearing Committee shall grant adjournments requested by either party to investigate evidence as to which there is a valid claim of surprise.

**.204**   Public Announcements. Private hearings are considered confidential. In such a private hearing, except for announcements covering the time and location of the hearing and similar matters, public statements and publicity about the case by either the Faculty member or administrative officers of the University shall be avoided until the proceedings have been completed, including consideration by the Board of Trustees.

**.205**   Committee's Determination. After the hearing, or after reviewing all documentary evidence presented in lieu of hearing, the Committee will render a decision by majority vote.

**.206**   If the Committee concludes that the President has established grounds for dismissal, it may further determine that some action other than dismissal is warranted. The Committee shall prepare written findings of facts identifying the factual bases for its conclusion. The evidentiary record must support the findings. The Faculty member and the President shall be notified of the decision in writing and shall be provided with a copy of the findings of facts and the conclusion. On request, the President and the Faculty member shall be given a copy of the hearing record.

45

**.207**   If the Committee concludes that adequate cause for dismissal has not been established, and the President rejects the Committee's conclusion, the President may so advise the Faculty member and the Committee in writing of the basis of the rejection and ask the Committee to reconsider the matter. In responding to the President's request the Committee will consider any response by the Faculty member. If the Committee reaffirms its conclusion that adequate cause for dismissal has not been established, it will so report to the President and the Faculty member.

**.208**   If the Committee concludes that adequate cause for dismissal has not been established, the President may ask the Committee to reconsider the matter. The request for reconsideration shall be in writing and shall state the basis for the request. A copy of the request shall be sent to the Faculty member who shall be given an opportunity to respond. In making its determination, the Committee shall give consideration to the response of the Faculty member and a copy of its final determination shall be sent to the President and to the Faculty member.

**.209**   <u>Board of Trustees</u>. If dismissal or other penalties are recommended, or, contrary to the Committee's conclusion the President chooses to pursue dismissal proceedings, the President will transmit the record of the case to the Board of Trustees. The Board's review will be based on the record of the Hearing Committee, and it will provide opportunity for argument, oral or written, by the parties. The decision of the Hearing Committee will either be sustained, or the proceeding returned to the Committee with specific objections to the Committee's findings or conclusions. The Hearing Committee will then reconsider, taking into account the stated objections of the Board and receiving new evidence if necessary. The Board of Trustees will make a final decision only after study of the Committee's reconsideration.

**.210**   <u>Status of Faculty Member During Proceedings</u>. Until a final decision regarding dismissal has been reached, the Faculty member will be suspended, or assigned to other duties in lieu of suspension, only if continuance in the normal course of Faculty duties threatens immediate harm to oneself or others. Before suspending a Faculty member, the President or a representative shall consult with the Committee on Academic Freedom and Tenure of the Academic Senate concerning the reason for the suspension. The Faculty member's compensation shall continue during the period of suspension.

**.211**   <u>Dismissal</u>. If dismissed, the Faculty member shall receive notice of termination and compensation for the notice period required for non-renewal as provided in *B-3.023-028* or, if the Faculty member was tenured, for one year. This provision for notice and salary does not apply if the conduct that justified dismissal involved moral turpitude.

# Section H. Policy and Procedures for Termination of Schools, Departments, or Programs

II-H-1 **Definition of Terms**

**.212** A School is a major academic division of the University. It is characterized by its own Faculty, presided over by a Dean, and by distinctive course offerings leading to degrees in one or more areas of specialization. A School has its own budget, approved by the Provost.

**.213** A Department is the basic instructional unit of the University within Schools that offer courses in a variety of disciplines. It is characterized by its own Faculty, presided over by a Chair, and by distinctive course offerings leading to degrees in its area of specialization. A Department has its own budget, approved by the Dean of the School within which it is located.

**.214** A Program is any course of studies or sequence of courses in an identifiable area of concentration, usually leading to a degree or certificate in one of the schools of the University. Programs may be confined to one Department or School, or they may involve two or more Departments or Schools. For purposes of this document, programs will be regarded as instructional units within the University differentiated from Departments or Schools in that they have more narrowly defined areas of study or concentration. They differ also from institutes and centers of the University in that their courses carry credit and usually lead to degrees or certificates. They also differ from purely research programs that are not considered here.

**.215** Faculty, as understood herein, refers to regular Faculty members as defined in *II-A-1.004*.

**.216** Financial exigency, for purposes of this document, refers to a state of fiscal need within an instructional unit of the University wherein it can no longer operate within the portion of the total annual budget of the University allocated to it by the responsible authorities and when continued subsidy of the unit is seriously undermining the University's overall academic mission in light of severe financial constraints on the institution.

II-H-2 **Grounds for Termination**

**.217** The University may terminate a School, Department or Program on grounds of financial exigency or for reasons other than financial exigency. Such reasons include, but are not limited to, seriously diminished academic quality or a persistent failure to attract qualified faculty or students. Any decision to terminate a School, Department or Program must reflect consideration of the School's, Department's or Program's relationship to the mission of the University.

II-H-3      **Authority for Termination and Initiation of the Process**

**.218**   A proposal to terminate a School, Department, or Program may be initiated by the academic unit itself upon a majority vote of the Faculty, or on the recommendation of the Dean. Such a recommendation may also originate with the Board of Trustees, the President or the Provost. The recommendation to terminate an academic unit shall require consultation with the representatives of the students enrolled in the School, Department or Program, with the affected Faculty, with the Dean, and with the Provost of the University.

