UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

John Tieso

    Plaintiff

v.                                    Case No. 1:22-CV-0031 PTG-JFA

The Catholic University of
America

    Defendant

## PLAINTIFF'S OBJECTIONS TO DEFENDANT'S MOTION TO DISMISS AND SUMMARY JUDGEMENT

Plaintiff objects to the Defendant's Motion to Dismiss as stated in *Fayetteville Invs. v. Com Builders Inc.* 936 F.2d 1462 (4th Cir. 1991), The Federal Rules of Civil Procedure only require that a complaint set forth "'a short statement of the claim showing that the pleader is entitled to relief', in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests'". *Bell Atl. Corp. V. Twombly*, 550 U.S. 544 (2007) quoting *Conley v. Gibson* 355 U.S. 41 (1957).

A Motion for Summary Judgement should not be granted if as stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable

1

jury could return a verdict for the nonmoving party." Plaintiff's position is that the Defendant has been given fair notice of Mr. Tieso's claim and that there is a dispute about material facts. Plaintiff asks that both Motions be denied.

The accompanying Memorandum is in support the Plaintiff's position.

The Plaintiff moves the Court to deny both Defendant's Motion to Dismiss and Summary Judgement.  The Plaintiff's position is that there are material facts in dispute and that the Plaintiff's claims are supported by the law and facts plead to provide relief requested to the Plaintiff.


/s/ Arthur Lander
_____
Arthur Lander
Counsel for the Plaintiff
Va Bar No. 29731
300 N. Washington St. #104
Alexandria, Va 22314
703-486-0700
law@businesslegalservicesinc.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division


John Tieso

    Plaintiff

v.                                   Case No. 1:22-CV-0031 PTG-JFA


The Catholic University of
America, a non stock corporation
registered in the state of Virginia

    Defendant


**PLAINTIFF'S MEMORANDUM IN SUPPORT IF ITS OBJECTIONS TO
DEFENDANT'S MOTION TO DISMISS
AND SUMMARY JUDGEMENT**

    The Plaintiff, by counsel, submits this Memorandum in Support of its objection to the Defendant's Motion to Dismiss and Summary Judgment on the following grounds.


<u>Violation of Free Speech</u>

1.    Article III Section 2 of the Constitution,

    The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;

3

28 U.S.C.A. 1331 states, "The district courts shall have original jurisdiction of all civil action arising under the constitution, laws, or treaties of the United States."

The 1928 Public Law No. 235 is a Federal law.  The Act of April 3, 1928 is specific to Catholic University, and the Complaint is regarding Constitutional issues of free speech and due process.

No cases cited by Defendant address a Federal law, in this case Act of April 3, 1928, directed for the specific benefit of a Defendant like Catholic University.  And no cases cited by the Defendant address the federal regulation 34 CFR part 75, 75.500, cited specifically to protect freedom of speech at both private and public universities.  All of the cases cited by Defendant are before 75.500.

2.   At Para. 34 of the Complaint the Plaintiff pled,

"34.   As Catholic University was formed by the United States Congress and is receiving public funds, it is a public university and is subject to CFR part 75.500 (b)(1)."

At paragraph 45(d) Plaintiff pled the University violated "Mr. Tieso's constitutional right to freedom of speech at a public university."

At paragraph 29 and 30 the Plaintiff outlined some of the governmental funding that Catholic University receives.

3 .  At Para. 32. Of the Complaint Plaintiff pled, "An Act of Congress in the 70th Congress 1928 approved and confirmed the

4

formation of Catholic University stating its rights, duties, and responsibilities. See attached **Exhibit P** made a part of this pleading." Nothing prevents "Congress from altering, amending or repealing" the Federal law regarding Catholic University.

4.   Plaintiff' Exhibit P outlines the powers and authorities the Law passed by Congress gave to the Board of Trustee of Catholic University and power to alter, amend, and repeal the same.

Plaintiff's position is the formation by Congress, the 1928 Act passed by Congress and signed by the President, gave Congress the powers to administer the University in detail under Section 4 of the Act, and powers Congress in Section 5 to alter, amend, and repeal the same. Defendant was formed and is regulated by a Federal law. The 1928 Act is still the law of the land. Catholic University asked for this legislation, and has benefitted from the Federal law for almost 100 years.

5.   At page 40 of the *Faculty Handbook* Part I it specifically mentions the Act of Congress in the formation, the powers granted to the Trustee and the retention of the power to alter, amend and repeal the formation of Catholic University. Catholic University admits to being subject to the 1928 Act.

6.   No where in their Memorandum does the Defendant deny Congressional power and oversight of Catholic University. The Defendant does not address the 1928 Act at all in its Motions.

7.   As a public university, Catholic University is subject to

the 1st Amendment, this matter is covered by Section 2 Article III of the constitution, and Mr. Tieso has standing in the Federal court as this is a Federal issue.

8.   In *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021) "... Under controlling Supreme Court and Sixth Circuit precedent, the First Amendment protects the academic speech of university professors."  The Court continues, "The First Amendment protects, "the right to speak freely and right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705,714 (1977). Thus, the government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp of Bos.,* 515 U.S. 557,573 (1995). When the government tries to do so anyway, it violates this 'cardinal constitutional command.' *Janus v. Am. Fed,n of State. Cnty & Mun. Emps.*, 138 S. Ct. 2448, 2463 (2018).

9.    In contrast to the *Meriwether* case where Meriwether's action was on campus, Mr. Tieso's speech was unrelated to his work and unconnected by him to Catholic University.

10.  The Plaintiff's position is that we have pled that Catholic University is a public institution established by an <u>Act</u> of Congress with Congressional oversight, and subject to federal regulation, and that Catholic University has violated Mr. Tieso's first amendment right of freedom of speech.

11.  Mr. J. Steven Brown makes an unsubstantiated claim in his

affidavit, and Defendant has argued Catholic is not a public university. There is no support for Mr. Brown being an expert in the determination of whether a university is private or public, and Plaintiff objects to this affidavit.

12.  In addition, Mr. Tieso's position is that he has standing in the enforcement as a private action his right to protect his Constitution right of free speech under Department of Education regulation 75.500.

75.500 *Constitutional rights, freedom of inquiry, and Federal statutes and regulations on nondiscrimination in (b)(1)*, states,

Each grantee that is an institution of higher education, as defined in 20 U.S.C. 1002(a), that is public and that is legally required to abide by the First Amendment to the U.S. Constitution (hereinafter "public institution"), must also comply with the First Amendment to the U.S. Constitution, including protections for freedom of speech, association, press, religion, assembly, petition, and academic freedom, as a material condition of the Department's grant. The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment. A final judgment is a judgment that the public institution chooses not to appeal or that is not subject to further appeal. Absent such a final, non-default judgment, the Department will deem the public institution to be in compliance with the First Amendment.

The regulation is regarding rights under the Constitution.

13.   In the alternative, even if it is decided by this Court that Catholic University is a private institution, at (C) 1, the

same rule applies,

> The Department will determine that a private institution has not complied with these stated institutional policies <u>only if there is a final, non-default judgment by a State or Federal court</u> to the effect that the private institution or an employee of the private institution, acting on behalf of the private institution, violated its stated institutional policy regarding freedom of speech or academic freedom.

Further, the <u>Act</u> of 1928 made no reference to Catholic University being a "private university".

14.  If the Court finds Catholic University is a "private university", that is no protection.  In *Gonzaga Univ. v. Doe*, 536 273 (2002), where the Court in deciding whether Doe's release of education records was a basis of a private right action against a **"private university"**, the Court ruled that funding statutes did not support a private right of action against Gonzaga, but the Court states, "Because § 1983 provides a remedy only for the deprivation of "rights"... secured by the [Federal] Constitution and laws," it is *rights* not the broader or vaguer "benefits" or "interests," that may be enforced thereunder.  Gonzaga University, a roman catholic institution, was not able to hide behind the label of "private" university versus public as Catholic University is attempting, but was only successful in that the Supreme Court did not find the funding statute sufficient basis to support a private right action.  In the present case, Mr. Tieso's case is not based a funding statute, but on the Federal Constitution, the 1928 <u>Act</u>, and his rights

8

under the Federal regulation.

Catholic University's deprivation of Mr. Tieso's Constitutional right to free speech is what was plead.

15.  Two key points to consider. First, the Department of Education has no internal administrative enforcement provision in its regulation.  Second, the regulation is regarding constitution rights and thus the Plaintiff's position is that Congressional expressed permission of a private right of action is not required.  The language of the regulation states that only if there is a final non-default judgement is there to be any action taken against Catholic University.  Who else is there to take action but a private citizen?

The Supreme Court in *Wright v. Roanoke Redevelopment Author.,* 479 U.S. 418 (1987) states,

> Nothing in the Housing Act or the Brooke Amendment evidences that Congress intended to preclude petitioners' 1983 claim against respondent.  Not only are the Brooke Amendment and its legislative history devoid of any express indiction that exclusive enforcement authority was vested in HUD, but also both congressional and agency actions have indicted that enforcement authority in not centralized, and that private action were anticipated. (Emphasis added)

16.  In the present case the Department of Education is going to take no action until and except there is a final judgement in either federal or state court.

17.  The Supreme Court in *Wilder v. Virginia Hospital Asso'n* 496 U.S. 498 (1990), states, "Section 1983 - which provides a cause

of action for the 'deprivation of any rights... secured by
[federal] laws' - id inapplicable if (1) the statute in question
does not create enforceable 'rights' within § 1983's meaning, or
(2) Congress has foreclosed such enforcement of the statute in
the enactment itself."   Freedom of speech is an enforceable
right.   There is no prohibition of Mr. Tieso bringing this
lawsuit in the regulation.

18.    The reasonable conclusion is that a private right of
action in a state of federal court is a permitted.   If the
Department of Education is not going to enforce its own
regulation pending a final default judgment, and there is no
prohibition in a private party enforcement, who else is going to
enforce the regulation and obtain a judgement but a private
party?  No where in the regulation is enforcement prohibited by a
private party.