**.219**   A recommendation to terminate will clearly state the reasons for the recommendation.

**.220**   Action by the Academic Senate on a recommendation, as required in this section, should be carried out expeditiously. In accord with the Constitution of the Academic Senate (*Art. VIII*), termination of a Program is not effective until the recommendation receives the favorable vote of the Academic Senate and is approved by the President of the University. In accord with the Bylaws of the University (*Sec. II, Art. 7*), termination of a School or Department is not effective until the advice of the Academic Senate is transmitted by the President to the Board of Trustees and acted upon by that body.

II-H-4      **Preliminary Consideration of Financial Exigency**

**.221**   Any recommendation for termination owing to financial exigency is to be referred to the Budget and Planning Committee of the Academic Senate for its judgment that, in the context of the recommendation and in light of the overall budget of the University, a state of financial exigency actually exists. To come to a termination decision the Budget and Planning Committee must be concerned, with regard to the overall budget, to assure the following:

a.   That adequate consultation has taken place between the Board of Trustees, the Administration, and the Academic Senate on the allocation of resources to academic programs;

b.   That the integrity of the academic enterprise of the University as a whole is recognized and preserved and that, within the restraints imposed by changing priorities and resources, the overall budget permits the University to maintain excellence as an academic community for itself and for each of its parts;

c.   That, in the projected allocation of resources to the Department or Program under consideration, the degree of relationship of that Department or Program to the University's purpose, as expressed in its mission statement, has actually been taken into account;

d.   That, in working out the details of the proposed budget for the School, Department

or Program under consideration, academic factors such as purpose, present strength, curriculum maintenance, and promise have been balanced against economic concerns with respect to the amount of past and present subsidy from the operational funds of the University and relative cost effectiveness measured as appropriate to the Department or Program involved.

**.222**  Having studied the recommendation for termination in light of the considerations above, the University Budget Committee of the Academic Senate may do one of the following:

a.  Judge that a state of financial exigency does exist such as to warrant the possible termination of the School, Department or Program;

b.  Judge that a general state of financial exigency exists, but that it is not sufficient to warrant the termination of an entire School or Department, and that

i)  the termination of a Program should be considered as an alternative; or

ii)  selective termination of Faculty within the specified School, Department or Program should be considered as an alternative;

c.  Judge that financial exigency does not exist.

**.223**  The Budget and Planning Committee shall report its findings and conclusions to the Academic Senate.

<u>**II-H-5**</u>        <u>**Preliminary Consideration of Reasons Other Than Financial Exigency**</u>

**.224**  A recommendation to terminate a School, Department or Program for reasons other than financial exigency will be referred to the Educational Policy Committee of the Academic Senate and/or such other committee or committees as the Senate deems appropriate for a preliminary determination that the recommendation does or does not establish that sound reason exists for termination. In reaching a determination the reviewing committee(s) must consider the integrity of the academic enterprise of the University as a whole and be satisfied that, within the constraints imposed by changing priorities and resources, its recommendation would allow the University to maintain excellence as an academic community for itself and for each of its parts.

**.225**  Having considered the recommendation to terminate in light of the considerations outlined above, the Senate Committee on Educational Policy or other reviewing committee(s) will determine and report to the Senate whether or not the recommendation establishes that there is sound reason to terminate the School, Department or Program.

49

II-H-6        **Ad Hoc Committee of the Academic Senate**

.226    After receiving the findings and conclusions of the appropriate committee(s) on the matter of financial exigency or other reasons for the proposed termination, the Academic Senate must determine whether or not to continue the termination process. If the Senate determines to continue the process, it will appoint an Ad Hoc Committee to study the proposed termination and to report its findings to the Senate for final approval.

.227    In coming to its decisions the Ad Hoc Committee should consider the following:

        a.    The academic priorities of the University as a whole in light of its goals and objectives, and the relative priority of the School, Department or Program when viewed in the same light;

        b.    Consultation within as wide a range as possible, including advice from related departments and programs on the short-term and long-term viability of the School without the Department or Program whose termination is under discussion, and advice from other Schools that might be affected by the termination of the concerned School, Department or Program;

        c.    The rights of Faculty members who are teaching in the Department or Program and of students who are pursuing its courses;

        d.    If termination is proposed on grounds of financial exigency, the fiscal limitations of the University as constraints within which the specific priority to be accorded the School, Department or Program is established (the constraints will be documented by appropriate budget analysis, student-faculty ratios, course evaluations, enrollment data, and other relevant information, and should be ascertained in consultation with the Senate's Budget and Planning Committee).

.228    If termination is proposed on grounds of financial exigency, the Ad Hoc Committee, in view of the fiscal constraints of financial exigency, should complete its work expeditiously so as to provide adequate lead time for terminating Faculty according to the procedures outlined below and for affecting the required economies.

II-H-7        **Final Recommendation and Action**

.229    A decision to recommend termination of a School, Department or Program will be made by a majority vote of the Academic Senate, following its review of the recommendation of the Ad Hoc Committee.

.230    The affected faculty and students must receive notice of the decision of the Academic Senate to recommend termination.

**.231**   If the proposal is to terminate a Program, the action of the Academic Senate also requires the approval of the President.

**.232**   If the proposal is to terminate a School or a Department, the recommendation of the Academic Senate will be transmitted by the President for action by the Board of Trustees.

**.233**   The University shall  make every effort to protect the rights of students in the School, Department or Program that is to be terminated, in order to bring work already begun to its normal completion.

### II-H-8          **Termination of Faculty**

**.234**   When a decision has been made to terminate a School, Department or a Program, and when it involves termination of Faculty appointments, special care must be taken to insure fairness and to protect and honor accepted procedures and rights appropriate to the status of affected Faculty member(s). An affected Faculty member must have an opportunity to be heard by the Ad Hoc Committee and all decisions must be subject to review by the President.