    Mr. Tieso is the intended beneficiary of the regulation, the
regulation is regarding constitution rights, and the regulation
imposes a binding obligation on Catholic University. Congress did
not nor did the Department of Education expressly forbid a remedy
to create an enforcement scheme that is incompatible with
individual enforcement. See *Blessing V. Freestone*, 520 U.S.  329
(1997).

19.  Defendant in support of their position cite *Hudgens v.
V.L.R.B.* 434 US 5076 513 (1976), which is a case regarding

10

shopping malls.  *Vaynberg v. Seton Hall Univ,* 2010 U.S. Dist.
Lexis 112634, is distinguished from the present case as the court
ruled that Vaynberg presented **no evidence**, which is just the
opposite as Mr. Tieso's Complaint paragraph 29 through 43 and
related exhibits support the claim that Catholic is a public
institution.  Seton Hall, a Catholic university, did not have
absolute protection by being a "private university", but was only
successful in that Vaynberg produced no evidence.  And just as
Catholic University in the present case is making a blank
statement that it is a 'private university', that alone is not
sufficient as shown in the *Vaynberg* case.

20.  The Second Circuit in *Weise v. Syracuse Univ.* 522 F2d 397,
407 (2d Cir. 1975) outlines what is the criteria for a "private
university". (1) the degree to which the "private" organization
is dependent on governmental aid; (2) the extent and
intrusiveness of the governmental regulatory scheme; (3) whether
that scheme connotes government approval of the activity or
whether the assistance is merely provided to all without such
connotation; (4) the extent to which the organization serves a
public function or acts as a surrogate for the State; (5) whether
the organization has legitimate claims to recognition as a
"private" organization in associational or other constitutional
terms.  The Court in *Weise* in reviewing the First Amendment in
*Grafton v. Brooklyn Law School,* 478 F2d 1137, on whether a

11

student received a passing grade, and *Wahba v. New York University* 492 F2d 96 (2d Cir. 1974) requiring advance approval before publication, states the Court was not equipped to regrade exams nor the evaluate the conduct of scientific research; "As the conduct complained of becomes more offensive, and as the nature of the dispute becomes more amenable to resolution by a court, the more appropriate it is to subject the issue to judicial scrutiny."

21.  It is Mr. Tieso's position that firing him for speech unrelated to his work and not identified with Catholic University is subject to judicial scrutiny.

22.  Catholic University in neither its Motion nor in the affidavits by Brown and Abela deny nor give any evidence to deny the Mr. Tieso's allegation of significant and substantial degree of financial dependence on the government nor of the other 4 factors listed by the 2nd Circuit.  The University has include in their *Handbook* at page 40 and 41 the "Act of Congress" which "connotes government approval of the activity".   Catholic does not deny receiving government aid.  Catholic has benefitted from the 1928 <u>Act</u>, a Federal law which has continuing oversight over the University.  The issue involve is not a religious question but a secular matter.  Mr. Tieso was not a religious teacher, but a professor teaching business.  Catholic University is serving a public function for the community in education and hosting

12

community events open to the public.

23.  In fact, the President of the University, John Garvey, has stated that the University has adopted the Constitutional right of free speech, and restated in the *Faculty Handbook* and in the University's Demonstrations Policy, and in being a member of the MSCHE which states under Standard II- Ethics and Integrity paragraph one, "a commitment to academic freedom, intellectual freedom, freedom of expression, and respect for intellectual property rights;" See Complaint paragraphs 35, 36, 37 and 38, 39 and 40 and the accompanying exhibits.  In doing so they serve a public function as to the importance of freedom of speech.

Here the University holds itself out for the principal of the Constitution and yet when challenged attempts to hide as a "private university".

The criteria outline in *Weise* when a "private university" should be considered a public university is not controlling as Catholic University is governed by a Federal law, the Act of April 3, 1928 and is a public university.   Nothing in the Act prohibits Mr. Tieso from enforcing his rights.  This Federal law was specifically requested by Catholic University.

No cases cited by Defendant address a Federal law, Act of April 3, 1928, for the specific benefit of the Defendnat. No cases cited by the Defendant address the federal regulation 75.500 cited specifically to protect freedom of speech at both

13

private and public universities.  All of the cases cited by
Defendant prior to the issuance of federal regulation 75.500.

24.  By Catholic University's contract with Mr Tieso, by Federal
Statute, by Federal regulation, and by their course of dealing,
Catholic University has adopted the Constitution right to freedom
of speech.

  The affidavits of Brown and Abela do not deny Catholics
University's role in promoting freedom of speech.   Catholic
University holds itself out as surrogate of the state in freedom
of speech and derives government, accreditation, and public
approval of their university for supporting freedom of speech.

25.    On one hand Catholic University embraces the
constitutional right to freedom of speech and the corollary that
it would not retaliate for opinions outside of work in exercise
of that freedom. Then the University acts against its own
principals by firing Mr. Tieso without a hearing.

26.  The _Weise_ Court concludes in its evaluation by stating and
**overriding** principal in reviewing the 5 factors, "... but there
comes a point where those claims [to being a private university]
are outweighed by the harm wrought on the public interest by
'private' misdeeds that is, by the offensiveness of the conduct"
(Emphasis added).  The Plaintiff's position is that Catholic
University is a public university, but even if the Court were to
find it is a private university _Weise_ has ruled that is not the

14

end of the discussion.

27.    Mr. Tieso's position is that Catholic University's malevolent conduct outweighs the claim to be a private university.  Mr. Tieso, as mentioned in the *Weise* case is not asking the court to regrade papers, nor determine how research should be conducted, but to enforce Mr. Teiso's right to freedom of speech under the Constitution.

By Catholic University's adoption in their contract with Mr. Tieso via the Faculty Handbook, their representation by the President of the University, federal regulations, the 1928 Act, the Constitution, and their agreement to accreditation standards, Catholic University has violated Mr. Tieso's rights regarding his outside the workplace and unrelated to Catholic University speech.

28.  The Defendant cites *Dixon v. Coburg Dairy, Inc*. 396 F.3d 811 (4th Cir. 2004) which is a case of an employee who brought confederate decals to work, as opposed to Mr Tieso who brought none of his opinions to the classroom. In *Dixon*, the employer offered a compromise of removing the decals from his tool box or offered to buy a new tool box to which Mr. Dixon declined. These facts are in opposite to the present case where Dean Abela asked Mr. Tieso to take down a few of the more than 109,000 of Mr. Tieso's tweets, to which Mr. Tieso agreed.  He stopped posting entirely and deactivated his account. Further, Coburg Dairy was

not holding itself out as a bastion of the constitution right to freedom of speech, and Coburg Dairy is not subject to the 1928 Federal law and the Department of Education regulation CFR part 75.500.  Hasn't Catholic University waived its claim to being a "private university" by the adoption and promotion of the protections of freedom of speech?

29.    It should be noted that Mr. Abela in paragraph 10 of his affidavit states that Mr. Tieso started retweeting later that month, but Mr. Abela is mistaken. Professor John Tieso shares the same name as his son.  See attach Affidavit of Mr. Tieso.  An example of how not allowing Mr. Tieso to participate has allowed a incorrect conclusion by Mr. Abela.

30.  Even though defendant makes the statement that "it is undisputed that CUA is not a public university" and Mr. Brown in his affidavit make the same conclusory statement, there is no supporting evidence provided.  Plaintiff has plead and provided supporting evidence that Catholic University is a public university.

31.  In *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) the Supreme Court ruled that mere financial funding was not sufficient, but concluded with the following rule in the Rendell-Baker case, that the discharge "was not compelled or even influenced by any state regulation".  In the present case, Mr. Tieso was not fired for job performance, but because of his deemed violation of the

constitution right to free speech by Catholic University and the interpretation of a Federal right to free speech outside the work place by Catholic University.  Catholic University made a unilateral ruling on a Constitutional question without a hearing while excluding Mr. Tieso's participation on the issue.  Shela Rendell-Baker was fired over an employer's administrative policy, not a constitutional issue.  New Perspective School was not representing itself the bastion of freedom of speech as opposed to Catholic University, nor was New Perspective School subject to the 1928 Act nor Department of Education regulation CFR part 75.500.

32.   As pled in paragraph 47 of the Complaint, "There is no statement in the *Faculty Handbook* barring Mr. Tieso's outside political internet statements unrelated to the subject matter of Mr. Tieso's courses."  Contrary to the *Rendell Baker* case, there was no dispute over administrative policy, as Catholic has no policy regarding speech outside unrelated to Mr. Tieso's job with his Twitter account making no mention of his employment with Catholic University.

33.   In the affidavits of Mr. Brown and Mr. Abela there is no mention of an administrative policy regarding speech outside the workplace and not related to Catholic University.

34.   In the Defendant's Motion and affidavits of Brown and Abela, there are no statements of fact that Mr. Tieso was not a good

17

teacher.  Plaintiff's Complaint pled that he had been promoted from lecture to assistant professor, had won an award, and students had found his teaching good.  See paragraphs 8 and 9 of the Complaint and the attached exhibits to the Complaint.

35.  In Defendant's Motion to Dismiss, it cites *DeBauche v. Trani*, 191 F3d 499 (4th Cir. 1999) a case regarding a political candidate being excluded from a debate and  Mr. Trani, the President of VCU, where the debate for the governor's race was being held.  The District Court found that DeBauche hailed to allege sufficient state action and in addition Mr. Trani was entitled to qualified immunity.

The question in *Debauche* was when does public and private joint activity subjects the private actors to the requirements of the Fourteenth Amendment. *See Blum*, 457 U.S. at 1011; *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357-58 (1974); see also *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 409 (1995)

The question in *Debauche* was whether the actions of VCU as a university, just like Catholic, with the joint involvement of former governor Wilder and 2 radio stations could cause Wilder and the 2 radio station, as non public entities, to be subject to a § 1983 action.  The Plaintiff's Complaint does not join any non public institution nor any non public parties in its Complaint again Catholic University, a public university.

36.  The *Debauche* case is also distinguishable from Tieso in the

subject matter of a political debate and Mr. Tieso's case is regarding being fired from his position because of his remarks on twitter were unrelated to his work and without a connection to Catholic University.

37.     The Executive Order does indeed states it is not intended to and does not create a right or benefit, but what the Executive Order does is give a purpose and reasoning to the Department of Education regulation which is an enforceable rule.