**.235**   With regard to tenured Faculty members, the following provisions should be observed in any termination procedure:

a.    The institution will make every effort to place the tenured Faculty member in another suitable position; if such a position is not available, the affected Faculty member should be given opportunity to adapt within a Department or School or elsewhere within the University, provided that the academic credentials and professional competence of the Faculty member and the needs of other programs make such adaptation a realistic possibility;

b.    The provisions that should be followed to safeguard the rights of the Faculty member are as follows:

i)    When termination of appointment is based upon abolition of a School, Department or Program, a Faculty member shall have the right of appeal as provided in *Section E. Appeals from Adverse Decisions*;

ii)    The affected Faculty member will be given notice as soon as possible, and never less than twelve months' notice, or in lieu thereof will be given compensation plus severance pay equivalent, in the aggregate, to compensation for twelve months;

iii)   The released Faculty member's position will not be filled by a replacement within a period of two years, unless the released Faculty member has first been offered reappointment and a reasonable time within which to accept or decline it.

c.    Early retirement or the reduction of the Faculty member from full-time to part-time service should be considered as possibilities.

**.236**    The rights of non-tenured Faculty members should be safeguarded in a manner analogous to that specified above for tenured Faculty members.  If there is no realistic choice other than to terminate the services of a non-tenured Faculty member, adequate notice should be given as provided in *B-3. 025-030*.  Commensurate compensation may be offered in lieu of the prescribed period of notice.

**.237**    If, for reasons of financial exigency, it becomes necessary to reduce the number of Faculty members rather than to eliminate a School, a Department, or a Program, the following procedure shall apply:

a.    Termination of tenured Faculty members in the Program or Department shall be considered only after all probationary Faculty have been terminated;

b.    Termination of tenured Faculty members shall be selective and need not be determined exclusively by seniority;

c.    Selective termination of tenured appointments, in the context of this document, shall be accomplished by applying the same criteria used to confer tenure, except that serious consideration should be given to the seniority status of the Faculty member. The selection of Faculty member(s) to be terminated is the responsibility of the Committee on Appointments and Promotions of the Academic Senate, which will report its recommendations to the Provost for approval by the President. In arriving at its recommendations the Senate CAP shall consult with the Dean of the School and, if the School is departmentalized, with the Chair of the Department. In addition the CAP, at its discretion, may also consult with other Faculty members of the affected academic unit.

# Section J. Policies and Procedures for Creation and Termination of Centers and Institutes

<u>II-J-1</u>            **<u>Definition of Terms</u>**

**.238**    A Center or Institute is an organizational component of the University established for the purpose of focusing on instruction, scholarship, research or other programmatic activity in a particular subject matter or a particular area of study. Centers and Institutes differ from Schools, Departments and Programs (*II-G*) in that members of the Faculty and others participating in a Center or Institute are, at the same time, either regular members of the Faculty in a School, Department or Program or Faculty Associates (*II-B-6*). For this reason, termination of a Center or Institute would not normally affect the employment status of those individuals.

<u>II-J-2</u>            **<u>Creation of Centers and Institutes</u>**

**.239**    One or more Faculty members of a School or of a Department may propose the creation of a Center or Institute based on the belief it will serve the educational research, scholarship or other needs of the University. The proposal for the creation of a Center or Institute shall contain a statement of the reasons for its establishment and shall be submitted to the Provost and the President. In deciding whether to approve the proposed creation of a Center or Institute, the Provost and President shall consult with the Academic Senate, but have final authority over the decision to create or terminate a Center or Institute. Typically, a Center or Institute is created for a period of five years, subject to renewal.

<u>II-J-3</u>            **<u>Termination of Centers and Institutes</u>**

**.240**    The Provost and President, in deciding to terminate a Center or Institute, shall consult with the Academic Senate. The Provost shall establish a cycle of review of all existing Centers and Institutes, and, based on this review, take appropriate action, after consultation with the Senate.

# EXHIBIT A-3





September 18, 2019

Mr. John V. Tieso
Busch School of Business
The Catholic University of America

Dear Professor Tieso:

On the recommendation of Dr. Andrew Abela, Dean, The Busch School of Business, I am pleased to extend to you an offer of appointment as Adjunct Assistant Professor in The Busch School of Business of The Catholic University of America, effective August 20, 2019 and extending until August 19, 2020. This appointment is made subject to the *Faculty Handbook* and may be extended by regular reappointment but does not include eligibility for continuous tenure or any benefits and does not carry with it a guarantee of salary.

The Catholic University of America was founded in the name of the Catholic Church and maintains a unique relationship with it. The University's operations, policies and activities reflect this foundation and relationship and are conducted in accordance with its stated mission. Regardless of their religious or denominational affiliation, all employees are expected to respect and support the University's mission in the fulfillment of their responsibilities and obligations appropriate to their appointment.

Best wishes.