The Defendant argues that since an executive order is not enforceable, that "75.550 cannot serve as the basis for a federal claim by a private party when the Executive Order from which it derived, and which it is implementing, expressly disclaims any private cause of action."  So on one hand, the Defendant's argument is that Executive orders are not enforceable, but when it comes to Federal regulations the executive order is enforceable to determine if the underlying regulation is enforceable.  There is no cite for this proposition.

38.  To the contrary, the federal regulation specifically states that the regulation is enforceable.

> The Department will determine that a public institution has not complied with the First Amendment only if there is a final, non-default judgment by a State or Federal court that the public institution or an employee of the public institution, acting in his or her official capacity, violated the First Amendment.

Defendant then argues that the regulation is enforceable

under 75.900, "No act or failure to act by an official, agent, or employee of ED can affect the authority of the Secretary to enforce regulations."  The plaintiff is not stating the Secretary is not acting. In fact, the regulations clearly states the Department of Education is **not** going to act until and <u>only if there is a final, non-default judgment by a State or Federal court.</u>

39.   75.901 does list other procedures that the Department of Education can bring "that are not subject to other procedures", and those other procedures are private parties bringing Complaints in federal and state court.

40.   Further, 75.901 says that the Secretary may use the Office of Administrative Law Judges (ALJ), which is <u>not</u> a federal court as stated in the regulation as ALJs are considered part of the executive branch, to resolve disputes.  The clear reading of the regulation is once there is a non-default judgment in a state or federal court, the Department of Education can and would proceed through ALJ to resolved and settle the dispute with the Catholic University.

41.   Defendant cites *Graves v. Depolo* (E.D. Va Mar. 9, 2011) for the proposition that Plaintiff is not entitled to due process.  The Graves case is regarding child custody and an action against two Virginia court judges which were dismissed under judicial immunity, and two Prince William County employees

20

regarding claims of sexual abuse against Graves in ongoing state court action.   The Court ruled the Plaintiff has not identified <u>any</u> false statements or explained why they are false. As a result, it does not appear that plaintiff has nudged his claim "across the linefrom conceivable to plausible."

Judge Ellis states,

It is well-settled that to state a claim for violation of procedural due process, a plaintiff must allege: (1) a cognizable liberty or property interest; (2) deprivation of that interest by state action; and (3) that the procedures employed were constitutionally inadequate. See *Iota Xi Chapter of Sigma Chi Fraternity v.Patterson,* 566 F.3d 138, 145 (4th Cir. 2009). Here, plaintiff has not adequately alleged that a protected liberty interest was implicated by his placement on the central registry. See *Paid v. Davis*, 424 U.S. 693, 701 (1976) (holding that reputational injury alone is not sufficient to allege deprivation of a liberty interest). Accordingly, this claim is dismissed for failure to state a claim.

42.  *Addressing the requirements in Graves*:

A.)  Mr. Tieso lost his job and future earning (his property interest), which is quite different from the affect of one reputation for being place on a central registry for sexual offense.   As pled in the Complaint at paragraph 45 Mr. Tieso's civil liberties of free speech were violated.

The termination of Mr. Tieso was:

a) a violation of the University's stated policy of free speech as pronounce publicly by the president of Catholic University and its written stated policies.
b) a violation of the standards of the university's accreditation requirements,
c)  a violation of federal Regulations issued by the Department of Education and Executive Order 13864, and

d) a violation of Mr. Tieso's constitutional right to freedom of speech at a public university.

B.) The Complaint alleges the action his termination (paragraph 1 of the Complaint) was by Catholic University a public university (paragraph 34 of the Complaint), and

C.) Procedurally, there was no opportunity for Mr. Tieso to participate, no hearing, no documents were provided to Mr. Tieso. See the following paragraphs 64 and 65 of the Complaint summarizing the constitutionally inadequate procedures:

64.   Catholic University breached the due process requirement of the Contract, the accreditation body MSCHE, and the industry norms by:
a. prejudging Mr. Tieso as a racist by Mr. Lawrence Miller, legal counsel for Catholic University, prior to the investigation even commencing,
b.  by failing to allow Mr. Tieso to know the undisclosed people who accused him of racism and sexism,
c. not allowing an opportunity to confront the accusers,
d. giving no notice and no opportunity to respond or participate in the investigation,
e. failing to provide any documentation which was the basis of Dean Abela's decision,
f. failing to honor the requirement under the *Faculty Handbook* for a formal hearing,
g. not providing due process as stated in the *Faculty Handbook*
h.  changing the punishment after he had agreed to the very corrective action that Dean Abela had requested,
i. the failure of Mr. Garvey to refer the matter to the Faculty Academic Senate,
j.  Catholic University violating is own policy on what must be done versus what is merely urged regarding social media, and
k.  a failure to clearly state how violations of the speech policy would be disciplined.
 m.  giving no indication or warning that comments unconnected and unassociated with the University and outside Mr. Tieso's job requirements would lead to his firing.

And

> 66.  Catholic University violated: 1. its own policies regarding the due process for termination of a faculty member according to the *Faculty Handbook*; 2. the ethic standards that Catholic University agreed to abide by with the MSCHE accreditation body standards for due process; 3. the standards developed by the America Association of University Professors due process standards; and 4.  Mr. Tieso's right to due process under the United States Constitution.

The *Graves* case does **not** address the Federal Act of April 3, 1928 nor 34 CFR Part 75.

Count II Due Process

43.  What the Defendant does not address is that Catholic University agreed to and adopted due process protections when it contracted with Mr. Tieso as pled in paragraph 66 of the Complaint.  "Catholic University violated: 1. its own policies regarding the due process for termination of a faculty member according to the *Faculty Handbook*".  At paragraph 63 of the Complaint, "The language in the Faculty Handbook at II G-7 193, states, 'The University may, following due process specified below....'"

43.  The Faculty Handbook is prepared soley by Catholic University.  Catholic University adopted "Due Process" and included it in the Contract with Mr. Tieso via the *Faculty Handbook*.  As authors they can define who is eligible for Due Process.

44.  Due Process rights in Black's Law Dictionary is defined as

"All right which are such fundamental importance as to required compliance with due process standards of fairness and justice. Procedural and substantive rights of citizens against government actions that threaten the denial of life, liberty or property."

45. Catholic University has adopted the Due Process rights, and those rights are defined by in the Constitution and case law.

46. At Section G Termination of Appointments, part II page 41 of the Faculty Handbook, Catholic University could and did not exclude adjunct professors from receiving Due Process as outline in paragraphs II-G-7 .193.

47. Paragraph I-G-7 193 makes no mention of a "regular member". It speaks of "Faculty member" are to be provided Due Process.

48. Catholic University and at their Memorandum paragraph 14, 15 and 16 try to distinguish a "regular member" vs. "non regular member". The conclusion Defendant argues is that a "non regular member" gets no Due Process and that is the basis of Mr. Tieso being fired without any Due Process.

49. The Defendant relies on II-A-1.001 the definition of Membership in the Faculty to support the idea of 2 levels of Faculty to make the alleged distinction between alleged "regular" and "non regular" faculty.

50. But II A-1.001 makes no distinction.

"Membership in the Faculty of a School or Department is hold by person with appointments to one fo four general recognized

24

Faculty ranks, namely Ordinary Professors, Associate Professors, Assistant Professors, and Instructors."   Mr. Tieso is an Assistant Professor.

51.  Further, the Defendant uses 1.004 to try again and argue there is a distinction between alleged 'regular' and 'non regular' faculty.

II A-1.004 says, "Appointment to regular membership in a Faculty are of three kinds: appointments with continuous tenure, term appointments probationary for tenure and contract appointments without tenure."   Mr. Tieso is a contract appointment without tenure and meets the definition of regular membership.   Does 1.004 say everyone else is a "non regular member"?   No.

52.  At paragraph 17 of Defendant's Memorandum it says regular Faculty have "the privileges of voting and serving in administrative capacity within the Faculty ....are enjoyed only by regular members of a Faculty."   Mr. Tieso was a voting member of the faculty and he served as chair of the International Business Ethics Case Competition for three years, served on numerous committees, and voted numerous times with the Faculty. See Mr. Tieso's Declaration which is made a part of this pleading.

53.  At II-B6 .046 says, An Adjunct Professor enjoys such privileges as the host Department or Faculty may extend, <u>except</u>

25

those of voting....” Mr. Tieso was a voting member of the
Faculty.  See Mr. Tieso’s Declaration attached and made a part of
the Pleading.  Mr. Tieso in his Declaration contests the
statements made on material facts in this case in the statements
made by Mr. Brown and Mr. Abela.

*54.  Contra proferentem*, Any ambiguity in the contract/Faculty
Handbook about whether Mr. Tieso was entitled to Due Process
regarding his first amendment rights should be interpreted
against Catholic University.

55.   Even if the Court finds there is no ambiguity in the terms
of the *Faculty Handbook* and finds Mr. Tieso was this undefined
person “non regular member”, based on the practice of allowing
Mr. Tieso to vote as a member of a faculty, the voting by Mr.
Tieso would show that it was not Catholic University’s custom of
dealing nor course of dealing to make a distinction between
‘regular’ and ‘non regular’ professors.

56.  Where does the words ‘non regular’ appear in the Faculty
Handbook?   A total creation after-the-fact by the Defendant.

57.  The Defendant takes the position that private universities,
citing *Heineke v. Santa Clara Univ.*, 965 F3d 1009 ,are “not
ordinarily obligated to comply with the constitutional due
process requirements.” *Doe v. Washington & Lee University*, where
the Court held private universities are not bound by Due Process
Clause of the Constitution.

26

58.   In the *Doe v. Washington & Lee*, Doe participated in the investigation, the hearing, and the appeal. The Plaintiff has pled that Catholic University is a public institution and submitted reasonable substantiation, with the limited public information available.  Additional proof that Catholic University is a public university would come forward to support this position during discovery.

59.   Catholic University in their Motion and in their Affidavits simply make bland unverified statements of being private, without any supporting documentation.