Sincerely,

Aaron Dominguez, Ph.D.
Provost

cc:    Mr. John Garvey, President
       Dr. Andrew Abela, Dean, Busch School of Business

**Office of the Provost**
620 Michigan Ave., N.E. | Washington, DC 20064 | 202-319-5244

# EXHIBIT A-4

**THE CATHOLIC UNIVERSITY OF AMERICA**

Contract Appointment to Instruction

pos #:  10001275

pay group: FAL   empl recd#:

**DEFENDANT'S EXHIBIT**

**A-4**

Appointee:  **TIESO, JOHN**          Permanent State of Residence: **VA**

Empl ID:  **2534700**          School: **BUSINESS**          Department:

**Current CUA Employee**          **\*|Type of Instructor|\***

| | | OFFICE USE ONLY |
|---|---|---|
| Total Salary: **$6,000.00** _____ | Work start date: **8/26/2019** | Pay start date: **9/1/2019** _____ |
| In order to ensure prompt payment, This form must be received 14 days before the work start date. The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date: **12/14/2019** | Pay end date: **12/31/2019** |

Amount: **$6,000.00**          Fund: **11**          Org: **354039**

Amount:          Fund:          Org:

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---------|-----------|---------|-------------|----------|-------|
| MGT | 240 | 2 | 3.00 | 2162 | No |
| | | | | | |

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):

Approved by (Budget Administration):
**Jonathan Aaron     9/23/2019**

Endorsed by (Dean or Designee):
**Andrew Abela     7/15/2019**

Approved by (Provost Office):
**J. Steven Brown     9/23/2019**

Accepted by: _____
          Appointee          PRINTED NAME

          _____
          Appointee          SIGNATURE          DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

**THE CATHOLIC UNIVERSITY OF AMERICA**                    pos #:  10001275

Contract Appointment to Instruction                       pay group: FAL   empl recd#:

Appointee: **TIESO, JOHN**      Permanent State of Residence: **VA**

Empl ID: **2534700**      School: **BUSINESS**      Department:

| **Current CUA Employee** | **\*\|Type of Instructor\|\*** |
|---|---|

| Total Salary: **$6,000.00** _____ | Work start date: **8/26/2019** | OFFICE USE ONLY<br>Pay start date: **9/1/2019** _____ |
|---|---|---|
| In order to ensure prompt payment, <u>This form must be received 14 days before the work start date.</u> The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date:  **12/14/2019** | Pay end date: **12/31/2019** |

Amount: **$6,000.00**      Fund: **11**      Org: **354039**

Amount:      Fund:      Org:

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 331 | 1 | 3.00 | 2166 | No |
|  |  |  |  |  |  |

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):          Approved by (Budget Administration):
                                            **Jonathan Aaron     9/23/2019**

Endorsed by (Dean or Designee):             Approved by (Provost Office):
**Andrew Abela     7/15/2019**              **J. Steven Brown     9/23/2019**

Accepted by: _____
                 Appointee                    PRINTED NAME

             _____
                 Appointee          SIGNATURE          DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

**THE CATHOLIC UNIVERSITY OF AMERICA**

pos #:  10001275

Contract Appointment to Instruction

pay group: FAL   empl recd#:

Appointee: **TIESO, JOHN**      Permanent State of Residence: **VA**

Empl ID: **2534700**      School: **BUSINESS**      Department:

| **Current CUA Employee** | **\*\|Type of Instructor\|\*** |
|---|---|

| Total Salary: **$6,000.00** _____ | Work start date: **8/26/2019** | OFFICE USE ONLY<br>Pay start date: **9/1/2019** _____ |
|---|---|---|
| In order to ensure prompt payment, This form must be received 14 days before the work start date. The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date:  **12/14/2019** | Pay end date: **12/31/2019** |

Amount: **$6,000.00**      Fund: **11**      Org: **354039**

Amount:      Fund:      Org:

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 365 | 1 | 3.00 | 2140 | No |
|  |  |  |  |  |  |

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):