60.   The Defendant has adopted the Due Process requirements in *their Faculty Handbook*, which is part of Catholic University's contract with Mr. Tieso.   The *Faculty Handbook* specifies in Part II Section G-7-193 the Due Process that will be followed through .194 to .211.  Is there any ambiguity that the right to Due Process derives from the U.S. Constitution.

61.   Mr. Tieso received no due process. In fact at one point he was told there was no investigation. See Complaint Paragraph 21.

> On June 11, 2020, Vincent Lacovara, Chief Ethics and Compliance Offer and Chief Privacy Officer at Catholic University, emailed stating there were no charges against Mr. Tieso, even though Mr. Tieso was suspended from his work on May 18th, and that the University "is looking at what University polices or standards might be vis-a-vis the tweets." See attached **Exhibit F** made a part of this pleading.

62.   If this Court decides Mr. Tieso, who was employed under

contract for a term period, was entitled to no due process under the *Faculty Handbook*, the Court is asked to look to Catholic University's *Staff Discipline and Termination Policy*. See attached Exhibit II, made a part of this pleading.

64.  The "at will" employees have greater rights to due process than what was given to Mr. Tieso. The clerks and grounds keepers are afford a warning, written notice to improve, and appeal rights.  Mr. Tieso got none of these protections.

65.  From Exhibit F of the Complaint the email from Mr. Lacovara can be read that the University has no policy about tweets unrelated to work.  There is no warning to Mr. Tieso of what job performance he violated.

66.  Defendant cites *Bd. Of Regents v. Roth*, 408 U.S.  564 (1972) in which the Court ruled, "University rules gave a nontenured teacher "dismissed" before the end of the year some <u>opportunity for review</u> of the 'dismissal,' but provided that no reason need be given for nonretention of a nontenured teacher, and no standards were specified for reemployment."  Mr. Tieso was dismissed before the end of his term and was given no opportunity for review of his firing.  The *Bd. Of Regents* case was a case about non renewal as opposed to the present case of firing Mr. Tieso before the contract ended.

67.  Even if the Court were to conclude that Mr. Tieso's case was one of non renewal, Catholic University violated its own policy

in the *Faculty Handbook* by failing to give required notice.  This breach denied him the ability to look for work at other Universities.  See paragraph 92 through 95 below pled in the Complaint.

92.  **Section B Categories and Terms of Appointment** of the *Faculty Handbook* in part II at II-B-1, page 5 categories the type of Faculty and which section of the *Handbook* apply, See attached **Exhibit Z** made a part of this pleading, addresses "Contract Appointments Without Tenure at II-B-4". Mr. Tieso was a contract appointment without tenure. II-B-4 .032 requires **notice** as outline in B-3 025-030 on page 7. See attached **Exhibit AA** made a part of this pleading.

93.  At part II of the *Faculty Handbook* at II-C-7 at page 17 regarding reappointment of contract terms, .091 requires **notice** of non renewal, as set forth above (B-4 .025-.030). See attached **Exhibit BB** made a part of this pleading.  The problem with II-C-7 .091 is there is no II-B-4 .025-.030. There is a II-B-3 .025-.030.  The error in drafting should be held against Catholic University as it were the sole author.

The error in II-C-7 can be resolved by II-B-4 .032 at page 7, which states clearly that notice is to be given as provided in II-B-3, at page 5 and 6, which describes the due dates for **notice** of in paragraphs II-B-3 at .025 -030.

94.  Catholic University failed to give proper notice to Mr. Tieso as outlined in B-4 regarding contract professors and referenced with detail in B-3.

95.  The industry norm regarding non reappointment is stated in the American Association of University Professors Bulletin (Autumn, 1964) and reads as follows:

   THE STANDARDS FOR NOTICE OF NON REAPPOINTMENT
   (Endorsed by The Fiftieth Annual Meeting)

   Because a probationary appointment, even though for a fixed or stated term, carries an expectation of renewal, the faculty member should be explicitly informed of a decision not to renew his appointment, in Order that he may seek a position at another college or university. Such notice should be given at an early date, since a failure to secure another position for the ensuing academic year will deny the faculty member the opportunity to practice his profession. The purpose of this Statement is to set forth in detail, for the use of the academic profession, those

standards for notice of non reappointment which the
Association over a period of years has actively supported
and which are expressed as a general principle in the 1940
Statement of Principles on Academic Freedom and Tenure.

68. The Complaint at paragraph 64, states "Catholic University

breached the due process requirement of the Contract, the

accreditation body MSCHE, and the industry norms by:

"a. prejudging Mr. Tieso as a racist by Mr. Lawrence Miller,

legal counsel for Catholic University, prior to the

investigation even commencing."

69.    Even if the Court finds that Catholic University is a

'private university' it is still subject to Due Process

requirements.

The Court in *Prof'l Massage Training Ctr. V. Accreditation*

*Alliance of Career Schs & Colls.* 781 f3d 161 (4th Cir 2015),

states, This court made clear that an "impartial decision maker

is an essential element of due process." *Morris v. City of*

*Danville*, 744 F.2d 1041, 1044 (4th Cir.1984) (quoting *Bowens v.*

*N.C. Dept. of Human Res.*, 710 F.2d 1015, 1020 (4th Cir.1983)).

That ACCSC is a private entity (albeit one with significant

public responsibilities) does not alter this imperative.

70.    Mr. Tieso never received his Due Process rights.

<u>Breach of Contract III</u>

71.   Nowhere in the Motion nor in the affidavits of Mr. Brown and Mr. Abela do they deny Catholic University breaching the contract with Mr. Tieso.

72.   On page 22 of Defendant's Memorandum the issue of 3rd party beneficiary is argued.

In the Complaint at paragraph 62 it states, "Mr. Tieso is a third party intended beneficiary from the Agreement between Catholic University and MSCHE, Mr. Tieso was aware of the accreditation and protections and relied on the Agreement." Defendant states the rule regarding 3rd party beneficiaries requires "contracting parties".  Plaintiff's position is the language "Agreement between Catholic University and MSCHE" meets that definition of contract.

73.   *Black's Law Dictionary* defines the word <u>Contract</u> as "An agreement between two or more persons wich creates an obligation to do or not to do a particular thing".  Notice in the Complaint the word "Agreement" is capitalized.

74.   Defendant argues that the rule on 3rd party beneficiary requires intention between the parties.  Plaintiff's position is that ""Mr. Tieso is a third party intended beneficiary from the Agreement between Catholic University and MSCHE" meets that requirement.

75.   Defendant cites the 4th Circuit case of *Prof'l Massage
Training Ctr. V. Accreditation Alliance of Career Schs & Colls.*
781 f3d 161 (4th Cir 2015).

The Court in *Prof'l Massage Training Ctr.* found that
"Accreditation, among other things,' entitles educational
institutions to access Title TV federal student aid funding. See
20 U.S.C. § 1070 et seq."  The Court continues, "....the cost to
an educational institution and its students of denial of
accreditation can be steep. An institution denied accreditation
is likely to "promptly [go] out of business — as very few people
[are] willing [or able] to pay" tuition out of their own
pockets. *Chi. Sch.,* 44 F.3d at 448." Catholic University relies
on the accreditation from MSCHE for federal funding.

76.   The Defendant cites the Court, "The Standards of
Accreditation do not constitute a binding contract between the
agency and the accredited educational institutions because the
Commission can alter the alleged "contract" <u>at will</u> and, thus,
is not bound by its terms." (Emphasis added)

77.   There is no evidence that the Agreement can be altered by
the MSCHE, and there is no such language in the Complaint.
Nowhere in the affidavits of Mr. Brown and Mr. Abela do they
deny a binding Agreement between MSCHE and Catholic University.

78.   As announced by the President of the University, Mr. John
Garvey on July 9, 2020,  "Following a two-year, a campus wide

effort, The Catholic University of America has successfully earned reaccreditation from Middle States Commission on Higher Education....". See Exhibit JJ, made a part of this pleading.

79. Even the President of the University speaks in terms a contract in which Catholic met certain requirements and thus allowing Catholic to earn the benefit of its designation of being a member of the MSCHE.

The fact that a particular standard of MSCHE may change in the future does not change the fact of this Agreement at the time Mr. Tieso was a member of the Faculty.

80. The Defendant argues that Catholic University can only comment on the changes to any future standards. The reality is this is not the case for two reasons:

A. In reality in the future that if the MSCHE were to change the standards as agreed to by Mr. Garvey as President of the University, and Catholic University did not agree to the new standard after its comments, Catholic University could relinquish its membership in the MSCHE and make an effort to obtain certification from another accreditation board.

B. The standards <u>cannot be changed at will</u>, and Catholic University has <u>voting rights</u> on any changes.

81. There is no evidence and nothing in the affidavits of Mr. Brown nor Mr. Abela that the standards have change.

82. In discovery, Plaintiff would be able to find out how much

33

was paid for the evaluation by MSCHE and any engagement letters, and correspondence.

83.  MSCHE states the Agreement as a contract, "In meeting the quality standards of MSCHE accreditation, institutions earn accredited status, and this permits them to state with confidence: "Our students are well-served; society is well-served." See Exhibit KK made a part of this pleading.

84.  The consistency from President Garvey's statement and the statement of MSCHE mirroring Mr. Garvey shows there is a meeting of the minds as to the contract.

85.  MSCHE in its Review of Commission Standards, Requirements of Affiliation, and Policies it states.  The standards cannot be changed on a whim.  Major changes are considered only once every 10 years.  If during this 10 year period substantive changes are needed, the start of the process will being within the year, but the change will not be completed until the next year.  Any substantive change will not be made unless notification is given to the institutions. See Exhibit LL MSCHE *Statement of Policy* attached and made a part of this Pleading.

86.  Further, Catholic University is entitled to vote on the change to changes to the substantive standards.  So Catholic University can do more than just comment. See Exhibit LL

In accordance with MARCHE (dba MSCHE) Bylaws, "Institutional members are entitled to vote on all policies that affect the

substance of MSCHE accreditation standards and requirements and on major substantive policy statements (not including statements of good practices or principles),except those mandated under Federal law or regulation, the Commission or the Executive Committee acting on behalf of the Commission" (Article III, Sec. 3.03.)