Approved by (Budget Administration):
**Jonathan Aaron      9/23/2019**

Endorsed by (Dean or Designee):
**Andrew Abela      7/15/2019**

Approved by (Provost Office):
**J. Steven Brown      9/23/2019**

Accepted by: _____
      Appointee                    PRINTED NAME

_____
      Appointee            SIGNATURE        DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

# EXHIBIT A-5

DEFENDANT'S EXHIBIT

A-5

| Pay Run ID | Pay Period End | Department | Pay Group | Off Cycle? | Empl Type | ID | Empl Record | Name | Position | Code | Descr | Amount | Dept ID | Acct | Fund | Class | Project | Acct Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19_0531MNT | 5/31/2019 | METRO_COL | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00390430 | 006725 | Lecturer - Summer Session | 236.84 | 460001 | 0270 | 11 | INDR | | D460001A0270F11 |
| 19_0531MNT | 5/31/2019 | METRO_COL | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00390430 | Med/ER | FICA Med Hospital Ins / ER | 2.75 | 460001 | 0900 | 11 | INDR | | X460001A0900F11 |
| 19_0531MNT | 5/31/2019 | METRO_COL | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00390430 | OASDI/ | OASDI/Disability - ER | 11.77 | 460001 | 0900 | 11 | INDR | | X460001A0900F11 |
| 19_0630MNT | 6/30/2019 | METRO_COL | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00390430 | 006725 | Lecturer - Summer Session | 363.16 | 460001 | 0270 | 11 | INDR | | D460001A0270F11 |
| 19_0630MNT | 6/30/2019 | METRO_COL | FAL | N | S | 2534700 | 1 | Tieso,John V. | 00390407 | 006725 | Lecturer - Summer Session | 2500.00 | 354034 | 0270 | 11 | INDR | | D354034A0270F11 |
| 19_0630MNT | 6/30/2019 | METRO_COL | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00390430 | Med/ER | FICA Med Hospital Ins / ER | 5.18 | 460001 | 0900 | 11 | INDR | | X460001A0900F11 |
| 19_0630MNT | 6/30/2019 | METRO_COL | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00390430 | OASDI/ | OASDI/Disability - ER | 22.15 | 460001 | 0900 | 11 | INDR | | X460001A0900F11 |
| 19_0630MNT | 6/30/2019 | METRO_COL | FAL | N | S | 2534700 | 1 | Tieso,John V. | 00390407 | Med/ER | FICA Med Hospital Ins / ER | 35.66 | 354034 | 0900 | 11 | INDR | | X354034A0900F11 |
| 19_0630MNT | 6/30/2019 | METRO_COL | FAL | N | S | 2534700 | 1 | Tieso,John V. | 00390407 | OASDI/ | OASDI/Disability - ER | 152.46 | 354034 | 0900 | 11 | INDR | | X354034A0900F11 |
| 19_0731MNT | 7/31/2019 | METRO_COL | FAL | N | S | 2534700 | 1 | Tieso,John V. | 00390407 | 006725 | Lecturer - Summer Session | 2500.00 | 354034 | 0270 | 11 | INDR | | D354034A0270F11 |
| 19_0731MNT | 7/31/2019 | METRO_COL | FAL | N | S | 2534700 | 1 | Tieso,John V. | 00390407 | Med/ER | FICA Med Hospital Ins / ER | 35.57 | 354034 | 0900 | 11 | INDR | | X354034A0900F11 |
| 19_0731MNT | 7/31/2019 | METRO_COL | FAL | N | S | 2534700 | 1 | Tieso,John V. | 00390407 | OASDI/ | OASDI/Disability - ER | 152.09 | 354034 | 0900 | 11 | INDR | | X354034A0900F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_0930MNT | 9/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.02 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.53 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1031MNT | 10/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.53 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1130MNT | 11/30/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.52 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.53 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 19_1231MNT | 12/31/2019 | ECON_BUS | FAL | N | S | 2534700 | 3 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 92.03 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0131MNT | 1/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 20_0131MNT | 1/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 20_0131MNT | 1/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.41 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0131MNT | 1/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 91.55 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0131MNT | 1/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.41 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0131MNT | 1/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 91.54 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0229MNT | 2/29/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 20_0229MNT | 2/29/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | | D354039A0270F11 |
| 20_0229MNT | 2/29/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.41 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0229MNT | 2/29/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 91.55 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |
| 20_0229MNT | 2/29/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.41 | 354039 | 0900 | 11 | INDR | | X354039A0900F11 |

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20_0229MNT | 2/29/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 91.54 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0331MNT | 3/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | D354039A0270F11 |
| 20_0331MNT | 3/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | D354039A0270F11 |
| 20_0331MNT | 3/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.41 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0331MNT | 3/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.41 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0331MNT | 3/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 91.54 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0430MNT | 4/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | D354039A0270F11 |
| 20_0430MNT | 4/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | 001080 | Lecturer | 1500.00 | 354039 | 0270 | 11 | INDR | D354039A0270F11 |
| 20_0430MNT | 4/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.75 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0430MNT | 4/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 93.00 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0430MNT | 4/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | Med/ER | FICA Med Hospital Ins / ER | 21.75 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |
| 20_0430MNT | 4/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 1 | Tieso,John V. | 10001275 | OASDI/ | OASDI/Disability - ER | 93.00 | 354039 | 0900 | 11 | INDR | X354039A0900F11 |

| | | | | | |
|---|---|---|---|---|---|
| Yellow | Metro School | Summer 2019 | 2 courses one at $5000 and the other at $600 (note that the original amount for the second one was $5000 but it was reduced to $600 since it had only 1 enrolled student in it) | Total Pay Highlighted in Yellow | $5,600 |
| Green | Business School Courses | Fall 2019 | 3 courses at $6000 each | Total Pay Highlighted in Green | $18,000 |
| Orange | Business School Courses | Spring 2020 | 2 courses at $6000 each | Total Pay Highlighted in Orange | $12,000 |

# EXHIBIT A-6

**THE CATHOLIC UNIVERSITY OF AMERICA**

Contract Appointment to Instruction

pos #:  10001275

pay group: FAL   empl recd#: 0

DEFENDANT'S EXHIBIT

A-6

Appointee:  **TIESO, JOHN**     Permanent State of Residence: **VA**

Empl ID:  **2534700**     School: **Busch School of Business**     Department:

| **Current CUA Employee** | **Lecturer** |
|---|---|

| Total Salary: **$6,000.00** _____ | Work start date: **1/13/2020** | OFFICE USE ONLY<br>Pay start date: **1/1/2020** _____ |
|---|---|---|
| In order to ensure prompt payment, This form must be received 14 days before the work start date. The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date:  **5/9/2020** | Pay end date: **4/30/2020** |

Amount: **$6,000.00**     Fund: **11**     Org: **354039**

Amount:     Fund:     Org:

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 240 | 2 | 3.00 | 1820 | No |
|  |  |  |  |  |  |

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):

Approved by (Budget Administration):
**Jonathan Aaron     12/6/2019**

Endorsed by (Dean or Designee):
**Harvey Seegers     11/4/2019**

Approved by (Provost Office):
**J. Steven Brown     12/7/2019**

Accepted by: _____
    Appointee            PRINTED NAME

    _____
    Appointee         SIGNATURE        DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

**THE CATHOLIC UNIVERSITY OF AMERICA**

pos #:  10001275

Contract Appointment to Instruction

pay group: FAL   empl recd#: 1

| | |
|---|---|
| Appointee: **TIESO, JOHN** | Permanent State of Residence: **VA** |
| Empl ID: **2534700** | School: **Busch School of Business**   Department: |