87.   The Court in *Prof'l Massage Training Ctr.* made its ruling because the "accreditation body could "alter the alleged "contract" <u>at will</u>." (Emphasis added).  The standards with MSCHE and Catholic <u>cannot</u> be altered at will.  See attached Exhibit LL made a part of this pleading.

88.   The Defendant cites *Irani V. Palmetto Health*, wherein Mr. Irani failed to name the correct contract that he was a beneficiary of.

> As the district court correctly noted, the amended complaint does not encompass a claim as to the Affiliation Agreement and the PLAs. The amended complaint alleges a claim for "Breach of Contract -- Intended Third Party Beneficiary of Accreditation Agreement." J.A. 40. Specifically, Appellant alleges, "[a]s a resident, [Appellant] was an intended, third-party beneficiary of the contract between Defendant [Palmetto]/USC-SOM and the ACGME." Id. <u>Appellant does not, however, allege at any point </u>in the amended complaint that he is a third party beneficiary to any agreement between Palmetto and USCSOM -- the parties to the Affiliation Agreement -- or between the orthopedic surgery department and the institutions that are parties to the PLAs. The amended complaint, therefore, does not fairly predict a claim based upon the Affiliation Agreement or the PLAs. Appellant's counsel acknowledged as much in an email to Appellees' counsel, in which he stated he "may need to amend the complaint again, because . . . there are three additional contracts that need to be included in [Appellant's] claims for . . . third party beneficiary breach of contract" and referenced the Affiliation Agreement and the PLAs. Id. at 2623. Appellant did not file a second amended complaint. (Emphasis added)

*Irani v. Palmetto Health*, No. 16-2439, 51-52 (4th Cir. Apr. 10, 2019)

89.   Catholic University is arguing that it has no contract and no requirement to perform and adhere to the representations and commitments it made to the MSCHE.   In that case, then Catholic University is misrepresenting itself to the MSCHE, the public, the federal funding sources, and Mr. Tieso, all of whom are reasonably relying on Catholic University's representation.

90.   The present case is distinguished from *Chicago School of Automatic Transmissions, Inc. V. Accrediation Alliance Career Schools and Colleges,* 44 F 3d 447 (7th Cir. 1994), states, "Congress provided for exclusive federal jurisdiction of any suit by a school or college protesting the denial or withdrawal of accreditation by "an accrediting agency or association approved by the Secretary" of Education. 20 U.S.C. § 1099b(f)." (Emphasis added).

91.    The Complaint nor the relationship between the Defendant and MSCHE is not about protesting the denial or withdrawal of accreditation.

92.   The present case is also distinguished from Chicago, "Accreditation groups adopt and change their rules unilaterally; by posting an application fee a trade school cannot lock in a favorable set of rules", in that MSCHE cannot change its rule unilaterally.

93.   In addition, the _Chicago_ case is distinguish from the present case as Catholic University has the right to vote "on all policies that affect the substance of MSCHE accreditation standards, and requirements and on major substantive policy statements...."  In _Chicago_, the relationship the Court considered the relationship between the school and accreditation "a proxy for the federal department whose spigot it opens and closes."

What federal agency allows for the entity it is regulating to vote on the very regulations the federal agency is suppose to enforce?

94.   The Court in _Chicago_ mentions only one benefit on the accreditation by MSCHE that being to the federal spigot. Catholic University derives other benefits by its two year campus wide effort in earning the accreditation of MSCHE: improvement to student education, identification of gaps in their programs and processes, promotes communication across the organization, decreases risk and liability costs, and to assure the public.

95.   The  Defendant argues on page 24 of their Memorandum regarding the AAUP, Plaintiff makes a summary claim at paragraph 66 and that there is no other reference to the standards of due process or otherwise regarding AAUP.

To the contrary, at paragraph 38, the Complaint states,

On page 14 of the *Faculty Handbook*, <u>Statement on Academic Freedom - The Catholic University of America</u>, Catholic University's policy is "It is a tradition that posits freedom of inquiry, open discussion and unrestricted exchange of ideas as essential to the pursuit of knowledge."

In 1915 the American Association of University Professors (hereafter referred to as 'AAUP') identified "three major components of academic freedom: research; teaching; and extramural utterances...."

In 1964 the Committee A on Academic Freedom and Tenure stated, "The controlling principal is that a faculty member's expression of opinion as a citizen cannot constitute grounds for dismissal unless it clearly demonstrates the faculty members unfitness to serve.  Extramural utterances rarely bear upon the faculty member's fitness for continuing service."

In the 1970 Interpretive Comments, the AAUP restated the 1964 position on extramural utterances, and added that "Moreover, a final decision should take into account the faculty member's entire record as a teacher and scholar."

96.  Where was the due process in taking Mr. Tieso's entire record as a teacher and scholar by Catholic University?

97.  Plaintiff would note that the contract between Mr. Tieso and Catholic University was performed in Washington D.C. and the Plaintiff's position is the choice of law would be the District of Columbia.

98.  TheDefendant argues there is no connection between CUA and AAUP whatsover.  The industry standards are relevant in the interpretation of the contract between Catholic University and Mr. Tieso as to terms and ambiguities of the Faculty Handbook. The American Association of University Professors (hereafter referred to as 'AAUP') is an industry standard and norm that can be used.

In *Western Surety Company v. U.S. Engineering Company*, 211

F. Supp 3d 302 (2016), the Court states, "Under District of Columbia law ... if an integrated agreement contains ambiguous terms, the court, after admitting parol evidence that may include habitual and customary practices, must interpret the contract using a reasonable person standard.

To Decide this question of breach of contract the D.C. Superior Court in *MEPT St. Matthews, Inc v. Baltimore Masonry Inc,* 2008-007370 (2014) states, "... turns to the general contract ... other related contract documents, and the applicable industry codes and standards"

99. The argument is made that "Plaintiff cannot bring a claim for violation of due process standards by which CUA does not abide by." First, The *Faculty Handbook* was written by Catholic University and to the extent there is ambiguity to the terms of the contract the industry norm should be applied. Since extramural utterances are at issue, Mr. Tieso's unrelated to work and unassociated to Catholic University, the industry norm should be used to resolve any ambiguities. Secondly, simply because Catholic University has chosen not to join the industry trade group does not diminish the standards set by the industry. 100. Nowhere in the affidavits of Mr. Brown and Mr. Abela do they deny that the AAUP definitions are not the industry norm.

Catholic University had every opportunity to draft the language in the *Faculty Handbook* to clearly exclude Mr. Tieso

39

from the protections afford under II-G <u>Termination of</u>
<u>Appointments</u>, and Catholic University did not do so.

Catholic University breached the contract, denied Mr. Tieso
due process, and violated his constitution right to freedom of
speech.

For these reasons the Plaintiff asks that the Defendant's
Motions be denied as to the Motion to Dismiss and to the Motion
for Summary Judgement.

/s/ Arthur Lander
_____
Arthur Lander
Counsel for the Plaintiff
300 N. Washington St. #104
Alexandria, Va 22314
703-486-0700
law@businesslegalservicesinc.com
703-527-7207 fax
Va Bar No. 29731

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 1, 2022 a copy of
Plaintiff's Objection to Defendant Motions, Memorandum, Proposed
Order, were emailed, and mailed first class postage to:

Michael Marinello, Esq.
Kagan Stern et al
238 West Street
Annapolis, MD   21401

/s/ Arthur Lander
Arthur Lander

Employment Policies > Staff Discipline and Termination Policy

# Staff Discipline and Termination Policy


PLAINTIFF'S EXHIBIT
I I
tabbies

| Approved by: | President | |
|---|---|---|
| History: | Issued | -- June 1, 1994 |
| | Revised | -- October 1, 2021 |
| | Last Reviewed -- | |
| Related Policies: | | |
| Additional References: | | |
| Responsible Official: | Associate Vice President and Chief Human Resources Officer tel. 202-319-5050 | |

## I. At Will Employment

All employees covered by this policy serve at the pleasure of the University and are considered "at will" employees. In such an "at will" employment relationship, either the employee or employer may terminate the employment relationship at any time without notice. Each party will endeavor to give the other notice, but it is not required. Any termination by the University must be consistent with applicable laws prohibiting discrimination. Initial and renewal appointment forms are budget documents and do not constitute a contract.

## II. Discipline

Job performance and conduct acceptable to the University must be maintained in the work environment. The employee is responsible for learning the norms of professional performance and behavior which are appropriate to the position. For a complete description of the behaviors expected from University employees, refer the Employee Responsibility Policy.

If an employee does not demonstrate accepted behaviors or maintain satisfactory performance, a supervisor may warn the employee of the need for change through counseling, oral reminders and/or written warnings. However, a pattern of increasingly serious disciplinary measures is not necessary prior to any particular disciplinary action, including termination. Appropriate types of discipline cannot always be anticipated. The facts and circumstances in each case should be considered in the supervisor's determination of an appropriate form of discipline.

Although progressive discipline is not always required, supervisors are responsible for providing feedback to employees and establishing corrective action plans where necessary. Each problem should be evaluated so that the facts of the situation are known and considered before disciplinary measures are imposed or the employee is terminated. When disciplinary action is taken it should be corrective rather than punitive and should be appropriate to the offense. Care should be taken to respect the dignity of the employee in all cases. The Associate Vice President and Chief Human Resources Officer is available for consultation on appropriate types of discipline. In cases of termination, the Associate Vice President and Chief Human Resources Officer must be consulted prior to the termination.

For exempt employees who are past the initial evaluation period, any disciplinary action involving withholding of a salary increase, demotion, reassignment to another position, or termination must be approved by the cognizant vice president.

## III. Suspension

In cases of unsatisfactory performance, non-exempt employees must be given a written notice that they have 30 days in which to improve and sustain improvement or they may be discharged from employment. When there is a need to remove an employee from the workplace to conduct an investigation (such as an instance where all of the facts are not immediately available), or to protect the health, safety or welfare of others, the employee may be suspended if, in the judgment of the supervisor, immediate action is required. The suspended employee should be asked to surrender all university property, and, if appropriate, should be advised that, effective at the start of the next working day, pay may be suspended until the situation is reviewed and final action is taken. The Associate Vice President and Chief Human Resources Officer should be consulted promptly whenever possible before an employee is suspended; such action must be reviewed by the appropriate dean or director and, in the case of a professional employee, by the cognizant vice president.