**Current CUA Employee          Lecturer**

| | | OFFICE USE ONLY |
|---|---|---|
| Total Salary: **$6,000.00** _____ | Work start date: **1/13/2020** | Pay start date: **1/1/2020** _____ |
| In order to ensure prompt payment, This form must be received 14 days before the work start date. The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date: **5/9/2020** | Pay end date: **4/30/2020** |

Amount: **$6,000.00**      Fund: **11**      Org: **354039**

Amount:         Fund:         Org:

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 331 | 1 | 3.00 | 1834 | No |
| | | | | | |

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):

Approved by (Budget Administration):
**Jonathan Aaron      12/6/2019**

Endorsed by (Dean or Designee):
**Harvey Seegers      11/4/2019**

Approved by (Provost Office):
**J. Steven Brown      12/7/2019**

Accepted by: _____

Appointee              PRINTED NAME

_____

Appointee          SIGNATURE        DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

# EXHIBIT A-7

**THE CATHOLIC UNIVERSITY OF AMERICA**                pos #:  00334430

Contract Appointment to Instruction                pay group: FAL   empl recd#:

DEFENDANT'S EXHIBIT

A-7

exhibitsticker.com

| | | |
|---|---|---|
| Appointee: **TIESO, JOHN** | Permanent State of Residence: **VA** | |
| Empl ID: **2534700** | School: **Business** | Department: |

| **Current CUA Employee** | **Part-time Faculty or Staff** | |
|---|---|---|
| Total Salary: **$4,000.00** | Work start date: **5/18/2020** | OFFICE USE ONLY<br>Pay start date: **5/18/2020** |
| In order to ensure prompt payment, <u>This form must be received 14 days before the work start date</u>. The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date:  **8/1/2020** | Pay end date: **7/31/2020** |

Amount: **$4,000.00**     Fund: **11**     Org: **354001**

Amount:          Fund:          Org:

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 240 | 01 | 3.00 | 1944 | No |
| | | | | | |

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):                Approved by (Budget Administration):
                                 **Jonathan Aaron    4/30/2020**

Endorsed by (Dean or Designee):                Approved by (Provost Office):
**H.F. Seegers    3/17/2020**                **J. Steven Brown    5/1/2020**

Accepted by: _____
                Appointee                PRINTED NAME

                _____
                Appointee                SIGNATURE        DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

**THE CATHOLIC UNIVERSITY OF AMERICA**                     pos #:  00334430

Contract Appointment to Instruction                        pay group: FAL   empl recd#:

---

Appointee:  **TIESO, JOHN**       Permanent State of Residence: **VA**

Empl ID:  **2534700**       School: **Business**       Department:

---

### Current CUA Employee          Part-time Faculty or Staff

| | | OFFICE USE ONLY |
|---|---|---|
| Total Salary: **$4,000.00** | Work start date: **5/18/2020** | Pay start date: **5/18/2020** |
| In order to ensure prompt payment, <u>This form must be received 14 days before the work start date</u>. The Office of the Provost cannot guarantee payment for any forms received after the deadline. | Work end date:  **8/1/2020** | Pay end date: **7/31/2020** |

Amount: **$4,000.00**       Fund: **11**       Org: **354001**

Amount:       Fund:       Org:

---

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 331 | 01 | 3.00 | 1945 | No |
|  |  |  |  |  |  |

---

UNIVERSITY ENDORSEMENTS  INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) HAS BEEN CONDUCTED AND THAT SUFFICIENT FUNDS ARE AVAILABLE FOR THE  SPECIFIED COMPENSATION AND  RELATED EXPENSES FOR THE SPECIFIED PERIOD.

Proposed by (Chair/Director/Dean):                Approved by (Budget Administration):
                                                  **Jonathan Aaron     4/30/2020**

Endorsed by (Dean or Designee):                   Approved by (Provost Office):
**H.F. Seegers     3/17/2020**                     **J. Steven Brown     5/1/2020**

Accepted by: _____
            Appointee            PRINTED NAME

            _____
            Appointee            SIGNATURE      DATE

THIS CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES HAVE BEEN CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED (SEE POLICIES.CUA.EDU.) NOTE: ELECTRONIC SIGNATURES ARE VALID SIGNATURES.

THIS CONTRACT CAN BE CANCELLED WITHOUT NOTICE BY THE COGNIZANT ACADEMIC PROGRAM AND/OR THE PROVOST OFFICE.