## IV. Involuntary Termination Process

If a supervisor decides to terminate an employee, the procedure followed in reaching the decision must be reviewed and approved by the Associate Vice President and Chief Human Resources Officer before the employee is notified.

In cases of unsatisfactory work performance of an employee who is past the initial evaluation period (if such a period is required by position status), a written notice must be given in which the employee has 30 (thirty) days to improve specific work performance issues and sustain the improvement. Such notice should be signed by the employee as acknowledgement of receipt of the warning. Refusal to sign the warning by the employee does not constitute non-receipt. One copy shall be given to the employee and one copy sent to Human Resources to be filed in the individual's personnel file. If after the thirty (30) day improvement period the employee has not made a sustained consistent improvement, the employee may be discharged from employment.

The requirement for a written warning and a 30 day improvement period may be waived where a termination is for:

- abandonment of position or excessive absenteeism;
- insubordination or a refusal to perform one's job;
- misconduct including theft, misuse or misappropriation of University property;
- unsafe conduct;
- misrepresentation of hours worked;
- sexual or racial harassment; or
- violations of University rules on substance abuse.

The requirement, however, can also be waived for any non-discriminatory reason deemed to be sufficient in the discretion of the cognizant vice president and in consultation with the Associate Vice President and Chief Human Resources Officer .

The written warning requirement does not apply to employees in an initial evaluation period.

All employee terminations must be approved by the Associate Vice President and Chief Human Resources Officer, the cognizant vice president and reviewed by the General Counsel and the Equal Opportunity Officer.

The University is not required to notify the employee of the decision to terminate prior to the effective date of separation. The employee will be paid his/her salary through the effective date. At any time after notice has been given, the supervisor may relieve the employee from the performance of the duties of his/her position or assign him/her to other duties until the date of separation.

## V. Reduction in Job Force or Job Elimination

In the case of a termination due to elimination of a particular position, the University will attempt to give the employee a minimum of one month's advance notice. Such employees will be encouraged to apply for similar positions within the University. However, the University is not required to provide the employee with another position.

## VI. Separation Pay

An employee who is involuntarily separated due to a reduction in force or job elimination and who has worked continuously as a regular employee for more than one year, will be eligible for separation pay equal to two weeks regular pay. Separation pay will not be made to an employee who is involuntarily separated for reasons other than a reduction in force or job elimination. This policy applies only to positions funded by the University's operating budget and does not apply to positions funded by contracts, grants and similar soft money positions.

## VII. Appeal of Involuntary Termination

When an employee feels he or she has been unfairly terminated, he/she may file an appeal in writing citing the reasons why the termination was unfair to the Associate Vice President and Chief Human Resources Officer within ten (10) working days of the termination. The Decision of the Director of Human Resources will be final.

This policy does not apply to those who have been terminated during the initial evaluation period or to employees whose termination is the result of a reduction in force or position elimination.

## VIII. Voluntary Termination or Resignation

A non-exempt employee planning to resign should submit written notice to his or her supervisor at least two weeks before the intended departure. For exempt employees, a month's notice is requested. The notice should state the reason for separation and the last active working day.

When an employee's termination date follows a holiday, the employee must be present at his or her work location the first work day after the holiday in order to be paid for the holiday except in cases of retirement.

## IX. Post-Termination: Voluntary and Involuntary

Non-exempt employees with less than six months' service are not entitled to payment for accumulated unused annual leave. For employees with six months or more of service, payment for accumulated unused annual leave, up to a maximum of twenty-one (21) days, will be made. No payment for unused sick leave will be made.

For exempt employees with six months or more of service, who are current with their timesheets at the time of their last regular payroll, payment for accumulated unused annual leave, up to a maximum of 10 days, will be made. No payment for unused sick leave will be made.

Continuing access to participation in health plans is available under circumstances defined by Federal law. The employee is responsible for taking necessary steps concerning taxes, payroll and pension matters, and for requesting any post-termination benefits.

When employment is terminated, an employee must return his/her University identification card, keys, or other property.

Case 1:22-cv-00031-PTG-JFA   Document 11   Filed 03/01/22   Page 45 of 61 PageID# 358



PLAINTIFF'S
EXHIBIT
JJ

Catholic University Homepage  >  2020  >  University Earns Reaccreditation Until 2028

# University Earns Reaccreditation Until 2028

July 09, 2020

Following a two-year, campus-wide effort, The Catholic University of America has successfully earned reaccreditation from the Middle States Commission on Higher Education (MSCHE) through 2028. President John Garvey received the official notification from MSCHE, climaxing a process that began in February 2018.

The commission's evaluation team that visited campus March 1-4 was comprehensive in its list of the University's accomplishments while returning only one recommendation and no requirements. The commission has requested that the University provide by April 1, 2021, a supplemental report describing the implementation of processes that measure the extent of student achievement, generally, as well as the extent of student achievement in general education.

Overall, the evaluation team determined that the University appears to meet all seven standards for reaccreditation, including fidelity to the institution's stated mission and goals, its adherence to high standards of ethics and integrity, and its design and delivery of the student learning experience. The University was assessed, as well, on its broad support for the student experience, educational effectiveness, planning and resources dedicated toward institutional improvement, and governance and leadership. The MSCHE visiting team's full report is available online.

"This important — indeed, existential — accomplishment is the result of countless hours of work by so many members of the University community," said Garvey. "That the visiting evaluation team's report is so overwhelmingly positive speaks not only to the comprehensive and thoughtful way we prepared for the reaccreditation process during the past two years, but also to how the University strives to improve in delivering a high-quality educational experience for our students every day. This is a moment for everyone involved with Catholic University to celebrate."

Case 1:22-cv-00031-PTG-JFA   Document 11   Filed 03/01/22   Page 46 of 61 PageID# 359

Among the "exemplary institutional characteristics" identified by the evaluation team are the University's unique role as the national university of the Catholic Church, its commitment to enhancing undergraduate and graduate programs in response to market needs, its focus on research, and its "exceptional commitment to student well-being."

CatholicU also received high marks for its efforts to promote environmental sustainability; create programs serving nontraditional students, veterans, and first-generation students; provide professional development opportunities for faculty through the Center for Teaching Excellence; and the high degree of student involvement in ministries and service.

Accreditation signifies that an institution maintains standards requisite for its graduates to gain admission to other reputable institutions of higher learning or to achieve a level of competency necessary for successful entry into the professional workforce. It helps prospective students determine acceptable institutions for enrollment while incentivizing colleges and universities to establish goals for institutional self-improvement. It is required for all colleges and universities receiving federal student assistance.

Traditionally, reaccreditation occurred on a 10-year cycle, though MSCHE recently changed that requirement to every eight years, meaning the University's next self-study is likely to begin sometime in 2026.

## Related News

**University Recognized with Eleven Catholic Press Awards** July 08, 2020

**$3.2 Million Awarded to CatholicU Social Work School** July 01, 2020

**Alumnus to Take Leadership of School of Arts and Sciences** June 19, 2020

**MORE NEWS**

Case 1:22-cv-00031-PTG-JFA    Document 11    Filed 03/01/22    Page 47 of 61 PageID# 360



**3624 Market Street**
**Suite 2 West**
**Philadelphia, PA 19104**
**www.msche.org**
**Follow us: @mscheorg**

MIDDLE STATES COMMISSION
ON HIGHER EDUCATION



# STANDARDS

## Standards for Accreditation and Requirements of Affiliation



An institution of higher education is a community dedicated to students, to the pursuit and dissemination of knowledge, to the study and clarification of values, and to the advancement of the society it serves. The Middle States Commission on Higher Education (MSCHE), through accreditation, mandates that its member institutions meet rigorous and comprehensive standards, which are addressed in the context of the mission of each institution and within the culture of ethical practices and institutional integrity expected of accredited institutions. In meeting the quality standards of MSCHE accreditation, institutions earn accredited status, and this permits them to state with confidence: "Our students are well-served; society is well-served."

Download the ***Standards for Accreditation and Requirements of Affiliation***.

**A Guided Review to the Standards for Accreditation and Requirements of Affiliation**
The below videos provide context for the Standards for Accreditation and Requirements of Affiliation. Please note that there have been updates to content contained within these videos, and they will be updated and replaced in Spring/Summer 2021.

**Understanding the Standards and Requirement of Affiliation** | **Standard I** | **Standard II** | **Standard III** | **Standard IV** | **Standard V** | **Standard VI** | **Standard VII**



**ACCREDITATION POLICY**



## Review of Commission Standards, Requirements of Affiliation, and Policies
*Effective Date: June 3, 2017*

Contents
   I.    Purpose
  II.    Statement of Policy
III.    Definitions

### I.    Purpose
This policy defines the types of documents that delineate or support accreditation requirements and directs their review for the Middle States Commission on Higher Education (the Commission).

### II.    Statement of Policy

<u>Accreditation Standards and Requirements of Affiliation:</u>

The Commission establishes accreditation standards and requirements of affiliation for accreditation through an interactive process involving the Commission, member institutions, and to the extent feasible, other relevant constituencies. The Commission maintains a systematic and ongoing program of review to confirm that the standards for accreditation and requirements of affiliation are adequate to evaluate the quality of the education provided by the institutions it accredits and that they are relevant to the educational needs of students.

The Commission conducts a comprehensive review of the standards and requirements of affiliation individually and as a whole at least every ten years. The Commission also receives ongoing feedback from participants in the accreditation process following on-site evaluation. If it determines that substantive changes in the standards may be warranted at any point in the ten-year period, action will be initiated within one year and the revision process will be completed during the following year.

Any substantive changes to standards for accreditation, requirements of affiliation, or accreditation-related policies will not be made without appropriate notification to member institutions. A meaningful opportunity for interested parties to provide input will be provided.