HUMAN RESOURCES

# EXHIBIT A-8

DEFENDANT'S EXHIBIT

A-8

**Labor Dist w** 12

| Pay Run ID | Pay Period End | Department | Pay Group | Off Cycle? | Empl Type | ID | Empl Record | Name | Position | Code | Descr | Amount | Dept ID | Acct Smry | Acct | Fund | Class | Project | Acct Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20_0531MNT | 5/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00334430 | 006725 | Lecturer - Summer Session | 769.24 | 354001 | 0270 | 0270 | 11 | INDR | | D354001A0270F11 |
| 20_0531MNT | 5/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 4 | Tieso,John V. | 00334430 | 006725 | Lecturer - Summer Session | 769.24 | 354001 | 0270 | 0270 | 11 | INDR | | D354001A0270F11 |
| 20_0531MNT | 5/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00334430 | OASDI/ | OASDI/Disability - ER | 47.70 | 354001 | 0900 | 0700 | 11 | INDR | | X354001A0900F11 |
| 20_0531MNT | 5/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 4 | Tieso,John V. | 00334430 | OASDI/ | OASDI/Disability - ER | 47.69 | 354001 | 0900 | 0700 | 11 | INDR | | X354001A0900F11 |
| 20_0531MNT | 5/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00334430 | Med/ER | FICA Med Hospital Ins / ER | 11.15 | 354001 | 0900 | 0710 | 11 | INDR | | X354001A0900F11 |
| 20_0531MNT | 5/31/2020 | ECON_BUS | FAL | N | S | 2534700 | 4 | Tieso,John V. | 00334430 | Med/ER | FICA Med Hospital Ins / ER | 11.15 | 354001 | 0900 | 0710 | 11 | INDR | | X354001A0900F11 |
| 20_0630MNT | 6/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00334430 | 006725 | Lecturer - Summer Session | 3230.76 | 354001 | 0270 | 0270 | 11 | INDR | | D354001A0270F11 |
| 20_0630MNT | 6/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 4 | Tieso,John V. | 00334430 | 006725 | Lecturer - Summer Session | 3230.76 | 354001 | 0270 | 0270 | 11 | INDR | | D354001A0270F11 |
| 20_0630MNT | 6/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00334430 | OASDI/ | OASDI/Disability - ER | 200.31 | 354001 | 0900 | 0700 | 11 | INDR | | X354001A0900F11 |
| 20_0630MNT | 6/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 4 | Tieso,John V. | 00334430 | OASDI/ | OASDI/Disability - ER | 200.30 | 354001 | 0900 | 0700 | 11 | INDR | | X354001A0900F11 |
| 20_0630MNT | 6/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 0 | Tieso,John V. | 00334430 | Med/ER | FICA Med Hospital Ins / ER | 46.85 | 354001 | 0900 | 0710 | 11 | INDR | | X354001A0900F11 |
| 20_0630MNT | 6/30/2020 | ECON_BUS | FAL | N | S | 2534700 | 4 | Tieso,John V. | 00334430 | Med/ER | FICA Med Hospital Ins / ER | 46.85 | 354001 | 0900 | 0710 | 11 | INDR | | X354001A0900F11 |

LABOR DISTRIBUTION SUMMARY FOR JOHN TIESO

Labor Distribution Summary for FY 2021 (University FY goes from May 1 of Year to April 30 of the following Year) for John Tieso. Thus, FY 2021 runs from May 1, 2020 to April 30, 2021.

See lines 3,4,9, and 10. The other lines are benefits.

You can see that he was paid $769.24 on 5/31/2020 and $3230.76 on 6/30/2020 for a total of $4000 for each course.

# EXHIBIT A-9

THE
**CATHOLIC**
**UNIVERSITY**
OF AMERICA | Office of the Provost



DEFENDANT'S
EXHIBIT

**A-9**

### SUMMER 2020 COMPENSATION GUIDELINES[1]

#### FULL-TIME CATHOLIC UNIVERSITY FACULTY COMPENSATION[2]

Full-time Catholic University faculty who teach during the summer term receive a percentage of their yearly base salary. For a three-credit course with a minimum of seven (7) enrolled students (at the end of the drop/add period for the course, that is, not at the beginning of the course, not at the end of the course, …), this amount is calculated as one-twelfth of the base salary, excluding supplemental contracts, for the 2019-2020 academic year **up to a maximum of $7,500**. Note, however, that the minimum contract for a three-credit course with a minimum of seven enrolled students is $5,000. The following table summarizes the pay structure for full-time Catholic University.

| Base Salary | Contract amount for 3-credit course with a minimum of 7 enrolled students at the end of the drop/add period for the course |
|---|---|
| Base Salary ≤ $60,000 | $5,000 |
| $60,000 < Base Salary < $90,000 | 1/12 of Base Salary |
| Base Salary ≥ $90,000 | $7,500 |

#### PART-TIME FACULTY COMPENSATION[2]

Part-time faculty are identified as anyone teaching a course who is not a full-time faculty member at Catholic University. This includes current Catholic University staff, graduate students in their role as teaching fellows, current Catholic University part-time faculty, and part-time faculty who only teach at Catholic University in the summer. The chair or dean of the respective school/department must determine the "rank" of each instructor (excluding teaching fellows).

| Level/Rank | Salary |
|---|---|
| Graduate Student Teaching Fellow | $3,500 |
| Assistant Professor Level | $4,000 |
| Associate Professor Level | $4,250 |
| Ordinary Professor Level | $4,750 |

#### SALARY REDUCTION DUE TO ENROLLMENT[2]

If there are six or fewer students enrolled at the end of the drop/add period for the course, the salary for full-time faculty is reduced. For part-time faculty and teaching fellows, salary reductions apply with four or fewer students. The salary reductions for a 3-credit course are as follows:

| # of Students | Full-time Faculty | Part-time Faculty | Teaching Fellow |
|---|---|---|---|
| 6 | 1/12 of base salary up to $5,000 | Full Salary (based on scale) | $3,500 (full salary) |
| 5 | 1/12 of base salary up to $4,000 | $4000 | $3,250 |
| 4 | $3,000 | $3,000 | $3,000 |
| 3 | $2,000 | $2,000 | $2,000 |
| 2 | $1,200 | $1,200 | $1,200 |
| 1 | $600 | $600 | $600 |

---

[1] For Summer 2020, these compensation guidelines do not apply to the Conway School of Nursing or to the Metropolitan School of Professional Studies

[2] Amounts for non 3-credit courses scale with credit hours, i.e., $\left(\frac{salary\ of\ 3\ credit\ course}{3}\right) x (\# of\ credits\ for\ course)$

# EXHIBIT A-10



**CARDINAL MAIL**

Academic Contracts <acad-contracts@cua.edu>

DEFENDANT'S
EXHIBIT
A-10

# Revision - Summer 2020 - Appointment to Instruction
1 message

**Provost Office - Academic Contracts** <acad-contracts@cua.edu>
To: tieso@cua.edu
Cc: mchale@cua.edu
Bcc: acad-contracts@cua.edu

Fri, May 29, 2020 at 12:04 PM

Dear JOHN TIESO:

Attached is your <u>REVISED</u> Summer 2020 contract for MGT  331 Sec. 01 (Database Management).