In accordance with MARCHE (dba MSCHE) Bylaws, "Institutional members are entitled to vote on all policies that affect the substance of MSCHE accreditation standards and requirements and on major substantive policy statements (not including statements of good practices or principles), except those mandated under Federal law or regulation, the Commission or the Executive Committee acting on behalf of the Commission" (Article III, Sec. 3.03.) This policy does not preclude the Commission or staff from making technical amendments to clarify the meaning of standards, requirements of affiliation, or policies without necessarily providing a notice and

comment period.  Technical amendments include the addition of supplemental information, the deletion of unnecessary, undesirable, or outdated information, or the correction of errors existing in the text.

Policies

The Commission may withdraw, amend, delete, or add to policies with the exception of policies related to the accreditation standards and requirements of affiliation at any time.  Approval of policies shall be taken at a Commission meeting subsequent to the first meeting when the policy was presented.  Accreditation policies related to the fulfillment of accreditation standards and requirements of affiliation will be provided to member institutions for comment and approval.

## III. Definitions:

Several types of Commission publications supplement the accreditation standards and requirements of affiliation.

1. Policy – Policies are issued by the Commission in accordance with applicable federal laws and the Bylaws of the Commission. They establish fundamental principles as a basis and guide for mandating action by Commissioners, staff, and member institutions.

    a. Policy Statement – Policy Statements are documents established by external organizations (such as C-RAC or CHEA) and endorsed or adopted by the Commission, the body representing member institutions.
    b. Accreditation Policy: Accreditation policies may be either Commission policies that establish requirements of the Commission including those obligations under federal regulation or Institutional policies that establish requirements for institutions.  Except as otherwise determined in Section 3.03 of the MARCHE bylaws, the Commission, the body representing member institutions, approves accreditation policy. Member institutions must be in compliance with accreditation policy.
    c. Administrative Policy - Corporate or administrative policy is related to the maintenance of the Commission's 501(c)(3) status or Commission operations. Administrative policies are approved by the Commission, the body representing member institutions, or the Executive Committee on its behalf.

2. Guidelines - Guidelines are based on effective practices and may provide advice to member institutions and peer evaluators for implementing the accreditation standards.

3. Procedures - Procedures define a series of steps, method, or course of action taken to implement policies and accreditation standards.

4. Handbooks - Handbooks may reference policy and provide procedure or guidelines to assist member institutions in implementing the accreditation standards and conducting accreditation activities.

5. <u>Templates (Request Forms)</u> – Templates are pre-formatted documents designed to facilitate the submission of consistent information to the Commission or for use by member institutions or teams in the Self-Study process.

Number: 6.1
Version: 060317
Effective: June 3, 2017 (Approved by Membership)
Initial Approval:
Revisions: 0904; October 30, 2012; June 3, 2017;
Related Documents: *MARCHE (dba MSCHE) Bylaws; Accreditation Policy Development and Review*
Federal Regulations: 34 CFR Part §602.21 (a) (b) (c)   The Secretary's Recognition of Accrediting Agencies
Filepath: J:\Policies & Guidelines\Review of Standards (P6.1)\Revision 060317\ReviewofStandards 060317(Approved).doc

Any questions about the content of these videos should be directed to an institution's MSCHE Vice President Staff Liaison, or to **info@msche.org**.

| Introduction | ⌄ |
|---|---|

| Requirements of Affiliation | ⌄ |
|---|---|

| Standard I - Mission and Goals | ⌄ |
|---|---|

| Standard II - Ethics and Integrity | ⌄ |
|---|---|

| Standard III - Design and Delivery of the Student Learning Experience | ⌄ |
|---|---|

| Standard IV - Support of the Student Experience | ⌄ |
|---|---|

| Standard V - Educational Effectiveness Assessment | ⌄ |
|---|---|

| Standard VI - Planning, Resources, and Institutional Improvement | ⌄ |
|---|---|

| Standard VII - Governance, Leadership, and Administration | ⌄ |
|---|---|

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOHN TIESO,                                )
                                           )
            Plaintiff,                     )
                                           )        Civil Action No.
                                           )        1:22-CV-00031 (PTG-JFA)
      v.                                   )
                                           )
THE CATHOLIC UNIVERSITY                    )
OF AMERICA,                                )
                                           )
            Defendant.                     )

**DECLARATION OF JOHN TIESO, PLAINTIFF**

**I – RESPONSE TO THE MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS, OR**

**IN THE ALTERNATIVE, FOR SUMMARY JUDGEMENT**

1.  Concerning the statement (1-Introduction) in the Defendant's Memorandum

(Memorandum) in support of It motion to dismiss, or in the alternative, for Summary Judgement[1], the

plaintiff responds, the terms "Racially charged" and "Insensitive" are completely unproven, and applied

to a private social media platform, neither required to be approved by the University under their own

rules nor identified in any way as the product of an adjunct faculty member of the University.

2.  Those unproven terms ('Racially Charged', 'Insensitive'), applied by conjecture leads to

the logical conclusion that CUA is attempting to subvert the First Amendment Freedom of Speech rights

of an American citizen who happens incidentally to be their part-time employee. The result was to assert

racial bias and insensitivity as quickly as possible to deny the right of freedom of speech in a political

context, without regard to any possible injury to the claimant.

3.  Plaintiff taught a total of 45 classes from 2013-2019, at the Busch School, the School of

Metropolitan Studies, and the School of Arts and Sciences at CUA, in some cases as many as 4-5 sections

---

[1] Defendant the Catholic University of America's Memorandum  in support of it motion, or in the alternative, for
Summary Judgement, Case 1:22-CV-00031-PTG-JFA, Document 7, p.128

of students in various classes. At the end of each semester, student evaluations of his teaching expertise were consistently high, from both undergraduates and graduate students.

4. Plaintiff served on several committees and boards and chaired the Competition for the International Business Ethics Case Competition (IBECC) for three years at the University.

5. Plaintiff was routinely invited to faculty meetings, generally held in the basement of the Business School, was never informed that he was merely "associated to the faculty", and was allowed to vote with the rest of the faculty on multiple occasions, in excess of 25 times, over three years prior to my suspension.

6. Logically, one could assume Plaintiff's reappointment as an Adjunct Assistant Professor would occur in due course in August 2020. The courses taught continued to be offered, and, in actuality, following Plaintiff's dismissal, were advertised several times in Catholic Diocesan media as vacancies to be filled.

7. In May 2020, an alleged anonymous letter, written by a person using a fictitious e-mail address, was supposedly received at the same time by Dean Andrew Abela (and others??) and a junior radio-tv reporter, Larry Miller, of WRC-9 in the District of Columbia, who both exposed it to the world without determining its authenticity, thus damaging both the employment opportunity and reputation of the Plaintiff. During this period, and until January 2022, Plaintiff was denied access to the alleged anonymous e-mail.

8. Plaintiff was notified by Associate Dean Seegers (**EXHIBIT B**) of an investigation into his previously private social media account with Twitter to be conducted by the Provost, but was informed by Dean Abela only of its 'results' and his (Abela's) determination not to reappoint the Plaintiff for the following academic year (**EXHIBIT I**). The University also provided similar information to WRC-9 in the District of Columbia and others., also damaging the Plaintiff's professional reputation.

9. Concerning Paragraphs 33 & 34 of the Memorandum, Plaintiff responds that Defendant assumed the legitimacy and veracity of the alleged 'anonymous complaint' by a 'student at another

university ', dated May 5, 2020, and its authenticity without further analysis. In actually, with extended research using several published sources, the e-mail address of

'Your Friend' Squared1738@GMAIL.COM

is proven to be a fictitious e-mail address. Without access to the original e-mail in a recognized mail format, with an Internet Protocol (IP) address for the system used to determine any possible authenticity, it must be considered fraudulent, and of no value to the court. The University, in doing so without verification of its own, despite its ability to do so with the assistance of their extensive technology staff, and a major program in the School of Engineering dedicated to computer sciences, took action to deny the plaintiff further employment and denying a proper opportunity for response by the plaintiff.

10. Concerning the defendant's claim in Paragraph 35, involving additional students, Larry Miller, the reporter for WRC-9 made two different statements, one initially claiming additional student complaints, but, on his broadcast, his statement was exactly the opposite and stated that no CUA students had come forward with complaints on the Plaintiff. Interestingly, his original e-mail to Plaintiff occurred on the same day as the alleged anonymous letter was supposedly received by Dean Abela.

11. Concerning Paragraph 38, the 'Lacovara Investigation', the Plaintiff was never notified by the Provost of any formal investigation, nor was Tieso notified between May 16, 2020, and June 11, 2020, of any investigation ordered by the CUA General Counsel. On June 8, 2020, Professor Tieso e-mailed the Provost requesting information on any ongoing investigation, as indicated by Seeger's e-mail of May 18, 2020, and supposedly underway through the Office of the Provost **EXHIBIT E**).

12. Similarly, Professor Tieso had already been deemed a 'racist' on May 6, 2020, in an e-mail between Lawrence J. Morris, Counselor to the President and the President of Catholic University, John Garvey (**EXHIBIT C**), who, in turn, on May 6, 2020, at 9:45 AM addressed an e-

mail to the Provost of the University, Aaron Dominquez, attaching the Morris e-mail and asking they meet to discuss.

13. Between May 6, 2020, and June 11, 2020, Plaintiff received no further communications from the University relative to his alleged supposed 'racist' statements, although it is understood from the Miller Broadcast that Karna Lozoya communicated information to the reporter, Larry Miller, indicating the University was taking disciplinary actions against Tieso.

14. On June 11, 2020, an e-mail from Vin Lacovara, simply saying "Would you like to speak with me by telephone about the matter?" was responded to the same day at 10:43 by the Plaintiff asking that the charges against him be specified and the citation for the regulations covering his private social media accounts also be provided.

15. Concerning Paragraph 39, Plaintiff was never notified in any form of the investigation conducted at the direction of the CUA General Counsel.