Please <u>sign and return this contract </u>to Carol McHale (mchale@cua.edu) either via email (scanned document) or in person <u>within 5 business days or your contract may be cancelled</u>.

Note: you do not need to include me in any of your correspondence with Carol McHale and please do not send your signed contract to me.

Best regards,

J. Steven Brown
Senior Vice Provost for Academic Administration and Dean of Graduate Studies

---

📄 **Revision - Contract Appointment to Instruction 1205.pdf**
115K

\*\*\*\*\*\*\*\*\*\*\*\*\*\***REVISED CONTRACT**\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THE CATHOLIC UNIVERSITY OF AMERICA**  pos #:  00334430

Contract Appointment to Instruction  pay group: FAL   empl recd#: 4

Appointee:  **TIESO , JOHN**  Permanent State of Residence: **VA**

Empl ID:  **2534700**  School: **Business**  Department:

| **Current CUA Employee** | **Part-time Faculty or Staff** | |
|---|---|---|
| Full-time Faculty Only | Work start date: **5/18/2020** | OFFICE USE ONLY<br>Pay start date: **5/18/2020** |
| Faculty Rank: | | |
| Faculty Base Salary: | | |
| Total Salary:  **$4,000.00** | Work end date:  **8/1/2020** | Pay end date: **7/31/2020** |
| Final Salary if adjusted:  **$2,000.00** | Final Enrollment:  **3.00** | Hours/week:  **8** |

Fund: **11**  Org: **354001**

Duties and Course Information: **TEACH, HOLD OFFICE HOURS, AND SUBMIT COURSE GRADES  BY UNIVERSITY DEADLINE**

| Subject | Course No. | Section | Credit Hrs. | Class ID | Bound |
|---|---|---|---|---|---|
| MGT | 331 | 01 | 3.00 | 1945 | No |

THIS APPOINTMENT IS MADE ON THE AUTHORITY OF THE PRESIDENT AND ISSUED BY THE PROVOST AFTER RECOMMENDATION OF THE COGNIZANT DEAN AND THE REQUIRED  REVIEWING BODIES.

SIGNATURES BELOW INDICATE REVIEW OF THE RESPECTIVE BUDGET(S) AND SUFFICIENT FUNDS ARE AVAILABLE FOR INDICATED SALARY AND RELATED COSTS FOR THE SPECIFIED  PERIOD.

Proposed by (Chair/Director/Dean):  Approved by (Budget Administration):
**Jonathan Aaron   4/30/2020**

Endorsed by (Dean):
**H.F. Seegers    3/17/2020**

Approved by (Provost):
**J. Steven Brown    5/1/2020**

Accepted by: _____

  Appointee  PRINTED NAME

  _____

  Appointee  SIGNATURE  DATE

CONTRACT IS NOT FINAL UNTIL ALL SIGNATURES ARE CAPTURED AND ELIGIBILITY TO WORK IS FINALIZED

HUMAN RESOURCES

# EXHIBIT A-11

Case 1:22-cv-00031-PTG-JFA   Document 7-1   Filed 02/15/22   Page 134 of 135 PageID# 292



**Provost** <provost@cua.edu>

**DEFENDANT'S EXHIBIT**

**A-11**

## Re: Revision - Summer 2020 - Appointment to Instruction
2 messages

**John V. Tieso** <tieso@cua.edu>                                                                                    Fri, May 29, 2020 at 12:21 PM
To: Provost Office - Academic Contracts <acad-contracts@cua.edu>, Carol McHale <McHale@cua.edu>, "Harvey F. Seegers" <seegersh@cua.edu>, "Andrew V. Abela" <deanabela.cua@gmail.com>, Aaron Dominguez <domingueza@cua.edu>, President John Garvey <cua-president@cua.edu>

Respectfully, with all the crap the business school has been putting me through with their fallacious racism charges, I decline this adjusted contract.
 More than enough students registered for the original class, before the incredibly stupid act of suspending me on charges for which I had no opportunity for reply.
Sadly, the students are the ones that suffer for the University's actions.

John V. Tieso
Adjunct Assistant Professor
The Busch School of Business

(c)703-864-1209
E-Mail: tieso@cua.edu

On Fri, May 29, 2020 at 12:04 PM Provost Office - Academic Contracts <acad-contracts@cua.edu> wrote:

Dear JOHN TIESO:

Attached is your <u>REVISED</u> Summer 2020 contract for MGT  331 Sec. 01 (Database Management).

Please <u>sign and return this contract</u> to Carol McHale (mchale@cua.edu) either via email (scanned document) or in person <u>within 5 business days or your contract may be cancelled</u>.

Note: you do not need to include me in any of your correspondence with Carol McHale and please do not send your signed contract to me.

Best regards,

J. Steven Brown
Senior Vice Provost for Academic Administration and Dean of Graduate Studies

**Provost** <provost@cua.edu>                                                                                    Wed, Jun 10, 2020 at 5:15 PM
To: Nancy O'Connor <oconnorn@cua.edu>

In case you didn't get this one.
[Quoted text hidden]
--
Aaron Dominguez
Provost

*Office of the Provost*
*103 McMahon Hall*
*Washington, DC 20064*
*Phone: 202-319-5244*
provost@cua.edu