16. Lacovara contacted Professor Tieso on June 11, 2020, at 1:13 PM by e-mail. Lacovara indicated no charges were pending against Plaintiff and indicated' The University is looking at what University policies or standards might be involved vis-à-vis the tweets in question in the alleged anonymous e-mail. (**EXHIBIT F**)

17. Lacovara did not indicate to Plaintiff any investigation alleged in the Brown Memorandum was ongoing, nor was Plaintiff informed at any time that the investigation was complete, either by Brown or Lacovara, its results and/or determinations made. The extent of Lacovara's communications with Plaintiff was informal and seeking information. Plaintiff, already injured by the about-face of Dean Abela, agreed to discuss the issues but wanted to be informed of any potential or actual charges pending against him. Lacovara indicated there was no 'investigation' pending – no charges against the plaintiff. Tieso agreed to speak with Lacovara, who never responded with a time/date for the conversation. (**EXHIBIT H**)

18. Concerning Paragraph 43, Dean Abela e-mailed Plaintiff on June 23, 2020, to announce "We have completed our investigation of the recent complaints about your (Tieso's) Twitter activity.

We have concluded that several of your tweets....would be interpreted by a reasonable person to be racist or sexists (**EXHIBIT I**)..."

## II - RESPONSE TO THE AFFIDAVIT OF J. STEVEN BROWN

19. This affidavit by the Senior Vice Provost and Dean of the Graduate School deals mostly with the formalisms of a faculty appointment, duties, rank and rights, and privileges at the University/School. While it is acknowledged that these formalisms exist, they were practiced differently within the various schools at the direction of the Dean. In the Busch School of Business, all teaching staff were routinely invited to 'faculty meetings,' voted together as members of the faculty on a wide range of issues, and were never, during my time at the Busch School ever referred to as 'Associates of the Faculty.'

20. When initially appointed as a part-time lecturer before the first semester of the existence of the Business School in 2013, the plaintiff attended two orientation sessions in 2013 and 2014 but were seldom repeated thereafter.

21. Initially, lecturers were not invited to faculty meetings under the first term of Dean Abela, Invitations were extended to lecturers under Dean Bowman, and continued during the second term of Dean Abela. Lecturers and adjunct professors could vote on most items on the faculty meeting agenda, which I attended over two dozen times, voting on over 25 different issues.

22. Faculty meetings at the Busch School were simply called "Faculty Meetings," and not "Meetings of the Faculty and Associates to the Faculty."

23. During my years at the university, there was never a distinction between the various levels of the faculty, and I was never told I was simply 'associated with the faculty.'

24. Contracts for courses in upcoming semesters were routinely handled by the administrative staff and instructors knew well in advance of their responsibilities, usually by a spreadsheet distributed throughout the faculty and staff. Plaintiff received notice of his Summer 2020 classes in April 2020, and informal plans were already underway for staffing fall 2020 classes.

## III – RESPONSE TO THE AFFIDAVIT OF DEAN ANDREW ABELA

25. Concerning the assertion of Dean Abela that I was appointed and 'associated' with the faculty as an Adjunct Assistant Professor effective August 19, 2019, his 'facts' are not correct. My appointment was originally recommended under Dean Bowman, and again under Dean Pakaluk, and was confirmed at the time by an e-mail indicating my new rank. Only later was it determined that the process had not been completed and it was left to Abela to complete in August 2019, after a vote of the Busch School faculty. I was never referred to as an 'Associate of the Faculty' by Abela or any other member of his or the University's Administration.

26. Plaintiff was never told by Abela or his staff that I was to be considered "Associated with the Faculty". The faculty listing on Business.cua.edu does not show a category of "Associated with the Faculty" in its listing.

27. Following my appointment to Adjunct Assistant Professor (**EXHIBIT A**), I continued to teach the same classes, received the same exceptional student-peer evaluations for my efforts, and received several awards from the school for my efforts.

28. Concerning Paragraph 4 of Dean Abela's affidavit, I was never informed that I was 'associated' with the faculty' but instead treated as a member of the faculty in all respects. I served on faculty groups, acted as a faculty advisor to 40 students over three years, and chaired for three years the International Business Ethics Case Competition (IBECC) at the Business School, producing international winners in each of those three years.

29. Concerning Paragraph 8, – The "Anonymous" Complaint. On May 5, 2020, Dean Abela allegedly received an e-mail from "Your Friend", squared1738@gmail.com which referred to my private, non-university-sponsored social media account on Twitter. As far as can be determined, Abela took no action to determine the veracity of the e-mail, instead simply assuming its validity, and moving forward to suppress any adverse consequences. Plaintiff's Twitter account did not indicate any association with Catholic University and consisted of personal, political comments protected under the First Amendment to the US Constitution.

30. Curiously, this 'anonymous' e-mail came at the same time Abela was called by a parent whose son plaintiff failed in a course, and Abela and his associate Harvey Seegers directed me to regrade the student's activity, remove the failing grade and give the student a higher grade, which I declined to do. Eventually, they directed Assistant Dean Kevin Rensch to post the higher grade despite my disagreement.

31. Similarly, at the same approximate time frame, I assisted in the defense of one of my students accused by another professor of cheating. While we proved that the student did not cheat, the decision of the board, coming after my suspension from teaching, supported the professor.

32. Defendant CUA and Abela assumed the legitimacy and veracity of the alleged 'anonymous complaint' by a 'student at another university,' and accepted its authenticity. In actually, with extended research using several published sources, the e-mail address of 'Your Friend' - Squared1738@GMAIL.COM is proven to be a fictitious e-mail address. Without access to the original e-mail in a recognized mail format, with an Internet Protocol (IP) address for the system used to determine any possible authenticity, it must be considered fraudulent, without value to either the court or to the University as a basis for conducting an investigation resulting in the removal of an employee of the University.

33. Members of the CUA Administration, including Karna Lozoya, were contacted by a Mr. Larry Miller, a junior reporter at WRC-9, a Washington DC Station, who alleged that five CUA students also made similar complaints about the Plaintiff, but CUA Officials made no effort to confirm those allegations or identify the students for inclusion in any investigation. Mr. Miller later, in his broadcast indicated he had no CUA students who spoke adversely about Professor Tieso.

34. As indicated in Paragraph 10, Dean Abela did speak briefly with Tieso on the morning of May 6, 2020, asking informally that Tieso bring down his Twitter account. That action was taken the following day, and a copy of the relevant tweet was provided to both Dean Abela, and his associate Harvey Seegers (**EXHIBIT D**). In that conversation, Dean Abela asked that the takedown occur to 'let things calm down for the time being." Abela made no demands, other than a minor, but veiled

reference to my future reappointment. He did not indicate any investigation was to commence or was ongoing.

35. Concerning the allegation I later reactivated my Twitter Account, something I had every legal right to do under the First Amendment of the US Constitution as a private social media activity, I do not recall any further effort on my part to reactivate conversations on that media, and it should also be noted that my son John is also a member of the Twitter Community and uses the name 'johntieso' in his tweets.

36. Plaintiff has no personal knowledge of any other contacts with the school as alleged in Paragraph 11, and the only parents the Plaintiff was aware were in communication with Abela attempted to get grades changed for a failed student, which Abela and Seegers, after Tieso's suspension, ordered upgraded by an Assistant Dean. Plaintiff's termination received wide publicity due to the damaging WRC-9 telecast and the negative information produced by CUA. Multiple publications told the story and the university possibly received feedback from their efforts to dismiss the plaintiff. Tieso also received a large number of e-mails and messages in support of his efforts to clear his damaged reputation.

37. Plaintiff was never informed about any investigation to be conducted by Lacovara, as alleged in Paragraph 12, who denied any charges were pending against Tieso in an e-mail dated June 11, 2020. (**EXHIBIT F**)

38. Plaintiff is unaware of any authorization by the CUA General Counsel, cited in Paragraph 12, to have Lacovara conduct an investigation, was not informed of the investigation, and similarly not informed of his right to formally present his views

39. Plaintiff is unaware of any authorization by the CUA General Counsel, cited in Paragraph 13, to have Lacovara conduct an investigation, was not informed of the investigation, and similarly not informed of his right to formally present his views

40. As related to paragraphs 14 & 15, classes for the summer session had been scheduled early in the spring. Copies of the schedule and the selected instructors had been provided well before

May 16th, when Dean Abela allegedly first learned of Tieso's assignments. The Busch School is not a large institution, and the number of summer classes is relatively small. It does not seem possible that the Dean of the School could be oblivious to faculty assignments.

41. Harvey Seegers, Associate Dean of the Busch School, cited in Paragraph 15 for an e-mail dated May 18, 2020, indicated that "an investigation will be conducted by the Provost's Office." (**EXHIBIT B**) Plaintiff received no notice from the Provost of any investigation and followed up by e-mail on June 8th asking again about an investigation, with no reply.

42. On June 11, 2020, Vin Lacovara, the Chief Ethics and Compliance Officer and Chief Privacy Officer, asked for an informal conversation, having been forwarded my correspondence by the Provost. Nothing was said about any investigation. In an e-mail later the same day, I asked what charges were pending, and he replied none. (**EXHIBIT H**) Yet, Lacovara had already, on May 16, 2020, been instructed to commence such an investigation.

43. The "offer" of Lacovara, cited in Paragraph 17, was an informal request that he and Plaintiff might speak over the phone to discuss any issues. Plaintiff requested the specifics be provided so he could consult with legal counsel, and, in the face of the already changing ground with WRC-9, Offered to discuss in an e-mail on June 11, 2020, at 6:23 PM if 'there is some objective reason to do so'. Plaintiff received no reply from Lacovara, who allegedly completed his 'investigation; seven days later with no testimony from Plaintiff. (**EXHIBIT H**)

44. Plaintiff was not informed by Lacovara any 'investigation' was complete without his input and testimony. The only information received was from Dean Abela on June 23, 2020, in which he announced the termination of the plaintiff's appointment.

45. The events from May 5, 2020, through August 2020 had a considerable impact on Plaintiff, who endured considerable difficulty securing new employment during an especially trying period, including the serious, and eventually fatal illness of his spouse.

46.     Relative to Paragraph 34, Plaintiff denies completely that his private, political comments, protected by the First Amendment to the United States Constitution were racist-oriented, or that he is not a' fit role model' for CUA students.

**Pursuant to 28 USC 1746, I SOLEMNLY AFFIRM UNDER THE PENALTIES OF PERJURY THAT UPON PERSONAL KNOWLEDGE THE CONTENTS OF THE FOREGOING ARE TRUE AND CORRECT.**

_____          2-27-20
John Pieso                                        Date